LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

CIVIL ACTION NO. NO 15:13-CV-426-GFVT

# ERNEST FOSTER

V.

# AMERICAN FIRE AND CASUALTY COMPANY

## DEPONENT:

## LAURA HARP-BIVEN

## DATE:

## August 08, 2016



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856  |  502.589.2273

www.kentuckianareporters.com

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF KENTUCKY

3            CENTRAL DIVISION AT LEXINGTON

4        CIVIL ACTION NO 15:13-CV-426-GFVT

5

6                ERNEST FOSTER,

7                  PLAINTIFF

8

9                     V.

10

11       AMERICAN FIRE AND CASUALTY COMPANY,

12                DEFENDANT

13

14

15

16

17

18

19

20

21

22

23  DEPONENT:  LAURA HARP-BIVEN

24  DATE:      AUGUST 8, 2016

25  REPORTER:  BRITTANY KENDALL

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202



Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
 1                      APPEARANCES
 2
 3    ON BEHALF OF THE PLAINTIFF, ERNEST FOSTER:
 4    PHILLIP G. FAIRBANKS
 5    MEHR, FAIRBANKSS, & PETERSON
 6    201 WEST SHORT STREET, SUITE 800
 7    LEXINGTON, KENTUCKY 40507
 8    TELEPHONE NO.: (859) 225-3731
 9    FACSIMILE NO.: (859) 225-3830
10    E-MAIL: PGF@AUSTINMEHR.COM
11
12    ON BEHALF OF DEFENDANT, AMERICAN FIRE AND CASUALTY:
13    HEATHER M. MCCOLLUM
14    QUINTAIROS, PRIETO, WOOD & BOYER, PA
15    2452 SIR BARTON WAY, SUITE 300
16    LEXINGTON, KENTUCKY 40509
17    TELEPHONE NO.: (859) 226-0057
18    FACSIMILE NO.: (859) 226-0059
19    E-MAIL: HMCCOLLUM@QPWBLAW.COM
20
21
22
23
24
25
```

Page 4

```
 1                      STIPULATION
 2
 3    The deposition of LAURA HARP-BIVEN, TAKEN AT 9300
 4    SHELBYVILLE ROAD, SUITE 400, LOUISVILLE, KENTUCKY on
 5    MONDAY, the 8TH day of AUGUST, 2016 at approximately
 6    10:00 a.m.; said deposition was taken pursuant to the
 7    FEDERAL RULES OF CIVIL PROCEDURE.
 8
 9    It is agreed that BRITTANY KENDALL, being a Notary
10    Public and Court Reporter for the State of KENTUCKY, may
11    swear the witness.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                        INDEX
 2                                              Page
 3    PROCEEDINGS                                 5
 4    DIRECT EXAMINATION BY MR. FAIRBANKS         5
 5    CROSS EXAMINATION BY MS. MCCOLLUM          99
 6    REDIRECT EXAMINATION BY MR. FAIRBANKS     105
 7
 8
 9                      EXHIBITS
10                                              Page
11    1    EVALUATION SHEETS                     18
12    2    OBJECTIVE AND PERFORMANCE EVALUATIONS 24
13    3    2012 EVALUATIONS                      30
14    4    2013 EVALUATIONS                      40
15    5    FOSTER CLAIM 1057-1153                77
16    6    CLAIM NOTE                            78
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                      PROCEEDINGS
 2
 3         MR. FAIRBANKS:  We are on the video record in
 4    the case of Ernest Foster versus American Fire and
 5    Casualty Company.  United States District Court,
 6    Eastern District of Kentucky, Central Division at
 7    Lexington, Civil Action number 13-CV-426.  This is
 8    the deposition of Laura Harp-Biven.  It's August 8,
 9    2016, approximately 10:00 a.m.  We are at the
10    offices of Quintairos, Prieto, Wood, & Boyer in
11    Louisville, Kentucky.  My name is Phil Fairbankss.
12    I'm operating the video and appearing for Mr.
13    Foster.  Heather, do you want to introduce
14    yourself?
15         MS. MCCOLLUM:  Heather McCollum on behalf of
16    the defendant, American Fire.
17         MR. FAIRBANKS:  Could you swear the witness
18    in, please?
19         COURT REPORTER:  Would you please raise your
20    right hand?  Do you solemnly swear or affirm that
21    the testimony you are about to give will be the
22    truth, the whole truth, and nothing but the truth?
23         THE WITNESS:  I do.
24              DIRECT EXAMINATION
25    BY MR. FAIRBANKS:
```



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1    Q    Ma'am, will you state your name for the
2  record, please.
3    A    Sure.  It's Laura Harp-Biven.
4    Q    Ms. Harp-Biven, who are you currently employed
5  by?
6    A    Liberty Mutual Insurance.
7    Q    How long have you been employed with Liberty
8  Mutual?
9    A    Approximately -- let's see.  15 years.
10   Q    What's your job position?
11   A    I'm a Senior Claims Resolution Specialist II.
12   Q    Is that what a juror might understand to be a
13  claims adjustor?
14   A    Yes.
15   Q    Can you describe, just in general terms, what
16  you do in that job position?
17   A    Sure.  I evaluate and negotiate claims
18  thoroughly and efficiently.
19   Q    So in that position, you're responsible for
20  settling claims that rise under insurance policies?
21   A    Yes.
22   Q    What is your business address?
23   A    Post office box 515097, Fairfield, Ohio, and
24  I'm not sure what the ZIP code is.
25   Q    Do you reside here in the Jefferson County

Page 7

1  area?
2    A    I do.
3    Q    And I'm going to ask you for your home
4  address.  I'm not trying to pry.  I'm just doing that
5  for purposes of where we would need to serve you with a
6  trial subpoena if that --
7    A    Sure.
8    Q    -- would be...
9         MS. MCCOLLUM:  And that needs to be redacted
10  from the record, please.
11   A    (REDACTED.)
12   Q    Thank you.
13   A    Uh-huh.
14   Q    What do you remember about the UIM claim for
15  Ernest Foster?
16   A    Not a whole lot.  I do remember that Mr.
17  Foster had some treating physicians and diagnostic
18  reports that showed degenerative changes, and Dr.
19  Jenkinson was an IME doctor that we had that agreed with
20  that until his deposition.
21   Q    Okay.  So you think that Mr. Foster had some
22  degenerative changes?
23   A    Yes.
24   Q    Whereabouts?
25   A    In his right knee.

Page 8

1    Q    What was the condition of his right knee that
2  was degenerative?
3    A    It was osteoarthritis, spurring, fraying.
4    Q    Do you recall that Mr. Foster was injured in a
5  motor vehicle accident in June of 2008?
6    A    I remember his complaints at the ER was --
7  bruised his kneecap, and I believe it bruised his arm --
8  his left arm maybe?
9    Q    And that was in June of '08?
10   A    Yes.
11   Q    What injuries do you think Mr. Foster
12  sustained in that June 2008 motor vehicle accident?
13   A    Well, the injuries that were listed in the
14  emergency room, like I said, were bruising to the right
15  kneecap and the right arm.  And that's what Dr.
16  Jenkinson's report said.
17   Q    So you think he had a bruised knee and a
18  bruised right arm?
19   A    Yes.
20   Q    What documents have you reviewed to prepare
21  for your deposition today?
22   A    Dr. Jenkinson's report and just the claim file
23  notes.
24   Q    I'm going to just kind of briefly flip
25  through.  These claim file notes that you're talking

Page 9

1  about that you would've reviewed?
2    A    I only reviewed mine, so I don't know --
3    Q    Okay.
4    A    -- if that's all of them or not, and that
5  looks like a lot, so I don't know.
6    Q    Yes, and that's what I'm trying to figure out.
7  Have you reviewed only the claim file notes that pertain
8  to the time period during which you were handling Mr.
9  Foster's claim?
10   A    Yes.
11   Q    Okay.  Approximately when did you begin being
12  the primary adjustor on Mr. Foster's claim?
13   A    I'd have to look in the file, but I think it
14  was May of 2014.  May or June, something like that.
15   Q    And how did it be that you came in to be
16  involved in Mr. Foster's claim?
17   A    It was just reassigned to me.  I don't...
18   Q    Do you know who reassigned it to you?
19   A    I have no recollection of who that would've
20  been, no.
21   Q    Do you know who was handling the claim before
22  you?
23   A    I -- I'm not sure.  I think Tony Dale had it
24  at one point.  I don't know if there was somebody in the
25  meantime or not, but I know he had it at one point.

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1    Q   Have you had any discussions with Tony Dale
2  recently about the Foster claim?
3    A   Not about the claim.  I contacted him for some
4  dates so that he could be deposed.
5    Q   And you and Tony didn't talk about anything
6  related to the UIM claim itself?
7    A   No, just dates and times of the deposition.
8    Q   You guys didn't discuss anything about Dr.
9  Jenkinson?
10   A   Not that I remember, no.  Other than maybe
11 just that -- I think he -- oh, I know.  I take that
12 back.  I think he asked me what happened, and I told him
13 Dr. Jenkinson did not testify consistent with his
14 report.  I do take that back.
15   Q   Have you read Dr. Jenkinson's deposition?
16   A   No.
17   Q   I didn't see it in the claim file anywhere.  Do
18 you think you would've ever received a copy of it?
19   A   I don't know.  I don't think so.  I received a
20 phone call from my defense attorney after the -- after
21 the deposition.
22   Q   Okay.  So everything that you know about Dr.
23 Jenkinson's deposition would've come from the defense
24 lawyer that was hired to represent American Fire?
25   A   Yes.

Page 11

1    Q   And who was that lawyer?
2    A   I believe it was Dave Richardson.
3    Q   Do you have any other cases right now where
4  you're working with Mr. Richardson?
5    A   I'm sure I do.
6    Q   Is Mr. Richardson's firm a firm that still
7  gets business from American Fire?
8    A   Yes.
9    Q   And let me just back up.  When I say "American
10 Fire," I don't mean to differentiate it from Liberty
11 Mutual or Safeco, but I wanted to ask you, maybe, if you
12 can explain the relationship between American Fire and
13 Liberty Mutual?
14       MS. MCCOLLUM:  If you know.
15   A   I think it's just a subsidiary company.  I
16 think Liberty Mutual is kind of an umbrella, and there
17 are subsidiary companies underneath is the way I
18 understood it.
19   Q   And you, in fact, are employed by Liberty
20 Mutual; is that fair?
21   A   My paycheck says, "Liberty Mutual," yes.
22   Q   I asked you about Dr. Jenkinson's deposition.
23 Any other depositions that you would've actually
24 reviewed from the UIM case?
25   A   There wouldn't have been any deposition

Page 12

1  transcripts given to me, no.
2    Q   Why not?
3    A   Because usually, I would get a summary from
4  the defense attorneys.
5    Q   And is that what, in fact, happened in this
6  Foster case?  You got summaries from the defense
7  lawyers?
8    A   I would imagine so, yes.
9    Q   What about medical records?  I've seen some
10 medical records within the claim file, but I'm not sure
11 that they're all in there.  Did you, in fact, review all
12 of Mr. Foster's medical records yourself?
13   A   All the ones that were in the file, yes.
14   Q   Did you also get summaries of those medical
15 records from the defense lawyers?
16   A   Yes.
17       MS. MCCOLLUM:  And I just wanted to interject
18    here.  The Court has upheld the attorney-client
19    privilege in this case, and you're getting close to
20    it but not breached it yet, but we don't intend to
21    waive anything the Court has said we don't have to
22    disclose. But go ahead and continue, please.
23 BY MR. FAIRBANKS:
24   Q   Thank you, and I understand.  And I am not,
25 Ms. Harp-Biven, intending to ask you any questions about

Page 13

1  conversations or communications that the Court has said
2  that I can't ask you about.  So if I get there, just
3  tell me.  I'm not trying to.
4    A   Sure.  No problem.
5    Q   Were those summaries of the medical records,
6  regardless of what was contained in them -- did those
7  form partially the basis of the evaluation that you were
8  doing on Mr. Foster's claim?
9    A   Sure.
10   Q   Similarly, did the defense lawyers send you
11 letters that summarized Mr. Foster's wage loss claim?
12   A   Yes.
13   Q   And did those letters, at least, in part, form
14 the basis of your evaluation of Mr. Foster's claim?
15   A   Yes.
16   Q   Did you watch any of the videos of the
17 depositions during the UIM case?
18   A   No, I did not.
19       MS. MCCOLLUM:  I'm going to interject there.
20    And I don't know the answer to this question:
21    Was Dr. Jenkinson's video available?  Because I -- it's
22    my recollection that the case was settled shortly after
23    the deposition, and I'm not for sure if there was a
24    transcript for Ms. Harp-Biven to read --
25       THE WITNESS:  That's right.

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW   Doc #: 188-6   Filed: 09/12/16   Page: 6 of 43 - Page ID#:
2290
The Deposition of LINDA HARP-BIVEN, taken on August 08, 2015                 14...17

Page 14

```
 1         MS. MCCOLLUM:  -- or even if there was a video
 2     for her to review of that.
 3         MR. FAIRBANKS:  Okay.
 4  BY MR. FAIRBANKS:
 5     Q     Same question, if you need to rely on the
 6  objection:  Did you review Dr. Jenkinson's video
 7  deposition at any time?
 8     A     No.
 9     Q     And you have not reviewed it since?
10     A     No.
11     Q     What about Mr. Foster's Social Security file?
12  Do you remember that being an issue in the case?
13     A     I -- I remember trying to obtain a copy of
14  that, yes, and we did.
15     Q     You did get a copy of that?
16     A     We did.
17     Q     And did you actually review that yourself?
18     A     I did.
19     Q     I haven't seen his Social Security file within
20  your claim file.  How would you have reviewed it?
21     A     It might've been sent directly over to
22  defendant's counsel.  That might not be why it's in the
23  -- in the file.  But I do remember we received the award
24  paperwork, not the entire file.  The award paperwork is
25  what -- we wanted the whole file, and I believe we just
```

Page 15

```
 1  got the award, the opinion and the award.
 2     Q     At some point did, to your knowledge, the
 3  defense lawyers for American Fire obtain something more
 4  than the award letter in relation to --
 5     A     Yes.
 6     Q     -- his Social Security file?
 7     A     Yes.
 8     Q     And what I'm wondering is:  Aside from whether
 9  or not the defense lawyers reviewed that file, did you
10  actually review that file?
11     A     It's hard for me to remember, it's been so
12  long ago, to be honest.  Probably relied on them.
13     Q     Okay.  Do you remember, at some point, in
14  addition to the tax returns of Mr. Foster, that the
15  defense lawyers for American Fire had requested some old
16  business invoices --
17     A     Yes.
18     Q     -- for Mr. Foster's business?
19     A     I do remember that, yes.
20     Q     I have not seen those in your claim file.  Have
21  you actually reviewed those yourself?
22     A     I don't think we ever received those.  I think
23  we kept asking for them, and I don't think they ever
24  supplied those.  They gave us -- they said they got rid
25  of those records, or I can't remember what the reasoning
```

Page 16

```
 1  was, but they couldn't produce the records.  Or at least
 2  I remember asking for quite a long time and them saying
 3  that.
 4     Q     So you don't think that any of the old
 5  business invoice tickets were ever produced?
 6     A     I'm not sure.
 7     Q     Okay.
 8     A     I really don't remember.
 9     Q     And even if they were, not something that you
10  actually reviewed, correct?
11     A     I'd say I can't -- I can't remember at this
12  point, it's been so long ago.
13     Q     Ms. Harp-Biven, I want to ask you about an
14  insurance term, the term "reserve;" do you know what
15  that is?
16     A     I do.
17     Q     Can you tell the jury what a reserve is?
18     A     The way I understand reserve, it's an
19  accounting procedure where you set a number, based on
20  the information that you have at that time, for what you
21  would likely pay out on a claim.  And that can fluctuate
22  based on new evidence that's come in.
23     Q     Is that kind of the best guess of what the
24  claim value is?
25     A     I'd say, yeah, a guesstimate.  Uh-huh.
```

Page 17

```
 1     Q     And that's something that's not disclosed to a
 2  claimant while the claim is ongoing, correct?
 3     A     Correct.
 4     Q     For example, you wouldn't have informed Mr.
 5  Foster of what the reserve was on his UIM claim at any
 6  time?
 7     A     No.
 8     Q     Ms. Harp-Biven, did you work for any other
 9  insurance companies before you began working for Liberty
10  Mutual?
11     A     I worked for the subsidiary, Safeco.
12     Q     Okay.  And I'm not intending to differentiate
13  between those with the Liberty Mutual group that now
14  exists, but any other insurance companies before that?
15     A     No, sir.
16     Q     Okay.  What did you do occupation-wise before
17  beginning to work for the Liberty Mutual group of
18  companies?
19     A     I worked for a law firm.
20     Q     What law firm did you work for?
21     A     Hargadon, Lenihan, Harbolt, and Herrington.
22     Q     Sorry, can you say that more slowly?
23     A     Sorry.  Hargadon, Lenihan, Harbolt, and
24  Herrington.
25     Q     What did you do there?
```

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1    A    I was a legal secretary/paralegal.
2    Q    What type of work did that law firm do?
3    A    Claims work.
4    Q    Are they in Louisville?
5    A    They are.
6    Q    To your knowledge, is that firm still in
7  operation one form or another?
8    A    It is.
9    Q    During your employment with Liberty Mutual,
10 has your performance been reviewed on a yearly basis?
11   A    It has.
12   Q    I'll tell you that we've received, in
13 discovery in this case, documents from some of your
14 performance reviews, and I'm going to hand you some of
15 the ones we have some questions about.
16   A    Sure.
17   Q    What I have here are labeled Foster Harp-Biven
18 34 through 39, which I believe is your 2007 performance
19 review. I'll hand that to you.
20   A    Okay. Sure.
21   Q    You can mark that as Exhibit 1.
22        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
23        MS. MCCOLLUM: And just for clarification,
24   you're going to see redactions, and the redactions
25   will remain consistent with the Court's order.

Page 19

1        THE WITNESS: Okay.
2        MS. MCCOLLUM: They -- that information did
3    not have to be disclosed.
4        THE WITNESS: Okay.
5  BY MR. FAIRBANKS:
6    Q    Does that look familiar to you, Ms. Harp-
7  Biven?
8    A    It does.
9    Q    For your 2007 performance review, it looks
10 like your manager was Lisa Thibodaux; is that correct?
11   A    It is, correct.
12   Q    Do you know if Ms. Thibodaux is still employed
13 by Liberty Mutual?
14   A    She is.
15   Q    What does she do?
16   A    I'm not sure what her current job title is
17 now.
18   Q    Where does she work?
19   A    Gosh, I think she lives in Virginia or
20 Maryland. I'm not sure. I haven't worked with her in a
21 long, long time.
22   Q    Okay. Ms. Harp-Biven, it looks like you had
23 four different goals on this performance review; do you
24 see that?
25   A    I do.

Page 20

1    Q    Goal number 1, it looks like it has a weight
2  of 45 percent. Goal number 2 has a weight of 25
3  percent. 3, 20 percent and 4, 10 percent; does that
4  look right?
5    A    Uh-huh. Sure.
6    Q    And I wanted to ask you about goal number 1
7  that has the most weight, the 45 percent. What is the
8  goal statement listed there on goal number 1?
9    A    Do you want me to just read what it says?
10   Q    Yes, please do.
11   A    Sure. "Profitable growth. We will capitalize
12 on our momentum in mitigating loss costs while
13 continuing to improve our work product. In doing so
14 provide a loss ratio and LAE advantage that improves our
15 market position. We will protect Safeco's reputation
16 through prompt and proper claims adjudication."
17   Q    Would you agree with me that during the time
18 that your performance was being reviewed on a yearly
19 basis that one of the focuses was the amount that you
20 were paying on claims?
21        MS. MCCOLLUM: Objection. Form.
22        THE WITNESS: Can I answer?
23        MS. MCCOLLUM: Yeah, you can go ahead and
24   answer.
25 BY MR. FAIRBANKS:

Page 21

1    A    I don't take it that way, but -- I just take
2  it to mean we pay what we owe is the way I kind of
3  interpret that goal.
4    Q    Right. And I'm not necessarily anchoring my
5  question to that particular goal statement, but just in
6  more general terms, was the amount that you were paying
7  on claims ever something that was discussed during your
8  performance review process?
9    A    Not really.
10        MS. MCCOLLUM: Same objection. If you want to
11   give me a continuing objection so I don't have to
12   interrupt you every time. I'd be happy to --
13        MR. FAIRBANKS: Sure. Yeah.
14        MS. MCCOLLUM: -- do that. Or I can object
15   every single time. And I also object at this
16   particular time, because this is 2007. I think
17   that this is outside this -- this is before Mr.
18   Foster's accident so...
19 BY MR. FAIRBANKS:
20   Q    Do you need me to ask again?
21   A    Please.
22   Q    And, again, I'm not anchoring it to this 2007
23 performance review or this particular statement that you
24 just read, but was one of the things that was discussed
25 with you, during your yearly performance reviews, the

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1  amount that you were paying on claims?
2      A    No.
3      Q    Okay.  Let's flip over to page 37 of this
4  exhibit.
5      What would that start with for me?
6      Q    It's the 37 there on the bottom right-hand
7  corner of the page.
8      A    Okay.  It starts with -- number 2?
9      Q    Yeah, it says, "Collaborative," at the top,
10 and there are, it looks like, six different categories
11 that are listed in "leadership traits;" do you see that?
12     A    Uh-huh.
13     Q    And I wanted to ask you about number five
14 which is titled "Externally Focused."
15     A    Uh-huh.
16     Q    And that's listed as a strength for you; do
17 you see that?
18     A    Uh-huh.  I do.
19     Q    Number 4, it says, "Excellent work by Laura
20 Harp yesterday on resolving a case at mediation for
21 $3,750.  The demand was $75K, and bad faith was being
22 threatened.  The mediator complimented Laura on her
23 legal handling and was shocked to learn that she was not
24 an attorney;" do you see that?
25     A    I do.

Page 23

1      Q    Would you agree with me, at least looking at
2  that, that Ms. Thibodaux is giving you a positive
3  accomplishment for resolving a case for less than what
4  was being demanded?
5      A    I don't take it that way.
6      Q    How do you take it?
7      A    Just that I paid what I owed on the claim.
8  Just because a demand is a certain amount doesn't mean
9  that's what the case is valued at.
10     Q    Okay.  Let's look at number six.  It says,
11 "Good results on blank reserve was $100K and settled for
12 $39K;" do you see that?
13     A    I don't see where it says, "Settled for $39K."
14 Oh, okay.  It's blended in with the rest of the stuff,
15 yes.
16     Q    That one, would you agree with me that Ms.
17 Thibodaux is giving you a positive accomplishment for
18 settling a case for $61000 less than the reserve?
19     A    Again, I just take that -- that it's -- I had
20 a good result.  I paid what I owed on the claim.
21     Q    So you think $39K was owed on that one despite
22 the reserve being set at 100?
23     A    Yes.
24     Q    Okay.  Let's look over to the next page.  I'm
25 looking at eight.  It says, "Good settlement on claim

Page 24

1  TSV was $25K, and it resolved for $7500."
2      A    Uh-huh.
3      Q    What's a TSV?
4      A    I think it's total settlement value, I think
5  is what it -- the acronym was for at that time.
6      Q    Okay.  So someone had placed a total
7  settlement value at $25,000?
8      A    Based on -- at that time, yes.
9      Q    Okay.  And you were able to get that resolved
10 for $7,500?
11     A    Right.  So it could've been something that
12 changed in the meantime, yes.
13     Q    Okay.  And that was a positive accomplishment
14 for you on your performance review, --
15     A    Yes.
16     Q    -- correct?
17     A    Uh-huh.
18     MS. MCCOLLUM:  I'm sorry.  What page are you
19 on?
20     MR. FAIRBANKS:  That's Foster Harp-Biven 38.
21 BY MR. FAIRBANKS:
22     Q    Ms. Harp-Biven, I'm going to hand you next
23 what we have labeled Foster Harp-Biven 125 through 138.
24     A    Okay.
25     Q    And we'll mark this as Exhibit 2.

Page 25

1         (EXHIBIT 2 MARKED FOR IDENTIFICATION)
2      A    Sure.
3      Q    And correct me if I'm wrong, but I believe
4  that is a performance evaluation form for you throughout
5  the calendar year of 2010?
6      A    It appears so, yes.
7      Q    And this has a little bit different format
8  than the one we just looked at.  It looks like you now
9  have six different objectives as opposed to four?
10     A    Sorry.  Bear with me.
11     Q    Sure.
12     A    Yes, that's -- that's correct.
13     Q    And there's a box that lists the degree of
14 importance for each of those objectives; do you see
15 that?
16     A    I do.
17     Q    And objectives one through three are listed as
18 "critical," and then four through six are just listed as
19 "important;" do you see that?
20     A    That's correct.
21     Q    Who is it that was reviewing your performance
22 in 2010?
23     A    It would be Jennifer Rennick (phonetic).
24     Q    Is Jennifer still with Liberty Mutual?
25     A    She is.

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    Q    What is her job position?
2    A    I have no idea what her job position is now.
3    Q    What was her job position at this point in
4    time?
5    A    She was Claims Manager.
6    Q    Do you know where she's located?
7    A    She's in Fairfield, Ohio.
8    Q    For objective number 1, what was the degree of
9    achievement that you were given for objective 1?
10   A    Exceeded.
11   Q    And is that the highest degree of achievement
12   you could get there?
13   A    Yes.
14   Q    And what is objective number 1?
15   A    Just read it again?
16   Q    Sure.  Please.
17   A    "Improve the quality of file work being done
18   in the PL casualty department."
19   Q    What does "PL" mean?
20   A    Personal lines.
21   Q    Let's look over to the next page, 126.  And
22   over in the results column, the first full paragraph, it
23   says, "Laura has had some very successful mediations in
24   first and second queue which demonstrated her strong
25   evaluation and negotiation skills.  She's been able to

Page 27

1    resolve claims at or below her settlement authority;" do
2    you see that?
3    A    I do.
4    Q    And is that a positive accomplishment for you
5    to settle claims below your settlement authority?
6    A    Again, I settle based on what the information
7    is at the time, so...
8    Q    That's what I'm wondering.  Why would it be a
9    positive goal to settle below your authority if you're
10   just needing to settle based on the information you have
11   at the time?
12   A    I just think it's important that you change
13   your skills or your evaluation based on the information
14   you get.  Like, if you go to a mediation, sometimes
15   you're given new information that changes.  Sometimes it
16   actually increases what you pay.  Sometimes it
17   decreases.  It just depends on the information you get
18   at the time.
19   Q    And that's not what it says there in the
20   results column.  It doesn't talk about changing your
21   evaluation based on new information.  It simply --
22   A    Right.
23   Q    -- talks about resolving claims at or below
24   settlement, correct?
25   A    Right.  So yeah, you don't know really what

Page 28

1    that situation is without looking at the file.
2         MS. MCCOLLUM:  And, again, just continuing
3    reminder that I have a standing objection as to
4    form.
5    Q    Continuing on, it says, "Our defense counsel
6    even said the following," and then it has -- it looks
7    like a part of an e-mail; do you see that?
8    A    Yes.
9    Q    And I don't know who it's from.  The "from" is
10   blacked out, but on January 21, 2010 it says, "If PC,"
11   and I assume that's plaintiff's counsel?
12   A    It is.
13   Q    "If plaintiff's counsel has any
14   familiarization with Laura, he should know there won't
15   be money coming.  I have heard some plaintiff's counsel
16   say it is easier to get an extra nickel out of a crack
17   in the sidewalk than out of Laura's hand;" do you see
18   that?
19   A    I do.
20   Q    Do you know who wrote that?
21   A    I don't have any recollection who that
22   would've been from, but...
23   Q    And that's something that's listed in the
24   positive results column in your performance review,
25   correct?

Page 29

1    A    Correct.
2    Q    Is that true?  Are you known to be difficult
3    to get settlement money from?
4    A    That's not the way I took it.  I just -- I
5    think that I'm known for, you know, working my claims,
6    evaluating my claims fairly, and when I put a value on
7    it I pay what we owe.  No more, no less.  Just what we
8    owe.  I try to be as fair as I can.
9    Q    Okay.  Let's flip over to page 138, which may
10   be the last page.  This page is titled, "Section 3
11   Overall Summary of Performance;" do you see that?
12   A    Yes.
13   Q    And then there's a mid-year and year-end
14   statement, and my assumption is that would be written by
15   your manager at the time; is that correct?
16   A    Yes.
17   Q    The first sentence of the mid-year summary
18   states, "Laura is meeting her goals and contributing
19   positively to the bottom line;" do you see that?
20   A    Uh-huh.
21   Q    How is it that a claims adjuster can
22   contribute to the bottom line?
23   A    By paying what we owe.
24   Q    What do you mean by that?
25   A    When you get the information to evaluate the

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1  claim, you do it quickly and effectively and fairly.

2      Q    Would you agree with me, not specific to this

3  document, but just in general terms, that a claim

4  adjuster could contribute to the bottom line by paying

5  less on claims?  That would increase the bottom line,

6  correct?

7          MS. MCCOLLUM:  I'm going to object as to

8      speculation.  She's already testified as to what

9      she did.

10 BY MR. FAIRBANKS:

11     A    I just -- I pay what I owe, so it's -- the

12 bottom line is the bottom line.  I mean, I pay what I

13 owe.  It doesn't matter to me more or less.  I pay what

14 I'm supposed to pay.

15     Q    And in follow-up to that objection, do you

16 understand what I'm asking?  How the amount of money

17 being paid by a claim adjuster can affect the bottom

18 line of the insurance company?

19         MS. MCCOLLUM:  Continue objection.  Go ahead

20     and answer if you can.

21     A    Okay.  I don't really understand what, I

22 guess, the bottom line for the company is.  I just -- I

23 know what my job is, and my job is, you know, evaluate a

24 claim fairly and pay what we owe on it.

25     Q    I'm going to hand you what we'll mark as

Page 31

1  Exhibit 3.  These are pages Foster Harp-Biven 164

2  through 173.

3          (EXHIBIT 3 MARKED FOR IDENTIFICATION)

4      A    Okay.

5      Q    Does this look like your performance

6  evaluation for the calendar year 2012?

7      A    It does.

8      Q    Who was your manager that year?

9      A    Jennifer Rennick.

10     Q    So is that the same one that was reviewing you

11 back in 2010?

12     A    Yes.

13     Q    Okay.  Does it look like you still have --

14 well, tell me if you can.  How many objectives did you

15 have that year?

16     A    Let's see.  It looks like two objectives.

17 Well, you're right.  You can't really tell.

18     Q    It looks like you have letters A through D,

19 and then part A is broken down into one and two; does

20 that look right?

21     A    That looks correct, uh-huh.

22     Q    A, B, and C are listed as critical objectives;

23 do you see that?

24     A    I do.

25     Q    And then D is listed as important, and it

Page 32

1  looks to me like that deals with kind of an ergonomic

2  work environment, that sort of thing; is that right?

3      A    That's correct.

4      Q    Okay.  I want to look again at that first

5  objective, and I'm looking particularly at objective A1.

6      A    Okay.

7      Q    Can you tell us what objective A1 was in 2012?

8      A    It says, "Produce best-in-class loss cost

9  management through quality and accuracy."

10     Q    And what was your degree of achievement in

11 2012 on that goal?

12     A    She marked, "Do not -- did not meet."

13     Q    And I'm looking over in the mid-year results,

14 and it looks like you're being graded on a numeric scale

15 on certain things.  For example, investigation,

16 evaluation, settlement, reserving; is that right?

17     A    That's correct.

18     Q    How, if you know, are those numerical values

19 calculated?

20     A    From what I understand, they just pull a file

21 or several files, it depends.  And they have a list of

22 questions that they answer, and then they do a

23 percentage that way of the number of files based upon

24 your -- so sometimes they may pull one, and if you don't

25 do well on that one, it'll bring your grade way, way

Page 33

1  down, or if they do two or three.  And that's how it's

2  done.

3      Q    After the numeric values are written in the

4  mid-year outcome it says, "The investigation evaluation

5  and settlement phases stood out in these two months."

6  And those months are May and June of 2012; is that

7  right?

8      A    Yes, that's what she said.  That's the

9  sentence before, uh-huh.

10     Q    And then it says, "Settlement due to some

11 mistakes on releases.  Evaluation due to high

12 consideration of general damages and no trends noted in

13 investigation."

14     A    Uh-huh.

15     Q    When it's talking about "evaluation was due to

16 high consideration of general damages," can you tell us

17 what general damages are?

18     A    I believe what she was referring to is the

19 amount of money for pain and suffering.

20     Q    And that's what I was thinking, too.  General

21 damages usually refers to pain and suffering.

22     A    Which means yes.

23     Q    So your supervisor was discussing with you

24 that you were giving a "high consideration of general

25 damages," high on pain and suffering?



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1    A   Not in general, just on whatever, like, she
2  read -- reviewed one file or two files or ten files. I'm
3  not sure how many files she reviewed at that time. So
4  maybe if it was just one file she felt, in her opinion,
5  it was too high.
6    Q   Okay. If you flip over to the next page, 165,
7  it says, "If scores continue to trend downward through
8  third and fourth quarter and overall quality does not
9  improve, progressive discipline would need to be
10 considered;" do you see that?
11   A   Uh-huh.
12   Q   And when I read this, I'm thinking that if, in
13 part, your general damages, your pain and suffering
14 evaluations continue to be too high, it's possible that
15 you could be subject to some sort of progressive
16 discipline throughout the rest of the year; is that the
17 way you understand it?
18   A   No, I read it in its -- in its entirety --
19 that whole block is in its entirety to read that. It's
20 not just that. It's the investigation, evaluation,
21 reserving, all of that that they list in the first part
22 of the first box.
23   Q   Okay. And so that's what I said, that in
24 part.
25   A   Yeah, sorry.

Page 35

1    Q   So yeah, it -- general damages and then
2  investigation and reserving, too. Those are the things
3  that are going into the potential for progressive
4  discipline, at least as listed on your performance
5  review?
6    A   Right.
7    Q   In the next paragraph down, the second
8  sentence says, "Laura could benefit from scaling back
9  her general damages consideration on soft tissue
10 injuries and not adding money to claims to avoid
11 litigation expense;" do you see that?
12   A   I do.
13   Q   And is that Ms. Rennick evaluating your
14 performance as to how you were paying claims?
15   A   I didn't take it in general, I just meant
16 whatever file she reviewed. I -- I took that to mean
17 the files that she reviewed she thought I paid -- or I
18 put too much money on the general damage portion of
19 whatever she found, in her opinion.
20   Q   And that led, I guess, in part to you not
21 meeting that goal for 2012?
22   A   That was in part, yes.
23   Q   The -- in the very last sentence of the
24 results in that first objective -- and this is on page
25 166.

Page 36

1    A   Uh-huh.
2    Q   It says, "Laura still has the opportunity to
3  embrace the litigation philosophy;" do you see that?
4    A   I do.
5    Q   What does that mean?
6    A   That just means at that time we did not
7  include defense counsel's -- how do I say this?
8  Additional work. So for example, let's say we were $500
9  apart on a claim, and we were going to have to take four
10 depositions and mediation costs and things like that.
11 Sometimes we would use that and say, "Well, rather than
12 go through this, we would go ahead and compromise and
13 pay $200 extra or something like that. And we weren't
14 doing that at that time. Everything's independent of
15 itself.
16   Q   So that has to do with compromising cases
17 considering litigation; is that what you're saying?
18   A   Not compromising them, no, just taking that
19 expense into consideration.
20   Q   Does that deal at all with Liberty Mutual
21 wanting to litigate more cases?
22   A   I don't take it that way, no.
23   Q   Okay.
24       MS. MCCOLLUM: And, again, she's not here as a
25 representative of Liberty Mutual to identify what

Page 37

1  the mindset is, and this is just what her
2  understanding is. There may be a completely
3  different one, so I just want to make it clear that
4  she's not testifying on behalf of Liberty Mutual in
5  that capacity.
6  BY MR. FAIRBANKS:
7    Q   Let's flip towards the back of the 2012
8  evaluation. I'm on page 173.
9    A   Okay.
10   Q   Looking at the overall summary of performance
11 here, mid-year. The first sentence says, "As of mid-
12 year Laura is producing mixed results;" do you see that?
13   A   Uh-huh.
14   Q   Okay. Do you know what your manager meant by
15 "mixed results?"
16   A   I think some results showed one thing, and
17 some results showed something else and maybe the
18 different criteria that she had that she was using to
19 review me, so it didn't show a trend.
20   Q   Okay. In the last sentence of the mid-year
21 summary states, "I look forward to taking a more
22 aggressive approach on her evaluations and contributing
23 positively to our quality results." What was your
24 understanding of what was meant by "taking a more
25 aggressive approach on your evaluations?"

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    A    Maybe getting to them quicker. I don't know
2 exactly what she meant by that at that time.
3    Q    Okay. Have anything to do with the amount of
4 settlement money you were putting on claims?
5    A    You'd really have to ask her. I don't really
6 know.
7    Q    Well, there's a section at the bottom that has
8 employee comments; do you see that?
9    A    I do.
10    Q    And I'm looking at the third sentence in
11 employee comments. It says, "I have already discussed
12 some ideas with my new manager and feel confident that
13 these approaches suggested will reap quality results;"
14 do you see that?
15    A    Uh-huh.
16    Q    Now, that's a statement that was written by
17 you, correct?
18    A    It is.
19    Q    What did you mean by that?
20    A    Gosh, I don't really know. There were so many
21 different changes just systems-wise and things that we
22 had to use at the company at that time, because we had
23 just been purchased by another company. It may have
24 been, like, a diary issue. I don't know.
25    Q    Do you remember, in fact, having face-to-face

Page 39

1 discussions with your manager about the amount of
2 general damages you were putting on your evaluations?
3    A    Not a face-to-face, no.
4    Q    Okay. How would that have happened?
5    A    Probably over the phone.
6    Q    Okay. Do you remember having those
7 discussions with her?
8    A    Not per se the general damages. Just in
9 general, you know. I guess, I -- when -- when you do
10 your evaluations, you put a range in. It wouldn't be
11 unusual for somebody else to either agree with that
12 range or think it's a little high or a little low. Just,
13 you know, I'm sure, you know, you could look at it and
14 see something different than I would or Heather.
15    Q    Have you ever had, I guess, as a negative
16 result on your evaluation, putting too little money on a
17 claim?
18         MS. MCCOLLUM: I'm sorry. Can you clarify the
19    question? Negative result? Do you mean a trial?
20    Do you mean --
21         MR. FAIRBANKS: No, I'm talking about
22    performance reviews.
23 BY MR. FAIRBANKS:
24    Q    Do you understand what I'm asking? I'm
25 talking about the performance review process.

Page 40

1    A    I don't know if anybody's ever put anything on
2 the performance review about it.
3    Q    And on the flip side, we've looked and seen
4 where putting too much money on files could result in a
5 "did not meet" on a performance appraisal?
6    A    Yeah, I -- I just try every day to do the
7 right thing and pay what I owe on a claim. So I don't -
8 - I don't really know how to answer that question,
9 honestly.
10    Q    I'm going to hand you what we'll mark as the
11 next exhibit. Are we on 4?
12         COURT REPORTER: Yes.
13         (EXHIBIT 4 MARKED FOR IDENTIFICATION)
14    A    This is what's been produced to me as your
15 2013 performance evaluation. These are labeled Foster
16 Harp-Biven 157 through 162. Who was your manager that
17 was reviewing your calendar year 2013 performance?
18    A    Sonya Williams.
19    Q    Is Sonya still with Liberty Mutual?
20    A    I believe she is, yes.
21    Q    Is she still your manager?
22    A    No, she's not.
23    Q    Do you know what her job position is?
24    A    I do not.
25    Q    Do you know where she's located?

Page 41

1    A    I think she's still in Fairfield, Ohio. I'm
2 not sure.
3    Q    Do you-all have a physical office there in
4 Fairfield?
5    A    We do.
6    Q    Are you -- I understand from looking at some
7 of the files that you telecommute or work from home most
8 of the time; is that right?
9    A    Majority of the time, yes.
10    Q    If you were to go to an office, would
11 Fairfield be your office location?
12    A    Yes.
13    Q    Does Liberty Mutual have any offices in
14 Kentucky?
15    A    I don't --
16    Q    Claims offices?
17    A    I don't know if they do anymore or not. Not
18 that I'm aware of.
19    Q    Was there any point in time when you worked at
20 a physical location in Kentucky during your time with
21 Liberty Mutual?
22    A    My home is the physical location I've always
23 worked at.
24    Q    Never in your 15 years there has there been an
25 actual location somewhere within Kentucky, a claims

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LAURA HARP-BIVEN, taken 12 August 2014

42..45

Page 42

1   office?
2       A    That I've reported to?
3       Q    Correct.
4       A    No, not that I reported to, no.
5       Q    Is there one that you haven't reported to?
6       A    Not that I'm aware of, no.
7       Q    I'm on the second page of this evaluation.
8   There's a section that says, "Areas of improvement;" do
9   you see that?
10      A    I do.
11      Q    And then there's a subsection that says, "Seek
12  excellence and execute thoroughly."
13      A    Uh-huh.
14      Q    And I'm looking at the first sentence of the
15  second paragraph in there.  It says, "Earlier this year,
16  we discussed Laura's evaluations needing to be tighter
17  with our ranges instead of having more money added to
18  the top of our range.  Laura immediately worked on this,
19  and through our discussions, found that she could
20  evaluate the claim and end up with a fair range in
21  sticking to it;" do you see that?
22      A    I do.
23      Q    Do you remember having that discussion with
24  Sonya Williams sometime in 2013?
25      A    I do.

Page 43

1       Q    And what did Sonya mean -- or what did you
2   understand her to mean that "you needed to be tighter
3   with your range?"
4       A    I needed to have the range more pinpointed.  In
5   other words, don't start here and end up here, but have
6   it more pinpointed to the exact where you wanted --
7   where you think that the claim value is.
8       Q    Okay.  And she's making reference to a range.
9   And is a range -- just so the jury knows.  What do you
10  mean by "range?"
11      A    It's usually referring to general damage
12  figures.
13      Q    Okay.  And Sonya's asking you to be "tighter
14  with your range instead of having more money added to
15  the top;" is that right?
16      A    Yeah, that's what the sentence says, yes.
17      Q    She's not asking you to tighten the range by
18  adding more money to the bottom, correct?
19      A    She's -- the way I -- the way I interpret it
20  was in -- to the range being, say, five to ten it was,
21  like, 7,500 to ten -- is the way I took it.  In other
22  words, have the amounts, the range itself, be closer
23  together.
24      Q    Well, your example there is the exact opposite
25  of what she's saying, correct?

Page 44

1       A    That's --
2       Q    You were -- you just added money to the bottom
3   range to go from five to 7,500 while keeping ten at the
4   top; is that right?
5       A    The way I just described it to you?
6       Q    Yes.
7       A    I just -- I described the range to be a
8   tighter -- a closer number rather than, like I said,
9   five to ten, make it more, like, 7,500 to ten so that
10  there's not such a distance between the first offer and
11  the last offer.
12      Q    Right.  And if your top range was ten, she's
13  actually asking you to reduce the ten as opposed to
14  adding from the bottom, correct?
15      A    That's not -- let me read it again.  You'd
16  have to ask her.  That's -- when we had the discussion,
17  that's what I did was try to narrow the distance.
18      Q    Okay.  Ms. Harp-Biven, who currently is your
19  manager right now?
20      A    It's Melissa Dearman.
21      Q    Where does Ms. Dearman work?
22      A    The Fairfield, Ohio office.
23      Q    Is she there every day?
24      A    She is.
25      Q    And what's her job title?

Page 45

1       A    She's -- Claims Team Manager is what her title
2   is.
3       Q    Do you know how many employees she manages?
4       A    Currently she has -- let's see.  Me -- I think
5   six.
6       Q    Okay.  How long has she had that position?
7       A    As being my manager or being a manager?
8       Q    Well, let's break that into two different
9   ones.  Do you know how long she's been a manager in
10  general?
11      A    I do not.
12      Q    Okay.  What about how long she's been your
13  manager?
14      A    Approximately two years, I think.
15      Q    Do you know what she was doing before she
16  became a manager?
17      A    She was a claims handler.  I'm not sure what
18  her actual title was, but she was a claims handler.
19      Q    Right.  And I guess you all have different
20  ranges of claims specialists, --
21      A    Right.
22      Q    -- but you're all doing the adjusting job --
23      A    Yes.
24      Q    -- at the different --
25      A    Yes, that's correct.

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1      Q    And I've seen that Ms. Dearman was involved in
2  the Foster claim as a claims handler, actually; did you
3  know that?
4      A    At some point much before my handling it.
5      Q    Have you reviewed any of the file related to
6  Ms. Dearman's handling of the Foster claim?
7      A    I have not.
8      Q    And I guess, after her handling of the Foster
9  claim she was promoted?
10      A    I have no idea.
11      Q    Is it a promotion to go from being a claims
12  handler to a claims manager?
13      A    It is if that's what happened.  I'm just not
14  sure in the timeframe when that happened for her.
15      Q    Have you had any discussions with her recently
16  about the Foster case?
17      A    No, just that she also told me she may be
18  deposed.  Same thing.
19      Q    What about while the claim was ongoing?  Did
20  you have any discussions with her?
21      A    Gosh, I would have, no idea.
22      Q    Nothing that you remember?
23      A    Nothing that I remember off the top of my
24  head, no.
25      Q    In your position that you hold at Liberty

Page 47

1  Mutual, is there a certain dollar amount that you're
2  permitted to offer before you have to seek approval from
3  somebody above you?
4      A    Yes.
5      Q    What is that?
6      A    Currently, I believe it's $100,000.
7      Q    When you were handling the Foster claim did
8  you have that same $100,000 approval?
9      A    I have no idea what it was at that time.
10      Q    Okay.  Do you know when -- at some point did
11  it switch?  Did it increase to go up to $100,000?
12      A    It's gone up, it's gone down, it's -- I
13  couldn't possibly tell you.  I have no idea.
14      Q    And what I'm trying to figure out is:  Were
15  you the one who had the final say on the settlement on
16  the Foster claim, or did you have to go to somebody else
17  to get the authority to make that --
18      A    Oh, no.  We had a -- we had a triage with that
19  file.
20      Q    And why is that?
21      A    I'm sure it was over my authority at the time.
22      Q    Who did you triage with?
23      A    It would've been probably my manager, my
24  manager's manager, and probably the home office
25  examiner, yeah.

Page 48

1      Q    Where's home office?
2      A    Fairfield, Ohio.
3      Q    What's a home office examiner?
4      A    It's a person who you triage cases that are
5  over the authority of yourself and possibly your
6  immediate manager.
7      Q    Do you know who your -- was it Ms. Dearman who
8  was your immediate manager during that triage in the
9  Foster case?
10      A    I don't think so.
11      Q    Do you know who it was?
12      A    I don't remember.  I don't know.  I'd have to
13  go back.  If you've got my performance review for 2014,
14  I could tell you.
15      Q    I do, and --
16      A    Okay.
17      Q    -- it looks like the reviewer is Melissa
18  Dearman for --
19      A    Okay.  Them maybe it -- she was.
20      Q    You think it would've been her?
21      A    Yeah, maybe she was, yeah.  So sorry.
22      Q    I've seen the name Mechley (phonetic), M-E-C -
23  -
24      A    Kurt Mechley, yeah.  Uh-huh.
25      Q    Kurt Mechley?

Page 49

1      A    Kurt Mechley, he was the home office examiner
2  at that time.
3      Q    So he's the home office examiner?
4      A    Uh-huh.
5      MR. FAIRBANKS:  Let's take about a five-minute
6  break.  We've been going for about an hour.
7      MS. MCCOLLUM:  Sure.  Sure.
8          (OFF THE RECORD)
9      MR. FAIRBANKS:    We're back on the video
10  record.
11  BY MR. FAIRBANKS:
12      Q    Ms. Harp-Biven, I wanted to ask you some
13  questions about some of the claim notes.  So what I'm
14  going to do is hand you a collection of documents that
15  are labeled Foster Claim 1057 through 1153.
16      A    Okay.
17      Q    Now, I held these up earlier when we were
18  getting started to talk about things that you would've
19  reviewed.  Are these what you were referring to as
20  "claim notes?"
21      A    Yes.
22      Q    And I think you stated that you didn't review
23  anything other than the notes that you were involved in,
24  at least in preparation for today; is that correct?
25      A    That's correct.

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1    Q    Along those lines, do you have any opinion one
2  way or the other about the manner in which the claim was
3  handled prior to your involvement?
4    A    I have no comment.
5    Q    Okay.
6    A    I mean --
7    Q    And that's all I needed to know is whether you
8  do or you don't.  If you don't, that's fine.  I figured
9  I have to ask you about it.  Why don't we flip to page
10 1100, and I'm trying to pinpoint the time when you
11 became involved in the Foster claim.
12   A    Okay.  Oops.  Okay.
13   Q    And on page 1100, I see a note made by Melissa
14 Dearman on March 28, 2014; do you see that?
15   A    No.  March 28th?  Oh, yes.
16   Q    Towards the top.
17   A    I'm so sorry.  Yeah.
18   Q    Do you see that one?
19   A    I do.
20   Q    And the very next note chronologically right
21 above that is one made by you on May 6, 2014; do you see
22 that?
23   A    I do.
24   Q    Do you think that's when you would've been
25 first involved in this Foster claim?

Page 51

1    A    Probably, yes.
2    Q    Okay.  And at that point in time, there was
3  already a lawsuit filed by Mr. Foster against American
4  Fire; is that correct?
5    A    That's correct, uh-huh.
6    Q    And I asked you this, I think, just generally,
7  but do you think any point in time March, April, or May
8  of 2014 you would've discussed the claim with Melissa
9  Dearman?
10   A    I said I don't have any independent
11 recollection of it.  I may have called her and said, you
12 know, "Thanks for the file," or, "Are you mailing me the
13 file," or something like that.  I just -- I don't have
14 any independent recollection.
15   Q    The next note that you make is on May 19,
16 2014, and it starts at the very bottom of page 1097.  It
17 looks like it continues onto 1098 and 99.
18   A    I see that.
19   Q    Okay.  When you first looked at this file,
20 what was your analysis of how much coverage the Fosters
21 had?
22   A    For UIMBI?
23   Q    Yes.
24   A    $100/$300.
25   Q    All right.  So that means he had -- in

Page 52

1  relation to this particular accident -- he had $100,000
2  of coverage available with American Fire; is that
3  correct?
4    A    That's correct.
5    Q    What was your analysis of the liability on
6  this case?
7    A    You mean fault?
8    Q    Yes.
9    A    That the other party was at fault for the
10 accident.
11   Q    Okay.  So there was never -- as far as I know,
12 there was never really any dispute that the other driver
13 was at fault for causing the motor vehicle collision,
14 itself; is that correct?
15   A    Correct.
16   Q    It looks like you have a section on
17 "Damages/injuries/reserve analysis;" do you see that?
18   A    I do.
19   Q    Where do you think you would've gotten the
20 information to come up with the analysis there in your
21 damages section?
22   A    Whatever documentation was in the file at the
23 time that I got the file.
24   Q    Okay.  So at this point in time, did you know
25 that Mr. Foster had had an arthroscopic surgery on his

Page 53

1  knee in October of 2009?
2    A    That's what it says, yes.
3    Q    And did you also know that Mr. Foster's
4  orthopedic surgeon was indicating that he did not think
5  that Mr. Foster was ever going to be able to return to
6  work as a mechanic?
7    A    Yes.
8    Q    Okay.
9    A    I'm not sure how that information was relayed.
10 I'm not sure if the doctor sent us something or Mrs. --
11 Mr. Foster or Mrs. Foster told us that or the attorney,
12 but yes.
13   Q    You also have listed in there that -- an
14 approximate amount of Mr. Foster's medical bills up to
15 the point in time.
16   A    I see that.
17   Q    And what do you have?  What's the number for
18 that?
19   A    Medical bills are $17,154.50, and his wage
20 loss claim is approximately $4,536.
21   Q    I wanted to ask you about that wage loss
22 claim.  How did you come up with the $4,536 for his wage
23 loss claim?
24   A    I'm not sure.  It may have come from the
25 attorney.  It may have come from documentations in the

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1   file.  He may have told a doctor that.  It may have been
2   on the medical records.  I'm not sure.
3       Q    And it says, "Total $21,690.50."
4       A    Uh-huh.
5       Q    Is that you just adding that wage loss to the
6   medical bills?
7       A    Hopefully correctly, yes.
8       Q    And just again, asking about that wage loss
9   claim, did you understand that Mr. Foster, or at least
10  his orthopedic surgeon, was saying he was not going to
11  be able to work ever again as a mechanic?
12      A    That -- well, I guess I'm not sure if that was
13  from the doctor saying that or maybe someone else
14  telling us that's what the doctor told him.  I'm not
15  sure.
16      Q    Do you know if you did any calculations
17  yourself to come up with $4,536 for his wage loss claim?
18      A    Like I said, I don't know how that information
19  came to me.  It may have come to me through the
20  attorney.  I don't know.
21      Q    And when you say "the attorney," are you
22  talking about somebody from Mr. Richardson's firm?
23      A    No, I'm -- it would be saying somebody from
24  Mr. Foster -- representing Mr. Foster.
25      Q    Okay.  Tell me --

Page 55

1       A    Can I just -- I'll just --
2       Q    Yeah, go ahead.
3       A    -- clarify for you.
4       Q    Sure.
5       A    Typically, what I'll do when I get a claim
6   file is I'll call the attorney and say, "Hey, can you
7   give me an update on your client?  Tell me are they done
8   treating.  What are they treating for?  What are their
9   injuries?  Do you know how much their medical bills are
10  to date?  How much was their wage loss claim?"  So that
11  information could've come directly from plaintiff's
12  counsel.  I'm really not sure.  But I do try to make
13  those kind of contacts so I get an accurate account of -
14  - of what they know from their clients, because I can't
15  contact the client at that time.
16      Q    Right.  And at least at this point, in
17  fairness to you, you're getting involved in a claim
18  where a lawsuit is already pending, correct?
19      A    Correct.
20      Q    So in this instance, you may not have reached
21  out directly to either me or somebody at my firm; is
22  that fair?
23      A    That's fair, or it could've even been in
24  discovery responses for all I know.
25      Q    Well, at least in the next paragraph down, it

Page 56

1   looks like you haven't received any discovery responses
2   yet.  So it wouldn't have been something that would've
3   come from the discovery responses from Mr. Foster; is
4   that right?
5       A    Where do you see that?  I'm sorry.
6       Q    In the second full paragraph there on page
7   1099.
8       A    Oh.  You're correct.
9       Q    Did you know that Mr. Foster also had PIP
10  coverage with American Fire?
11      A    I -- I'm aware that he had it, yes.  I didn't
12  handle it, but, yes.
13      Q    Right.  Did you ever talk with any of the
14  adjusters that were handling his PIP claim?
15      A    No.
16      Q    Did you understand in April of 2014 that PIP
17  had already paid out a lot more than $4,536 for wage
18  loss?
19      A    I don't review the PIP file.
20      Q    Are you saying that you did not review the PIP
21  file at all during the handling of Mr. Foster's claim?
22      A    No, because -- it -- they're separate --
23  separate handlers.  So I don't review that unless I have
24  permission to do that, so no.
25      Q    Whose permission would you need to get to look

Page 57

1   at the PIP file?
2       A    The attorney and his client or her client.
3       Q    Do you know of anybody, either Mr. Foster or
4   any of his attorneys, saying that they didn't want you
5   looking at the PIP file?
6       A    I don't have any recollection of that one way
7   or the other.
8       Q    Okay.  In your note here on May 19th, what do
9   you document the current situation as to settlement
10  offers with Mr. Foster?
11      A    Are you referring to a certain paragraph or --
12      Q    Yes, I'm just looking at that first paragraph.
13  You have a figure there.
14      A    Okay.  The last sentence?  Is that what you're
15  referring to?
16      Q    Yeah.
17      A    Uh-huh.  It just says, "It appears the last
18  offer was $17,264, which has been refused by insured,
19  and they have continued to reiterate their full policy
20  -- their full policy limit demand."
21      Q    At some point did you come to realize that
22  $17,264 had never actually been offered to Mr. Foster?
23      A    I would have to go through the file and see if
24  that's what it says.  It may have just been a typo.
25      Q    Do you remember at some point that there had

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of LAURA HAGEN, taken 5/12/August 27, 2014

58..61

Page 58

1   been a $7,500 combined offer by both American Fire and
2   Philadelphia Insurance Company?
3       A    At some point prior to my handling, you mean?
4       Q    Yes.
5       A    I think so, and I think maybe that would've
6   been -- maybe that's the typographical error, or maybe
7   it was only 7264 or something like that instead of 17.
8       Q    Okay.  Well, I'll just tell you that no one
9   ever offered $17,264 to Mr. Foster.
10      A    Uh-huh.
11      Q    Was that you impression during the handling of
12  the claim, that that actually had been offered to him?
13      A    Like I said, I think it's probably a typo, to
14  be honest, because I do remember that $7,500 number
15  being the actual offer.  Yeah, I think it's just a
16  typographical error, typing.
17      Q    I'm also looking in this paragraph, and
18  there's a sentence in there that says, "We are waiting
19  for the recs," and I guess that's medical records, "from
20  Dr. Cecil and OpenMRI along with a complete copy of the
21  SSDI file;" do you see that?
22      A    I do.
23      Q    And it says, "Once this has been received, we
24  will likely be scheduling IME."
25      A    Uh-huh.

Page 59

1       Q    What's an IME?
2       A    An independent medical evaluation or
3   examination.
4       Q    Do you know why that hadn't been done yet?
5       A    Because we didn't have all the records.
6       Q    And you're waiting on Dr. Cecil?
7       A    Dr. Cecil and the SSDI file and the OpenM --
8   OpenMRI, yes.
9       Q    Do you know why -- well, do you know whether
10  or not you actually had the Dr. Cecil records at that
11  point in time?
12      A    I don't believe we had all of them, no.
13      Q    Okay.  What about the OpenMRI records?  Do you
14  know whether you had those or not?
15      A    I don't believe we had all of them.
16      Q    Why hadn't there been a request for those
17  earlier than May of 2014 if you didn't have them?
18      A    I can't comment on -- they might not have even
19  been aware of them.
20      Q    Okay.  What about the SSDI file?  Do you know
21  whether or not anybody had requested that yet?
22      A    I'm fairly certain we kept asking plaintiff's
23  counsel for it, and for whatever reason it just wasn't
24  supplied.  So I think we had to get a -- maybe a release
25  or a subpoena or something like that possibly.  I'm not

Page 60

1   sure.
2       Q    Tell me what you thought was going to be
3   important in that SSDI file.
4       A    Well, we would make sure we'd have a complete
5   copy of all of his prior records and his pertinent
6   records relating to when he was claiming for his SSDI
7   case.  Because he was telling us that this accident was
8   part of the reason why he was being -- or the reason why
9   he was being deemed disabled.
10      Q    Couldn't you have gotten those records
11  yourself outside of the SSDI file?
12      A    Well, we could have, as long as he disclosed
13  all of them.
14      Q    Why hadn't Mr. Foster given you an
15  authorization to get whatever records you all wanted?
16      A    Well, it's more than just having the release.
17  You also have to know what vendors you're ordering them
18  from.
19      Q    Do you remember whether or not he had provided
20  you a list of the places that he had been to the doctor?
21      A    I'm not -- I'm not sure.  I don't remember a
22  list from him, no.
23      Q    Okay.  And is that why the IME hadn't been
24  scheduled yet?  You-all were still waiting on records?
25      A    I know that, you know, we don't want to

Page 61

1   schedule an IME until we have all the records, because
2   we want to make sure that the -- the doctor who's
3   performing the IME has all the information available to
4   them and can give us, you know, the most accurate
5   opinion of, you know, what they're trying to discuss for
6   us.  Because we just want to know the truth, and if they
7   don't have all the information, they can't necessarily
8   give us a, you know, good report to tell us what the
9   truth actually is.
10      Q    Why was it taking you so long to gather up
11  medical records?
12      A    From what I -- I just remember records in
13  general being difficult in this case.  You know,
14  employment records, medical records.  I just remember in
15  general asking for things and just not getting them for
16  whatever reason, or getting redacted documentation or
17  part of it, and I don't know why that was.  That just --
18  I think that's just a little immediate recollection that
19  I have.
20      Q    Okay.  Let me explore that a little bit.  What
21  did you get that was redacted?
22      A    I don't remember.  I just remember getting
23  documentation and everything not being there, like, it's
24  SSDI records or maybe not all of them.  Maybe just,
25  like, the opinion and the award and not all the actual

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  file itself.  I can't remember but I just remember it
2  not being complete.
3      Q    Okay.  And once you did get that SSDI file,
4  that did not make it into your claim file?
5      A    I think --
6      Q    Is that right?
7      A    I think defense counsel obtained that.
8      Q    Do you know if you provided that file to the
9  IME doctor you-all eventually hired?
10     A    I'm sure -- I'm sure he gave everything that
11 we had to the IME doctor.
12     Q    So you think you gave him the whole SSDI file?
13     A    I would think we gave him every medical record
14 that we had ever obtained for him.
15     Q    Okay.  So you think that Dr. Jenkinson, who's
16 the IME doctor, had every piece of medical documentation
17 that he needed on Mr. Foster?
18     A    I would not have given those to him
19 personally, but I would assume that defense counsel
20 would've given him everything, yes.
21     Q    And at this point, we're, you know, just
22 looking at the dates we're in May of 2014.  The accident
23 took place in June of 2008.  So we're almost six years
24 after the accident, and would you agree with me that six
25 years is too long for it to take for medical records to

Page 63

1  be gathered by a claims handler?
2         MS. MCCOLLUM:  Objection.  Form.
3      A    I would -- I would say as long as the adjuster
4  is aware of needing them and trying to get them.  I
5  mean, once -- once an attorney is involved, the
6  attorney, you know, needs to help provide that
7  information to us.  So we would've asked for it, and if
8  we wouldn't have gotten it -- you know.
9      Q    Well, what about before the lawsuit was filed?
10 Do you know whether or not Mr. Foster had given an
11 authorization to American Fire to get medical records?
12     A    I have no -- no idea.  Like I said, I don't
13 remember, because I didn't review that part of the file.
14     Q    Let's flip kind of forward in time to page
15 1095.
16     A    Okay.
17     Q    I'm looking at -- there's a series of notes on
18 July 21, 2014, and I'm looking at one that's dated
19 9:57 a.m.; do you see that?
20     A    Yes.
21     Q    And it's talking about a vocational expert
22 named Dr. Barnes.
23     A    Uh-huh.  I see that.
24     Q    Do you remember Dr. Barnes?
25     A    I remember it was a female.

Page 64

1      Q    Okay.
2      A    And I'm not even sure she's a doctor,
3  actually, but she was the vocational expert that
4  plaintiff's counsel obtained.
5      Q    And I'll tell you, she's not a medical doctor.
6      A    Yeah.
7      Q    What do you remember her opinion was about Mr.
8  Foster's work loss, the amount of it?
9      A    The amount that she put in her report?
10     Q    Correct.
11     A    Or the amount that she did -- in -- she put in
12 her deposition?
13     Q    Well, I guess, both.
14     A    I remember that her deposition testimony was
15 different than what her report said.
16     Q    Okay.  Tell me about that.  What was
17 different?
18     A    I remember that her -- when she was, I guess,
19 cross examined, it came out that she didn't use
20 plaintiff's actual wage loss.  She used plaintiff and
21 his wife.  She didn't review any of his prior tax
22 returns to get a, maybe, more accurate account of what
23 he actually made himself.  And I think they used gross
24 rather than net in order to determine his wage loss.
25     Q    Okay.  So what was different between the

Page 65

1  report and the deposition?
2      A    Her report numbers were considerably higher
3  than what she testified to.
4      Q    What --
5      A    And she even -- I think she even said in her
6  deposition that, you know, she was in error by using the
7  wife's -- the wife's wages along with Mr. Foster's.
8      Q    How did you come to know that, that she was in
9  error?
10     A    My defense attorney told me after the
11 deposition that's what she said.
12     Q    You haven't reviewed Dr. Barnes' deposition
13 yourself?
14     A    No, I have not.
15     Q    You have not watched the video of that either?
16     A    I have not.
17     Q    So anything that -- any notes that you're
18 making, I guess, about Dr. Barnes' testimony all
19 would've come from conversations or letters with the
20 defense lawyers hired by American Fire; correct?
21     A    Correct.
22     Q    Who was the economist that American Fire
23 consulted with in this case?
24     A    I don't remember who it even was at this
25 point.

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW    Doc #: 188-6    Filed: 09/12/16    Page: 19 of 43 - Page
ID#: 2303
The Deposition of LAURA HARP-BIVEN, taken 12 August 2014

66..69

Page 66

1    Q   You-all did consult with an economist about
2  the wage loss claim, did you not?
3    A   We did consult with someone, yes.
4    Q   Do you know Dr. William Baldwin; does that
5  ring a bell?
6    A   That, perhaps, could be who it was, yes.
7    Q   Did you have any discussions with Dr. Baldwin?
8    A   Personally?
9    Q   Yes.
10   A   No, I did not.
11   Q   Tell me what you know about Dr. Baldwin's
12  opinion about the wage loss.
13   A   Well, I remember that they -- he said that
14  they weren't using gross -- they were using the gross
15  numbers rather than net income.  I do remember that.
16   Q   Let me stop you there for a second.  Did he
17  say -- well, he didn't say that that was the incorrect
18  way to do it, correct?
19       MS. MCCOLLUM:  I'm going to object, because I
20       think that Dave Richardson said that he was
21       consulted as a consulting expert and not for sure
22       if we have to disclose those in federal court, but
23       that his purpose of being contacted was to assist
24       with preparation of cross exam and not to really
25       render an opinion.

Page 67

1        THE WITNESS:  That's exactly right.
2  BY MR. FAIRBANKS:
3    Q   Well, let me state that question again.  Dr.
4  Baldwin wasn't telling you that Dr. Barnes' calculation
5  was incorrect, was he?
6    A   I just -- I don't think he said that.  I just
7  think he said that the proper way to do it would be to
8  use the net rather than the gross to get an accurate
9  account.  Not necessarily an error, just maybe not as
10  accurate.
11   Q   Well, he actually told you that using the net
12  was too low, didn't he?
13   A   I don't remember it being too low.  I think he
14  said there was a range, if I remember correctly.  There's
15  a -- is there a particular document that you remember me
16  reporting that,
17   Q   Yeah, let me show you what I've got.
18   A   -- that maybe can refresh my memory?  Yeah, I
19  don't mean necessarily already.  I mean, in the claim file
20  that I reviewed already.  Because this is --
21   Q   I think this is part of the claim file.
22   A   Okay.
23   Q   This is page -- Foster claim 15.
24   A   Okay.
25   Q   And I'll just tell you, Ms. Harp-Biven --

Page 68

1    A   Okay.
2    Q   I think that you had, at one point, wrote a
3  narrative note because your system was down or something
4  like that.
5    A   Okay.
6    Q   Do you remember that?
7    A   I'm sure my system's been down, yes.
8    Q   Okay.  Well, this was in the claim file --
9    A   Okay.
10   Q   -- in the first paragraph on page 15.  This is
11  what I'm asking you about.
12   A   Okay.  Sure.
13   Q   It says, "We also retained Dr. Baldwin
14  regarding the alleged wage loss claim;" do you see that?
15   A   Correct.
16   Q   And you guys did not ask him to provide a
17  written report; is that right?
18   A   That's correct.
19   Q   Nor did you disclose him to Mr. Foster?
20   A   That's correct.
21   Q   And that was because his opinions were going
22  to help Mr. Foster's case, correct?
23   A   Well, they could possibly.  We just wanted
24  really his in -- his help in determining how to cross
25  examine their expert.  Make sure we had a good

Page 69

1  understanding of how they arrived at the numbers that
2  they did.
3    Q   Well, in fact, his opinions were possibly
4  going to help Mr. Foster's claim?  That's true, isn't
5  it?
6    A   That's not necessarily true.  I just said it
7  possibly could.
8    Q   Well, your note here says, "We choose not to
9  disclose him because his opinions could possibly help
10  the plaintiff's case."
11   A   Correct, "could possibly."  Not that they
12  would.
13   Q   Okay.  And then the next sentence it says, "He
14  advises that plaintiff's economic expert used the gross
15  receipts rather than the net profits/loss for self-
16  employed individuals, which tend to exaggerate income
17  level;" do you see that?
18   A   Correct.  Uh-huh.
19   Q   The next sentence says, "However, using the
20  net profits/loss receipts would undervalue the lost
21  income;" do you see that?
22   A   I see that.
23   Q   So he was telling you that using the net
24  profit and loss receipts was going to undervalue Mr.
25  Foster's lost income claim, correct?

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 70

1    A    I'm not sure if that should've said would or
2  could, but --
3    Q    Well, it says "would."
4    A    Yeah, it says "would," but...
5    Q    What number did Dr. Baldwin tell you was the
6  correct one for the wage loss claim?
7    A    I don't believe he ever told me a number that
8  was -- I know he didn't tell me anything directly.
9    Q    Did you ever hear a number disclosed to you at
10  all from Dr. Baldwin?
11    A    No, I just -- I believe they had just some
12  real concern with the gross receipts rather than the net
13  profits, because he was self-employed, and I believe he
14  was a mechanic.  So you're using parts, you know, in
15  there, and parts is not a profit for him in his wage
16  loss claim.
17    Q    Do you know the position that American Fire
18  was going to take at trial related to Mr. Foster's lost
19  income claim?
20    A    Before or after Dr. Jenkinson's deposition?
21    Q    Did it change?
22    A    It did.  Dr. Jenkinson's --
23    Q    Okay.  Tell me how it changed.
24    A    -- deposition changed our handling of the
25  file, because he's -- he didn't testify consistent with

Page 71

1  his report.
2    Q    Well, I'm asking specific to the lost income
3  claim.  What was the position that American Fire was
4  going to take at trial on the lost income claim?  And if
5  it's different before or after Jenkinson, tell me.
6    A    I believe it was that they -- he was already
7  indemnified through PIP.  If I remember correctly, I
8  think he was overpaid under his PIP claim.
9    Q    Were you-all going to use the net profit loss
10  calculation?
11    A    I think we were -- I remember in -- at some
12  point, we received information.  He told the doctor or
13  told someone he made $100 a day at his job, and I don't
14  know what document that came from.  It may have been
15  from his Social Security file.  I'm not sure.  Where he
16  said he made $100 a day, which would've equated to,
17  like, $26,000 a year.  $25, $26,000 a year.  And I think
18  that along with our tax returns that we had for him
19  previous were the numbers we were going to use for him,
20  not the numbers that they were using.
21    Q    So you were going to use the $100 a day
22  figure?
23    A    That, maybe, along with whatever his prior tax
24  return showed that were separated from his wife.
25    Q    Well, let's say you did use that $100 a day

Page 72

1  figure, $26,000 a year.
2    A    Okay.
3    Q    His claim's going to clearly exceed the policy
4  limits then, isn't it?
5    A    Well, that's if you accept that the -- his --
6  his injuries are related to the car accident.
7    Q    Okay.  Assuming you do -- assuming you accept
8  his injuries --
9    A    We didn't.
10    Q    I'm not saying you did.
11    A    So -- yeah.  Yeah.
12    Q    Assuming you did, $26,000 a year.  Easy policy
13  limits case, correct?
14        MS. MCCOLLUM:  Objection.  Form.
15    A    Well, that's also if he's not able to return
16  to work, and it's based upon those injuries
17  specifically.  He had other problems, too.  Because from
18  what I remember, his Social Security file -- he wasn't
19  deemed disabled right after our accident for car
20  accident related injuries.  He had, like, heart problems
21  and I'm thinking a shoulder problem or something else,
22  too.  And he was obese, so all those things can come
23  into play along with, you know, your disability, not
24  just this car accident.
25    Q    Well, do you know that he wasn't considered

Page 73

1  disabled right after the accident, because he tried to
2  go back to work for a while; do you know that?
3    A    I do know that, yes.  I think the doctor at
4  one point told him not to work, and he did anyway.
5    Q    So -- okay.  So you were thinking about the
6  $100 a day as maybe one way to calculate it.  Another
7  way is to use the net figure from his tax returns?
8        MS. MCCOLLUM:  I would just like to interject.
9    I think this was -- issue was fully briefed for the
10    Court.  So there may be other legal basis argued to
11    the Court, and I don't think there was yet a ruling
12    on that prior to resolution of the case.  So I
13    would just argue that this may be a more
14    appropriate -- or an appropriate question for
15    counsel as well.  Underlying counsel -- excuse me,
16    Mr. Richardson.
17  BY MR. FAIRBANKS:
18    Q    Do you know whether you-all were planning to
19  use the net figure from the tax returns as the basis for
20  calculating the lost income claim?
21    A    Like I said, that would be a Dave Richardson
22  question.
23    Q    Let me ask you this --
24    A    Because what his plan was at trial, I don't
25  know.

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 74

1    Q    Okay.  Let me ask that a different way:
2  Regardless of what you were planning to do at trial, in
3  your evaluations, you were using the net income figures
4  off of the tax returns, correct?
5    A    I'd have to look and see.  Do you have my
6  evaluation anywhere in the file?
7    Q    I think a lot of that's redacted.
8    A    Okay.  Sorry.
9    Q    I'm wondering:  Do you know?
10    A    I don't remember.
11    Q    Okay.
12    A    Like I said, if I could look at the document,
13  I could tell, perhaps.
14    Q    We know at least from looking at this note
15  that Dr. Baldwin had advised that using that would
16  undervalue his claim, correct?
17    A    That's what it says.  I'm not sure that's what
18  I meant, but, yes.  I think it could've been could
19  rather than would, but...
20    Q    Do you know which witnesses you-all were
21  planning to call at trial?
22    A    No, that's a Dave Richardson question, too.
23  Sorry.
24    Q    Let's talk a little bit about Dr. Jenkinson.
25    A    Okay.

Page 75

1    Q    I think we've alluded to him a couple of
2  times, and just to refresh everybody's memory, he was
3  the medical examiner that was hired by the defense to
4  examine Mr. Foster; is that correct?
5    A    That's correct.
6    Q    Is this the first case that you ever had Dr.
7  Jenkinson involved in?
8    A    Gosh, I have no idea.
9    Q    Okay.
10    A    I have no memory --
11    Q    Any other cases right now where he's involved?
12    A    That I have, personally?
13    Q    Yes.
14    A    I don't know.  I don't think so.  I don't
15  know.
16    Q    Okay.  Tell me what you know about Dr.
17  Jenkinson.
18    A    I know he's a Board Certified Orthopedic
19  Surgeon.
20    Q    Do you know where he's located?
21    A    I do not.
22    Q    Do you know how many medical examinations he
23  does each year?
24    A    I have no idea.
25    Q    Did anybody ever tell you that?

Page 76

1    A    No.
2    Q    Do you know how much he charges for the
3  medical examinations?
4    A    No idea.
5    Q    Would you agree with me that in hiring a
6  medical examination -- examiner, you want somebody who's
7  going to be fair to both sides?
8    A    Absolutely.
9    Q    You want somebody who is truly independent?
10    A    Yes.
11    Q    Why did it take so long to send Mr. Foster to
12  see Dr. Jenkinson?
13    A    Because we didn't have all the medical
14  records.
15    Q    Okay.  So it took until October of 2014 to
16  send Mr. Foster to Dr. Jenkinson because you did -- guys
17  didn't have all the medical records?
18    A    Correct.
19    Q    And you don't know what access anybody had to
20  the medical records before the time you were involved in
21  the file?
22    A    Correct.  I have no idea.
23    Q    And at that point in time -- and just, you
24  know, using the math, from June of '08 to October of
25  2014 was six years and four months after his accident?

Page 77

1    A    Correct.  Yeah, I don't think he applied for
2  Social Security until, like...
3         MS. MCCOLLUM:  And I'd like to object there
4     that even if the accident occurred in 2008, he did
5     not make a UIM claim until many years afterwards,
6     and it may be 2010.  And I may be incorrect about
7     it, but I think it's 2010.
8  BY MR. FAIRBANKS:
9    Q    Yep.  Let me ask it that way, too.  Assuming
10  that Mr. Foster formally made a UIM claim in May of
11  2010, we're still four years and five months after the
12  UIM claim was asserted?
13    A    If your math's correct, yes.
14    Q    Let's flip over and flip forward in time again
15  to page 1094.
16    Mr. Fairbankss, do you want this to be an
17  exhibit?
18         MR. FAIRBANKS:  Oh, let's -- yeah.  Let's do
19     that.  Thank you.  What is the next exhibit?  It's
20     5?
21         COURT REPORTER:  This one right here will be
22     6.  The next one will be 7 after that.
23         MR. FAIRBANKS:  Okay.  Let's make that 6.
24     That's 5.  Okay.  Thank you.
25         (EXHIBIT 5 MARKED FOR IDENTIFICATION)

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1  (EXHIBIT 6 MARKED FOR IDENTIFICATION)
2  THE WITNESS:  You're welcome.
3  BY MR. FAIRBANKS:
4    Q    I'm on 1094, and I want to ask you just a
5  couple of questions about a note on August 14, 2014.  Do
6  you remember, at some point when you were handling the
7  claim, that there was an amended complaint filed against
8  American Fire?
9    A    Against both UIM carriers, yes.
10    Q    And that was the bad faith unfair claims
11  practices case that we're here talking about today?
12    A    Correct.
13    Q    At that point, in August of 2014, you had not
14  made any offers to Mr. Foster on the UIM claim, correct?
15    A    I'm not sure.  I think we may have reiterated
16  our offer.  I'm not sure.
17    Q    To the extent that a prior offer had been
18  reiterated, that would've been $4,500, correct?
19    A    I don't know.  I'd have to --
20    Q    And that would've --
21    A    I wish we had our computer.  That would be
22  easier to tell you that information, quite honestly.
23    Q    Sure.  Do you know when that $4,500 offer from
24  American Fire was first made?
25    A    I couldn't -- I have no idea.

Page 79

1    Q    Okay.  And I'll tell you --
2    A    It could be --
3    Q    -- it was made in May of 2011.
4    A    Okay.
5    Q    Do you remember, yourself, reiterating that
6  $4,500 offer at any point in time?
7    A    I don't recall that, no.
8    Q    Okay.  At this point in time also in August of
9  2014, American Fire had not sent Mr. Foster to see Dr.
10  Jenkinson yet, correct?
11    A    I'm not sure.  I don't know what the date was.
12    Q    I think he went on October 8, 2014.
13    A    Okay.
14    Q    And I'll just show you a copy of his report.
15    A    Sure.
16    Q    I don't want to put words in your mouth.
17    A    Sure.  No.  No.  That's fine.  Yeah, October
18  8, '14.  You're right.
19    Q    And I don't need to mark this as an exhibit.
20    A    You're right, okay.
21    Q    Was the fact that this amended complaint was
22  filed one of the reasons why you guys went ahead and
23  scheduled the IME?
24    A    I don't know.
25    Q    Okay.

Page 80

1    A    No.
2    Q    Did this affect the way that you handled the
3  claim at all?  This amended complaint?
4    A    No, didn't change anything for me.
5    Q    Let's flip over to page 1091.
6    A    Okay.
7    Q    There's a note near the top, September 3,
8  2014.
9    A    Uh-huh.
10    Q    It says, "Have you called Bob Stouffer and
11  made the combined offer to plaintiff's counsel that we
12  discussed?  What's the status?"
13    A    I see that.
14    Q    Who is that note meant for?  Who were those --
15  are these just questions that you're having in your own
16  mind to remind yourself to do something?
17    A    I think it's probably a -- it's probably a
18  call that I probably made to defense counsel.
19    MS. MCCOLLUM:  And I object to form.
20    Q    Is that a note that you made?
21    A    Yes, it is.
22    Q    Who is Bob Stouffer?
23    A    Bob Stouffer, I believe, was the attorney
24  representing Philadelphia Insurance.
25    Q    Do you know what the combined offer was that

Page 81

1  you-all were discussing?
2    A    No, because it's probably contained in these
3  black boxes, and I can't see in there.
4    Q    Do you know why there was no combined offer
5  made?
6    A    I -- I didn't know if a combined offer was
7  made or not to -- based on this information.
8    Q    Okay.  Well, let's just flip forward enough to
9  get our bearings here.
10    A    Sure.
11    Q    Let's flip over to page 1084.
12    A    Okay.  Okay.
13    Q    And I'm looking at -- this is a few months
14  after that September note we were just looking at.  I'm
15  looking at a note December 19, 2014; are you with me?
16    A    I am.
17    Q    It says, "Approved defense counsel's letter
18  confirming our offer of $10,000."
19    A    Okay.
20    Q    Do you see that?
21    A    I do.
22    Q    That was not a combined offer, that $10,000,
23  correct?
24    A    I'm not sure.  I would think it would just be
25  our offer.

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

Page 82

1    Q    Does that refresh your memory as to why a
2 combined offer wasn't made back in September?
3    A    No, it doesn't really help me. I'm sorry. My
4 computer would help me more.
5    Q    Would you agree with me that that $10,000
6 offer was the first offer that you made to Mr. Foster?
7    A    That, I don't know for sure, either, without
8 my computer.
9    Q    Do you know how you came up with that $10,000
10 figure?
11    A    It would've been whatever my evaluation said
12 at the time. And it would've included the medical
13 records that we had, wage loss, docket -- Dr.
14 Jenkinson's report.
15    Q    Yeah, let me ask you about that. You-all were
16 relying on Dr. Jenkinson as a basis for making the
17 settlement offer that you did, correct?
18    A    He definitely was part of it, yes.
19    Q    Did you, yourself, have any discussions with
20 Dr. Jenkinson?
21    A    I did not.
22    Q    Do you remember at some point his deposition
23 was taken?
24    A    Yes.
25    Q    And he did not perform well for American Fire

Page 83

1 in the deposition; is that fair?
2    A    I wouldn't say that. Just he was inconsistent
3 with what his report...
4    Q    Tell me what was inconsistent.
5    A    Well, in his report, he was very strong that
6 the plaintiff only sustained a bruise to his kneecap and
7 a bruise, I believe, to his shoulder -- his arm. His
8 injuries weren't permanent. The surgery wasn't related.
9 Everything was degenerative. It was related to his
10 morbid obesity. And then I received a call from defense
11 counsel after the deposition and said he completely
12 reneged on all of that. He said that it was not
13 possibly related, and surgery could've been related to
14 the accident as well. So he was completely inconsistent
15 with what he told us in the report.
16    Q    And he didn't -- let me back up. Did you ever
17 find any prior medical records where Mr. Foster had any
18 problems with his right knee before the accident?
19    A    I would have to review the file to know that
20 for sure. I just know that his diagnostics all said,
21 "Degenerative conditions."
22    Q    Do you know how old Mr. Foster was when he was
23 having those studies done?
24    A    I think he was in his 50s, I think.
25    Q    You handle a lot of claims, correct?

Page 84

1    A    Uh-huh. Yeah.
2    Q    Would you agree that it's not uncommon for
3 somebody in their 50s to have some degree of
4 degeneration in their joints?
5    A    I would agree with that statement.
6    Q    And actually, you would be surprised if there
7 was no degeneration, correct?
8    A    There's differing ranges. Mild, medium,
9 severe. So yeah, I would -- I would be surprised a 50-
10 year-old person would have at least some mild
11 degenerative changes, probably. It also depends on what
12 you do for a living, you know.
13    Q    And anything that was showing up on Mr. Foster
14 was mild; is that right?
15    A    I don't believe that's true.
16    Q    Okay. Tell me what you believe it was.
17    A    Oh, I remember at one point, they talked about
18 some fraying and some tearing, and that's not mild.
19 That's usually the next level. And he had -- was it
20 tendonitis, I believe. I'm trying to think what all the
21 report said since it's been so long. But I know he was
22 morbidly obese, and I remember Dr. Jenkinson said that
23 would have a lot to do with his condition along with his
24 job as an auto mechanic.
25    Q    Do you also remember seeing that he had

Page 85

1 sustained a -- an impaction fracture on his knee? Do
2 you remember that at all?
3    A    Are you referring to a certain date on
4 something? A report or something I can look at? Or a
5 note in my file?
6    Q    Give me just a second. I'll see what I can
7 pull up for you.
8    A    Sure.
9    Q    I'm going to flip this around.
10    A    Okay.
11    Q    I have a copy. This is actually page 1 of
12 your claim file. And I'll zoom out so you can get your
13 bearings and see what this is.
14    A    Do you know what the date of that is, by
15 chance?
16    Q    Yeah.
17    A    There we go.
18    Q    Date of exam is July 12, 2008.
19    A    Okay.
20    Q    So that's an MRI report from about a month
21 after the motor vehicle collision, correct?
22    A    Uh-huh.
23    Q    Okay. The summary says, "He's got sever edema
24 and subtle cortical indentation in the far medial
25 femoral condyle, suggesting an osteochondral impaction



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LAURA HARP-BIVEN, taken 12/18/2014     86..89

Page 86

1  fracture;" do you see that?

2      A  Uh-huh.

3      Q  What did you make of the fact that the MRI

4  report was showing an osteochondral impaction fracture

5  on the right knee?

6      A  Osteo usually means arthritis.  So it's

7  arthritic.

8      Q  Well, osteo means bone, doesn't it?

9      A  It could, yes.

10      Q  It doesn't mean arthritis.

11      A  That's true.  That's true.

12      Q  So you've got this record showing that he's

13  got an impaction fracture there.  Why did you think that

14  he just sustained a bruise to his right knee?

15      A  Edema.

16      Q  Okay.  So he could have bruising and an

17  impaction fracture, could he not?

18      A  He could, and I think the doctor that did this

19  was not a -- who's Dr. Cecil?  Oh, you know what?  Dr.

20  Cecil, didn't we get those records later?  I don't think

21  we got Dr. Cecil's records until later.

22      Q  Dr. Cecil was his primary care physician --

23      A  Yes.

24      Q  -- dating back to the 1970s.

25      A  Yes, and he didn't disclose that information

Page 87

1  to us.  I remember.

2      Q  Who didn't disclose it?

3      A  The plaintiff.  We didn't have Dr. Cecil's

4  records until, I think, later on.  Because I remember we

5  had to give those records to Dr. Jenkinson, who did an

6  addendum to his report because of those records.

7      Q  You-all had those records all the way back in

8  December of 2010, didn't you?

9      A  I'm trying to think.  I'm sorry.  I do

10  remember getting some additional records, and I thought

11  they were Dr. Cecil's records; is that not right?  Can I

12  see Dr. Jenkinson's report again?  I remember there was

13  an addendum to that report, and I thought the addendum

14  lists some additional records from Dr. Cecil, so I don't

15  know which they were -- what they were, but...

16      MS. MCCOLLUM:  And I may be confusing cases,

17      but wasn't doctor -- didn't Dr. Cecil retire?

18      MR. FAIRBANKS:  Yeah, he did.

19      MS. MCCOLLUM:  And then there was a problem

20      with location of where the actual records were?

21      MR. FAIRBANKS:  Let me see if we can show you

22      where you guys had Dr. Cecil's records.

23          (OFF THE RECORD)

24      MR. FAIRBANKS:  We're back on the video

25      record.

Page 88

1  BY MR. FAIRBANKS:

2      Q  Ms. Harp-Biven, I took a little break there so

3  that I could pull up the correspondence where American

4  Fire received Mr. Foster's prior records from Dr. Cecil.

5  I'm going to show you this.  And this is before you were

6  handling the claim.  I've got an e-mail pulled up here,

7  December 31, 2010, and I'm going to zoom out.  And Mrs.

8  Foster is telling Tony Dale that she has a copy of Dr.

9  Cecil's records and, in fact, is sending them to them.

10  Do you see that, December 31, 2010?

11      A  I see that.

12      Q  And I'll just scroll down a couple of pages,

13  just so we can kind of see where we are.  And then we

14  actually have the records going back from the 1970s all

15  the way up to the accident.  Do you know why you hadn't

16  seen these yet when you were handling the claim?

17      MS. MCCOLLUM:  Hold on.  Can you keep

18      scrolling down, because we see the record that you

19      were referencing previously, the MRI record.

20  BY MR. FAIRBANKS:

21      A  Uh-huh.  I don't think that was part of the

22  record.

23      Q  Okay.  Do you know when you would've gotten

24  the Richmond MRI record?

25      A  Whatever my file says.  I do remember we

Page 89

1  didn't have all of Dr. Cecil's records, so that may have

2  been one of the records that we didn't have.

3      Q  Well, that was not a record of Dr. Cecil, the

4  Richmond MRI record.

5      A  Well, he should have that in his file, though.

6  It was not in his file.  If he wrote it, he was -- on

7  that previous documents you showed me, it said,

8  "Referring physician, Dr. Cecil," so it should be in his

9  record.

10      Q  Do you know whether you had requested that

11  record from Richmond MRI?

12      A  I'm not sure we would know it existed, because

13  we would be asking for Dr. Cecil's records and assume we

14  got everything, and then found out we didn't have

15  everything.

16      Q  Okay.  Let me explore that a little bit more,

17  because I don't see in your file where you requested

18  that record from Richmond MRI.  Do you remember doing

19  that?

20      A  Like I said, I'm not sure I would know it

21  existed, because if this is the documentation that we

22  had in our file, we would assume that's everything, and

23  now we find out there's an MRI with Dr. Cecil's name on

24  it that wasn't part of this record.

25      MS. MCCOLLUM:  And if I could just interject



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

THE DEPOSITION OF LAURA HARP-BIVEN, taken 12 August 2016

90..93

Page 90

1      as a possible explanation, sometimes when you
2      request medical records from especially Eastern
3      Kentucky physicians, they will not include all
4      diagnostics with their record for some reason or
5      another, and they just don't deem it as part of the
6      record, and that may have been what occurred here,
7      because it does not appear as though it was
8      forwarded by Mrs. Foster.
9              THE WITNESS:  Uh-huh.
10  BY MR. FAIRBANKS:
11      Q   Well, do you know whether you-all had that
12  before December of 2010, the Richmond MRI record?
13      A   I don't -- I would know if I could look in my
14  computer.  I don't know.
15      Q   Do you know whether that was paid by PIP back
16  in 2008?
17      A   You'd have to ask PIP.  I have no idea.
18      Q   Assuming that PIP paid that bill back in 2008,
19  would you agree with me that somebody at American Fire
20  knew that Mr. Foster had an MRI done at Richmond MRI?
21      A   I would say if PIP paid it, PIP would know of
22  it, yes.
23      Q   Uh-huh.
24      A   Do you want to attach this?
25      Q   No, I was just showing you that so you knew

Page 91

1  when those records were sent, because that was before
2  you were involved in handling the claim.
3      A   Sure.
4      Q   Ms. Harp-Biven, what went into your analysis
5  of the claim payment of $91,500 that was ultimately
6  paid?
7      A   Dr. Jenkinson's deposition testimony.  We had
8  a triage with myself, my boss, home-office examiner,
9  likely the CSM, and just the information we had at the
10  time.  Things had changed, like I said, due to Dr.
11  Jenkinson's deposition testimony.
12      Q   Okay.  Would you agree with me that you all
13  had some concerns that the value of the claim was
14  actually more than $100,000?
15              MS. MCCOLLUM:  Objection.  Form.
16      A   I'm not sure we had concerns.  I think, you
17  know, there was ranges.  So the range possibly could've
18  been more than $100.  I'm not sure.
19      Q   Well, let me ask you that:  After Dr.
20  Jenkinson's deposition the range of settlement was more
21  than $100000; is that right?
22      A   I thought it was 90 -- up to $93,000, I
23  thought.  I can't remember, but I thought the -- I
24  thought the top end -- it was $93000, I thought.
25              MS. MCCOLLUM:  Do you have a specific note you

Page 92

1  can refer to?
2              MR. FAIRBANKS:  Well, that's the problem.  I
3  don't have any notes that show how -- what
4  happened.
5              MS. MCCOLLUM:  I agree with you.
6              THE WITNESS:  Sorry.
7  BY MR. FAIRBANKS:
8      Q   Let's look at, you know, the first few pages
9  of your claim notes.
10      A   Okay.
11      Q   Maybe I can tell you when Dr. Jenkinson's
12  deposition was taken.  All right.  So Dr. Jenkinson's
13  deposition was taken April 28, 2015.
14      A   Okay.
15      Q   And I'm looking on page 1059.
16      A   Uh-huh.
17      Q   And the note at the bottom of that's an April
18  27th note, so I don't see anything in your notes at all
19  about what you thought the range of value was on this
20  claim after Dr. Jenkinson's deposition.
21      A   Well, there is.  It's just not detailed
22  probably.  It looks like that meeting that I'm referring
23  to happened on 04-30-15, because it's entered by Kurt
24  Mechley, and that's -- he would've put the note in the
25  file after we had that discussion.

Page 93

1      Q   What page are you on?
2      A   I'm sorry, 1058.  Down at the very bottom it
3  says, "05-11 at 7:39 a.m."  It says, "File was last
4  discussed on 04-03-15."  So that means that would've
5  been right at the time span where I would've received
6  the call from defense attorney saying, you know, Dr.
7  Jenkinson's testified inconsistent with his report.  And
8  then I would've contacted my boss to tell her that, and
9  she would've set up a triage for us to talk to Mr.
10  Mechley.
11      Q   Did you have authority to pay up to $100,000
12  if that's what it took to settle the claim?
13      A   Personal authority, you mean, or just --
14      Q   On this claim.
15      A   -- people?  I don't believe so.  I think -- I
16  think I had up to $93,000.  For some reason, I remember
17  seeing that number somewhere.  Or maybe I'm wrong.  I
18  don't know.
19      Q   I haven't seen the figure $93,000.  Do you
20  just remember that from your discussions?
21      A   For some reason that number sticks out.  I may
22  be thinking of another claim.
23      Q   Well, at this point in time, before Dr.
24  Jenkinson's deposition, Mr. Foster had reduced his
25  demand below policy limits, correct?

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 94

1    A   He did.
2    Q   And part of the reason that American Fire was
3  urging Mr. Foster to do so was because they had this
4  report from Dr. Jenkinson, correct?
5    A   Correct.  Correct.
6    Q   Okay.  Do you know, other than Dr. Jenkinson,
7  what medical doctors were going to support American
8  Fire's position at trial?
9    A   I think the doctor that did the surgery also
10 agreed that his conditions were degenerative.  He may
11 have placed some -- a little bit more emphasis on the
12 car accident, but I think his testimony -- and I believe
13 some of the radiologists and people who had taken x-rays
14 and MRIs before, their notes might've been helpful to
15 that as well.
16   Q   Shows a little bit of wear and tear on that
17 knee?
18   A   I don't know.  A little bit, a lot, but wear
19 and tear, yes.
20   Q   You think there was a lot of wear and tear?
21   A   Well, I think that -- I think that there was
22 enough that he needed to have surgery.
23   Q   And he didn't need surgery before the
24 accident, correct?
25       MS. MCCOLLUM:  Objection.

Page 95

1    A   I have no idea.  He -- if he had been to the
2  doctor or not, I don't know.
3    Q   He didn't have any complaints on his right
4  knee before the accident, did he?
5    A   Not any complaints to any of the doctors whose
6  notes that we received probably.  I don't know.  I know
7  he continued to try to work, too.  The doctor told him
8  not to do that.
9    Q   How does that -- are you faulting him some
10 kind --
11   A   No, not faulting him.  Just, you know, when
12 you're doctor usually tells you, you know, "Hey, stay
13 off your leg for a little while or get some bedrest,"
14 you know, you want to comply with your doctor's orders,
15 because they're trying to help you heal faster, or...
16   Q   So you think maybe -- and I'm just trying to
17 figure this out, because I'm not following you.
18   A   Sure.
19   Q   You think maybe him trying to work after the
20 accident hurt his knee more?
21   A   I don't think it would help, probably.
22   Q   Okay.
23   A   I think whenever you hurt yourself, you know,
24 usually you try to take it easy for a couple days no
25 matter what your injury is, and usually, if you do that,

Page 96

1  it does help with at least pain levels and -- the doctor
2  just, you know, that's just personal examples, when I've
3  sprained ankles and things like that.
4    Q   Would you agree with me that when you're
5  handling insurance claims, you want to conduct a prompt
6  investigation?
7    A   Yes.
8    Q   When you're making settlement offers, you want
9  those offers to be fair?
10   A   Absolutely.
11   Q   You don't want them to be unreasonably low?
12   A   Absolutely not.
13   Q   Would you also agree with me that you don't
14 want to make a claimant file a lawsuit to get a claim
15 payment?
16   A   They should never do that, no.
17   Q   Do you think the $4,500 settlement offer that
18 was on the table for Mr. Foster was fair?
19       MS. MCCOLLUM:  Objection.  Form.
20   A   I think based on the information we had at the
21 time, yes.  Like I said, this file definitely changed
22 considerably over time, so...
23   Q   Well, that $4,500 was on the table before you
24 got Jenkinson's report, right?
25   A   Correct.

Page 97

1    Q   It turns out Jenkinson's report was not good
2  for you in the end, correct?
3    A   The report was good.  The deposition was not.
4    Q   The $10,000 --
5        MS. MCCOLLUM:  I'm going to object to the word
6    "good," because it makes it seem like American
7    Fire's trying to somehow manipulate the process.
8        THE WITNESS:  Right.
9        MS. MCCOLLUM:  That his opinions were not
10   consistent with his report or that that's good or
11   bad for the company, I don't think really can be
12   testified to.
13 BY MR. FAIRBANKS:
14   Q   Did you understand what I was asking you, or
15 do you need me to ask that again?
16   A   I agree with what Heather is saying.  Yeah,
17 the way I would take "good" would be consistent, and he
18 was not consistent.
19   Q   Okay, so he was inconsistent?
20   A   Correct.
21   Q   Okay.  And he was your only medical witness?
22   A   He was our only medical expert.
23   Q   Okay.  And before October of 2014, you-all
24 didn't have anything from Jenkinson; is that right?
25   A   No, not that I'm aware of anyway.

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1    Q    What about the $10,000 offer you made in
2  December of 2014; you think that's fair?
3         MS. MCCOLLUM:  Objection.  Form.
4    A    Based on the information we had at that time,
5  yes.
6    Q    Do you think Mr. Foster's UIM claim settled
7  and settled promptly?
8         MS. MCCOLLUM:  Objection.  Form.
9    A    How do I say this?  It -- it takes some
10  cooperation from the other side to get all the
11  information, so that process took quite some time to get
12  the information that we kept asking for.  Like I said,
13  just the business records.  I remember that.
14    Q    Okay, business records?
15         MS. MCCOLLUM:  I'm a little confused by the
16         question.  Do you mean promptly after Dr.
17         Jenkinson's change in opinion, or do you mean --
18         THE WITNESS:  That's true.
19         MR. FAIRBANKS:  Heather, I interjected, but
20         your objections are speaking objections, and you're
21         coaching the witness how to answer the questions.
22         I don't mind if you object to the form, but I
23         prefer if you did not make speaking objections that
24         suggested answers to the witness.
25  BY MR. FAIRBANKS:

Page 99

1    Q    And, no, I wasn't asking if it was prompt in
2  relation to Dr. Jenkinson.  I'm asking if it was prompt
3  in relation to a UIM claim being made in May of 2010 and
4  it gets settled in May of 2015.
5    A    I think it was prompt in my handling, because
6  I can only testify to, you know, what I did on the file.
7    Q    Would you use Dr. Jenkinson again as a medical
8  examiner?
9    A    Sure.
10    Q    You would?
11    A    I'd just want to make sure that he's solid in
12  his, you know, information before we would take him
13  again.
14         MR. FAIRBANKS:  Okay, Ms. Harp-Biven, I think
15         those are all the questions I had for you.
16              CROSS EXAMINATION
17  BY MS. MCCOLLUM:
18    Q    I just have a few questions for you.  In
19  obtaining records in a bodily injury case, you have to
20  depend upon someone else in those cases; is that
21  correct?
22    A    Correct.
23         MR. FAIRBANKS:  Objection to form.  Leading.
24         MS. MCCOLLUM:  If you want to have a standing
25         objection to form, I'm okay with that.

Page 100

1  BY MS. MCCOLLUM:
2    Q    And in that case, you'd actually depend upon
3  the medical facility in which to provide you records,
4  correct?
5    A    Correct.
6    Q    So you can call and request records, but
7  you're really at their whim as to when they would
8  respond; is that correct?
9    A    Correct.
10    Q    In making an evaluation of Mr. Foster's wage
11  claim, were you able to review any W-2s?
12    A    Not until much later.  Much, much, much later.
13    Q    And in fact, the information that had
14  previously been provided, half of it was redacted,
15  correct?
16    A    Correct.
17    Q    On his W-2.  And Mr. Foster was self-employed,
18  correct?
19    A    He was.
20    Q    Which means that the net value of his income
21  would be especially important, correct?
22    A    Correct.
23    Q    Is it your understanding that if you're self-
24  employed, and in this case Mr. Foster was employed at --
25  in a repair -- vehicle repair business, that his gross

Page 101

1  income would include purchase of parts?
2    A    Yes.
3    Q    And things necessary to the daily operation of
4  the business; is that correct?
5    A    Yes, correct.
6    Q    Okay.  And is it your understanding -- or
7  would it be best if we just looked at Dr. Barnes'
8  testimony as to whether she agreed with defense's
9  evaluation -- a possible evaluation of the wage loss?
10    A    I think they should just look and see what she
11  said, sure.
12    Q    All right.  If -- and we agree that Dr.
13  Jenkinson's report was not consistent with his previous
14  written report to you, correct?
15    A    Not at all.
16    Q    It -- do you rely on IME reports?
17    A    I do, in some part, yes.
18    Q    Is it fair to say you don't care what the
19  report says, you just want the answer?
20    A    I just want the truth, absolutely.
21    Q    If Dr. Jenkinson had told you, when he
22  initially did the report, what eventually he testified
23  to that was completely contrary to his report, would
24  that have changed you evaluation in -- when he made the
25  report?

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1    A    Absolutely.  Sure.
2    Q    And I'm sorry, what was the date of his
3  report?  I think you still have it in front of you.
4    A    I don't anymore.
5         MR. FAIRBANKS:  October 8.
6    Q    October 8.  I knew it was sometime in October.
7  October 8, 2014.  So if he had told you on October 8,
8  2014 that, "Yeah, this all could be related," would you
9  have evaluated the claim differently?
10   A    Oh, absolutely.  Sure.
11   Q    And after you were aware of his deposition
12  testimony, did you immediately re-evaluate the claim?
13   A    I did.
14   Q    And is that when it was settled?
15   A    It was.
16   Q    Do you recall that the plaintiff refused to
17  provide Social Security records?
18   A    Yes.
19   Q    And we don't know if that changed at some
20  point, but at least there was some back and forth of
21  initially refusing to provide.  As far as -- are you
22  aware what discovery is in a case?
23   A    I am.
24   Q    Are you aware if the plaintiff timely
25  responded to discovery request or if there were

Page 103

1  additional requests for time?
2    A    There were -- there was an extension requested
3  for time.
4    Q    And American Fire consented to that, correct?
5    A    We did.
6    Q    And that could delay the evaluation of the
7  claim as well, correct?
8    A    It can, yes.  Or I should say it will, because
9  we don't have all the information.
10   Q    What do you deem to be the defining factor in
11  evaluation of his claim?
12   A    Dr. Jenkinson's deposition testimony,
13  absolutely.
14   Q    And, again, that was the first time you were
15  aware of some of his opinions?
16   A    Oh, yes.
17   Q    And those opinions were diametrically opposed
18  to his written report, correct?
19   A    Completely, yes.
20   Q    And in this case, were you aware that the
21  plaintiff received $25,000 underlying settlement --
22  underlying port feasure --
23   A    Yes, from the port feasure money, yes.
24   Q    And then even though you were not aware of the
25  particulars of the PIP file, were you aware the $60,000

Page 104

1  payment PIP had been made?
2    A    Yes.
3    Q    Do you know Mr. Foster's current medical
4  condition?
5    A    Currently, I do not.
6    Q    You don't know anything about him since his
7  case settled, --
8    A    No.
9    Q    -- correct?
10   A    Absolutely not.
11   Q    There were some numbers I wanted to go
12  through.  Do you know if there was anything that
13  American Fire did not do to comply with the scheduling
14  order entered by the Court?
15   A    As far as I know, no, nothing.
16   Q    And the scheduling order with the Court would
17  identify when depositions had to be taken and when
18  discovery had to be completed; is that fair, to your
19  understanding?
20   A    Sure.  Uh-huh.
21        MS. McCOLLUM:  I think that that's all I have
22  for you, Laura.
23        MR. FAIRBANKS:  I have a few follow-ups.
24        MS. McCOLLUM:  Sure.
25            REDIRECT EXAMINATION

Page 105

1  BY MR. FAIRBANKS:
2    Q    Just so we're clear on Dr. Jenkinson.  He was
3  selected by American Fire's lawyers, correct?
4    A    Yes.
5    Q    And his bills were all paid by American Fire,
6  correct?
7    A    I would assume so, yes.
8    Q    He was your-alls guy?  He wasn't one of Mr.
9  Foster's treating physicians, correct?
10   A    Correct.  He was an independent medical
11  examiner.
12   Q    You were asked a few questions about W-2s?
13   A    Uh-huh.
14   Q    You understand that Mr. Foster doesn't have
15  any W-2s because he's self-employed?
16   A    Well, he was filing tax returns with his wife.
17   Q    But he doesn't have any W-2s; do you
18  understand --
19   A    I understand that, but he has tax returns,
20  yes.
21   Q    Something about the gross income including the
22  purchase of parts.  What do you mean by that?
23   A    Well, when you own a repair business, or say
24  an automobile company, like he does, maybe you would be
25  repairing somebody's bumper.  So you have to buy the

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LAURA HARGROVEN, taken on August 19, 2016

106..108

Page 106

1  bumper and then put it on.  Well, the price of the
2  bumper is not -- would not be his wage loss.  It's the
3  labor involved in putting the bumper on.
4      Q    So you think that parts were included in gross
5  income?
6      A    I think they were, yes.  I think his wife's
7  income was also included, because that's what Dr. Barnes
8  testified to.
9      Q    Parts would not just be a deduction?
10     A    I'm not sure how he would do it, because that
11 was never explained to us, and those documents were
12 never given to us for us to even figure that out.
13     Q    Well, you got, at some point, all of these
14 business invoices.  Didn't the lawyers get them?
15     A    Those were after the fact, and they -- they
16 still didn't clarify anything.
17     Q    Well, you didn't look at them, right?
18     A    I can't remember if I looked at them
19 specifically or not.
20     Q    Dr. Barnes' testimony, I think you mentioned
21 it would be best to look at that.  You've not looked at
22 that, have you?
23     A    Her testimony itself?  No.
24     Q    So how would you know that that would be the
25 best place to look?

Page 107

1      A    I received a summary, I believe, from the --
2      Q    Okay.  So it's all --
3      A    -- defense attorney.
4      Q    -- from Mr. Richardson's office?
5      A    Yes.
6      Q    And let me just ask you that:  If Mr.
7  Richardson was not the lawyer there primarily handling
8  this file, was he?
9      A    I think his firm was, yes.
10     Q    You were dealing with Michael Bartlett,
11 correct?
12     A    He would've been one of the attorneys, yes.
13     Q    What do you think the first time was that you
14 spoke with Mr. Richardson about this file?
15     A    I have no idea.
16     Q    I'll tell you the first time I spoke with him
17 was at the pretrial conference in April of 2015.
18     A    Yeah, I would have no way of -- I have other
19 cases with him, so I couldn't possibly tell you which --
20 what date it was.
21          MR. FAIRBANKS:  Okay.  No more questions.
22 Thank you.
23          (DEPOSITION CONCLUDED AT 12:17 P.M.)
24
25

Page 108

1          CERTIFICATE OF REPORTER
2     COMMONWEALTH OF KENTUCKY AT LARGE
3
4     I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after first
7  being duly sworn to testify the truth, the whole truth,
8  and nothing but the truth; and that the said matter was
9  recorded stenographically and mechanically by me and
10 then reduced to typewritten form under my direction, and
11 constitutes a true record of the transcript as taken,
12 all to the best of my skill and ability. I certify that
13 I am not a relative or employee of either counsel, and
14 that I am in no way interested financially, directly or
15 indirectly, in this action.
16
17
18
19
20
21
22 BRITTANY KENDALL,
23 COURT REPORTER / NOTARY
24 MY COMMISSION EXPIRES: 01/07/2020
25 SUBMITTED ON: 08/19/2016

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**EXHIBIT 1** 18:21,22

**EXHIBIT 2** 24:25 25:1

**EXHIBIT 3** 31:1,3

**EXHIBIT 4** 40:13

**EXHIBIT 5** 77:25

**EXHIBIT 6** 78:1

**$**

**$10,000** 81:18, 22 82:5,9 97:4 98:1

**$100** 71:13,16, 21,25 73:6 91:18

**$100,000** 47:6, 8,11 52:1 91:14 93:11

**$100/$300** 51:24

**$100000** 91:21

**$100K** 23:11

**$17,154.50** 53:19

**$17,264** 57:18, 22 58:9

**$200** 36:13

**$21,690.50** 54:3

**$25** 71:17

**$25,000** 24:7 103:21

**$25K** 24:1

**$26,000** 71:17 72:1,12

**$3,750** 22:21

**$39K** 23:12,13, 21

**$4,500** 78:18, 23 79:6 96:17, 23

**$4,536** 53:20, 22 54:17 56:17

**$500** 36:8

**$60,000** 103:25

**$61000** 23:18

**$7,500** 24:10 58:1,14

**$7500** 24:1

**$75K** 22:21

**$91,500** 91:5

**$93,000** 91:22 93:16,19

**$93000** 91:24

**0**

**04-03-15** 93:4

**04-30-15** 92:23

**05-11** 93:3

**08** 8:9 76:24

**1**

**1** 18:21,22 20:1, 6,8 26:8,9,14 85:11

**10** 20:3

**100** 23:22

**1057** 49:15

**1058** 93:2

**1059** 92:15

**1084** 81:11

**1091** 80:5

**1094** 77:15 78:4

**1095** 63:15

**1097** 51:16

**1098** 51:17

**1099** 56:7

**10:00** 5:9

**1100** 50:10,13

**1153** 49:15

**12** 85:18

**125** 24:23

**126** 26:21

**12:17** 107:23

**13-CV-426** 5:7

**138** 24:23 29:9

**14** 78:5 79:18

**15** 6:9 41:24 67:23 68:10

**157** 40:16

**162** 40:16

**164** 31:1

**165** 34:6

**166** 35:25

**17** 58:7

**173** 31:2 37:8

**19** 51:15 81:15

**1970s** 86:24 88:14

**19th** 57:8

**2**

**2** 20:2 22:8 24:25 25:1

**20** 20:3

**2007** 18:18 19:9 21:16,22

**2008** 8:5,12 62:23 77:4 85:18 90:16,18

**2009** 53:1

**2010** 25:5,22 28:10 31:11 77:6,7,11 87:8 88:7,10 90:12 99:3

**2011** 79:3

**2012** 31:6 32:7, 11 33:6 35:21 37:7

**2013** 40:15,17 42:24

**2014** 9:14 48:13 50:14,21 51:8,16 56:16 59:17 62:22 63:18 76:15,25 78:5,13 79:9,12 80:8 81:15 97:23 98:2 102:7,8

**2015** 92:13 99:4 107:17

**2016** 5:9

**21** 28:10 63:18

**25** 20:2

**27th** 92:18

**28** 50:14 92:13

**28th** 50:15

**3**

**3** 20:3 29:10 31:1,3 80:7

**31** 88:7,10

**34** 18:18

**37** 22:3,6

**38** 24:20

**39** 18:18

**4**

**4** 20:3 22:19 40:11,13

**45** 20:2,7

**5**

**5** 77:20,24,25

**50-** 84:9

**50s** 83:24 84:3

**515097** 6:23

**6**

**6** 50:21 77:22, 23 78:1

**7**

**7** 77:22

**7,500** 43:21 44:3,9

**7264** 58:7

**7:39** 93:3

**8**

**8** 5:8 79:12,18 102:5,6,7

**9**

**90** 91:22

**99** 51:17

**9:57** 63:19

**A**

**a.m.** 5:9 63:19 93:3

**A1** 32:5,7

**absolutely** 76:8 96:10,12 101:20 102:1, 10 103:13 104:10

**accept** 72:5,7

**access** 76:19



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**accident** 8:5, 12 21:18 52:1, 10 60:7 62:22, 24 72:6,19,20, 24 73:1 76:25 77:4 83:14,18 88:15 94:12,24 95:4,20

**accomplishment** 23:3,17 24:13 27:4

**account** 55:13 64:22 67:9

**accounting** 16:19

**accuracy** 32:9

**accurate** 55:13 61:4 64:22 67:8,10

**achievement** 26:9,11 32:10

**acronym** 24:5

**Action** 5:7

**actual** 41:25 45:18 58:15 61:25 64:20 87:20

**added** 42:17 43:14 44:2

**addendum** 87:6,13

**adding** 35:10 43:18 44:14 54:5

**addition** 15:14

**additional** 36:8 87:10,14 103:1

**address** 6:22 7:4

**adjudication** 20:16

**adjuster** 29:21 30:4,17 63:3

**adjusters** 56:14

**adjusting** 45:22

**adjustor** 6:13 9:12

**advantage** 20:14

**advised** 74:15

**advises** 69:14

**affect** 30:17 80:2

**affirm** 5:20

**aggressive** 37:22,25

**agree** 20:17 23:1,16 30:2 39:11 62:24 76:5 82:5 84:2, 5 90:19 91:12 92:5 96:4,13 97:16 101:12

**agreed** 7:19 94:10 101:8

**ahead** 12:22 20:23 30:19 36:12 55:2 79:22

**alleged** 68:14

**alluded** 75:1

**amended** 78:7 79:21 80:3

**American** 5:4, 16 10:24 11:7, 9,12 15:3,15 51:3 52:2 56:10 58:1 63:11 65:20,22 70:17 71:3 78:8,24 79:9 82:25 88:3 90:19 94:2,7 97:6 103:4 104:13 105:3,5

**amount** 20:19 21:6 22:1 23:8 30:16 33:19 38:3 39:1 47:1 53:14 64:8,9,11

**amounts** 43:22

**analysis** 51:20 52:5,17,20 91:4

**anchoring** 21:4,22

**ankles** 96:3

**answers** 98:24

**anybody's** 40:1

**anymore** 41:17 102:4

**appearing** 5:12

**appears** 25:6 57:17

**applied** 77:1

**appraisal** 40:5

**approach** 37:22,25

**approaches** 38:13

**approval** 47:2, 8

**Approved** 81:17

**approximate** 53:14

**approximately** 5:9 6:9 9:11 45:14 53:20

**April** 51:7 56:16 92:13,17 107:17

**area** 7:1

**Areas** 42:8

**argue** 73:13

**argued** 73:10

**arm** 8:7,8,15,18 83:7

**arrived** 69:1

**arthritic** 86:7

**arthritis** 86:6, 10

**arthroscopic** 52:25

**asserted** 77:12

**assist** 66:23

**assume** 28:11 62:19 89:13,22 105:7

**assuming** 72:7,12 77:9 90:18

**assumption** 29:14

**attach** 90:24

**attorney** 10:20 22:24 53:11,25 54:20,21 55:6 57:2 63:5,6 65:10 80:23 93:6 107:3

**attorney-client** 12:18

**attorneys** 12:4 57:4 107:12

**August** 5:8 78:5,13 79:8

**authority** 27:1, 5,9 47:17,21 48:5 93:11,13

**authorization** 60:15 63:11

**auto** 84:24

**automobile** 105:24

**avoid** 35:10

**award** 14:23,24 15:1,4 61:25

**aware** 41:18 42:6 56:11 59:19 63:4 97:25 102:11, 22,24 103:15, 20,24,25

**arthroscopic** 52:25

**back** 10:12,14

**11**:9 31:11 35:8 37:7 48:13 49:9 73:2 82:2 83:16 86:24 87:7,24 88:14 90:15,18 102:20

**bad** 22:21 78:10 97:11

**Baldwin** 66:4,7 67:4 68:13 70:5,10 74:15

**Baldwin's** 66:11

**Barnes** 63:22, 24 106:7

**Barnes'** 65:12, 18 67:4 101:7 106:20

**Bartlett** 107:10

**based** 16:19,22 24:8 27:6,10, 13,21 32:23 72:16 81:7 96:20 98:4

**basis** 13:7,14 18:10 20:19 73:10,19 82:16

**Bear** 25:10

**bearings** 81:9 85:13

**bedrest** 95:13

**began** 17:9

**begin** 9:11

**beginning** 17:17

**behalf** 5:15 37:4

**bell** 66:5

**benefit** 35:8

**best-in-class** 32:8

**bill** 90:18

**bills** 53:14,19 54:6 55:9 105:5

**B**



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**bit** 25:7 61:20 74:24 89:16 94:11,16,18

**Biven** 19:7

**black** 81:3

**blacked** 28:10

**blank** 23:11

**blended** 23:14

**block** 34:19

**Board** 75:18

**Bob** 80:10,22, 23

**bodily** 99:19

**bone** 86:8

**boss** 91:8 93:8

**bottom** 22:6 29:19,22 30:4, 5,12,17,22 38:7 43:18 44:2,14 51:16 92:17 93:2

**box** 6:23 25:13 34:22

**boxes** 81:3

**Boyer** 5:10

**breached** 12:20

**break** 45:8 49:6 88:2

**briefed** 73:9

**briefly** 8:24

**bring** 32:25

**broken** 31:19

**bruise** 83:6,7 86:14

**bruised** 8:7,17, 18

**bruising** 8:14 86:16

**bumper** 105:25 106:1,2,3

**business** 6:22

11:7 15:16,18 16:5 98:13,14 100:25 101:4 105:23 106:14

**buy** 105:25

---

**C**

**calculate** 73:6

**calculated** 32:19

**calculating** 73:20

**calculation** 67:4 71:10

**calculations** 54:16

**calendar** 25:5 31:6 40:17

**call** 10:20 55:6 74:21 80:18 83:10 93:6 100:6

**called** 51:11 80:10

**capacity** 37:5

**capitalize** 20:11

**car** 72:6,19,24 94:12

**care** 86:22 101:18

**carriers** 78:9

**case** 5:4 11:24 12:6,19 13:17, 22 14:12 18:13 22:20 23:3,9,18 46:16 48:9 52:6 60:7 61:13 65:23 68:22 69:10 72:13 73:12 75:6 78:11 99:19 100:2,24 102:12 103:20 104:7

**cases** 11:3

36:16,21 48:4 75:11 87:16 99:20 107:19

**casualty** 5:5 26:18

**categories** 22:10

**causing** 52:13

**Cecil** 58:20 59:6,7,10 86:19,20,22 87:14,17 88:4 89:3,8

**Cecil's** 86:21 87:3,11,22 88:9 89:1,13,23

**Central** 5:6

**Certified** 75:18

**chance** 85:15

**change** 27:12 70:21 80:4 98:17

**changed** 24:12 70:23,24 91:10 96:21 101:24 102:19

**changing** 27:20

**charges** 76:2

**choose** 69:8

**chronologically** 50:20

**Civil** 5:7

**claim** 7:14 8:22,25 9:7,9, 12,16,21 10:2, 3,6,17 12:10 13:8,11,14 14:20 15:20 16:21,24 17:2,5 23:7,20,25 30:1,3,17,24 36:9 39:17 40:7 42:20 43:7 46:2,6,9,19 47:7,16 49:13, 15,20 50:2,11,

25 51:8 53:20, 22,23 54:9,17 55:5,10,17 56:14,21 58:12 62:4 66:2 67:19,21,23 68:8,14 69:4,25 70:6,16,19 71:3,4,8 73:20 74:16 77:5,10, 12 78:7,14 80:3 85:12 88:6,16 91:2,5,13 92:9, 20 93:12,14,22 96:14 98:6 99:3 100:11 102:9, 12 103:7,11

**claim's** 72:3

**claimant** 17:2 96:14

**claiming** 60:6

**claims** 6:11,13, 17,20 18:3 20:16,20 21:7 22:1 26:5 27:1, 5,23 29:5,6,21 30:5 35:10,14 38:4 41:16,25 45:1,17,18,20 46:2,11,12 63:1 78:10 83:25 96:5

**clarification** 18:23

**clarify** 39:18 55:3 106:16

**clear** 37:3 105:2

**client** 55:7,15 57:2

**clients** 55:14

**close** 12:19

**closer** 43:22 44:8

**coaching** 98:21

**code** 6:24

**Collaborative**

22:9

**collection** 49:14

**collision** 52:13 85:21

**column** 26:22 27:20 28:24

**combined** 58:1 80:11,25 81:4,6,22 82:2

**comment** 50:4 59:18

**comments** 38:8,11

**communications** 13:1

**companies** 11:17 17:9,14, 18

**company** 5:5 11:15 30:18,22 38:22,23 58:2 97:11 105:24

**complaint** 78:7 79:21 80:3

**complaints** 8:6 95:3,5

**complete** 58:20 60:4 62:2

**completed** 104:18

**completely** 37:2 83:11,14 101:23 103:19

**complimented** 22:22

**comply** 95:14 104:13

**compromise** 36:12

**compromising** 36:16,18

**computer** 78:21 82:4,8 90:14



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

concern 70:12

concerns 91:13,16

CONCLUDED 107:23

condition 8:1 84:23 104:4

conditions 83:21 94:10

conduct 96:5

condyle 85:25

conference 107:17

confident 38:12

confirming 81:18

confused 98:15

confusing 87:16

consented 103:4

considerably 65:2 96:22

consideration 33:12,16,24 35:9 36:19

considered 34:10 72:25

consistent 10:13 18:25 70:25 97:10,17, 18 101:13

consult 66:1,3

consulted 65:23 66:21

consulting 66:21

contact 55:15

contacted 10:3 66:23 93:8

contacts 55:13

contained 13:6 81:2

continue 12:22 30:19 34:7,14

continued 57:19 95:7

continues 51:17

continuing 20:13 21:11 28:2,5

contrary 101:23

contribute 29:22 30:4

contributing 29:18 37:22

conversations 13:1 65:19

cooperation 98:10

copy 10:18 14:13,15 58:20 60:5 79:14 85:11 88:8

corner 22:7

correct 16:10 17:2,3 19:10,11 24:16 25:3,12, 20 27:24 28:25 29:1,15 30:6 31:21 32:3,17 38:17 42:3 43:18,25 44:14 45:25 49:24,25 51:4,5 52:3,4, 14,15 55:18,19 56:8 64:10 65:20,21 66:18 68:15,18,20,22 69:11,18,25 70:6 72:13 74:4,16 75:4,5 76:18,22 77:1, 13 78:12,14,18 79:10 81:23 82:17 83:25 84:7 85:21 93:25 94:4,5,24

96:25 97:2,20 99:21,22 100:4, 5,8,9,15,16,18, 21,22 101:4,5, 14 103:4,7,18 104:9 105:3,6, 9,10 107:11

correctly 54:7 67:14 71:7

corresponden ce 88:3

cortical 85:24

cost 32:8

costs 20:12 36:10

could've 24:11 55:11,23 74:18 83:13 91:17

counsel 14:22 28:5,11,13,15 55:12 59:23 62:7,19 64:4 73:15 80:11,18 83:11

counsel's 36:7 81:17

County 6:25

couple 75:1 78:5 88:12 95:24

court 5:5,19 12:18,21 13:1 40:12 66:22 73:10,11 77:21 104:14,16

Court's 18:25

coverage 51:20 52:2 56:10

crack 28:16

criteria 37:18

critical 25:18 31:22

cross 64:19 66:24 68:24 99:16

CSM 91:9

current 19:16 57:9 104:3

———

D

daily 101:3

Dale 9:23 10:1 88:8

damage 35:18 43:11

damages 33:12,16,17,21, 25 34:13 35:1,9 39:2,8 52:21

Damages/ injuries/ reserve 52:17

date 55:10 79:11 85:3,14, 18 102:2 107:20

dated 63:18

dates 10:4,7 62:22

dating 86:24

Dave 11:2 66:20 73:21 74:22

day 40:6 44:23 71:13,16,21,25 73:6

days 95:24

deal 36:20

dealing 107:10

deals 32:1

Dearman 44:20,21 46:1 48:7,18 50:14 51:9

Dearman's 46:6

December 81:15 87:8 88:7,10 90:12

98:2

decreases 27:17

deduction 106:9

deem 90:5 103:10

deemed 60:9 72:19

defendant 5:16

defendant's 14:22

defense 10:20, 23 12:4,6,15 13:10 15:3,9,15 28:5 36:7 62:7, 19 65:10,20 75:3 80:18 81:17 83:10 93:6 107:3

defense's 101:8

defining 103:10

degeneration 84:4,7

degenerative 7:18,22 8:2 83:9,21 84:11 94:10

degree 25:13 26:8,11 32:10 84:3

delay 103:6

demand 22:21 23:8 57:20 93:25

demanded 23:4

demonstrated 26:24

department 26:18

depend 99:20 100:2

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**depends** 27:17 32:21 84:11

**deposed** 10:4 46:18

**deposition** 5:8 7:20 8:21 10:7, 15,21,23 11:22, 25 13:23 14:7 64:12,14 65:1, 6,11,12 70:20, 24 82:22 83:1, 11 91:7,11,20 92:12,13,20 93:24 97:3 102:11 103:12 107:23

**depositions** 11:23 13:17 36:10 104:17

**describe** 6:15

**detailed** 92:21

**determine** 64:24

**determining** 68:24

**diagnostic** 7:17

**diagnostics** 83:20 90:4

**diametrically** 103:17

**diary** 38:24

**differentiate** 11:10 17:12

**differently** 102:9

**differing** 84:8

**difficult** 29:2 61:13

**DIRECT** 5:24

**directly** 14:21 55:11,21 70:8

**disability** 72:23

**disabled** 60:9 72:19 73:1

**discipline** 34:9,16 35:4

**disclose** 12:22 66:22 68:19 69:9 86:25 87:2

**disclosed** 17:1 19:3 60:12 70:9

**discovery** 18:13 55:24 56:1,3 102:22, 25 104:18

**discuss** 10:8 61:5

**discussed** 21:7,24 38:11 42:16 51:8 80:12 93:4

**discussing** 33:23 81:1

**discussion** 42:23 44:16 92:25

**discussions** 10:1 39:1,7 42:19 46:15,20 66:7 82:19 93:20

**dispute** 52:12

**distance** 44:10,17

**District** 5:5,6

**Division** 5:6

**docket** 82:13

**doctor** 7:19 53:10 54:1,13, 14 60:20 61:2 62:9,11,16 64:2,5 71:12 73:3 86:18 87:17 94:9 95:2,7,12 96:1

**doctor's** 95:14

**doctors** 94:7 95:5

**document** 30:3 57:9 67:15 71:14 74:12

**documentatio n** 52:22 61:16, 23 62:16 89:21

**documentatio ns** 53:25

**documents** 8:20 18:13 49:14 89:7 106:11

**dollar** 47:1

**downward** 34:7

**driver** 52:12

**due** 33:10,11, 15 91:10

—— E ——

**e-mail** 28:7 88:6

**earlier** 42:15 49:17 59:17

**easier** 28:16 78:22

**Eastern** 5:6 90:2

**easy** 72:12 95:24

**economic** 69:14

**economist** 65:22 66:1

**edema** 85:23 86:15

**effectively** 30:1

**efficiently** 6:18

**embrace** 36:3

**emergency** 8:14

**emphasis** 94:11

**employed** 6:4, 7 11:19 19:12 69:16 100:24

**employee** 38:8,11

**employees** 45:3

**employment** 18:9 61:14

**end** 42:20 43:5 91:24 97:2

**entered** 92:23 104:14

**entire** 14:24

**entirety** 34:18, 19

**environment** 32:2

**equated** 71:16

**ER** 8:6

**ergonomic** 32:1

**Ernest** 5:4 7:15

**error** 58:6,16 65:6,9 67:9

**evaluate** 6:17 29:25 30:23 42:20

**evaluated** 102:9

**evaluating** 29:6 35:13

**evaluation** 13:7,14 25:4 26:25 27:13,21 31:6 32:16 33:4,11,15 34:20 37:8 39:16 40:15 42:7 59:2 74:6 82:11 100:10 101:9,24 103:6, 11

**evaluations** 34:14 37:22,25 39:2,10 42:16 74:3

**eventually** 62:9 101:22

**everybody's** 75:2

**Everything's** 36:14

**evidence** 16:22

**exact** 43:6,24

**exaggerate** 69:16

**exam** 66:24 85:18

**examination** 5:24 59:3 76:6 99:16 104:25

**examinations** 75:22 76:3

**examine** 68:25 75:4

**examined** 64:19

**examiner** 47:25 48:3 49:1,3 75:3 76:6 91:8 99:8 105:11

**examples** 96:2

**exceed** 72:3

**Exceeded** 26:10

**excellence** 42:12

**Excellent** 22:19

**excuse** 73:15

**execute** 42:12

**exhibit** 18:21, 22 22:4 24:25 25:1 31:1,3 40:11,13 77:17, 19,25 78:1 79:19

**existed** 89:12, 21

**exists** 17:14



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LAURA HARTMAN, taken on August 8, 2016          114

**expense** 35:11
36:19

**expert** 63:21
64:3 66:21
68:25 69:14
97:22

**explain** 11:12

**explained**
106:11

**explanation**
90:1

**explore** 61:20
89:16

**extension**
103:2

**extent** 78:17

**Externally**
22:14

**extra** 28:16
36:13

---

**F**

---

**face-to-face**
38:25 39:3

**facility** 100:3

**fact** 11:19 12:5,
11 38:25 69:3
79:21 86:3 88:9
100:13 106:15

**factor** 103:10

**fair** 11:20 29:8
42:20 55:22,23
76:7 83:1 96:9,
18 98:2 101:18
104:18

**FAIRBANKS**
5:3,17,25 12:23
14:3,4 19:5
20:25 21:13,19
24:20,21 30:10
37:6 39:21,23
49:5,9,11 67:2
73:17 77:8,18,
23 78:3 87:18,
21,24 88:1,20
90:10 92:2,7
97:13 98:19,25

99:14,23 102:5
104:23 105:1
107:21

**Fairbankss**
5:11 77:16

**Fairfield** 6:23
26:7 41:1,4,11
44:22 48:2

**fairly** 29:6 30:1,
24 59:22

**fairness** 55:17

**faith** 22:21
78:10

**familiar** 19:6

**familiarization**
28:14

**faster** 95:15

**fault** 52:7,9,13

**faulting** 95:9,
11

**feasure**
103:22,23

**federal** 66:22

**feel** 38:12

**felt** 34:4

**female** 63:25

**femoral** 85:25

**figure** 9:6
47:14 57:13
71:22 72:1
73:7,19 82:10
93:19 95:17
106:12

**figured** 50:8

**figures** 43:12
74:3

**file** 8:22,25 9:7,
13 10:17 12:10,
13 14:11,19,20,
23,24,25 15:6,
9,10,20 26:17
28:1 32:20
34:2,4 35:16
46:5 47:19
51:12,13,19

52:22,23 54:1
55:6 56:19,21
57:1,5,23 58:21
59:7,20 60:3,11
62:1,3,4,8,12
63:13 67:19,21
68:8 70:25
71:15 72:18
74:6 76:21
83:19 85:5,12
88:25 89:5,6,
17,22 92:25
93:3 96:14,21
99:6 103:25
107:8,14

**filed** 51:3 63:9
78:7 79:22

**files** 32:21,23
34:2,3 35:17
40:4 41:7

**filing** 105:16

**final** 47:15

**find** 83:17
89:23

**fine** 50:8 79:17

**Fire** 5:4,16
10:24 11:7,10,
12 15:3,15 51:4
52:2 56:10 58:1
63:11 65:20,22
70:17 71:3
78:8,24 79:9
82:25 88:4
90:19 94:2
103:4 104:13
105:5

**Fire's** 94:8
97:7 105:3

**firm** 11:6 17:19,
20 18:2,6 54:22
55:21 107:9

**five-minute**
49:5

**flip** 8:24 22:3
29:9 34:6 37:7
40:3 50:9 63:14
77:14 80:5
81:8,11 85:9

**fluctuate** 16:21

**Focused** 22:14

**focuses** 20:19

**follow-up**
30:15

**follow-ups**
104:23

**form** 13:7,13
18:7 20:21 25:4
28:4 63:2 72:14
80:19 91:15
96:19 98:3,8,22
99:23,25

**formally** 77:10

**format** 25:7

**forward** 37:21
63:14 77:14
81:8

**forwarded**
90:8

**Foster** 5:4,13
7:15,17,21 8:4,
11 10:2 12:6
15:14 17:5
18:17 24:20,23
31:1 40:15
46:2,6,8,16
47:7,16 48:9
49:15 50:11,25
51:3 52:25
53:5,11 54:9,24
56:3,9 57:3,10,
22 58:9 60:14
62:17 63:10
67:23 68:19
75:4 76:11,16
77:10 78:14
79:9 82:6
83:17,22 84:13
88:8 90:8,20
93:24 94:3
96:18 100:17,
24 105:14

**Foster's** 9:9,
12,16 12:12
13:8,11,14
14:11 15:18
21:18 53:3,14
56:21 64:8 65:7
68:22 69:4,25
70:18 88:4 98:6

100:10 104:3
105:9

**Fosters** 51:20

**found** 35:19
42:19 89:14

**fourth** 34:8

**fracture** 85:1
86:1,4,13,17

**fraying** 8:3
84:18

**front** 102:3

**full** 26:22 56:6
57:19,20

**fully** 73:9

---

**G**

---

**gather** 61:10

**gathered** 63:1

**gave** 15:24
62:10,12,13

**general** 6:15
21:6 30:3
33:12,16,17,20,
24 34:1,13
35:1,9,15,18
39:2,8,9 43:11
45:10 61:13,15

**generally** 51:6

**get all** 98:10

**give** 5:21 21:11
55:7 61:4,8
85:6 87:5

**giving** 23:2,17
33:24

**goal** 20:1,2,6,8
21:3,5 27:9
32:11 35:21

**goals** 19:23
29:18

**good** 23:11,20,
25 61:8 68:25
97:1,3,6,10,17

**Gosh** 19:19
38:20 46:21



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

75:8

**grade** 32:25

**graded** 32:14

**gross** 64:23
66:14 67:8
69:14 70:12
100:25 105:21
106:4

**group** 17:13,17

**growth** 20:11

**guess** 16:23
30:22 35:20
39:9,15 45:19
46:8 54:12
58:19 64:13,18
65:18

**guesstimate**
16:25

**guy** 105:8

**guys** 10:8
68:16 76:16
79:22 87:22

_____

**H**

**half** 100:14

**hand** 5:20
18:14,19 24:22
28:17 30:25
40:10 49:14

**handle** 56:12
83:25

**handled** 50:3
80:2

**handler** 45:17,
18 46:2,12 63:1

**handlers**
56:23

**handling** 9:8,
21 22:23 46:4,
6,8 47:7 56:14,
21 58:3,11
70:24 78:6
88:6,16 91:2
96:5 99:5 107:7

**happened**
10:12 12:5 39:4

46:13,14 92:4,
23

**happy** 21:12

**Harbolt** 17:21,
23

**hard** 15:11

**Hargadon**
17:21,23

**Harp** 22:20

**Harp-** 19:6

**Harp-biven**
5:8 6:3,4 12:25
13:24 16:13
17:8 18:17
19:22 24:20,22,
23 31:1 40:16
44:18 49:12
67:25 88:2 91:4
99:14

**head** 46:24

**heal** 95:15

**hear** 70:9

**heard** 28:15

**heart** 72:20

**Heather** 5:13,
15 39:14 97:16
98:19

**held** 49:17

**helpful** 94:14

**Herrington**
17:21,24

**Hey** 55:6 95:12

**high** 33:11,16,
24,25 34:5,14
39:12

**higher** 65:2

**highest** 26:11

**hired** 10:24
62:9 65:20 75:3

**hiring** 76:5

**hold** 46:25
88:17

**home** 7:3 41:7,

22 47:24 48:1,3
49:1,3

**home-office**
91:8

**honest** 15:12
58:14

**honestly** 40:9
78:22

**hour** 49:6

**hurt** 95:20,23

_____

**I**

**idea** 26:2
46:10,21 47:9,
13 63:12 75:8,
24 76:4,22
78:25 90:17
95:1 107:15

**ideas** 38:12

**IDENTIFICATI
ON** 18:22 25:1
31:3 40:13
77:25 78:1

**identify** 36:25
104:17

**II** 6:11

**imagine** 12:8

**IME** 7:19 58:24
59:1 60:23
61:1,3 62:9,11,
16 79:23
101:16

**immediately**
42:18 102:12

**impaction**
85:1,25 86:4,
13,17

**importance**
25:14

**important**
25:19 27:12
31:25 60:3
100:21

**impression**
58:11

**improve** 20:13
26:17 34:9

**improvement**
42:8

**improves**
20:14

**include** 36:7
90:3 101:1

**included** 82:12
106:4,7

**including**
105:21

**income** 66:15
69:16,21,25
70:19 71:2,4
73:20 74:3
100:20 101:1
105:21 106:5,7

**inconsistent**
83:2,4,14 93:7
97:19

**incorrect**
66:17 67:5 77:6

**increase** 30:5
47:11

**increases**
27:16

**indemnified**
71:7

**indentation**
85:24

**independent**
36:14 51:10,14
59:2 76:9
105:10

**indicating**
53:4

**individuals**
69:16

**information**
16:20 19:2
27:6,10,13,15,
17,21 29:25
52:20 53:9
54:18 55:11
61:3,7 63:7
71:12 78:22

**improve** (column 5 starts)

81:7 86:25 91:9
96:20 98:4,11,
12 99:12
100:13 103:9

**informed** 17:4

**initially** 101:22
102:21

**injured** 8:4

**injuries** 8:11,
13 35:10 55:9
72:6,8,16,20
83:8

**injury** 95:25
99:19

**instance** 55:20

**insurance** 6:6,
20 16:14 17:9,
14 30:18 58:2
80:24 96:5

**insured** 57:18

**intend** 12:20

**intending**
12:25 17:12

**interject** 12:17
13:19 73:8
89:25

**interjected**
98:19

**interpret** 21:3
43:19

**interrupt** 21:12

**introduce** 5:13

**investigation**
32:15 33:4,13
34:20 35:2 96:6

**invoice** 16:5

**invoices** 15:16
106:14

**involved** 9:16
46:1 49:23
50:11,25 55:17
63:5 75:7,11
76:20 91:2
106:3

**involvement**



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

50:3

**issue** 14:12 38:24 73:9

---

**J**

---

**January** 28:10

**Jefferson** 6:25

**Jenkinson** 7:19 10:9,13 62:15 71:5 74:24 75:7,17 76:12,16 79:10 82:16,20 84:22 87:5 94:4,6 97:24 99:2,7 101:21 105:2

**Jenkinson's** 8:16,22 10:15, 23 11:22 13:21 14:6 70:20,22 82:14 87:12 91:7,11,20 92:11,12,20 93:7,24 96:24 97:1 98:17 101:13 103:12

**Jennifer** 25:23, 24 31:9

**job** 6:10,16 19:16 26:1,2,3 30:23 40:23 44:25 45:22 71:13 84:24

**joints** 84:4

**July** 63:18 85:18

**June** 8:5,9,12 9:14 33:6 62:23 76:24

**juror** 6:12

**jury** 16:17 43:9

---

**K**

---

**keeping** 44:3

**Kentucky** 5:6, 11 41:14,20,25

90:3

**kind** 8:24 11:16 16:23 21:2 32:1 55:13 63:14 88:13 95:10

**knee** 7:25 8:1, 17 53:1 83:18 85:1 86:5,14 94:17 95:4,20

**kneecap** 8:7, 15 83:6

**knew** 90:20,25 102:6

**knowledge** 15:2 18:6

**Kurt** 48:24,25 49:1 92:23

---

**L**

---

**labeled** 18:17 24:23 40:15 49:15

**labor** 106:3

**LAE** 20:14

**Laura** 5:8 6:3 22:19,22 26:23 28:14 29:18 35:8 36:2 37:12 42:18 104:22

**Laura's** 28:17 42:16

**law** 17:19,20 18:2

**lawsuit** 51:3 55:18 63:9 96:14

**lawyer** 10:24 11:1 107:7

**lawyers** 12:7, 15 13:10 15:3, 9,15 65:20 105:3 106:14

**leadership** 22:11

**Leading** 99:23

**learn** 22:23

**led** 35:20

**left** 8:8

**leg** 95:13

**legal** 18:1 22:23 73:10

**Lenihan** 17:21, 23

**letter** 15:4 81:17

**letters** 13:11, 13 31:18 65:19

**level** 69:17 84:19

**levels** 96:1

**Lexington** 5:7

**liability** 52:5

**Liberty** 6:6,7 11:10,13,16,19, 21 17:9,13,17 18:9 19:13 25:24 36:20,25 37:4 40:19 41:13,21 46:25

**limit** 57:20

**limits** 72:4,13 93:25

**lines** 26:20 50:1

**Lisa** 19:10

**list** 32:21 34:21 60:20,22

**listed** 8:13 20:8 22:11,16 25:17, 18 28:23 31:22, 25 35:4 53:13

**lists** 25:13 87:14

**litigate** 36:21

**litigation** 35:11 36:3,17

**lives** 19:19

**living** 84:12

**located** 26:6 40:25 75:20

**location** 41:11, 20,22,25 87:20

**long** 6:7 15:12 16:2,12 19:21 45:6,9,12 60:12 61:10 62:25 63:3 76:11 84:21

**looked** 25:8 40:3 51:19 101:7 106:18, 21

**loss** 13:11 20:12,14 32:8 53:20,21,23 54:5,8,17 55:10 56:18 64:8,20, 24 66:2,12 68:14 69:24 70:6,16 71:9 82:13 101:9 106:2

**lost** 69:20,25 70:18 71:2,4 73:20

**lot** 7:16 9:5 56:17 74:7 83:25 84:23 94:18,20

**Louisville** 5:11 18:4

**low** 39:12 67:12,13 96:11

---

**M**

---

**M-e-c** 48:22

**made** 50:13,21 64:23 71:13,16 77:10 78:14,24 79:3 80:11,18, 20 81:5,7 82:2, 6 98:1 99:3 101:24 104:1

**mailing** 51:12

**Majority** 41:9

**make** 37:3 44:9 47:17 51:15 55:12 60:4 61:2 62:4 68:25 77:5,23 86:3 96:14 98:23 99:11

**makes** 97:6

**making** 43:8 65:18 82:16 96:8 100:10

**management** 32:9

**manager** 19:10 26:5 29:15 31:8 37:14 38:12 39:1 40:16,21 44:19 45:1,7,9, 13,16 46:12 47:23,24 48:6,8

**manager's** 47:24

**manages** 45:3

**manipulate** 97:7

**manner** 50:2

**March** 50:14, 15 51:7

**mark** 18:21 24:25 30:25 40:10 79:19

**marked** 18:22 25:1 31:3 32:12 40:13 77:25 78:1

**market** 20:15

**Maryland** 19:20

**math** 76:24

**math's** 77:13

**matter** 30:13 95:25

**Mccollum** 5:15 7:9 11:14 12:17 13:19 14:1 18:23 19:2

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

20:21,23 21:10, 14 24:18 28:2 30:7,19 36:24 39:18 49:7 63:2 66:19 72:14 73:8 77:3 80:19 87:16,19 88:17 89:25 91:15,25 92:5 94:25 96:19 97:5,9 98:3,8,15 99:17,24 100:1 104:21,24

**means** 33:22 36:6 51:25 86:6,8 93:4 100:20

**meant** 35:15 37:14,24 38:2 74:18 80:14

**meantime** 9:25 24:12

**mechanic** 53:6 54:11 70:14 84:24

**Mechley** 48:22,24,25 49:1 92:24 93:10

**medial** 85:24

**mediation** 22:20 27:14 36:10

**mediations** 26:23

**mediator** 22:22

**medical** 12:9, 10,12,14 13:5 53:14,19 54:2,6 55:9 58:19 59:2 61:11,14 62:13, 16,25 63:11 64:5 75:3,22 76:3,6,13,17,20 82:12 83:17 90:2 94:7 97:21,22 99:7 100:3 104:3 105:10

**medium** 84:8

**meet** 32:12 40:5

**meeting** 29:18 35:21 92:22

**Melissa** 44:20 48:17 50:13 51:8

**memory** 67:18 75:2,10 82:1

**mentioned** 106:20

**Michael** 107:10

**mid-** 37:11

**mid-year** 29:13,17 32:13 33:4 37:11,20

**might've** 14:21 94:14

**mild** 84:8,10, 14,18

**mind** 80:16 98:22

**mindset** 37:1

**mine** 9:2

**mistakes** 33:11

**mitigating** 20:12

**mixed** 37:12,15

**momentum** 20:12

**money** 28:15 29:3 30:16 33:19 35:10,18 38:4 39:16 40:4 42:17 43:14,18 44:2 103:23

**month** 85:20

**months** 33:5,6 76:25 77:11 81:13

**morbid** 83:10

**morbidly** 84:22

**motor** 8:5,12 52:13 85:21

**mouth** 79:16

**MRI** 85:20 86:3 88:19,24 89:4, 11,18,23 90:12, 20

**MRIS** 94:14

**Mutual** 6:6,8 11:11,13,16,20, 21 17:10,13,17 18:9 19:13 25:24 36:20,25 37:4 40:19 41:13,21 47:1

———

**N**

**named** 63:22

**narrative** 68:3

**narrow** 44:17

**necessarily** 21:4 61:7 67:9, 19 69:6

**needed** 43:2,4 50:7 62:17 94:22

**needing** 27:10 42:16 63:4

**negative** 39:15,19

**negotiate** 6:17

**negotiation** 26:25

**net** 64:24 66:15 67:8,11 69:15, 20,23 70:12 71:9 73:7,19 74:3 100:20

**nickel** 28:16

**note** 50:13,20 51:15 57:8 68:3 69:8 74:14 78:5 80:7,14,20 81:14,15 85:5

**91:25 92:17,18, 24**

**noted** 33:12

**notes** 8:23,25 9:7 49:13,20,23 63:17 65:17 92:3,9,18 94:14 95:6

**number** 5:7 16:19 20:1,2,6, 8 22:8,13,19 23:10 26:8,14 32:23 44:8 53:17 58:14 70:5,7,9 93:17, 21

**numbers** 65:2 66:15 69:1 71:19,20 104:11

**numeric** 32:14 33:3

**numerical** 32:18

———

**O**

**obese** 72:22 84:22

**obesity** 83:10

**object** 21:14, 15 30:7 66:19 77:3 80:19 97:5 98:22

**objection** 14:6 20:21 21:10,11 28:3 30:15,19 63:2 72:14 91:15 94:25 96:19 98:3,8 99:23,25

**objections** 98:20,23

**objective** 26:8, 9,14 32:5,7 35:24

**objectives** 25:9,14,17 31:14,16,22

**obtain** 14:13 15:3

**obtained** 62:7, 14 64:4

**obtaining** 99:19

**occupation-wise** 17:16

**occurred** 77:4 90:6

**October** 53:1 76:15,24 79:12, 17 97:23 102:5, 6,7

**offer** 44:10,11 47:2 57:18 58:1,15 78:16, 17,23 79:6 80:11,25 81:4, 6,18,22,25 82:2,6,17 96:17 98:1

**offered** 57:22 58:9,12

**offers** 57:10 78:14 96:8,9

**office** 6:23 41:3,10,11 42:1 44:22 47:24 48:1,3 49:1,3 107:4

**offices** 5:10 41:13,16

**Ohio** 6:23 26:7 41:1 44:22 48:2

**ongoing** 17:2 46:19

**Oops** 50:12

**Openm** 59:7

**Openmri** 58:20 59:8,13

**operating** 5:12

**operation** 18:7 101:3

**opinion** 15:1 34:4 35:19 50:1



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

61:5,25 64:7
66:12,25 98:17

**opinions** 68:21
69:3,9 97:9
103:15,17

**opportunity**
36:2

**opposed** 25:9
44:13 103:17

**opposite** 43:24

**order** 18:25
64:24 104:14,
16

**ordering** 60:17

**orders** 95:14

**orthopedic**
53:4 54:10
75:18

**osteo** 86:6,8

**osteoarthritis**
8:3

**osteochondral**
85:25 86:4

**outcome** 33:4

**overpaid** 71:8

**owe** 21:2 29:7,
8,23 30:11,13,
24 40:7

**owed** 23:7,20,
21

---

**P**

**P.M.** 107:23

**pages** 31:1
88:12 92:8

**paid** 23:7,20
30:17 35:17
56:17 90:15,18,
21 91:6 105:5

**pain** 33:19,21,
25 34:13 96:1

**paperwork**
14:24

**paragraph**
26:22 35:7
42:15 55:25
56:6 57:11,12
58:17 68:10

**part** 13:13 28:7
31:19 34:13,21,
24 35:20,22
60:8 61:17
63:13 67:21
82:18 88:21
89:24 90:5 94:2
101:17

**partially** 13:7

**particulars**
103:25

**parts** 70:14,15
101:1 105:22
106:4,9

**party** 52:9

**pay** 16:21 21:2
27:16 29:7
30:11,12,13,14,
24 36:13 40:7
93:11

**paycheck**
11:21

**paying** 20:20
21:6 22:1 29:23
30:4 35:14

**payment** 91:5
96:15 104:1

**PC** 28:10

**pending** 55:18

**people** 93:15
94:13

**percent** 20:2,3,
7

**percentage**
32:23

**perform** 82:25

**performance**
18:10,14,18
19:9,23 20:18
21:8,23,25
24:14 25:4,21
28:24 29:11

31:5 35:4,14
37:10 39:22,25
40:2,5,15,17
48:13

**performing**
61:3

**period** 9:8

**permanent**
83:8

**permission**
56:24,25

**permitted** 47:2

**person** 48:4
84:10

**personal**
26:20 93:13
96:2

**personally**
62:19 66:8
75:12

**pertain** 9:7

**pertinent** 60:5

**phases** 33:5

**Phil** 5:11

**Philadelphia**
58:2 80:24

**philosophy**
36:3

**phone** 10:20
39:5

**phonetic** 25:23
48:22

**physical** 41:3,
20,22

**physician**
86:22 89:8

**physicians**
7:17 90:3 105:9

**piece** 62:16

**pinpoint** 50:10

**pinpointed**
43:4,6

**PIP** 56:9,14,16,
19,20 57:1,5

71:7,8 90:15,
17,18,21
103:25 104:1

**PL** 26:18,19

**place** 62:23
106:25

**places** 60:20

**plaintiff** 64:20
83:6 87:3
102:16,24
103:21

**plaintiff's**
28:11,13,15
55:11 59:22
64:4,20 69:10,
14 80:11

**plan** 73:24

**planning** 73:18
74:2,21

**play** 72:23

**point** 9:24,25
15:2,13 16:12
26:3 41:19 46:4
47:10 51:2,7
52:24 53:15
55:16 57:21,25
58:3 59:11
62:21 65:25
68:2 71:12 73:4
76:23 78:6,13
79:6,8 82:22
84:17 93:23
102:20 106:13

**policies** 6:20

**policy** 57:19,20
72:3,12 93:25

**port** 103:22,23

**portion** 35:18

**position** 6:10,
16,19 20:15
26:1,2,3 40:23
45:6 46:25
70:17 71:3 94:8

**positive** 23:2,
17 24:13 27:4,9
28:24

**positively**

29:19 37:23

**possibly** 47:13
48:5 59:25
68:23 69:3,7,9,
11 83:13 91:17
107:19

**Post** 6:23

**potential** 35:3

**practices**
78:11

**prefer** 98:23

**preparation**
49:24 66:24

**prepare** 8:20

**pretrial** 107:17

**previous**
71:19 89:7
101:13

**previously**
88:19 100:14

**price** 106:1

**Prieto** 5:10

**primarily**
107:7

**primary** 9:12
86:22

**prior** 50:3 58:3
60:5 64:21
71:23 73:12
78:17 83:17
88:4

**privilege** 12:19

**problem** 13:4
72:21 87:19
92:2

**problems**
72:17,20 83:18

**procedure**
16:19

**PROCEEDING
S** 5:1

**process** 21:8
39:25 97:7
98:11



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

produce 16:1 32:8

produced 16:5 40:14

producing 37:12

product 20:13

profit 69:24 70:15 71:9

Profitable 20:11

profits 70:13

profits/loss 69:15,20

progressive 34:9,15 35:3

promoted 46:9

promotion 46:11

prompt 20:16 96:5 99:1,2,5

promptly 98:7, 16

proper 20:16 67:7

protect 20:15

provide 20:14 63:6 68:16 100:3 102:17, 21

provided 60:19 62:8 100:14

pry 7:4

pull 32:20,24 85:7 88:3

pulled 88:6

purchase 101:1 105:22

purchased 38:23

purpose 66:23

purposes 7:5

put 29:6 35:18 39:10 40:1 64:9,11 79:16 92:24 106:1

putting 38:4 39:2,16 40:4 106:3

―――――――

Q

quality 26:17 32:9 34:8 37:23 38:13

quarter 34:8

question 13:20 14:5 21:5 39:19 40:8 67:3 73:14,22 74:22 98:16

questions 12:25 18:15 32:22 49:13 78:5 80:15 98:21 99:15,18 105:12 107:21

queue 26:24

quicker 38:1

quickly 30:1

Quintairos 5:10

―――――――

R

radiologists 94:13

raise 5:19

range 39:10,12 42:18,20 43:3, 4,8,9,10,14,17, 20,22 44:3,7,12 67:14 91:17,20 92:19

ranges 42:17 45:20 84:8 91:17

ratio 20:14

re-evaluate

102:12

reached 55:20

read 10:15 13:24 20:9 21:24 26:15 34:2,12,18,19 44:15

real 70:12

realize 57:21

reap 38:13

reason 59:23 60:8 61:16 90:4 93:16,21 94:2

reasoning 15:25

reasons 79:22

reassigned 9:17,18

recall 8:4 79:7 102:16

receipts 69:15, 20,24 70:12

received 10:18,19 14:23 15:22 18:12 56:1 58:23 71:12 83:10 88:4 93:5 95:6 103:21 107:1

recently 10:2 46:15

recollection 9:19 13:22 28:21 51:11,14 57:6 61:18

record 5:3 6:2 7:10 49:8,10 62:13 86:12 87:23,25 88:18, 19,22,24 89:3, 4,9,11,18,24 90:4,6,12

records 12:9, 10,12,15 13:5 15:25 16:1 54:2 58:19 59:5,10, 13 60:5,6,10,

15,24 61:1,11, 12,14,24 62:25 63:11 76:14,17, 20 82:13 83:17 86:20,21 87:4, 5,6,7,10,11,14, 20,22 88:4,9,14 89:1,2,13 90:2 91:1 98:13,14 99:19 100:3,6 102:17

recs 58:19

redacted 7:9, 11 61:16,21 74:7 100:14

redactions 18:24

REDIRECT 104:25

reduce 44:13

reduced 93:24

refer 92:1

reference 43:8

referencing 88:19

referring 33:18 43:11 49:19 57:11,15 85:3 89:8 92:22

refers 33:21

refresh 67:18 75:2 82:1

refused 57:18 102:16

refusing 102:21

reiterate 57:19

reiterated 78:15,18

reiterating 79:5

related 10:6 46:5 70:18 72:6,20 83:8,9, 13 102:8

relating 60:6

relation 15:4 52:1 99:2,3

relationship 11:12

relayed 53:9

release 59:24 60:16

releases 33:11

relied 15:12

rely 14:5 101:16

relying 82:16

remain 18:25

remember 7:14,16 8:6 10:10 14:12,13, 23 15:11,13,19, 25 16:2,8,11 38:25 39:6 42:23 46:22,23 48:12 57:25 58:14 60:19,21 61:12,14,22 62:1 63:13,24, 25 64:7,14,18 65:24 66:13,15 67:13,14,15 68:6 71:7,11 72:18 74:10 78:6 79:5 82:22 84:17,22,25 85:2 87:1,4,10, 12 88:25 89:18 91:23 93:16,20 98:13 106:18

remind 80:16

reminder 28:3

render 66:25

reneged 83:12

Rennick 25:23 31:9 35:13

repair 100:25 105:23

repairing 105:25

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**report** 8:16,22
10:14 61:8
64:9,15 65:1,2
68:17 71:1
79:14 82:14
83:3,5,15 84:21
85:4,20 86:4
87:6,12,13 93:7
94:4 96:24
97:1,3,10
101:13,14,19,
22,23,25 102:3
103:18

**reported** 42:2,
4,5

**REPORTER**
5:19 40:12
77:21

**reporting**
67:16

**reports** 7:18
101:16

**represent**
10:24

**representative**
36:25

**representing**
54:24 80:24

**reputation**
20:15

**request** 59:16
90:2 100:6
102:25

**requested**
15:15 59:21
89:10,17 103:2

**requests**
103:1

**reserve** 16:14,
17,18 17:5
23:11,18,22

**reserving**
32:16 34:21
35:2

**reside** 6:25

**resolution**
6:11 73:12

**resolve** 27:1

**resolved** 24:1,
9

**resolving**
22:20 23:3
27:23

**respond** 100:8

**responded**
102:25

**responses**
55:24 56:1,3

**responsible**
6:19

**rest** 23:14
34:16

**result** 23:20
39:16,19 40:4

**results** 23:11
26:22 27:20
28:24 32:13
35:24 37:12,15,
16,17,23 38:13

**retained** 68:13

**retire** 87:17

**return** 53:5
71:24 72:15

**returns** 15:14
64:22 71:18
73:7,19 74:4
105:16,19

**review** 12:11
14:2,6,17 15:10
18:19 19:9,23
21:8,23 24:14
28:24 35:5
37:19 39:25
40:2 48:13
49:22 56:19,20,
23 63:13 64:21
83:19 100:11

**reviewed** 8:20
9:1,2,7 11:24
14:9,20 15:9,21
16:10 18:10
20:18 34:2,3
35:16,17 46:5
49:19 65:12
67:20

**reviewer** 48:17

**reviewing**
25:21 31:10
40:17

**reviews** 18:14
21:25 39:22

**Richardson**
11:2,4 66:20
73:16,21 74:22
107:7,14

**Richardson's**
11:6 54:22
107:4

**Richmond**
88:24 89:4,11,
18 90:12,20

**rid** 15:24

**right-hand**
22:6

**ring** 66:5

**rise** 6:20

**room** 8:14

**ruling** 73:11

———————

**S**

**Safeco** 11:11
17:11

**Safeco's** 20:15

**scale** 32:14

**scaling** 35:8

**schedule** 61:1

**scheduled**
60:24 79:23

**scheduling**
58:24 104:13,
16

**scores** 34:7

**scroll** 88:12

**scrolling**
88:18

**secretary/
paralegal** 18:1

**section** 29:10
38:7 42:8
52:16,21

**Security**
14:11,19 15:6
71:15 72:18
77:2 102:17

**seek** 42:11
47:2

**selected** 105:3

**self-** 69:15
100:23

**self-employed**
70:13 100:11
105:15

**send** 13:10
76:11,16

**sending** 88:9

**Senior** 6:11

**sentence**
29:17 33:9
35:8,23 37:11,
20 38:10 42:14
43:16 57:14
58:18 69:13,19

**separate**
56:22,23

**separated**
71:24

**September**
80:7 81:14 82:2

**series** 63:17

**serve** 7:5

**set** 16:19 23:22
93:9

**settle** 27:5,6,9,
10 93:12

**settled** 13:22
23:11,13 98:6,7
99:4 102:14
104:7

**settlement**
23:25 24:4,7
27:1,5,24 29:3
32:16 33:5,10
38:4 47:15 57:9

82:17 91:20
96:8,17 103:21

**settling** 6:20
23:18

**sever** 85:23

**severe** 84:9

**shocked** 22:23

**shortly** 13:22

**should've** 70:1

**shoulder**
72:21 83:7

**show** 37:19
67:17 79:14
87:21 88:5 92:3

**showed** 7:18
37:16,17 71:24
89:7

**showing** 84:13
86:4,12 90:25

**Shows** 94:16

**side** 40:3 98:10

**sides** 76:7

**sidewalk**
28:17

**Similarly**
13:10

**simply** 27:21

**single** 21:15

**sir** 17:15

**situation** 28:1
57:9

**skills** 26:25
27:13

**slowly** 17:22

**Social** 14:11,
19 15:6 71:15
72:18 77:2
102:17

**soft** 35:9

**solemnly** 5:20

**solid** 99:11

**somebody's**

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

105:25

**Sonya** 40:18, 19 42:24 43:1

**Sonya's** 43:13

**sort** 32:2 34:15

**span** 93:5

**speaking** 98:20,23

**Specialist** 6:11

**specialists** 45:20

**specific** 30:2 71:2 91:25

**specifically** 72:17 106:19

**speculation** 30:8

**spoke** 107:14, 16

**sprained** 96:3

**spurring** 8:3

**SSDI** 58:21 59:7,20 60:3,6, 11 61:24 62:3, 12

**standing** 28:3 99:24

**start** 22:5 43:5

**started** 49:18

**starts** 22:8 51:16

**state** 6:1 67:3

**stated** 49:22

**statement** 20:8 21:5,23 29:14 38:16 84:5

**states** 5:5 29:18 37:21

**status** 80:12

**stay** 95:12

**sticking** 42:21

**sticks** 93:21

**stood** 33:5

**stop** 66:16

**Stouffer** 80:10, 22,23

**strength** 22:16

**strong** 26:24 83:5

**studies** 83:23

**stuff** 23:14

**subject** 34:15

**subpoena** 7:6 59:25

**subsection** 42:11

**subsidiary** 11:15,17 17:11

**subtle** 85:24

**successful** 26:23

**suffering** 33:19,21,25 34:13

**suggested** 38:13 98:24

**suggesting** 85:25

**summaries** 12:6,14 13:5

**summarized** 13:11

**summary** 12:3 29:11,17 37:10, 21 85:23 107:1

**supervisor** 33:23

**supplied** 15:24 59:24

**support** 94:7

**supposed** 30:14

**surgeon** 53:4 54:10 75:19

**surgery** 52:25 83:8,13 94:9, 22,23

**surprised** 84:6,9

**sustained** 8:12 83:6 85:1 86:14

**swear** 5:17,20

**switch** 47:11

**system** 68:3

**system's** 68:7

**systems-wise** 38:21

———————

**T**

**table** 96:18,23

**takes** 98:9

**taking** 36:18 37:21,24 61:10

**talk** 10:5 27:20 49:18 56:13 74:24 93:9

**talked** 84:17

**talking** 8:25 33:15 39:21,25 54:22 63:21 78:11

**talks** 27:23

**tax** 15:14 64:21 71:18,23 73:7, 19 74:4 105:16, 19

**Team** 45:1

**tear** 94:16,19, 20

**tearing** 84:18

**telecommute** 41:7

**telling** 54:14 60:7 67:4 69:23 88:8

**tells** 95:12

**ten** 34:2 43:20, 21 44:3,9,12,13

**tend** 69:16

**tendonitis** 84:20

**term** 16:14

**terms** 6:15 21:6 30:3

**testified** 30:8 65:3 93:7 97:12 101:22 106:8

**testify** 10:13 70:25 99:6

**testifying** 37:4

**testimony** 5:21 64:14 65:18 91:7,11 94:12 101:8 102:12 103:12 106:20,23

**Thibodaux** 19:10,12 23:2, 17

**thing** 32:2 37:16 40:7 46:18

**things** 21:24 32:15 35:2 36:10 38:21 49:18 61:15 72:22 91:10 96:3 101:3

**thinking** 33:20 34:12 72:21 73:5 93:22

**thought** 35:17 60:2 87:10,13 91:22,23,24 92:19

**threatened** 22:22

**tickets** 16:5

**tighten** 43:17

**tighter** 42:16 43:2,13 44:8

**tells** 95:12

**time** 9:8 14:7 16:2,20 17:6 19:21 20:17 21:12,15,16 24:5,8 26:4 27:7,11,18 29:15 34:3 36:6,14 38:2,22 41:8,9,19,20 47:9,21 49:2 50:10 51:2,7 52:23,24 53:15 55:15 59:11 63:14 76:20,23 77:14 79:6,8 82:12 91:10 93:5,23 96:21, 22 98:4,11 103:1,3,14 107:13,16

**timeframe** 46:14

**timely** 102:24

**times** 10:7 75:2

**tissue** 35:9

**title** 19:16 44:25 45:1,18

**titled** 22:14 29:10

**today** 8:21 49:24 78:11

**told** 10:12 46:17 53:11 54:1,14 65:10 67:11 70:7 71:12,13 73:4 83:15 95:7 101:21 102:7

**Tony** 9:23 10:1, 5 88:8

**top** 22:9 42:18 43:15 44:4,12 46:23 50:16 80:7 91:24

**total** 24:4,6 54:3

**traits** 22:11

**transcript** 13:24



Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**transcripts** 12:1

**treating** 7:17 55:8 105:9

**trend** 34:7 37:19

**trends** 33:12

**triage** 47:18,22 48:4,8 91:8 93:9

**trial** 7:6 39:19 70:18 71:4 73:24 74:2,21 94:8

**true** 29:2 69:4,6 84:15 86:11 98:18

**truth** 5:22 61:6, 9 101:20

**TSV** 24:1,3

**turns** 97:1

**type** 18:2

**Typically** 55:5

**typing** 58:16

**typo** 57:24 58:13

**typographical** 58:6,16

_____

**U**

**uh-huh** 7:13 16:25 20:5 22:12,15,18 24:2,17 29:20 31:21 33:9,14 34:11 36:1 37:13 38:15 42:13 48:24 49:4 51:5 54:4 57:17 58:10,25 63:23 69:18 80:9 84:1 85:22 86:2 88:21 90:9,23 92:16 104:20 105:13

**UIM** 7:14 10:6

11:24 13:17 17:5 77:5,10,12 78:9,14 98:6 99:3

**UIMBI** 51:22

**ultimately** 91:5

**umbrella** 11:16

**uncommon** 84:2

**underlying** 73:15 103:21, 22

**underneath** 11:17

**understand** 6:12 12:24 16:18 30:16,21 32:20 34:17 39:24 41:6 43:2 54:9 56:16 97:14 105:14, 18,19

**understanding** 37:2,24 69:1 100:23 101:6 104:19

**understood** 11:18

**undervalue** 69:20,24 74:16

**unfair** 78:10

**United** 5:5

**unreasonably** 96:11

**unusual** 39:11

**update** 55:7

**upheld** 12:18

**urging** 94:3

_____

**V**

**valued** 23:9

**values** 32:18 33:3

**vehicle** 8:5,12 52:13 85:21 100:25

**vendors** 60:17

**versus** 5:4

**video** 5:3,12 13:21 14:1,6 49:9 65:15 87:24

**videos** 13:16

**Virginia** 19:19

**vocational** 63:21 64:3

_____

**W**

**W-2** 100:17

**W-2s** 100:11 105:12,15,17

**wage** 13:11 53:19,21,22 54:5,8,17 55:10 56:17 64:20,24 66:2,12 68:14 70:6,15 82:13 100:10 101:9 106:2

**wages** 65:7

**waiting** 58:18 59:6 60:24

**waive** 12:21

**wanted** 11:11 12:17 14:25 20:6 22:13 43:6 49:12 53:21 60:15 68:23 104:11

**wanting** 36:21

**watch** 13:16

**watched** 65:15

**wear** 94:16,18, 20

**weight** 20:1,2,7

**Whereabouts** 7:24

**whim** 100:7

**wife** 64:21 71:24 105:16

**wife's** 65:7 106:6

**William** 66:4

**Williams** 40:18 42:24

**witnesses** 74:20

**wondering** 15:8 27:8 74:9

**Wood** 5:10

**word** 97:5

**words** 43:5,22 79:16

**work** 17:8,17, 20 18:2,3 19:18 20:13 22:19 26:17 32:2 36:8 41:7 44:21 53:6 54:11 64:8 72:16 73:2,4 95:7,19

**worked** 17:11, 19 19:20 41:19, 23 42:18

**working** 11:4 17:9 29:5

**would've** 9:1, 19 10:18,23 11:23 28:22 47:23 48:20 49:18 50:24 51:8 52:19 56:2 58:5 62:20 63:7 65:19 71:16 78:18,20 82:11, 12 88:23 92:24 93:4,5,8,9 107:12

**written** 29:14 33:3 38:16 68:17 101:14 103:18

**wrong** 25:3 93:17

**wrote** 28:20 68:2 89:6

_____

**X**

**x-rays** 94:13

_____

**Y**

**year** 25:5 31:6, 8,15 34:16 37:12 40:17 42:15 71:17 72:1,12 75:23

**year-end** 29:13

**year-old** 84:10

**yearly** 18:10 20:18 21:25

**years** 6:9 41:24 45:14 62:23,25 76:25 77:5,11

**yesterday** 22:20

**you-all** 41:3 60:24 62:9 66:1 71:9 73:18 74:20 81:1 82:15 87:7 90:11 97:23

**your-alls** 105:8

_____

**Z**

**ZIP** 6:24

**zoom** 85:12 88:7

Kentuckiana Reporters
730 West Main St. Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com