

# Transcript of the Testimony of

# Anthony T. Dale

### Date: July 29, 2016

### Case: Ernest Foster v. American Fire and Casualty Company

### 5:13-CV-426-GFVT

Emerson Reporting, Inc.
Phone:317-695-3300
Fax:317-865-8910
Email:emersonreporting@aol.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON
CIVIL ACTION NO. 5:13-CV-426-GFVT

ERNEST FOSTER,                              )
                                            )
          Plaintiff,                        )
                                            )
          -vs-                              )
                                            )
AMERICAN FIRE AND CASUALTY COMPANY,         )
                                            )
          Defendant.                        )


     The videotaped deposition upon oral examination of

ANTHONY T. DALE,

     a witness produced and sworn before me, Joyce
Emerson, a Notary Public in and for the County of
Johnson, State of Indiana, taken on behalf of the
Defendant, at Greenwood Office Suites, 3209 West Smith
Valley Road, Conference Room 2, Greenwood, Johnson
County, Indiana, taken on the 29th day of July 2016,
commencing at 9:07 a.m., pursuant to Indiana Rules of
Trial Procedure, and by written notice as to the time
and place thereof.


EMERSON REPORTING, INC.
704 South State Road 135, #D322
Greenwood, Indiana  46143
(317) 695-3300
Email: joyce@emersonreporting.com
www.emersonreporting.com

Examination of Anthony T. Dale

A P P E A R A N C E S

FOR THE PLAINTIFF:

    Philip G. Fairbanks, Esq.
    MEHR FAIRBANKS & PETERSON TRIAL LAWYERS, PLLC
    201 West Short Street, Suite 800
    Lexington, Kentucky 40507
    859.225.3731
    pgf@austinmehr.com

FOR THE DEFENDANT:

    Donald L. Miller, II, Esq.
    QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
    9300 Shelbyville Road, Suite 400
    Louisville, Kentucky, 40222
    502.423.6390
    dmiller@qpwblaw.com

Examination of Anthony T. Dale

Page 3

## I N D E X   O F   E X A M I N A T I O N

|  | PAGE |
|---|---|
| DIRECT EXAMINATION ............................<br>Questions by Mr. Philip G. Fairbanks | 4 |
| CROSS-EXAMINATION.............................<br>Questions by Donald L. Miller, II | 82 |
| DIRECT EXAMINATION ............................<br>Questions by Mr. Philip G. Fairbanks | 91 |

## I N D E X   O F   E X H I B I T S

| Deposition Exhibit No.: | PAGE |
|---|---|
| 1 - Loss Notice Notes.......................... | 25 |
| 2 - 5/25/10 Email from Billy Jo Foster.......... | 34 |
| 3 - Liberty Mutual Claims Examiner Toolbox...... | 41 |
| 4 - 5/23/11 Email to Betty Jo Foster............ | 52 |
| 5 - 10/10/12 Letter to Ernest Foster........... | 69 |
| 6 - 8/8/12 Email to Betty Jo Foster............ | 70 |
| 7 - Lexington Clinic Questionnaire...:.......... | 88 |
| 8 - 8/8/12 Email to Betty Jo Foster............ | 91 |

Page 4

```
1                    (9:50 a.m.)
2                  July 29, 2016
3          MR. FAIRBANKS: We're on the video record in
4    the case of Ernest Foster versus American Fire and
5    Casualty Company, United States District Court,
6    Eastern District of Kentucky, Central Division at
7    Lexington, Civil Action Number 13-CV-426.
8          Today's date is July 29, 2016. It's
9    approximately 9:50 a.m. We're in Greenwood,
10   Indiana. This is the videotaped deposition of
11   Anthony Dale.
12         My name is Phil Fairbanks appearing for the
13   plaintiff Ernest Foster.
14         MR. MILLER: Don Miller for American Fire and
15   Casualty.
16   A N T H O N Y  T.  D A L E, having been first duly
17   sworn to tell the truth, the whole truth and nothing
18   but the truth relating to said matter, was examined
19   and testified as follows:
20   DIRECT EXAMINATION,
21   QUESTIONS BY PHILIP G. FAIRBANKS:
22   Q  Sir, would you state your name for the record,
23      please.
24   A  Anthony Thomas Dale.
25   Q  Mr. Dale, by whom are you employed?
```

Page 5

```
1    A  Liberty Mutual.
2    Q  How long have you worked at Liberty Mutual?
3    A  Thirteen years. I started out with Safeco and
4       Safeco was acquired by Liberty Mutual.
5    Q  Approximately when did that happen?
6    A  2008.
7    Q  What is your job title at Liberty Mutual?
8    A  Senior claims resolution specialist 1.
9    Q  Is that a claims adjuster position?
10   A  Yes.
11   Q  For those on the jury who might not know, can you
12      just generally tell us what it is that an adjuster
13      does.
14   A  In a nutshell I investigate and pay claims.
15   Q  Some juries may be familiar with the term "insurance
16      agent". Insurance agent is on, kind of, the front
17      end, the sales end, and you're on the back end, the
18      claims payment end; is that a fair statement?
19   A  Correct.
20   Q  What types of claims do you handle at Liberty
21      Mutual, injury claims, property claims, commercial
22      liability claims? Can you just talk about what
23      types of claims you handle.
24         MR. MILLER: Can you give us a timeframe.
25         MR. FAIRBANKS: Sure. Right -- right now.
```

Page 6

```
1    Q  What do you -- what -- what's on your plate?
2    A  Primarily auto accidents with injury and also
3       homeowners liability claims, injuries that occur in
4       people's homes.
5    Q  How long have you been primarily handling those
6       types of claims?
7    A  Since 2009.
8    Q  Do you recall when you first became involved in this
9       claim of Mr. Foster?
10   A  I -- I don't recall about when.
11   Q  Okay. If it was sometime after 2009, it would have
12      been in the same role that you're in today with
13      Liberty Mutual?
14   A  Correct.
15   Q  Have you had any advancements or promotions since
16      2009?
17   A  Yes.
18   Q  Can you --
19   A  I -- I've had one.
20   Q  Okay. Can you describe what that was.
21   A  It was -- essentially our job titles were different
22      then, but it was just a promotion to the next level
23      up primarily handling claims of more of a severe
24      nature, more of a complex nature.
25   Q  Approximately when did that promotion take place?
```

Page 7

```
1    A  That was approximately 2013.
2    Q  I've seen some records in this -- in this Foster
3       case indicating that you became involved
4       approximately May of 2010 through sometime in the
5       late fall of 2012. Does that sound about right to
6       you?
7    A  That sounds right.
8    Q  Okay. So after your time handling this Foster
9       claim, you were given a promotion at Liberty Mutual?
10   A  Yes.
11   Q  Okay. Mr. Foster's claim is an underinsured
12      motorist claim. Do you recall that?
13   A  Correct.
14   Q  Can you just describe again generally for those
15      people on the jury who might not know, what is an
16      underinsured motorist claim.
17   A  Underinsured motorist is considered like an excess
18      coverage. When someone is at fault and they don't
19      have enough insurance, then underinsured motorist
20      steps in and picks up where the at-fault party's
21      insurance paid out.
22   Q  So for example in Mr. Foster's case to the extent
23      that the individual that caused the motor vehicle
24      collision didn't have enough insurance to cover his
25      injuries, he could look to his own underinsured
```

4  (Pages 4 to 7)

Examination of Anthony T. Dale

Page 8

1    motorist coverage for benefits; is that fair?
2  A  Correct.
3  Q  And that is, in fact, what Mr. Foster did; is that
4    correct?
5  A  Yes.
6  Q  I also understand that Mr. Foster had what's called
7    no fault -- or what we call PIP, P-I-P, in
8    Kentucky -- on his policy as well.  Do you remember
9    that?
10  A  Right.
11  Q  Can you tell again for those on the jury who may not
12    know what PIP is, can you just talk about what PIP
13    is in comparison to the UIM.  How are they
14    different?
15  A  I don't handle PIP claims so it's a very -- I'll
16    give you a general explanation of what I know, but
17    it's essentially more for medical expenses and some
18    wage loss I believe.
19  Q  By comparison a UIM claim would include those same
20    elements of medical expense and wage loss but could
21    also include pain and suffering for example?
22  A  Correct.
23  Q  It could also include an amount for future medical
24    expense, for example, on the UIM claim?
25  A  Yes.

Page 9

1  Q  Could also include, for example, an impairment of
2    the ability to labor and earn money in the future?
3  A  Yes.
4  Q  Whereas PIP would just cover what's been incurred
5    thus far, correct?
6  A  I don't know for sure.
7  Q  Okay.  When did you begin working with Safeco and/or
8    Liberty Mutual?
9  A  2003.
10  Q  What position did you start in at Safeco?
11  A  My first position was a customer service
12    representative.
13  Q  When did you move into handling claims?
14  A  Approximately 2004.
15  Q  Have you ever worked on the agency side of things in
16    selling policies?
17  A  No.
18  Q  What about in underwriting where you might determine
19    the cost of a policy?
20  A  No.
21  Q  So your time at Safeco and/or Liberty Mutual has
22    been either as a customer service representative or
23    working in claims?
24  A  Correct.
25  Q  Mr. Dale, what's your educational background?

Page 10

1  A  I graduated from high school and I have attended
2    some college, but I don't have a degree.
3  Q  What did you study in college, anything in
4    particular?
5  A  Several things:  Education and psychology.
6  Q  Do you have any -- aside from your high school
7    education and a little bit of college -- any medical
8    type training or anything like that?
9  A  Other than training given through my employer, no.
10  Q  And when you're talking about training through your
11    employer, are you talking about medicine on kind of
12    an as-needed basis for handling claims?
13  A  Yes.  They'll sometimes give us like online training
14    to go through that gives a general overview of
15    certain types of injuries just for background
16    knowledge.
17  Q  What about any training that you might have had at
18    Safeco or Liberty Mutual about claims handling
19    itself?
20  A  There is an initial training that -- that I went
21    through when I started handling claims.
22  Q  That would have been in maybe 2004?
23  A  That would have been, yeah, 2004.
24  Q  Was that an online course or did you go somewhere
25    and sit in on a class?  Can you talk a little bit

Page 11

1    more about that.
2  A  This was a three-week training live classroom, and
3    they sent us to our Atlanta office for that.
4  Q  Since then any additional live training or anything
5    that you can think of?
6  A  There have been a handful of times where they've had
7    other live training as kind of a refresher.
8  Q  Do you have any licenses in any states for handling
9    claims?  Are you a licensed claim adjuster?
10  A  Kentucky, Connecticut, Texas.  I think I might still
11    have a Louisiana license.  I can't remember if we
12    renewed the last time or not.
13  Q  In which states do you currently actively handle
14    claims?
15  A  The states I handle now are Indiana, Illinois,
16    Michigan, Wisconsin, Minnesota, North and South
17    Dakota, Iowa and Nebraska.
18  Q  So currently not handling any claims in Kentucky?
19  A  Correct.
20  Q  Obviously Mr. Foster's claim is a claim in Kentucky.
21    Can you tell me at what point in time you
22    ceased to handle claims in Kentucky.
23  A  About 2012.
24  Q  What was the reason for the change?
25  A  There was a change in alignment of employees to

5 (Pages 8 to 11)

Examination of Anthony T. Dale

Page 12

1    different offices, and the Indianapolis office had
2    been handling Kentucky.  And they realigned our
3    region footprints and Kentucky then fell into a
4    different region than -- Indiana is considered the
5    Midwest region and Kentucky fell into what's called
6    the mid-Atlantic region which is based in Fairfield,
7    Ohio.  So the adjusters in that office started
8    handling Kentucky.
9    Q   Is that the reason that you were moved off of the
10       Foster file?
11   A   Correct.
12   Q   So all of the claims that were pending, all of the
13       Kentucky claims that were pending in the
14       Indianapolis office, those -- all of them got
15       immediately switched over to the Fairfield, Ohio
16       office?
17   A   There was -- for several years, probably three years
18       or so, there were people who reported to the
19       Fairfield office but did sit in Indianapolis and
20       continued to handle Kentucky claims as well as their
21       other states so that they didn't just -- I mean they
22       didn't just let those people go.  And then as those
23       people moved to other departments or left the
24       company, they replaced those positions in Fairfield.
25           At the same time as positions became available

Page 13

1    in the -- in the Midwest department, then they
2    picked people from the mid-Atlantic department, and
3    so I was the first one picked and moved over to the
4    Midwest department to handling claims in those
5    states that I just told you, and I kept my Kentucky
6    files for probably about a year and a half.  And
7    then when I had probably less than 20, they went
8    ahead and shipped those to someone else in
9    Fairfield.
10   Q   So was this Foster claim one of the ones that you
11       had kept for a little while and then got shifted?
12   A   I believe so, yes.
13   Q   Do you remember who took over the handling of the
14       claim?
15   A   I -- I don't recall.  I think it might have been
16       Melissa Dearman.
17   Q   Did you have any personal discussions with Melissa
18       Dearman about the Foster claim that you can recall?
19   A   Not that I can recall.
20   Q   Is she located -- or at the time that it got
21       switched was she located in Fairfield, Ohio?
22   A   I believe so.
23   Q   Have you ever met Ms. Dearman before?
24   A   A few times.
25   Q   Mr. Foster's insurance policy is written through

Page 14

1    American Fire and Casualty Company.  Do you know the
2    relation of American fire to Safeco and Liberty
3    Mutual?  Can you talk about that.
4    A   It's just another one of the companies in the
5        Liberty Mutual family.
6    Q   So there are a bunch of different insurance
7        companies that have their names on the actual
8        policies of insurance that are owned by Liberty
9        Mutual?
10   A   Correct.
11   Q   American Fire being one of those?
12   A   Yes.
13   Q   Are all of the claims that arise under those
14       American Fire policies handled by Liberty Mutual
15       employees?
16           MR. MILLER:  We object to the form.  Go ahead.
17       Answer if you can.
18   A   I believe so.
19   Q   Okay.  There's not, to your knowledge, a -- a
20       separate department or just American Fire Casualty
21       Claims?
22   A   Not to my knowledge, no.
23   Q   Outside of your licensing do you have any particular
24       insurance designations?  And I'm talking about a
25       CPCU or an AIC or an SCLA, those sorts of things.

Page 15

1    A   I do have an SCLA.
2    Q   Okay.  Tell me what you did to -- to get that.
3    A   SCLA stands for senior claims law associate.  It's
4        through the American Educational Institute.  And it
5        is a series of four sections, and each section has
6        about anywhere from four to six parts.  Each part of
7        each section has a book about a certain topic such
8        as different legal principles or about auto
9        insurance.  And after each book you take a test, and
10       then once you pass all the tests in one part, then
11       you finish that part.  And then once you take all
12       the tests for each part, then you get the
13       designation of the SCLA.
14   Q   So you've gone through that process and have earned
15       that designation.  Do you know when that was?
16   A   It was probably around 2014.
17   Q   Okay.  In the training for the -- the SCLA
18       designation is there some training about fair claims
19       handling or Unfair Claims Settlement Practices Act,
20       that sort of thing?
21   A   I don't recall one way or the other.
22   Q   Okay.  Tell me what your understanding is of what
23       Kentucky's Unfair Claims Settlement Practices Act
24       is.
25           MR. MILLER:  Object to the form.

6 (Pages 12 to 15)

Examination of Anthony T. Dale

Page 16

1 A My understanding is not to intentionally delay or
2 deny a claim.
3 Q Would you agree with me that not specific to any
4 unfair claims act that as a claims adjuster you
5 would want to conduct a reasonable investigation of
6 a claim based upon all available information?
7 MR. MILLER: Object to the form. Go ahead.
8 A Yes.
9 Q Similarly you would want to make an attempt to
10 settle a claim for a fair amount promptly when
11 liability is reasonably clear?
12 MR. MILLER: Object to the form. Go ahead.
13 Q Do you agree with that?
14 A Liability as in? Can you be more specific?
15 Q Sure. Liability for the accident in question.
16 A Yes.
17 Q You don't want to, as a claims adjuster, require an
18 insurer or a claimant to litigate to get a claim
19 payment; is that fair?
20 A Not necessarily, no.
21 Q If you have a -- if you do deny a claim or you offer
22 a compromise amount on it, would you agree that you
23 want to set out all of the reasons for the denial or
24 for the offer of a compromise payment?
25 MR. MILLER: Object to the form; compound. Go

Page 17

1 ahead.
2 A Yes.
3 Q With regard to gathering medical information, would
4 you want to do that at the earliest opportunity that
5 you have?
6 A Yes. The earliest opportunity being sometimes it's
7 helpful to wait until someone is finished treating
8 with a certain provider to get the records at once.
9 Sometimes it's easier for the patient that way so
10 there's not multiple requests that we have to wait
11 for, but it's -- it's -- I usually leave it up to
12 the injured party.
13 Q And you wouldn't want to delay that process if the
14 injured party wants to move forward, correct?
15 A Right.
16 Q Would you agree that your, as a claims handler,
17 investigation should be proactive?
18 A Yes.
19 Q With respect to making offers of settlement, would
20 you agree that you should do that even if an insured
21 or a claimant hasn't made a specific demand for a
22 specific amount?
23 A Yes.
24 MR. MILLER: Object to the form. Go ahead.
25 A Yes.

Page 18

1 Q And when you do an evaluation of a claim amount, you
2 would want to consider all available information?
3 A Correct.
4 Q Mr. Dale, do you know approximately when
5 Mr. Foster's UIM claim was ultimately paid?
6 A My understanding was it was sometime within the last
7 year or so.
8 Q I'll -- I'll tell you that there was, I think, a
9 payment made in June of 2015, so about -- about a
10 year ago.
11 A Okay.
12 Q Am I correct that your handling of the claim ceased
13 in 2012?
14 A That sounds right.
15 Q What have you reviewed, if anything, to determine
16 what happened with Mr. Foster's claim after you
17 stopped handling it in 2012?
18 MR. MILLER: We object to the form. Are you
19 talking about in preparation for the deposition
20 or --
21 MR. FAIRBANKS: I think just anything.
22 MR. MILLER: Okay. Go ahead.
23 Q Either in your employment or in preparation for the
24 deposition. And I don't want you to tell me
25 anything that you and Don talked about, but I'm just

Page 19

1 wondering what -- what documents have you reviewed
2 to determine, if you have reviewed anything, what
3 went on with the claim after you stopped handling it
4 in late 2012?
5 A I didn't review anything until I was preparing for
6 this deposition; and I reviewed claim file notes,
7 and that was it, just claim file notes.
8 Q Do you think you would have reviewed claim file
9 notes that were from 2014 or 2015?
10 A No, just my own.
11 Q Okay. And what I'm trying to figure out is whether
12 or not you have any independent knowledge or
13 opinions about the claims handling that took place
14 after you stopped handling the claim in late 2012?
15 A No, I don't.
16 Q Okay.
17 MR. MILLER: There were a couple of other
18 things he reviewed if you want my help. I don't
19 want to be --
20 MR. FAIRBANKS: Sure.
21 MR. MILLER: -- incomplete.
22 MR. FAIRBANKS: Yeah, please.
23 Q Do you recall reviewing anything else other than
24 some claims notes?
25 MR. MILLER: Your May offer you made.

7 (Pages 16 to 19)

Examination of Anthony T. Dale

## Page 20

1  A  Oh, correspondence, yes.
2  Q  Okay.  Some of the correspondence you had with
3  Mrs. Foster?
4  A  Correct.
5  Q  Ernest's wife?
6  A  Right.
7  Q  Okay.  And we'll get into some of those in a little
8  bit.
9     Have you -- again not specific to discussions
10  with any of the lawyers, have you talked with any of
11  the other claims adjusters recently about the
12  handling of Mr. Foster's claim?
13  A  I did talk to Laura Harp.
14  Q  Okay.  When did you all talk?
15  A  That was probably about a month ago or so.
16  Q  Can you tell me what you and Ms. Harp discussed.
17  A  She had asked me for my contact information to give
18  to Mr. Miller's office to schedule the deposition,
19  and I asked her what happened with the claim and she
20  told me that they did end up paying -- I don't
21  remember the exact amount but they ended up paying
22  it.
23  Q  Did she tell you when or why?
24  A  She didn't tell me when but she told me that they
25  had an expert that changed his opinion.

## Page 21

1  Q  Have you reviewed any of the expert reports?
2  A  No.
3  Q  Okay.  So Laura Harp had told you that an expert
4  that Liberty Mutual had had changed his opinion and
5  that was one of the reasons why the payment was
6  made?
7     MR. MILLER:  Object to the form.  Go ahead.
8  A  She told me that the opinion he gave in his
9  deposition was different than the opinion he gave in
10  his report.  She didn't specifically say that that's
11  why they ended up paying it, but she just told me
12  that that's what happened with the claim.
13  Q  Okay.  Do you know how many days before this UIM
14  case was scheduled to go to trial that the case
15  settled?
16  A  No.
17  Q  Okay.  During the time that you were handling
18  Mr. Foster's claim I seen some -- some notes talking
19  about wanting to send him to a medical examiner.  Do
20  you remember that?
21  A  Yes.
22  Q  While you were handling the claim that -- that never
23  came to fruition, is that correct --
24  A  Right --
25  Q  -- he never --

## Page 22

1  A  I don't believe so.
2  Q  Tell me how that process would work.  How would you
3  have gone about finding a doctor to send Mr. Foster
4  to see?
5  A  Normally I consult with a defense attorney that I
6  work with in the areas wherever we need it to ask if
7  they would recommend anyone or know of a doctor that
8  does independent medical examinations.  We -- yeah.
9  Q  Okay.  So you may, from time to time, consult with a
10  local defense lawyer about what doctors they may
11  suggest to send one of the claimants to?
12  A  (Affirmative nod).
13  Q  Do you remember ever --
14  A  Correct.
15     MR. MILLER:  Thank you.
16  Q  -- ever getting to that point with regard to
17  Mr. Foster's claim, ever getting a recommendation of
18  who -- who he could go to?
19  A  I don't recall.
20  Q  And when you say -- again, just for the jury to
21  know, when you're talking about an independent
22  medical examination, can you just describe generally
23  what you're talking about.
24  A  That's where we have the injured party go see a
25  doctor of our selection to examine him just like any

## Page 23

1  other doctor would.
2  Q  And when you're talking about an independent medical
3  examination, you do want the doctor that's selected
4  to be independent, correct?
5  A  Independ -- what do you mean?
6  Q  Well, let me ask you this:  Would you want the --
7  the doctor that sees a claimant or an insured to be
8  open about offering a fair opinion after the
9  examination?
10  A  Yes.
11     MR. MILLER:  Object to the form.  Go ahead.
12  Q  Do you all have any lists of approved doctors or
13  medical examiners that you use at Liberty Mutual?
14  A  It differs by state.  I don't honestly know if we do
15  in Kentucky or not.  I know for the other states
16  that I handle we do work with different vendors who
17  logistically set up the appointment and they have
18  doctors signed up with them that have agreed to use
19  their services and have a set fee.
20  Q  Do you know what the -- the set fees are that you
21  guys have negotiated?
22  A  I don't.
23  Q  What about Dr. David Jenkinson, do you know of him?
24  A  I only know from my preparation yesterday that he
25  was the expert that Liberty Mutual had selected.

8  (Pages 20 to 23)

Examination of Anthony T. Dale

Page 24

1  Q  Have you ever utilized Dr. Jenkinson back when you
2      were handling the claims in Kentucky?
3  A  I don't recall.
4  Q  And I think you've touched on this, but just to tie
5      this idea up, you have not reviewed either
6      Dr. Jenkinson's report or his deposition, correct?
7  A  No.
8  Q  While you were handling Mr. Foster's claim, did you
9      make any settlement offers to him?
10 A  Yes.
11 Q  Do you recall the amount?
12 A  I believe 7500.
13 Q  Let's talk about that 7500-dollar offer. How much
14     of that 7500 was going to be paid by American Fire?
15 A  I believe all of it.
16 Q  Do you recall working together with an adjuster from
17     Philadelphia Insurance Company?
18 A  Yes.
19     MR. MILLER: Object to the form. Go ahead.
20 A  Okay. Yeah, now I recall. There was a split
21     because they had another policy, so it was going to
22     be paid in conjunction with them.
23 Q  So that 7500-dollar offer that was made was a
24     combined offer?
25 A  Correct.

Page 25

1  Q  Do you recall the amount of that that American Fire
2      was going to pay?
3  A  I believe 60 percent.
4  Q  Okay. And I think that's right. I think it was
5      4500. Do you remember that?
6  A  If that's what -- yeah, if that's the right math,
7      then yes.
8  Q  Do you remember when that offer was made?
9  A  I think May 2011.
10 Q  And at that point in May 2011 how -- how had
11     Mr. Foster's UIM claim been pending with you?
12 A  Probably about a year.
13 Q  Do you recall the date of the accident itself?
14 A  No.
15 Q  Okay.
16     MR. MILLER: Phil, before you -- not to
17     interrupt you, do you have that May 23, '11 email?
18     Are you going to use that for an exhibit today?
19     MR. FAIRBANKS: I am, yes; and I do.
20     MR. MILLER: Okay.
21 Q  Let's do this, Mr. Dale. I've got a few exhibits
22     here that we may make reference to. What I've got
23     printed out here I believe is a complete set of the
24     claim notes that --
25 A  Okay.

Page 26

1  Q  -- I've been provided. And I'll just ask you to
2      just maybe flip through those briefly, not
3      necessarily to read all of them but just to confirm
4      that those, in fact, are claim notes that you all
5      use at Liberty Mutual.
6  A  (Witness complies.)
7      MR. MILLER: I've got that you produced six or
8      seven pages in addition to what you've shown the
9      witness, but it's all after he got out of the claim,
10     so --
11 A  Yeah. Yes, these are all claim notes from our
12     electronic system.
13 Q  Now just looking at the -- the first page here, and
14     they're labeled in the bottom right-hand corner so I
15     may make reference to that. This is Page 1057.
16 A  Okay.
17 Q  You see up at the top loss date is June 8th of 2008.
18 A  Yes.
19 Q  Does that sound right that the -- the collision
20     occurred in June of 20 -- 2008?
21 A  If that's what it says, yes.
22 Q  Okay. All right. Mr. Dale, I'm going ask you to
23     flip kind of towards the back to Page 1139.
24 A  Okay.
25 Q  And what I'm trying to do is get us kind of in a

Page 27

1      timing track to figure out -- pindown some of the
2.     dates that you got involved in the case.
3  A  Okay.
4  Q  And I'm looking at a note that's dated May 20, 2010
5      made by Geoffrey Maddox. Do you see that?
6  A  Yes.
7  Q  Who is Geoffrey Maddox?
8  A  He was the PIP adjuster at the time I believe.
9  Q  Do you know Mr. Maddox?
10 A  Not personally.
11 Q  Do you know which Liberty Mutual office he worked
12     out of?
13 A  I don't.
14 Q  Is he at the same Indianapolis location as you?
15 A  No.
16 Q  Do you know generally out of which office Kentucky
17     PIP claims are handled -- were -- were handled back
18     at this time?
19 A  At that time I don't remember. I know it's not the
20     same office -- well, they're handled out of a
21     different office than they were then. I just can't
22     remember which one it was at the time.
23 Q  Do you remember where they're handled now?
24 A  Now I believe they're handled out of Liberty Lake,
25     Washington and Farmingdale, New York.

9  (Pages 24 to 27)

Examination of Anthony T. Dale

Page 28

1  Q  Okay.  So Washington state and New York state?
2  A  And possibly Florida.
3  Q  Are there any Liberty Mutual claims offices in
4     Kentucky?
5  A  No, not to my knowledge.
6  Q  Do you remember having any conversations with
7     Mr. Maddox himself about Mr. Foster's claim?
8  A  No.
9  Q  Okay.  It looks like on this May 20, 2010 note that
10    Mr. Maddox is stating that he received a call from
11    Mr. Foster's wife wanting to set up a UIM claim.  Do
12    you see that?
13 A  Yes.
14 Q  And then it looks like the next note above that is
15    one made by you the next day on May 21, 2010.  Do
16    you see that?
17 A  Correct.
18 Q  What is the first thing that you did according to
19    the notes when you got involved with this Foster
20    claim?
21 A  It looks like I called Progressive to get the status
22    on the bodily injury claim.
23 Q  And Progressive was the insurance company that
24    insured Gary Washabaugh.  Do you remember that name?
25 A  I don't recall the name.

Page 29

1  Q  Okay.  Well, he's the at -- he's the at-fault
2     driver.
3        Do you remember that Progressive was the
4     insurer for the at-fault driver?
5  A  Yeah, it appears so.
6  Q  Do you remember how much coverage Progressive had?
7  A  I don't remember.
8  Q  Do you know what the state minimum liability
9     insurance level is in Kentucky?
10 A  I believe it's 25,000.
11 Q  You're -- you're correct, and I'll tell you that's
12    how much coverage Mr. Washabaugh had.
13 A  Okay.
14 Q  What did the adjuster at Progressive tell you?
15 A  It looks like on May 25th I received a voicemail
16    from her that they had offered their policy limit of
17    25,000 and that she had sent a letter and a copy of
18    their dec page to the insured and that she offered
19    to fax it to us if we needed it.
20 Q  Okay.  So Progressive -- pretty much as soon as
21    you're getting involved, Progressive has offered to
22    pay its policy limits to Mr. Foster, correct?
23 A  Correct.
24 Q  And at that point in time do you understand that
25    there is a potential for a UIM claim over and above

Page 30

1     what's being paid by Progressive?
2  A  Yes.
3  Q  Okay.  I see on May 21st you had a conversation with
4     Mrs. Foster, Betty.  Do you see that?
5  A  Yes.
6  Q  Did you primarily communicate with Mrs. Foster
7     instead of Mr. Foster directly?
8  A  Yes.
9  Q  What do you remember about your conversation -- your
10    initial conversation with Mrs. Foster?
11 A  I don't independently recall it.
12 Q  Okay.  Do you have any independent recollection of
13    any of your conversations with her?
14 A  No.
15 Q  Okay.  Have you -- and I don't think you have, but
16    have you ever met either Mr. or Mrs. Foster
17    face-to-face?
18 A  No.
19 Q  What do you remember about the -- the collision
20    itself, the mechanics of how it happened?
21 A  The only thing I recall just from when I was
22    reviewing my notes yesterday is -- is that his knees
23    hit the dashboard.  Other than that, I don't -- I
24    don't recall any other knowledge.
25 Q  Do you remember it being a front end, kind of a

Page 31

1     head-to-head collision?
2  A  I believe so, that's correct.
3  Q  Did you ever get any copies of the photographs of
4     the vehicles?
5  A  I -- I don't recall.
6  Q  I haven't seen any of them in your file, and I'm
7     just wondering if aside from what I can gather from
8     looking at the file, if you did -- if you do
9     remember reaching out and trying to get photos?
10 A  That's normally something that I would try to get if
11    we didn't have them already, but I don't remember if
12    we did -- if they were either -- either available or
13    if we did receive them on this one.
14 Q  Tell me how, if it does, a -- the photos of the
15    vehicles involved in the accident affect your
16    evaluation of a claim.
17 A  I like to look at the photos to see what the
18    severity of the impact was, how -- how damaged the
19    vehicle was from the impact so I can get an idea of
20    what kind of force the injured party would have
21    received or went through.  I also like to see where
22    on the vehicle the impact was in relation to where
23    the injured party was sitting to see, you know, if
24    that -- you know, because if they were sitting where
25    the impact occurred, obviously that would be more

10 (Pages 28 to 31)

Examination of Anthony T. Dale

Page 32

1  traumatic than maybe somewhere else in the vehicle.
2  Q  And on the flip side of that if you've got a -- you
3     know, a fender bender where you can't really even
4     see if there was much damage, that's going to be
5     important to you too to determine whether or not
6     somebody was injured in a minor accident; is that
7     fair?
8  A  Yes.
9  Q  But you -- you don't recall looking at either the
10    photos of Mr. Foster's truck or Mr. Washabaugh's
11    vehicle?
12       MR. MILLER:  Object to the form.  Go ahead.
13 A  I don't remember if we ever received them or not.
14 Q  Mr. Dale, mixed in with the notes that you're making
15    into the file are notes that the -- the PIP
16    adjusters are making into the file.  Do you see
17    that?
18 A  Yes.
19 Q  I'm wondering in -- in realtime if you would have
20    pulled this file up in 2010, would it look the same
21    as it does here when we're looking at it, you would
22    have the -- all those same notes in here?
23 A  Correct.
24 Q  From looking at those notes did you understand that
25    the PIP adjusters had been paying Mr. Foster PIP

Page 33

1  benefits for wage loss?
2       MR. MILLER:  Object to the form.  Go ahead.
3  A  I don't necessarily read the notes.  I mean I try to
4     skip past them until I have authorization from the
5     injured party to read them, but -- and I don't
6     independently recall a conversation but usually what
7     I do when there is PIP involved and I don't have
8     authorization, I contact the PIP adjuster just like
9     I would a PIP adjuster at another insurance company
10    and ask them what the status is on their PIP claim.
11 Q  Aside from the notes did you understand when you
12    took over the handling of this UIM claim that there
13    was an ongoing PIP wage loss claim?
14 A  I don't independently recall, but I believe that's
15    correct.
16 Q  Okay.  Mr. Dale, I'm going to hand you what we'll
17    mark as Exhibit 1.
18       MR. MILLER:  You don't want to do the claim
19    notes?
20       MR. FAIRBANKS:  I probably will.
21       THE WITNESS:  You want me to just leave them
22    here.
23       MR. MILLER:  Just leave them right here and let
24    him --
25       MR. FAIRBANKS:  Let's do that.  I -- I agree

Page 34

1  with you, Don, let's -- let's make the claim notes,
2  that big exhibit, Exhibit 1; and then we'll make
3  this Exhibit 2 (indicating).
4       MR. MILLER:  Is that my copy you're handing me?
5       MR. FAIRBANKS:  Either way.  They're -- yes,
6  that's your copy right there, that's correct.
7       MR. MILLER:  Hold on.  Let me read it before
8  you -- you answer.
9       THE WITNESS:  Okay.
10 A  Can I read it?
11 Q  Sure.  Go ahead.  Feel free to look through it.
12 A  Did you ask a question, I'm sorry?
13 Q  I have not.
14 A  Okay.  I wasn't sure.
15 Q  Okay.  What I'm wanting to ask you, Mr. Dale, is if
16    this looks like some email correspondence between
17    you and Ms. -- Mrs. Foster about getting some
18    information about Ernest's medical providers?
19 A  Yes.
20 Q  Are you asking Ernest to sign an authorization so
21    that you can request whatever medical information
22    you might need on the claim?
23 A  Correct.
24 Q  And does he do that?
25 A  I believe so, yes.

Page 35

1  Q  And it looks to me --
2  A  Yeah.
3  Q  -- like on May 25, 2010, I guess just a few days
4     after you took over the claim, Mr. Foster has
5     provided you with a signed authorization to release
6     health information for claims processing; is that
7     right?
8  A  Correct.  That's the date on the authorization.
9  Q  And he's given you a list of medical providers that
10    he's seen?
11 A  Yes.
12 Q  And the Fosters are also providing you with a letter
13    from Progressive showing that Progressive is
14    offering the policy limits of 25,000?
15 A  Correct.
16 Q  Okay.
17       MR. MILLER:  Madam Court Reporter, Joyce,
18    Page 90 -- the Bates label 92, which is the second
19    or third page back in this exhibit, has Mr. Foster's
20    Social Security Number and date of birth on it.  If
21    you'll -- I don't want a federal judge getting mad
22    at any of us.
23 Q  Is that the normal process that you go through when
24    you begin investigating a claim, try to get a
25    medical authorization from the claimant?

Examination of Anthony T. Dale

Page 36

1  A  Not always right away.
2  Q  Was there something about the Foster claim that made
3     you want to get one right away?
4  A  I don't independently recall, but I would imagine
5     more to be able to see the PIP file and the records
6     that Progressive already had so I could get an
7     understanding of what his injuries and treatment
8     were to date.
9  Q  Did this authorization give you access to that PIP
10    file?
11 A  Yes.
12 Q  So at least as of May 25th of 2010 you had access to
13    whatever the PIP adjusters had with respect to
14    medical records, medical bills or wage loss
15    information?
16 A  Correct.
17 Q  Okay.  I'm going to go back to the -- claim
18    notes exhibit.
19 A  Okay.
20       (Whereupon Deposition Exhibit 2 was marked for
21       identification.)
22 Q  I'm going to try to go through this chronologically
23    so we can keep it all straight.
24 A  Okay.
25 Q  I'm looking at Page 1135.

Page 37

1  A  Okay.
2  Q  Okay.  We've talked about your May 25th note of your
3     receiving a voicemail from the adjuster at
4     Progressive.  What I'm looking at is the next
5     voicemail.
6        Tell me about the voicemail that you received
7     from the Progressive adjuster on June the 4th of
8     2010.
9  A  It says that she is sending records to me and that
10    Dr. Cecil's notes are very light.
11 Q  What do you mean by that?
12 A  Which part?
13 Q  That Dr. Cecil's notes are very light?
14 A  I don't independently recall.  My understanding
15    would be that the -- the records she's sending,
16    they -- they might be difficult to read because the
17    print must -- or the copy must be really light.
18 Q  Do you remember who Dr. Cecil was?
19 A  I don't.
20 Q  Okay.  It looks like you make a longer note that
21    same day.  It looks like your conversation with --
22    or the voicemail from the Progressive adjuster was
23    received at about 11:30 in the morning.  Do you see
24    that?
25 A  Uh-huh, yes.

Page 38

1  Q  And then the next note is one that's logged in at
2     2:51 p.m.
3  A  On Page 1134?
4  Q  It's on --
5        MR. MILLER:  Yeah.
6  Q  -- 1133 and 34, yes.
7  A  Yes, I see that.
8  Q  I'm going to start looking at that note on 1133.
9     There's a section in your note that talks about
10    coverage.  Do you see that?
11 A  Yes.
12 Q  As a claims adjuster one of the first things you
13    want to do is determine whether or not there's
14    coverage for the claim that's being made; is that
15    fair?
16 A  Correct.
17 Q  What did you determine with respect to the coverage
18    for Mr. Foster's UIM claim?
19 A  I determined that there was coverage.
20 Q  Now, it looks like you state there there's no
21    exclusion.  All conditions are met.  Coverage is in
22    place --
23 A  Correct.
24 Q  -- right?  Down in the facts -- facts section
25    there's a note about the liability or who is at

Page 39

1     fault.  What did you determine with respect to who
2     was at fault?
3  A  The claimant; that is, the Progressive insured.
4  Q  Okay.  So at this point Mr. Foster has a covered
5     claim under his policy and he is not going to bear
6     any comparative responsibility for it --
7  A  Correct.
8  Q  -- right?
9  A  Yes.
10 Q  At that point it looks like you proceed to analyze
11    the damages --
12 A  Yes.
13 Q  -- is that right?  Tell me about your recommendation
14    on the damages on June 4, 2010.
15 A  It looks like my recommendation was to set a reserve
16    of the policy limit of 100,000 pending review by my
17    manager and to triage, I believe, with our business
18    analyst.
19 Q  Now the $100,000, that's how much UIM coverage
20    Mr. Foster had with American Fire, correct?
21 A  Yes.
22 Q  What went into your basis that you recommended
23    setting a reserve at 100,000?
24 A  At this point, because I didn't have any records, it
25    was essentially based on what Mrs. Foster had told

12  (Pages 36 to 39)

Examination of Anthony T. Dale

## Page 40

1  me; and -- and then in addition, I knew about the
2  other insurance company, Philadelphia, that might
3  have other UIM coverage, and so it appears that I
4  looked at that. It doesn't appear that had any
5  bearing yet because I didn't have their policy
6  language, so I didn't know how those two policies
7  would apply together. And so I assessed that based
8  on what I knew, the approximate value of his injury
9  was 150,000 but then there is an offset when you
10 settle a claim, an underinsured motorist claim, for
11 whatever is paid by the PIP coverage as well as what
12 is paid by the at-fault party's insurance. And so
13 that leaves us at $100,000.
14 Q  In coming up with your amount of approximately
15    150,000 it looks like that's based on some
16    additional medical expense that Mr. Foster was going
17    to need for a neurologist, injections, knee
18    replacement, physical therapy. Do you see that?
19 A  Correct, yes.
20 Q  And it doesn't look to me like your 150,000 figure
21    is including anything for wages at that point in
22    time; is that right?
23 A  I believe so.
24 Q  Where did you get the information that the knee
25    replacement would be approximately $45,000?

## Page 41

1  A  That's just an estimate based on experience.
2  Q  Okay. I want to show you what we'll mark as
3     Exhibit 3.
4        MR. MILLER: I'll put a Number 3 on it for you.
5  Q  And most of this has been -- been blacked out,
6     Mr. Dale. I'll give you a chance to look at it for
7     just a second.
8  A  Okay.
9  Q  This has been provided to me along with some manuals
10    and claims handling materials from Liberty Mutual.
11    Is this familiar to you?
12 A  No.
13 Q  Okay. It's titled Claims Examiner Toolbox. Do you
14    know what that is?
15 A  That is familiar, yes.
16 Q  Can you tell me what that is.
17 A  It's been a long time since we had that because I
18    believe it's been -- the name has changed and the
19    format has changed, but I believe at that time that
20    was kind of a lot of resources that we could use for
21    reference for different things in claims handling.
22 Q  And this particular section of it is titled Medical
23    Disability and Cost Guidelines. Do you see that?
24 A  Yes.
25 Q  Now it looks to me like it has different sections

## Page 42

1  for different types of injuries. You know, for
2  example, injuries to fingers or hands, elbows, kind
3  of going through all that, which are all covered up;
4  but what I want to look at is on Page 1528 when
5  they're talking about the -- the knee.
6  A  Uh-huh, yes.
7  Q  So,there are two sections there. One is for knee
8     strains/tear, do you see that?
9  A  Yes.
10 Q  And then the next one is for total knee replacement.
11    Do you see that?
12 A  Yes.
13 Q  And with respect to the total knee
14    replacement/arthroplasty on pages 1528 continuing
15    onto 1529, can you tell me what the -- the cost and
16    the reserve for that procedure is as listed in this
17    claim examiner toolbox.
18 A  It says 45,000 to $70,000, reserve for $125,000
19    medically.
20 Q  And that would be just for the knee replacement
21    itself, correct?
22 A  I believe so. I'm not sure. That might include
23    physical therapy as well because that's listed here.
24 Q  Okay. But that wouldn't include any wage loss that
25    might be associated with it, that sort of thing?

## Page 43

1  A  I don't believe so, no.
2  Q  Okay. Going back to the claim notes, just kind of
3     keeping this chronologically, on June the 4th of
4     2010 you make a recommendation of setting the policy
5     limit reserve at 100,000.
6        Just for -- again, for the jury's
7     understanding, can you tell us what a reserve is.
8  A  A reserve is kind of an estimate, an estimate of
9     what we intend -- of what we may pay out in that
10    coverage.
11 Q  Who was your supervisor at this particular time,
12    June of 2010?
13 A  I'll have to look at my notes. Allen Faber.
14 Q  Where was Allen Faber located?
15 A  In Fairfield, Ohio.
16 Q  And what was his position at that time?
17 A  I believe it was unit leader, I think, but he was my
18    manager.
19 Q  I'm looking at Page 1132. Looks like there's a note
20    that Mr. Faber makes June 7, 2010?
21 A  Yes.
22 Q  What is he relaying to you?
23 A  Are you talking about the one that starts with
24    "Tony"?
25 Q  Yes.

13 (Pages 40 to 43)

Examination of Anthony T. Dale

Page 44

1   A   He's relaying to me that there is $50,000 in PIP
2       coverage that will have offset.  So I had said that
3       there was 10,000 in PIP that would be offset and so
4       he was letting me know that because of the extra
5       coverage they had, there would actually be a $50,000
6       offset.  So we -- plus the 25,000 of the at-fault
7       party's insurance, so we would then have a total
8       credit of 75,000 off the total value of the injury.
9           And then he says that he sees the case having a
10      greater full value before the offsets of 150,000 if
11      there are no priors; that is, pre-existing
12      condition.  And he said full value is at least
13      $200,000.  And so he recommended to go ahead and
14      reserve $100,000, the policy limit.
15  Q   Okay.  So Mr. Faber agreed with you on setting the
16      reserve at $100,000?
17  A   Yes.
18  Q   It looks like he valued the case from a gross
19      perspective a little bit higher than you; is that
20      right?
21  A   Yes.
22  Q   And even taking into account an additional $40,000
23      in offsets, he still thinks it's a policy limits
24      case; is that right?
25  A   Correct.

Page 45

1   Q   Why didn't you go ahead and offer the policy limits
2       to Mr. Foster here in June of 2010?
3   A   We didn't -- I don't believe we had all the medical
4       records.
5   Q   Do you know what medical records you were missing?
6   A   I don't recall, no.
7   Q   Did you let either Mr. or Mrs. Foster know that you
8       guys were putting up a 100,000-dollar reserve on the
9       case?
10  A   No.
11  Q   Did you make any request to Mrs. Foster or
12      Mr. Foster that you needed more medical information?
13  A   There is a reference on 6/10 that I tried to call
14      and that I would send an email; so I -- I don't know
15      what was in that email, but I don't independently
16      recall if I did or not.
17  Q   Okay.  So at this point in time in June of 2010 when
18      you all have the reserve at 100,000, the reason that
19      you just don't go ahead and pay the claim is because
20      you need more medical information?
21  A   I believe so, yes.
22  Q   Do you know what requests you made with the
23      authorization that Mr. Foster had given you a couple
24      of weeks earlier?
25  A   I would presume that I requested the records from

Page 46

1       Progressive since they called and left a message and
2       said that they were sending those records to me.
3       And then there is a note from who I presume is one
4       of our support staff because they sent a records
5       request to a provider.
6           MR. MILLER:  Give us a date if you don't mind.
7           THE WITNESS:  Oh, 6/10 at 2:51 p.m.
8   Q   Do you know who that provider was?
9   A   I don't.
10  Q   And at this point in time you had access to whatever
11      medical information was in the PIP file; is that
12      right?
13  A   At this point we -- we had paper files so PIP would
14      have had any medical records or bills they received
15      in a physical file, so I would have had to have them
16      copy and send it to me.  So I don't know at this
17      point if I actually had those copies or not.
18  Q   Do you remember at some point ever making that
19      request to the PIP department to send you what
20      medical file -- files that they already had?
21  A   Not independently, I don't remember.
22  Q   And at least with the authorization that Mr. Foster
23      gave you, you could have done that when that
24      authorization was sent to you in May of --
25  A   Correct.

Page 47

1   Q   -- 2010?
2   A   Yes.
3           MR. FAIRBANKS:  Let's take a five-minute break.
4           THE WITNESS:  Okay.
5           MR. FAIRBANKS:  Let's go off the video.
6           (Whereupon a recess was taken from 10:48 a.m.
7           to 11:01 a.m.)
8           MR. FAIRBANKS:  We are back on the video
9       record.
10  Q   Mr. Dale, what do you remember about Mr. Foster's
11      job?
12  A   From what I recall, he was a mechanic that worked
13      out of his garage.
14  Q   Do you know what his educational background was?
15  A   I don't recall.
16  Q   Did you have any discussions that you remember with
17      Mrs. Foster about the type of work that Ernest was
18      doing?
19  A   I -- I don't remember.
20  Q   Allen Faber, do you know, is he still with Liberty
21      Mutual?
22  A   He's not, no.
23  Q   Okay.  Do you know what -- where he's at now?
24  A   I don't.
25  Q   How long was he your manager during this Foster

14  (Pages 44 to 47)

Examination of Anthony T. Dale

Page 48

1    claim, do you remember?
2    A  I believe it was less than a year.  I don't remember
3       exactly though.
4    Q  Let's get back into the claim notes and kind of
5       take -- take some more chronological steps.
6    A  Okay.
7    Q  I'm going to ask you a few questions with respect to
8       the wage loss claim.  There's a note on Page 1130
9       made by Geoffrey Maddox at the bottom of that page.
10      July 9, 2010, do you see that?
11   A  Yes.
12   Q  It says:  Called Lexington Clinic and was advised
13      that Ernest has not been released back to work,
14      unsure if he ever will.  Do you see that?
15   A  Yes.
16   Q  Going forward you have a note September 14, 2010
17      beginning on 1128 going on to 1129.  Do you see
18      that?
19   A  September 14?
20   Q  September 14.
21   A  At --
22   Q  Of 2010.
23   A  Okay.  At what time did you say?
24   Q  2:18 p.m.
25   A  Oh, I thought you said 11:18.

Page 49

1    Q  Oh, sorry.  I'm -- I'm talking about the numbers at
2       the bottom of the page, 1128 --
3    A  Oh, I see.
4    Q  -- and 1129.
5    A  Okay.  Okay.  Yes, I see that.
6    Q  And what do you have the reserve set at on September
7       14, 2010 on the UIM claim?
8    A  It looks like it's still $100,000.
9    Q  Okay.  Let's flip forward a couple more pages to
10      Page 1126.  There are two notes made on November 29,
11      2010.  It looks like by the PIP adjuster.  I'm
12      looking at the second one at 3:25 p.m.  Do you see
13      that?
14   A  Yes.
15         MR. MILLER:  Can you give me the numbers again.
16      I fell asleep for a half a second.  I apologize.
17         MR. FAIRBANKS:  Sure.  Page 1126.
18         MR. MILLER:  Thank you.
19   Q  So on November 29, 2010 it looks like the PIP
20      adjuster is making a note that they have received a
21      new doctor's excuse for Ernest Foster and will issue
22      lost -- lost wage payments of $300 for six weeks.
23      Do you see that?
24   A  Yes.
25   Q  Okay.  I'm looking next at a note made by you about

Page 50

1    a month later, December 23, 2010.
2    A  Okay.
3    Q  Pages 1124 and 1125.  Do you see that?
4    A  Yes.
5    Q  At the top of Page 1125 what are you indicating in
6       the issues section?
7    A  That he has completed treatment, has reached maximum
8       medical improvement with some permanent restrictions
9       of no bending, squatting, kneeling and can't do
10      normal job.  He hasn't decided whether or not to
11      have knee replacement.
12   Q  And what do you have the reserves set at there on
13      December 23 of 2010?
14   A  $100,000.
15   Q  And at that point have you made any offer to
16      Mr. Foster?
17   A  It doesn't appear so.
18   Q  And have you disclosed to Mr. or Mrs. Foster what
19      you have reserves set at?
20   A  No.
21   Q  Let's flip over to Page 1123, and this is moving
22      forward a couple of months again.
23         You have a note on March 24, 2011.  Describe
24      for me what you're making a note of that day.
25   A  It says:  Waiting on wage loss supports from PIP

Page 51

1    adjuster to evaluate underinsured motorist claim.
2    Q  What -- what other wage loss supports were you
3       waiting for other than what's already noted in the
4       file?
5    A  I --
6         MR. MILLER:  Object to the form.  Go ahead.
7    A  I don't independently recall.
8    Q  If we look at the note -- the next note up, April 1
9       of 2011, are you with me there?
10   A  Yes.
11   Q  The end of that note says:  Insured permanently
12      disabled from doing his job as a mechanic.  Do you
13      see that?
14   A  Yes.
15   Q  And is that the PIP adjuster making that note?
16   A  I believe so.
17   Q  And you would have had access to that note kind of
18      as an -- in realtime at that point in the spring of
19      2011.
20   A  Yes.
21   Q  Okay.  So we're up to April of 2011.  And I know you
22      mentioned that you had reviewed this -- this note
23      yesterday, and I want to hand this to you.
24         MR. FAIRBANKS:  We'll mark this as the next
25      exhibit.

15  (Pages 48 to 51)

Examination of Anthony T. Dale

Page 52

```
 1          MR. MILLER: Number 4.
 2   Q   So Mr. Dale, in May of 2011 is your reserve still
 3       set at $100,000?
 4          MR. MILLER: Look at your 6/30 note.
 5   A   No, it's not.
 6   Q   In May of 2011 what was your reserve?
 7   A   Oh, I'm sorry. In May, yes, it still was.
 8   Q   Still set at 100,000?
 9   A   Yes.
10   Q   And in Exhibit 4, your May 23, 2011 email to
11       Mrs. Foster, how much do you offer Mr. Foster?
12   A   $7,500 exclusive of PIP, and that's shared 60/40
13       with Philadelphia Insurance.
14   Q   So you're offering 60 percent of $7500?
15   A   Correct.
16   Q   How much of your settlement offer did you allocate
17       to pain and suffering?
18          MR. MILLER: Object to the form. Go ahead.
19   Q   Let me -- let me back up. Did you allocate a
20       particular amount of your settlement offer to pain
21       and suffering?
22   A   I don't recall if there was a specific -- what
23       specific amount was.
24   Q   You would agree that he is entitled to a claim
25       payment for the pain and suffering that he's had
```

Page 53

```
 1       from his injury, correct?
 2   A   Yes.
 3   Q   What about future medical costs, what had you
 4       allocated for future medical costs?
 5   A   I'm -- I'm not sure. I don't have the evaluation to
 6       know for sure.
 7   Q   What -- let me rephrase that a different way.
 8       What did you tell Mrs. Foster you were
 9       allocating for Ernest's future medical care?
10   A   I don't see any reference to future medical care.
11   Q   Why did you omit that?
12   A   I don't recall.
13   Q   Because as we had looked at before back in June of
14       2010 you had allocated, in setting your reserve,
15       amounts for knee replacement surgery, correct?
16   A   Right based on --
17          MR. MILLER: Object to form.
18   A   -- the information I had at the time.
19   Q   What was your rationale for not including that in
20       your May 23, 2011 email to Mrs. Foster?
21   A   I wouldn't know without reviewing my evaluation.
22   Q   Do you recall receiving any information that
23       suggested that Mr. Foster wasn't going to need that
24       knee replacement surgery sometime in the future?
25   A   I don't recall.
```

Page 54

```
 1   Q   You would agree though that that's an element of
 2       damages that he would be entitled to recover if he
 3       did, in fact, need a medical procedure in the
 4       future?
 5          MR. MILLER: Object to the form.
 6   A   Can you repeat the question.
 7   Q   Sure. And let's -- let's make it not specific to
 8       Mr. Foster. Someone who is making a UIM claim in
 9       Kentucky one of the elements of compensation, to the
10       extent that it's proven, is that they can recover
11       for future medical costs?
12   A   Correct.
13          MR. MILLER: Object to the form. It would have
14       to be caused by the accident.
15   Q   Walk me through how you came up with the 7500-dollar
16       offer?
17   A   I honestly don't recall because I don't have my
18       evaluation to refresh my memory.
19   Q   Walk me through what -- what you're describing to
20       Mrs. Foster because Mrs. Foster is not going to have
21       whatever internal notes that you have that we've
22       been looking at. She wouldn't have access to those,
23       correct?
24   A   Okay.
25   Q   So tell me what -- how you're trying to describe it
```

Page 55

```
 1       to her?
 2   A   So what I'm saying is there is an amount of total
 3       medical bills and outstanding wage loss and then
 4       medical bills that were already paid by PIP, wage
 5       loss that was already paid and then future wage loss
 6       that was paid. So the total of the medical bills
 7       and the wage loss was approximately 74,000.
 8   Q   Okay.
 9   A   And that under the underinsured motorist coverage we
10       essentially get a 75,000-dollar credit, and so we
11       are making an additional offer of 7500 which doesn't
12       affect any future or ongoing payments by PIP that
13       are being made for the wage loss.
14   Q   Okay. So what -- what did you tell Mr. -- Mr. and
15       Mrs. Foster the basis of the $7500 was?
16   A   I don't believe I specifically said exactly what
17       that's allocated towards.
18   Q   Okay. Let's talk about the -- the wage loss element
19       because that seems like where the majority of your
20       calculations are here in the email.
21   A   Okay.
22   Q   There's a bullet point as part of the second
23       paragraph there, and tell me in that bullet point
24       how are you coming up with Mr. Foster's average
25       earnings.
```

16 (Pages 52 to 55)

Examination of Anthony T. Dale

Page 56

1      MR. MILLER: Object to form.
2  A   The one that starts in 2009?
3  Q   Yes.
4  A   So in 2009 he made 23,000 but in 2009 he didn't work
5      November or December. So I took the figure that he
6      made in 2009 and divided that by the 10 months that
7      he worked to -- to determine what he made monthly
8      and then multiplied that by 12 to get the figure of
9      28,000 which is, had he been able to work November
10     and December, what his total income would have been
11     for 2009.
12         And then using his 2000 -- 2000 -- 2007 and
13     2008 and then the 2009 projected income took an
14     average of that to see on average what he usually
15     makes in a year and then divided that amount which
16     is -- that was -- the average was about 31,000,
17     divided that by 52 weeks to determine $599 being his
18     average weekly earnings.
19  Q  Okay. So you had done some calculations to
20     determine his average weekly earnings and it came
21     out to about $599 per week; is that correct?
22  A  Correct.
23  Q  Okay.
24  A  Yes.
25  Q  Then in the next paragraph you mentioned that PIP

Page 57

1      had paid some of that. They had been paying 300 a
2      week which was leaving essentially $299 a week
3      uncompensated; is that right?
4  A   Correct.
5  Q   The second sentence of that paragraph states: It
6      appears that he hasn't been able to work at all
7      since the surgery on 10/29/09. Do you see that?
8  A   Yes.
9  Q   And you go on: Since Ernest is a self-employed
10     mechanic, and is on permanent restrictions, that
11     makes his profession he normally has virtually
12     obsolete. Do you see that?
13  A  Correct.
14  Q  The next sentence: In this kind of profession, it
15     would be difficult for him to do much of anything
16     else, given that all his experience is in this type
17     of job. Do you see that?
18  A  Correct.
19  Q  Now, is that information that you knew at -- from
20     talking with the Fosters and from looking at the
21     files?
22  A  I would presume so, yeah.
23  Q  So if -- if you know that he's on permanent
24     restrictions and it's -- he's not -- it's going to
25     be difficult for him to do much of anything else,

Page 58

1      why did you stop your future wage loss calculation
2      at the end of May, 2011?
3          MR. MILLER: Object to the form.
4  A   I don't recall because I don't have my evaluation to
5      refresh my memory.
6  Q   Do you know how old Mr. Foster was in 2011?
7  A   I don't.
8  Q   At least looking at this email, the email doesn't
9      explain why you're ending the wage loss calculations
10     at the end of May 2011, correct?
11         MR. MILLER: Object to the form.
12  A  Correct.
13  Q  Did you ever make any additional offers to Mr. or
14     Mrs. Foster aside from the $7500 or 60 percent of
15     $7500?
16  A  I don't independently recall, but let me review the
17     claim file notes to see.
18         I don't believe I did.
19  Q  Okay. So from May of 2011 until October of 2012
20     that was the only offer that was outstanding to the
21     Fosters?
22  A  Correct.
23  Q  Okay. Let's look back at -- in the claim notes
24     again. I'm on 1122.
25  A  Okay.

Page 59

1  Q   Okay. Bottom of the page there's a note on April 1,
2      2011 and then the next one is June the 3 -- June 3,
3      2011. Do you see those?
4  A   Yes.
5  Q   And I guess your email would fall kind of in between
6      there, is that right, timeline wise?
7  A   Correct.
8  Q   The June 3, 2011 note, what does it say about
9      Mr. Fos -- Mr. Foster's disability in his job?
10  A  It looks like that's from the PIP adjuster, and it
11     said: Issued lost wages for insured. Paid five
12     weeks. $300 per week at five weeks equals 1500.
13     Doctor excuse received. Insured permanently
14     disabled from doing his job as a mechanic.
15  Q  About a month later up on July 6 of 2011 what is the
16     status of Mr. Foster's disability as noted there?
17  A  That's from the PIP adjuster, and that says: Issued
18     lost wages for insured. Paid four weeks June 6 to
19     June -- July 1, 2011. 300 per week at four weeks
20     equals 1200 dollars. Doctor excuse received.
21     Insured permanently disabled from doing his job as a
22     mechanic.
23  Q  And those are wage loss payments being made in June
24     and July of '11 for $300, correct?
25  A  Correct.

17 (Pages 56 to 59)

Examination of Anthony T. Dale

Page 60

1   Q  And in looking at your email to Mrs. Foster,
2      there -- there was another 299 that was going
3      uncompensated because PIP was capping at $300; is
4      that right?
5   A  Yes.
6   Q  Is there any reason why you didn't increase your
7      offer based on the fact that there were additional
8      PIP payments being made in June and July of 2011?
9         MR. MILLER: Object to the form.
10  A  I don't recall without being able to review my
11     evaluation.
12  Q  Is there -- is there something that you need to look
13     at?  What evaluation are you referring to?
14  A  My evaluation of the injury that would have had my
15     notes as to how we're evaluating the claim.
16  Q  Is it -- is it somewhere in the claim file?  Did you
17     look at that in preparation for the deposition
18     today?
19  A  I did not.  I don't know if it's --
20        MR. MILLER: Judge Wier didn't require it
21     produced.
22  Q  Does it appear to you that you've taken a different
23     position than what the PIP adjusters were taking
24     with respect to the ongoing wage loss?
25        MR. MILLER: Object to the form.

Page 61

1   A  Yes.
2   Q  Did you have any discussions with the PIP adjusters
3      about why they were paying lost wages but you were
4      not considering them beyond the end of May of 2011?
5   A  Not that I recall.
6   Q  Do you remember at some point that Mr. Foster was
7      approved for Social Security Disability benefits?
8   A  I -- I don't recall one way or the other.
9   Q  Did you make some attempts to gather up some sort of
10     file from the Social Security Administration about
11     Mr. Foster?
12  A  I believe so.
13  Q  Tell me what the purpose of that was.
14  A  She had emailed me and told me that he had been
15     approved for disability, so we wanted to obtain a
16     copy of the file in order to review the basis for
17     that determination along with the -- the records
18     that were used to support that.
19  Q  So tell me what -- what were you expecting to --
20     there to be in this Social Security Administration
21     file?
22  A  Usually there is a copy of the application as well
23     as medical records supporting the request for
24     disability and then some kind of document from the
25     Social Security Administration approving or denying.

Page 62

1   Q  Okay.  So you -- you knew, I guess, already that --
2      from Mrs. Foster that Mr. Foster had been approved
3      for disability, so you knew he had been approved,
4      correct?
5   A  That's what she told me, yes.
6   Q  And any medical records that the Social Security
7      Administration would have would be the same medical
8      records that the Fosters had given you the authority
9      to request on your own --
10        MR. MILLER: Object to the form.
11  Q  -- is that right?
12  A  Not necessarily.
13  Q  Tell me -- well, let me ask that a different way.
14        Back in May of 2010 the Foster -- or Mr. Foster
15     gave you an authorization to gather whatever medical
16     records you wanted to gather with respect to his
17     claim, correct?
18  A  Yes.
19  Q  Were there some records that you thought that Social
20     Security Administration would have that you hadn't
21     requested?
22  A  No.  Nothing in particular.
23  Q  What I'm trying to figure out is how the contents of
24     the Social Security Administration's file would have
25     any bearing on your evaluation of his UIM claim?

Page 63

1   A  The Social Security Administration usually has a
2      doctor that reviews those and provides an opinion
3      for them to make a decision, so we were wondering
4      what that opinion was and what the decision was
5      based on; and also to see if there were any
6      pre-existing issues that it was based on, if there
7      was any other -- any other ailments or reasons why
8      he was put on disability aside from the injuries he
9      received here.
10  Q  Had you reviewed any notes from Mr. Fosters's
11     orthopaedic surgeon, Dr. Burandt, about whether he
12     should be off work?
13        MR. MILLER: Object to the form.
14  A  I don't recall.
15  Q  Was there any issue in your mind with whether or not
16     his off-work status was supported by the records
17     that you had?
18        MR. MILLER: Object to the form.
19  A  Can you repeat the question.
20  Q  Sure.  Was there any dispute in your mind about
21     whether Mr. Foster's off-work status was supported
22     in the records that you all already had?
23  A  I -- I don't recall one way or the other.
24  Q  Aside from Mr. Foster's claim have you ever
25     requested a Social Security Administration file

18  (Pages 60 to 63)

Examination of Anthony T. Dale

---

Page 64

1 before?
2 A Yes.
3 Q Was your request for the Social Security
4 Administration file affecting, in any way, whether
5 or not you were going to make an additional
6 settlement offer?
7 MR. MILLER: Object to the form.
8 A I honestly don't recall either way because I don't
9 recall what the total amount that -- whether we were
10 intending to offer any more than the 7500 or not.
11 Q Do you remember what the Fosters' reaction was to
12 the offer of $7500?
13 A I don't have the email that she sent me, but I do
14 see the note that she made a policy limit demand.
15 MR. MILLER: Give a date if you don't mind.
16 A On 2/14/12, it's in the middle of Page 1115, I made
17 a note that she recently -- insured recently made a
18 policy limit demand. And I don't know how she made
19 that, whether she mailed a letter or emailed; and I
20 don't recall the contents of what was in there.
21 There was a conversation that I had with her on
22 May 22nd that starts on Page 1113.
23 Q Did you make -- after receiving the policy limits
24 proposal from the Fosters did you make any
25 additional settlement offer to them?

---

Page 65

1 A I don't believe so, no.
2 Q Who is Kyle Joniec?
3 A He was my manager.
4 Q Did I say that correctly, the last name?
5 A Yeah.
6 Q Is -- is he still with Liberty Mutual?
7 A He is.
8 Q Where is he located?
9 A He's here in Indianapolis.
10 Q Is he still in the same building as you?
11 A Yes.
12 Q There's a note from -- from him on February 21, 2012
13 at the top of Page 1115. It says: I am escalating
14 file to SBA for review and triage.
15 What does that mean?
16 A SBA is -- I believe that that stood for senior
17 business analyst; and claims of a certain -- with
18 certain triggers, we had an analyst review those
19 with us to provide their recommendations.
20 Q And who was that? Who is the senior business
21 analyst?
22 A It looks like it was David Reeves.
23 Q Is David Reeves still with Liberty Mutual?
24 A I think so.
25 Q Is a senior business analyst a claim adjuster or

---

Page 66

1 what is that?
2 A It's sort of a consultant role. They have claims
3 adjusting experience.
4 Q And did the senior business analyst have some
5 concern about Mr. Foster's claim?
6 MR. MILLER: Object to the form.
7 A I -- I don't recall if he did or not.
8 Q Who was Jay Hatfull?
9 A He, at that time -- he was my manager after Kyle;
10 and I can't remember when he made these notes if he
11 was my manager then. I think he was but they also,
12 because they were all in the same group, when one
13 was out, the other one filled in for the other; but
14 he was a manager as well.
15 Q Do you remember having any discussions with
16 Mr. Hatfull about the Fosters' claim?
17 A Not independently, no.
18 Q Did you have an opinion one way or the other about
19 whether Mr. Foster could find another job aside from
20 his mechanic work?
21 MR. MILLER: Object to the form.
22 A I did discuss with her that it appears he has
23 permanent restrictions for his job as a mechanic but
24 not that he's not able to work any job.
25 Q What page are you on?

---

Page 67

1 A I'm sorry, Page 1113, 5/22/12.
2 Q Okay. What jobs were you thinking about that he --
3 he could do?
4 A I didn't have anything specific.
5 Q Do you -- did you ever know what Mr. Foster's
6 educational background was?
7 A If I did, I don't recall what it was.
8 Q Okay. So let's see if we can maybe find some things
9 that we agree on. I guess from looking at that
10 note, there was -- there was an agreement that -- at
11 least from you to Mrs. Foster that his doctor had
12 put him on permanent restrictions from his mechanic
13 job, correct?
14 A Correct.
15 Q And that -- and you knew he had had a surgical
16 procedure on his knee, an arthroscopic procedure, at
17 some point in time, correct?
18 A Yes.
19 Q And you knew that he was not able to work as a
20 mechanic?
21 A Correct.
22 Q A disagreement that you had was whether or not he
23 could find a different job?
24 A No, not that whether or not he could find a
25 different job but that the accident rendered him

---

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

Page 68

1  disabled from being able to do the physical things
2  that were involved with this job, but that not every
3  job out there has these kinds of physical
4  requirements. So he could do something that was
5  within his restrictions.
6  Q  So you were thinking it was possible that another
7  job existed that would meet his restrictions?
8  A  Correct.
9  Q  Although you did not have anything specific in mind
10  for Mr. Foster?
11  A  Correct.
12  Q  The fact that he was on disability with the Social
13  Security Administration, did you know whether or not
14  that would allow him to seek employment elsewhere?
15  A  No, I didn't know that one way or the other.
16  Q  Do -- do you know now?
17  A  No, I don't know.
18  Q  What about at least at this point in time, this May
19  22, 2012 note, I don't see anything in there about
20  his knee replacement.
21       Were you having some disagreement over whether
22  he would need a knee replacement sometime in the
23  future?
24  A  I don't recall one way or the other.
25  Q  Aside from sending Mr. Foster to see a physician,

Page 69

1  did you have any doctor review any of his medical
2  records?
3  A  I don't -- I don't recall.
4  Q  Aside from the things that we're talking about now,
5  is there anything that you recall that was an issue
6  in your mind of why the claim wasn't resolving?
7       MR. MILLER: Object to the form.
8  A  No. I -- I honestly don't independently recall very
9  much about this given the amount of time that's
10  passed.
11  Q  Okay. I'm going to hand you what we'll mark as the
12  next exhibit, 5.
13       MR. MILLER: Let me know when you get to a
14  stopping point. I've been sucking this water down.
15       MR. FAIRBANKS: Well, let's -- let's take a
16  break before we get into this. I'm kind of
17  switching gears anyway.
18       THE WITNESS: Okay.
19       MR. FAIRBANKS: Let's go off record.
20       (Whereupon a recess was taken from 11:41 to
21       11:55 a.m. and Deposition Exhibit 5 was marked
22       for identification.)
23       MR. FAIRBANKS: We're back on the video record.
24  Q  Mr. Dale, I just handed you what we marked as
25  Exhibit 5. I'm going to hand you what we'll mark as

Page 70

1  Exhibit 6 and maybe we'll look at those together.
2       (Whereupon Deposition Exhibit 6 was marked for
3       identification.)
4  Q  Let's start with 6. Can you tell me what that
5  exhibit is.
6  A  It looks like they're emails to Betty Foster as well
7  as a Social Security Administration consent for
8  release of information.
9  Q  What's the date that you sent that to Mrs. Foster?
10  A  August 8, 2012.
11  Q  In looking at your notes, you all had had a
12  conversation I think back in May of 2012 about the
13  fact that Ernest had received his disability?
14  A  Yes. It looks like she notified me of that via
15  email.
16  Q  And then a few months later you send the request for
17  an authorization on the Social Security file itself;
18  is that right?
19  A  Correct.
20  Q  August 8, 2012 the email, again, you're talking
21  about scheduling an independent medical exam. It
22  says you use an outside vendor to coordinate that.
23       Who was your outside vendor?
24  A  There are several. We have like a -- we submit a
25  referral online through an internal system and then

Page 71

1  they're -- like our support staff then uploads all
2  the information into this program that we have and
3  there are several venders there. And then depending
4  on if we have a specific doctor to request, they
5  then somehow match it with a vendor that has that
6  doctor already existing on their list.
7  Q  So you all have a system already in place to contact
8  a vendor, find a doctor, get that set up?
9  A  Yes.
10  Q  Why did you think that whoever that doctor was would
11  need to review this Social Security Administration
12  file?
13  A  Just so he has all the information available.
14  Q  The -- the medical records that you would want that
15  doctor to review, was that something that you all
16  already had in the file?
17       MR. MILLER: Object to the form.
18  A  Yes. What we -- the medical records that we had we
19  would have sent to the doctor.
20  Q  So what out of that Social Security Administration
21  file, aside from the medical records, did you think
22  that the -- the medical examiner would need?
23       MR. MILLER: Object to the form; asked and
24  answered.
25  A  I believe he would need the basis of their decision

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

Page 72

1  so that then he could use that in order to form his
2  own opinion as well about the cause for the
3  disability.
4      Let me rephrase that. Whether the accident
5  caused the disability or hot.
6  Q  Did you ever, during your handling of the claim,
7  think that something else had caused his disability?
8      MR. MILLER:  Object to the form.
9  A  There was an MRI that he had that apparently,
10  according to my notes, references he has
11  pre-existing conditions of arthritis. And so in
12  getting the disability file, we wanted to see if the
13  disability was because of his pre-existing arthritis
14  or because of the accident.
15      MR. FAIRBANKS:  Let's go off the video.
16      (Whereupon a brief recess was taken from 12:00
17      to 12:01 p.m.)
18      MR. FAIRBANKS:  We're back on video record.
19  Q  Mr. Dale, you were just talking about some arthritis
20  that Mr. Foster may have had.
21      Would you agree with me that to the extent he
22  did have arthritis, it wasn't -- the arthritis
23  wasn't preventing him from working before this
24  particular motor vehicle accident, right?
25      MR. MILLER:  Object to the form of the

Page 73

1  question.
2  A  I don't know that for sure.
3  Q  Okay. So you don't know whether he was working
4  full-time or not leading up to the accident?
5  A  No.
6  Q  Let's say that Mr. Foster had high blood pressure
7  that also wasn't keeping him from working before the
8  accident. What if the Social Security
9  Administration said that 50 percent of his
10  disability is related to his knee and 50 percent is
11  related to high blood pressure, how would that
12  affect --
13      MR. MILLER:  Object --
14  Q  -- your analysis?
15      MR. MILLER:  Object to the form of the
16  question.
17  A  It depends on whether they said the portion of the
18  knee was related to his arthritis or to his injuries
19  from the accident.
20  Q  Do you think that the Social Security Administration
21  would make a differentiation between those two?
22  A  I don't know.
23      MR. MILLER:  Object to the form.
24  Q  Do you remember what Dr. Burandt's opinion was, the
25  treating orthopedic surgeon, about whether the

Page 74

1  accident caused his knee to be off work?
2  A  I don't recall.
3  Q  I see in your email to Mrs. Foster you were wanting
4  her to send the Social Security authorization back
5  to, I guess, a P.O. Box in Los Angeles.
6      Why would it go there?
7  A  That's our mailing address nationwide for claims.
8  Q  Okay. So any time somebody wants to mail something
9  in, they've got to send it out to California, or
10  they did I guess at that time?
11  A  Correct. They still do.
12  Q  Okay. Well, let's look -- move over and look at
13  Exhibit 5. This is an October 10, 2012 letter.
14      Tell me what this letter is.
15  A  This is a letter to Mr. Foster requesting that he
16  complete the enclosed forms, which are a medical
17  authorization, a medical provider list, the Social
18  Security consent form, and return those; and
19  actually stating that we had requested these on two
20  previous occasions and we haven't received a
21  response or received a copy of the completed forms.
22      And then it outlines the duties in the -- that
23  are listed in the policy; and then that once we
24  receive those forms, we would request the records
25  and then contact him to coordinate scheduling of the

Page 75

1  independent medical exam.
2      And then further, because we haven't had a
3  response, we're reserving our rights to deny the
4  claim based on the duty to cooperate and the duty to
5  submit to physical exam as we reasonably require and
6  so that we -- we were reserving our right to deny
7  coverage. And that if they fail to cooperate as
8  outlined above or we find any other reasons for
9  which to deny coverage, we reserve the right to
10  decline any duty to indemnify or to pay the claim.
11  Q  Would you call this the reservation of rights
12  letter?
13  A  Yes, that's what it's called.
14  Q  And basically you're telling Mr. Foster that you
15  might not pay him anything if he doesn't provide you
16  with forms --
17      MR. MILLER:  Object to the form.
18  Q  -- correct?
19  A  We're saying we have the right to do that.
20  Q  The medical authorization and the medical provider
21  list, he had actually given you that back in May of
22  2010, correct?
23      MR. MILLER:  Object to the form.
24  A  He had given us one previously, yes.
25  Q  Mr. Foster had also agreed to go see whatever

Examination of Anthony T. Dale

Page 76

1    medical doctor you wanted to send him to, correct?
2  A  Yes.  She informed Jay Hatfull on August 8, 2012
3    that they would agree to that, yes.
4  Q  So am I right that this reservation of rights letter
5    boils down to you not having the Social Security
6    release back?
7       MR. MILLER: Object to the form.
8  A  Yes, that's correct.
9  Q  Do you know whether the Fosters ever sent that in?
10  A  I don't know.
11  Q  And I guess around this time is around the time that
12    you got off the file?
13  A  Right.  It was a couple of months later.
14  Q  Let's see if we can pinpoint that date looking at
15    your claim notes.
16       I'm looking on Page 1111, October 23rd, 2012
17    note by Jay Hatfull.  Are you with me?
18  A  Yes.
19  Q  It says:  File reassigned to Mark Konerman?
20  A  Correct.
21  Q  To handle the UIM claim?
22  A  Correct.
23  Q  So at that point you're off the file?
24  A  Right.
25  Q  So you don't know -- or do you know whether the

Page 77

1    Social Security authorization was ever provided back
2    to Liberty Mutual?
3  A  I don't know.
4  Q  Do you know whether Liberty Mutual ever requested
5    any Social Security records?
6  A  I don't know.
7  Q  Do you know whether Liberty Mutual ever provided any
8    Social Security records to the doctor that they
9    ultimately sent Mr. Foster to?
10  A  I don't know.
11  Q  Where was Mark Konerman located?  Is he over in
12    Fairfield, Ohio?
13  A  Yes.
14  Q  Did you ever talk with Mark about the claim?
15  A  Not that I recall.
16  Q  Aside from the issue with the authorizations, can
17    you think of anything that the Fosters did that was
18    uncooperative with you?
19       MR. MILLER: Object to the form.
20  A  No.
21  Q  Mr. Foster was self-employed as we've discussed
22    before.  Do you understand that?
23  A  Yes.
24  Q  How do you go about calculating, as -- as a claims
25    adjuster, wage loss, damages, for a self-employed

Page 78

1    person?
2  A  It's different for each person but normally we
3    request documentation from them to support what they
4    were making before the accident happened and then
5    what, if anything, they made after the accident and
6    then compare the two to see if we can find any
7    differences while looking at the dates we know that
8    they were unable to work because of the accident.
9  Q  I guess that's a little bit different from someone
10    who's a W-2 employee who's getting a paycheck every
11    two weeks.  You can look at that pretty easily?
12  A  Correct.
13  Q  What types of documents do you normally request from
14    self-employed persons?
15  A  Usually copies of tax returns and any -- any
16    additional forms that explain income, profits, loss
17    during those times that they submit it with their
18    tax returns; also any -- any documentation they have
19    of work that was requested that they had to decline
20    doing for customers; and any other documentation
21    they feel would be relevant to support what they
22    didn't make or what they lost.
23  Q  Did you feel like you had enough information about
24    Mr. Foster to do some calculations for his wage
25    loss?

Page 79

1       MR. MILLER: Object to the form.
2  A  I don't independently recall, but given that I
3    didn't request anything additional, it appeared I
4    had enough to make some kind of decision.
5  Q  Mr. Dale, in your position do you handle any claims
6    that are involved in litigation or do you just
7    handle prelitigation claims?
8  A  Both.
9  Q  Both?
10  A  Yes.
11  Q  How does that work at Liberty Mutual?  I know some
12    companies have prelitigation adjusters and then
13    adjusters that just handle claims during litigation.
14       Do you all make a distinction between those two
15    in any way?
16  A  Sort of.  We have, at least in my department -- and
17    I believe this is pretty consistent across the
18    country, but we have your first level adjuster, for
19    just an easy way to describe it, that handles
20    nonlitigation claims; and then as you progress up
21    from there in experience and -- and promotions,
22    usually it's the next level up that you'll start
23    handling some litigation, some fairly noncomplex
24    litigation; and then it goes up from there.
25  Q  From the files that I've seen, once Mr. Foster filed

22  (Pages 76 to 79)

Examination of Anthony T. Dale

Page 80

1  a lawsuit in this case, the file was assigned to
2  Laura Harp.
3      Does -- do you know whether she handles both
4  pre- and post litigation or does she just do
5  litigated files, if you know?
6  A  I believe she does both.  Most everyone does both.
7  We don't have any litigation-only handlers as far as
8  I know.
9  Q  Can you think of anything that you would have done
10  differently in the handling of this Foster claim?
11      MR. MILLER:  Object to the form.
12  A  No.
13  Q  Have -- has -- have you been -- have you had any
14  discussion with any of your supervisors about how
15  this claim was handled?
16  A  No.
17  Q  As far as you're concerned, is Liberty Mutual fine
18  with the way that you handled the claim?
19      MR. FAIRBANKS:  Object to the form.
20  Q  As far as I know.  I haven't been told otherwise.
21  A  Okay.
22  Q  Same question with regard to your supervisors.  Any
23  of your supervisors had any criticisms of the way
24  that you handled the claim?
25  A  No.

Page 81

1  Q  Let me ask just a few general questions.  Are you
2  from the Indianapolis area originally?
3  A  Yes.
4  Q  No family in Lexington, Kentucky area?
5  A  No.
6  Q  Any friends that you have down in that area?
7  A  I do have a few friends.
8  Q  Okay.  And what I'm doing now is just kind of asking
9  generally if there's a list of jurors that pop up,
10  is there somebody that I need it say, well, that guy
11  knows Tony Dale?
12  A  The only person I know well enough is an attorney
13  that we worked with down there named Jeff Taylor.
14  Q  Okay.
15  A  Other than that, it's more just acquaintances.
16      MR. MILLER:  Phil would like Jeff on the jury,
17  wouldn't you?
18      MR. FAIRBANKS:  Doubt it.  Although I do like
19  Jeff.
20      MR. MILLER:  Yeah, he's a good guy.
21      THE WITNESS:  Yeah.
22      MR. FAIRBANKS:  Let's take a break for just a
23  second here.
24      THE WITNESS:  Sure.
25      (Whereupon a recess was taken from 12:16 p.m.

Page 82

1  to 12:18 p.m.)
2      MR. FAIRBANKS:  We're back on the video record.
3  Mr. Dale, I don't have any more questions for you.
4      THE WITNESS:  Thank you.
5  CROSS-EXAMINATION,
6  QUESTIONS BY DONALD L. MILLER, II:
7  Q  Do you know Mr. Foster's physical condition today,
8  in particular whether he's ever had a single
9  injection in his knee much less a knee replacement?
10  Do you know anything about that?
11      MR. FAIRBANKS:  Object to form.
12  A  Not independently, no.
13  Q  Let me show you what has been introduced as
14  Exhibit 2 to your deposition.
15      MR. MILLER:  Mr. Fairbanks, and --
16  Q  You can use this one (indicating).
17  A  Okay.
18  Q  It's the authorization that Mr. Foster signed on May
19  25, 2010, Bates label 92.  Could you read the
20  sentence there under Expiration and Revocation.
21  A  "I may revoke this authorization at any time except
22  to the extent that action has been taken in reliance
23  upon it.  Requests for revocation must be in
24  writing.  To revoke the authorization I must contact
25  Anthony Dale, Claim Representative, Ohio Casualty

Page 83

1  Insurance Company, PO Box 7046, Indianapolis, IN
2  46207-7046, 317-428-2861.  If I do not revoke it,
3  this authorization will expire one year after the
4  date on which the authorization is signed."
5  Q  So by the time you wrote your -- an email in August
6  of 2012 and sent the reservation of rights letter in
7  October of 2012, the authorization you had had
8  expired, correct?
9  A  Correct.
10  Q  Let's look at Exhibit 4 --
11  A  Okay.
12  Q  -- which is your May 23 email.  And to the extent
13  you need to look at Exhibit 1, the claim notes, as
14  well to refresh your recollection, that's fine.
15  A  Okay.
16  Q  Now, you made this offer.  Why -- why did you -- why
17  did you write it out in so much detail?
18  A  I wanted Mr. and Mrs. Foster to be able to
19  understand what we were offering and how we
20  calculated it; and because the PIP was involved and
21  there are offsets with the PIP for certain things,
22  it's very complicated to explain to someone over the
23  phone.
24      The way I always look at it is when I talk to
25  people, I want to talk to them like I'm talking to

23  (Pages 80 to 83)

Examination of Anthony T. Dale

Page 84

1   my grandma, and so I want to make sure it's as clear
2   as possible so they understand it.
3       So given all the calculations that had to go
4   into what was being considered, a written
5   explanation via email I felt would help explain it
6   better so they could see everything rather than me
7   having to explain it over the phone and then
8   carrying the burden of having to write all that
9   down.
10  Q   Now, did you get a response to this email looking --
11      referring you to Exhibit 1, Bates label 1122, your
12      note of 6/30/2011?
13  A   I don't believe I did as of that date, no.
14  Q   Okay.  And what did you do?  Did you follow up?
15  A   I sent a follow-up email that day.
16  Q   And then on August 31, 2011, Bates label 1121, you
17      actually got a call from one of the salespeople who
18      was visiting the agency at which Ms. Foster worked
19      and Ms. Foster had said something about this claim
20      to that visitor.  And they called you and said, hey,
21      what's up, didn't they?
22  A   Yes.
23  Q   Did you call Ms. Foster again and explain again what
24      the offer was?
25  A   I believe I did.

Page 85

1   Q   Okay.  Well, you say in this note you're going to,
2       right?
3   A   Yeah.
4   Q   Okay.
5   A   Yes.
6   Q   Did you ever get any kind of demand from the Fosters
7       through Mrs. Foster other than a policy limits
8       demand?
9   A   I don't believe so.
10  Q   Now looking at Exhibit 4 again, your May 23, 2011
11      email, the second paragraph for the outstanding wage
12      loss portion, you -- when you're doing your
13      calculations in the bullet point there in 2009,
14      you're using the tax returns or profit and loss
15      statements that had been provided to you at that
16      time, correct?
17  A   I believe so, yes.
18  Q   You didn't know at that time that those were
19      reporting only gross income and not net income, did
20      you?
21  A   No.
22  Q   And then later in May 22, 2012 referring to
23      Exhibit 1, Bates label 1113, at that point you said,
24      look, I need unaltered profit and loss statements,
25      the Schedule C on your tax returns I think is what

Page 86

1   you meant there and -- is that correct?
2       MR. FAIRBANKS:  Objection to form.
3   A   Let me double-check.  Yes, that's correct.
4   Q   Now, Mr. Fairbanks asked you if there was any
5       consideration to lost wage pain and suffering split
6       out or anything.
7       At the time you wrote Exhibit 4 on May 23, 2011
8       looking down to the bottom of Page 1 under where it
9       says, "Our offer is broken down as follows," he
10      still had almost $17,000 in no fault coverage to
11      take care of his wage loss, correct?
12      MR. FAIRBANKS:  Objection to form.
13  A   Correct.
14  Q   There was a reference in one of your emails.  I can
15      find it if I need to.  I just want to flesh this out
16      just in case we have to use the video instead of you
17      coming live to trial.  There was a reference in one
18      of your claims notes about the Fosters not being
19      attorney repped.
20      Why in the world would you put something like
21      that in there?
22  A   That's what I was trained to do.  For me, it helps
23      me recognize that because they are not attorney
24      repped, that I need to make sure and explain things
25      more clearly to them because it's not a process

Page 87

1   they're familiar with.  So I note that so that I'm
2   aware that I'm talking with some individual --
3   someone individually about their own injuries and
4   I'm not talking to a representative for them.
5   Q   Okay.  I can again find this claim note if I need
6       to, but do you recall also on the second day after
7       you received the file, you talked to Ms. Foster and
8       it was -- it was clear to you from your note she
9       understood the coverages in the policy, correct?
10  A   Yes.
11  Q   Did -- one of the no-fault adjusters, the person who
12      was handling the no fault or PIP claim, was the one
13      that notified you that there was -- or notified
14      Liberty Mutual that there was an underinsured
15      motorist claim coming down the pike because
16      Ms. Foster told them that, right?
17  A   Correct.
18  Q   You've said "I don't recall" to several things, and
19      that's a perfectly legitimate answer, but let's put
20      it in context.
21      You're in this file in 2011, 2012 and we're
22      sitting here in the summer of 2016, correct?
23  A   Yes.
24  Q   Is there any way you can estimate to us how many
25      claims you've handled since then?  Would it be

Examination of Anthony T. Dale

Page 88

1   hundreds if not thousands?
2   A   I would say hundreds, yes.
3   Q   You were asked whether you ever saw any notes from
4       Dr. Burandt and you answered no, that you recall.
5       Let me show you one since you were asked.
6   A   Okay.
7           MR. MILLER:  What's the next number there?
8           THE WITNESS:  7.
9           (Whereupon Deposition Exhibit 7 was marked for
10          identification.)
11          MR. MILLER:  7.
12  Q   I'll hand you what's been marked Exhibit 7 to your
13      deposition.  It's a -- it's an office entry
14      from Dr. Burandt with some attached radiology
15      reports.  Go to the third page of this exhibit.
16  A   Okay.
17  Q   The Lexington Clinic progress note dated October 14,
18      2014.
19  A   Okay.
20  Q   Go down to the plan.
21  A   Uh-huh.
22  Q   However, at the time of his scope we found that he
23      had full-thickness cartilage loss along the medial
24      femoral condyle and that it makes it very probable
25      that he will need a joint placement sometime in his

Page 89

1   life, although not now.  He certainly does not feel
2   like he needs a cortisone injection at the moment.
3   We will see him back in the future as he feels
4   necessary.
5           Did I read had a correctly?
6   A   Yes.
7           MR. MILLER:  Objection.  Objection to form;
8       foundation.
9   Q   Now, you have no way of knowing one way -- one way
10      or the other whether October 14, 2014 is the first
11      time there is a note signed by a doctor mentioning
12      the probability, from whatever cause, of a knee
13      replacement?
14  A   Right.  I don't know.
15          MR. FAIRBANKS:  Objection to form; foundation.
16  Q   Do you ever recall looking at the July 12, 2008 MRI
17      report yourself as you sit here today?
18  A   Not independently, no.
19  Q   Okay.  It's not something we looked at yesterday, so
20      I'll -- it says what it says.
21          Now, a lot of time was spent by Mr. Fairbanks
22      talking to you about your initial reserve when --
23      you know, within a week of you opening the file or
24      getting the file sent to you.
25          The information I think I heard you say that

Page 90

1   you primarily had back at that time was what
2   Ms. Foster was telling you?
3   A   Correct.
4   Q   Though you believed her?
5   A   Yes.
6   Q   And at some point later you adjusted the reserves
7       down?
8   A   Correct.
9   Q   Is it common to adjust reserves up and down based
10      upon what new information does or does not come in?
11  A   Yes.
12  Q   So in this example if you're assuming knee
13      replacement is coming and then the claim goes on and
14      you've got no information that a knee replacement is
15      more likely than not and caused by this accident,
16      the reserve goes down, right?
17          MR. FAIRBANKS:  Objection to form.
18  A   Correct.
19  Q   Back to Exhibit 1 looking at Page 1113 on the bottom
20      which is your 6/11/2012 note which is close to your
21      last note, within a couple three months --
22  A   Uh-huh.
23  Q   -- of your last note, what is -- what is your work
24      plan there?
25  A   Are you talking about the very top?

Page 91

1   Q   Yes.
2   A   "Continue working towards settlement with insured."
3           MR. MILLER:  Thank you, Mr. Dale.
4           THE WITNESS:  Thank you.
5           MR. FAIRBANKS:  I'm going to have just a few
6       follow-ups, Mr. Dale.
7   REDIRECT EXAMINATION,
8   QUESTIONS BY MR. FAIRBANKS:
9   Q   The note you just looked at, "Continue working
10      towards settlement with insured," you did not make
11      any additional settlement offers to the Fosters at
12      that time in June 2012 or any time after that,
13      correct?
14  A   Correct.
15  Q   The medical authorization that you were shown with
16      an expiration date on it, do you remember seeing
17      that?
18  A   Yes.
19  Q   I'm going to hand you what we'll mark --
20          MR. MILLER:  It's Exhibit 2.
21  Q   -- we'll mark as the next exhibit, which I believe
22      is 8.
23  A   8.
24          MR. MILLER:  Thank you.
25  Q   August 8, 2012 email from you to Mrs. Foster, do you

25  (Pages 88 to 91)

Examination of Anthony T. Dale

---

Page 92

1   see that?
2   A  Yes.
3   Q  What are you telling her the reason is that you're
4      requesting another medical authorization from her?
5   A  Because the authorization we have had on file
6      expired.
7   Q  Correct.  And what are you telling her you're going
8      to request with the new one?
9   A  X-rays and MRI films.
10  Q  Why hadn't you requested those yet?
11  A  They're usually not something that we get as
12     ordinary retrieval of medical records.  We only
13     usually request them when we're going to have a
14     doctor review those films or x-rays.
15  Q  Okay.  So you just had not yet requested any x-ray
16     or MRI films using the authorization that the
17     Fosters had already given you?
18  A  Correct.
19  Q  Did you, upon receipt of a new authorization from
20     the Fosters, request the x-ray and MRI films?
21        MR. MILLER:  Object to the form.
22  A  I don't believe an authoriz -- a new authorization
23     was returned before the file was reassigned to
24     someone else.
25  Q  Do you know whether anybody at Liberty Mutual ever

---

Page 93

1   requested MRI films or x-ray films?
2   A  I don't.
3   Q  You were asked about records relative to the need
4      for a knee replacement.  Do you remember that?
5   A  Yes.
6   Q  Do you know from reviewing it or from talking with
7      Ms. Harp what Liberty Mutual -- Liberty Mutual's
8      hired medical examiner said about Mr. Fosters' need
9      for a knee replacement?
10        MR. MILLER:  At which point?
11        MR. FAIRBANKS:  At any point.
12  A  The only thing I know is that his opinion in his
13     deposition changed then from what his opinion was in
14     his report.
15  Q  Do you know why -- if it did really change, do you
16     know why that happened?
17  A  I don't.
18        MR. FAIRBANKS:  Okay.  Mr. Dale, I don't have
19     any more questions for you.  Thank you.
20        THE WITNESS:  Thank you.
21        MR. MILLER:  I'm done.
22        MR. FAIRBANKS:  Let's go off the video.
23     (Whereupon Deposition Exhibits 1, 3, 4 and 8
24        were marked for identification.)
25

---

Page 94

1        AND FURTHER DEPONENT SAITH NOT
2              (12:37 p.m.)
3
4            (Signature Waived)
5   _____
    ANTHONY T. DALE
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

26  (Pages 92 to 94)

STATE OF INDIANA          )
                          )   SS:
COUNTY OF JOHNSON         )

I, Joyce Emerson, a Notary Public in and for the County of Johnson, State of Indiana at large, do hereby certify that ANTHONY T. DALE, the deponent herein, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiff at Greenwood Office Suites, 3209 West Smith Valley Road, Conference Room 2, Greenwood, Johnson County, Indiana, on the 29th day of July 2016, commencing at the hour of 9:50 a.m., pursuant to the Indiana Rules of Trial Procedure;

That said deposition was taken down in stenographic notes and afterwards reduced to typewriting under my direction, and that the typewritten transcript is a true record of the testimony given by said deponent; and thereafter presented to said deponent for his signature; and that the signature of said deponent to his deposition was waived by the deponent and all parties present, the deposition to be read with the same force and effect as if signed by him.

That the parties were represented by their aforementioned counsel.

Examination of Anthony T. Dale

Page 96

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney of either party, or otherwise interested in the event of this action, and am not in the employ of the attorneys for either party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this _____ day of _____, 2016.


_____
Joyce Emerson
Notary Public, Stenographic Reporter


My County of Residence is:  Johnson

My Commission Expires:  February 20, 2023

Examination of Anthony T. Dale

## A

**a.m** 1:15 4:1,9 47:6
47:7 69:21 95:13
**ability** 9:2
**able** 36:5 56:9 57:6
60:10 66:24 67:19
68:1 83:18
**access** 36:9,12
46:10 51:17 54:22
**accident** 16:15
25:13 31:15 32:6
54:14 67:25 72:4
72:14,24 73:4,8
73:19 74:1 78:4,5
78:8 90:15
**accidents** 6:2
**account** 44:22
**acquaintances**
81:15
**acquired** 5:4
**act** 15:19,23 16:4
**action** 1:2 4:7
82:22 96:2,4
**actively** 11:13
**actual** 14:7
**addition** 26:8 40:1
**additional** 11:4
40:16 44:22 55:11
58:13 60:7 64:5
64:25 78:16 79:3
91:11
**address** 74:7
**adjust** 90:9
**adjusted** 90:6
**adjuster** 5:9,12
11:9 16:4,17
24:16 27:8 29:14
33:8,9 37:3,7,22
38:12 49:11,20
51:1,15 59:10,17
65:25 77:25 79:18
**adjusters** 12:7
20:11 32:16,25
36:13 60:23 61:2
79:12,13 87:11

**adjusting** 66:3
**Administration**
61:10,20,25 62:7
62:20 63:1,25
64:4 68:13 70:7
71:11,20 73:9,20
**Administration's**
62:24
**advancements** 6:15
**advised** 48:12
**affect** 31:15 55:12
73:12
**Affirmative** 22:12
**affixed** 96:7
**aforementioned**
95:7,25
**agency** 9:15 84:18
**agent** 5:16,16
**ago** 18:10 20:15
**agree** 16:3,13,22
17:16,20 33:25
52:24 54:1 67:9
72:21 76:3
**agreed** 23:18 44:15
75:25
**agreement** 67:10
**ahead** 13:8 14:16
16:7,12 17:1,24
18:22 21:7 23:11
24:19 32:12 33:2
34:11 44:13 45:1
45:19 51:6 52:18
**AIC** 14:25
**ailments** 63:7
**alignment** 11:25
**Allen** 43:13,14
47:20
**allocate** 52:16,19
**allocated** 53:4,14
55:17
**allocating** 53:9
**allow** 68:14
**American** 1:7 4:4
4:14 14:1,2,11,14
14:20 15:4 24:14

25:1 39:20
**amount** 8:23 16:10
16:22 17:22 18:1
20:21 24:11 25:1
40:14 52:20,23
55:2 56:15 64:9
69:9
**amounts** 53:15
**analysis** 73:14
**analyst** 39:18 65:17
65:18,21,25 66:4
**analyze** 39:10
**and/or** 9:7,21
**Angeles** 74:5
**answer** 14:17 34:8
87:19
**answered** 71:24
88:4
**Anthony** 1:11 4:11
4:24 82:25 94:5
95:5
**anybody** 92:25
**anyway** 69:17
**apologize** 49:16
**apparently** 72:9
**appear** 40:4 50:17
60:22
**appeared** 79:3
**appearing** 4:12
**appears** 29:5 40:3
57:6 66:22
**application** 61:22
**apply** 40:7
**appointment** 23:17
**approved** 23:12
61:7,15 62:2,3
**approving** 61:25
**approximate** 40:8
**approximately** 4:9
5:5 6:25 7:1,4
9:14 18:4 40:14
40:25 55:7
**April** 51:8,21 59:1
**area** 81:2,4,6
**areas** 22:6

**arthritis** 72:11,13
72:19,22,22 73:18
**arthroscopic** 67:16
**as-needed** 10:12
**aside** 10:6 31:7
33:11 58:14 63:8
63:24 66:19 68:25
69:4 71:21 77:16
**asked** 20:17,19
71:23 86:4 88:3,5
93:3
**asking** 34:20 81:8
**asleep** 49:16
**assessed** 40:7
**assigned** 80:1
**associate** 15:3
**associated** 42:25
**assuming** 90:12
**at-fault** 7:20 29:1,4
40:12 44:6
**Atlanta** 11:3
**attached** 88:14
**attempt** 16:9
**attempts** 61:9
**attended** 10:1
**attorney** 22:5 81:12
86:19,23 96:3
**attorneys** 96:5
**August** 70:10,20
76:2 83:5 84:16
91:25
**authority** 62:8
**authoriz** 92:22
**authorization** 33:4
33:8 34:20 35:5,8
35:25 36:9 45:23
46:22,24 62:15
70:17 74:4,17
75:20 77:1 82:18
82:21,24 83:3,4,7
91:15 92:4,5,16
92:19,22
**authorizations**
77:16
**auto** 6:2 15:8

**available** 12:25
16:6 18:2 31:12
71:13
**average** 55:24
56:14,14,16,18,20
**aware** 87:2

## B

**B** 3:9
**back** 5:17 24:1
26:23 27:17 35:19
36:17 43:2 47:8
48:4,13 52:19
53:13 58:23 62:14
69:23 70:12 72:18
74:4 75:21 76:6
77:1 82:2 89:3
90:1,19
**background** 9:25
10:15 47:14 67:6
**based** 12:6 16:6
39:25 40:7,15
41:1 53:16 60:7
63:5,6 75:4 90:9
**basically** 75:14
**basis** 10:12 39:22
55:15 61:16 71:25
**Bates** 35:18 82:19
84:11,16 85:23
**bear** 39:5
**bearing** 40:5 62:25
**beginning** 48:17
**behalf** 1:13 95:9
**believe** 8:18 13:12
13:22 14:18 22:1
24:12,15 25:3,23
27:8,24 29:10
31:2 33:14 34:25
39:17 40:23 41:18
41:19 42:22 43:1
43:17 45:3,21
48:2 51:16 55:16
58:18 61:12 65:1
65:16 71:25 79:17
80:6 84:13,25

Examination of Anthony T. Dale

85:9,17 91:21 92:22
believed 90:4
bender 32:3
bending 50:9
benefits 8:1 33:1 61:7
better 84:6
Betty 3:16,18,20 30:4 70:6
beyond 61:4
big 34:2
bills 36:14 46:14 55:3,4,6
Billy 3:14
birth 35:20
bit 10:7,25 20:8 44:19 78:9
blacked 41:5
blood 73:6,11
bodily 28:22
boils 76:5
book 15:7,9
bottom 26:14 48:9 49:2 59:1 86:8 90:19
Box 74:5 83:1
BOYER 2:9
break 47:3 69:16 81:22
brief 72:16
briefly 26:2
broken 86:9
building 65:10
bullet 55:22,23 85:13
bunch 14:6
Burandt 63:11 88:4 88:14
Burandt's 73:24
burden 84:8
business 39:17 65:17,20,25 66:4

———————
C
———————

C 2:1 85:25
calculated 83:20
calculating 77:24
calculation 58:1
calculations 55:20 56:19 58:9 78:24 84:3 85:13
California 74:9
call 8:7 28:10 45:13 75:11 84:17,23
called 8:6 12:5 28:21 46:1 48:12 75:13 84:20
capping 60:3
care 53:9,10 86:11
carrying 84:8
cartilage 88:23
case 4:4 7:3,22 21:14,14 27:2 44:9,18,24 45:9 80:1 86:16
Casualty 1:7 4:5,15 14:1,20 82:25
cause 72:2 89:12 96:2
caused 7:23 54:14 72:5,7 74:1 90:15
ceased 11:22 18:12
Cecil 37:18
Cecil's 37:10,13
Central 1:2 4:6
certain 10:15 15:7 17:8 65:17,18 83:21
certainly 89:1
certify 95:5 96:1
chance 41:6
change 11:24,25 93:15
changed 20:25 21:4 41:18,19 93:13
chronological 48:5
chronologically 36:22 43:3
Civil 1:2 4:7

claim 6:9 7:9,11,12 7:16 8:19,24 11:9 11:20,20 13:10,14 13:18 16:2,6,10 16:18,21 18:1,5 18:12,16 19:3,6,7 19:8,14 20:12,19 21:12,18,22 22:17 24:8 25:11,24 26:4,9,11 28:7,11 28:20,22 29:25 31:16 33:10,12,13 33:18 34:1,22 35:4,24 36:2,17 38:14,18 39:5 40:10,10 42:17 43:2 45:19 48:1,4 48:8 49:7 51:1 52:24 54:8 58:17 58:23 60:15,16 62:17,25 63:24 65:25 66:5,16 69:6 72:6 75:4,10 76:15,21 77:14 80:10,15,18,24 82:25 83:13 84:19 87:5,12,15 90:13
claimant 16:18 17:21 23:7 35:25 39:3
claimants 22:11
claims 3:15 5:8,9 5:14,18,20,21,21 5:22,23 6:3,6,23 8:15 9:13,23 10:12,18,21 11:9 11:14,18,22 12:12 12:13,20 13:4 14:13,21 15:3,18 15:19,23 16:4,4 16:17 17:16 19:13 19:24 20:11 24:2 27:17 28:3 35:6 38:12 41:10,13,21 65:17 66:2 74:7

77:24 79:5,7,13 79:20 86:18 87:25
class 10:25
classroom 11:2
clear 16:11 84:1 87:8
clearly 86:25
Clinic 3:19 48:12 88:17
close 90:20
college 10:2,3,7
collision 7:24 26:19 30:19 31:1
combined 24:24
come 90:10
coming 40:14 55:24 86:17 87:15 90:13
commencing 1:15 95:13
commercial 5:21
Commission 96:16
common 90:9
communicate 30:6
companies 14:4,7 79:12
company 1:7 4:5 12:24 14:1 24:17 28:23 33:9 40:2 83:1
comparative 39:6
compare 78:6
comparison 8:13 .8:19
compensation 54:9
complete 25:23 74:16
completed 50:7 74:21
complex 6:24
complicated 83:22
complies 26:6
compound 16:25
compromise 16:22 16:24
concern 66:5

concerned 80:17
condition 44:12 82:7
conditions 38:21 72:11
conduct 16:5
condyle 88:24
Conference 1:14 95:11
confirm 26:3
conjunction 24:22
Connecticut 11:10
consent 70:7 74:18
consider 18:2
consideration 86:5
considered 7:17 12:4 84:4
considering 61:4
consistent 79:17
consult 22:5,9
consultant 66:2
contact 20:17 33:8 71:7 74:25 82:24
contents 62:23 64:20
context 87:20
Continue 91:2,9
continued 12:20
continuing 42:14
conversation 30:3 30:9,10 33:6 37:21 64:21 70:12
conversations 28:6 30:13
cooperate 75:4,7
coordinate 70:22 74:25
copies 31:3 46:17 78:15
copy 29:17 34:4,6 37:17 46:16 61:16 61:22 74:21
corner 26:14
correct 5:19 6:14 7:13 8:2,4,22 9:5

Examination of Anthony T. Dale

9:24 11:19 12:11
14:10 17:14 18:3
18:12 20:4 21:23
22:14 23:4 24:6
24:25 28:17 29:11
29:22,23 31:2
32:23 33:15 34:6
34:23 35:8,15
36:16 38:16,23
39:7,20 40:19
42:21 44:25 46:25
52:15 53:1,15
54:12,23 56:21,22
57:4,13,18 58:10
58:12,22 59:7,24
59:25 62:4,17
67:13,14,17,21
68:8,11 70:19
74:11 75:18,22
76:1,8,20,22
78:12 83:8,9
85:16 86:1,3,11
86:13 87:9,17,22
90:3,8,18 91:13
91:14 92:7,18
**correctly** 65:4 89:5
**correspondence**
20:1,2 34:16
**cortisone** 89:2
**cost** 9:19 41:23
42:15
**costs** 53:3,4 54:11
**counsel** 95:25
**country** 79:18
**County** 1:12,14
95:2,4,12 96:15
**couple** 19:17 45:23
49:9 50:22 76:13
90:21
**course** 10:24
**Court** 1:1 4:5 35:17
**cover** 7:24 9:4
**coverage** 7:18 8:1
29:6,12 38:10,14
38:17,19,21 39:19

40:3,11 43:10
44:2,5 55:9 75:7,9
86:10
**coverages** 87:9
**covered** 39:4 42:3
**CPCU** 14:25
**credit** 44:8 55:10
**criticisms** 80:23
**CROSS-EXAMI...**
3:4 82:5
**currently** 11:13,18
**customer** 9:11,22
**customers** 78:20

## D

**D** 3:1,9 4:16
**D322** 1:20
**Dakota** 11:17
**Dale** 1:11 4:11,24
4:25 9:25 18:4
25:21 26:22 32:14
33:16 34:15 41:6
47:10 52:2 69:24
72:19 79:5 81:11
82:3,25 91:3,6
93:18 94:5 95:5
**damage** 32:4
**damaged** 31:18
**damages** 39:11,14
54:2 77:25
**dashboard** 30:23
**date** 4:8 25:13
26:17 35:8,20
36:8 46:6 64:15
70:9 76:14 83:4
84:13 91:16
**dated** 27:4 88:17
**dates** 27:2 78:7
**David** 23:23 65:22
65:23
**day** 1:14 28:15
37:21 50:24 84:15
87:6 95:12 96:7
**days** 21:13 35:3
**Dearman** 13:16,18

13:23
**dec** 29:18
**December** 50:1,13
56:5,10
**decided** 50:10
**decision** 63:3,4
71:25 79:4
**decline** 75:10 78:19
**Defendant** 1:8,13
2:8
**defense** 22:5,10
**degree** 10:2
**delay** 16:1 17:13
**demand** 17:21
64:14,18 85:6,8
**denial** 16:23
**deny** 16:2,21 75:3,6
75:9
**denying** 61:25
**department** 13:1,2
13:4 14:20 46:19
79:16
**departments** 12:23
**depending** 71:3
**depends** 73:17
**deponent** 94:1 95:5
95:18,19,20,21
**deposition** 1:10
3:11 4:10 18:19
18:24 19:6 20:18
21:9 24:6 36:20
60:17 69:21 70:2
82:14 88:9,13
93:13,23 95:9,15
95:21,22
**describe** 6:20 7:14
22:22 50:23 54:25
79:19
**describing** 54:19
**designation** 15:13
15:15,18
**designations** 14:24
**detail** 83:17
**determination**
61:17

**determine** 9:18
18:15 19:2 32:5
38:13,17 39:1
·56:7,17,20
**determined** 38:19
**differences** 78:7
**different** 6:21 8:14
12:1,4 14:6 15:8
21:9 23:16 27:21
41:21,25 42:1
53:7 60:22 62:13
67:23,25 78:2,9
**differentiation**
73:21
**differently** 80:10
**differs** 23:14
**difficult** 37:16
57:15,25
**DIRECT** 3:3,6
4:20
**direction** 95:17
**directly** 30:7
**disability** 41:23
·59:9,16 61:7,15
61:24 62:3 63:8
68:12 70:13 72:3
72:5,7,12,13
73:10
**disabled** 51:12
59:14,21 68:1
**disagreement**
67:22 68:21
**disclosed** 50:18
**discuss** 66:22
**discussed** 20:16
77:21
**discussion** 80:14
**discussions** 13:17
20:9 47:16 61:2
66:15
**disinterested** 96:1
**dispute** 63:20
**distinction** 79:14
**District** 1:1,1 4:5,6
**divided** 56:6,15,17

**Division** 1:2 4:6
**dmiller@qpwbla...**
2:11
**doctor** 22:3,7,25
23:1,3,7 59:13,20
63:2 67:11 69:1
71:4,6,8,10,15,19
76:1 77:8 89:11
92:14
**doctor's** 49:21
**doctors** 22:10
23:12,18
**document** 61:24
**documentation**
78:3,18,20
**documents** 19:1
78:13
**doing** 47:18 51:12
59:14,21 78:20
81:8 85:12
**dollars** 59:20
**Don** 4:14 18:25
34:1
**Donald** 2:9 3:5
82:6
**double-check** 86:3
**Doubt** 81:18
**Dr** 23:23 24:1,6
37:10,13,18 63:11
73:24 88:4,14
**driver** 29:2,4
**duly** 4:16 95:6
**duties** 74:22
**duty** 75:4,4,10

## E

**E** 2:1,1 3:1,1,9,9
4:16
**earlier** 45:24
**earliest** 17:4,6
**earn** 9:2
**earned** 15:14
**earnings** 55:25
56:18,20
**easier** 17:9

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

easily 78:11
Eastern 1:1 4:6
easy 79:19
education 10:5,7
educational 9:25
    15:4 47:14 67:6
effect 95:23
either 9:22 18:23
    24:5 30:16 31:12
    31:12 32:9 34:5
    45:7 64:8 96:3,5
elbows 42:2
electronic 26:12
element 54:1 55:18
elements 8:20 54:9
email 1:21 3:14,16
    3:18,20 25:17
    34:16 45:14,15
    52:10 53:20 55:20
    58:8,8 59:5 60:1
    64:13 70:15,20
    74:3 83:5,12 84:5
    84:10,15 85:11
    91:25
emailed 61:14
    64:19
emails 70:6 86:14
Emerson 1:12,19
    95:3 96:11
employ 96:4
employed 4:25
employee 78:10
employees 11:25
    14:15
employer 10:9,11
employment 18:23
    68:14
enclosed 74:16
ended 20:21 21:11
entitled 52:24 54:2
entry 88:13
equals 59:12,20
Ernest 1:4 3:17 4:4
    4:13 34:20 47:17
    48:13 49:21 57:9

70:13
Ernest's 20:5 34:18
    53:9
escalating 65:13
Esq 2:4,9
essentially 6:21
    8:17 39:25 55:10
    57:2
estimate 41:1 43:8
    43:8 87:24
evaluate 51:1
evaluating 60:15
evaluation 18:1
    31:16 53:5,21
    54:18 58:4 60:11
    60:13,14 62:25
event 96:4
exact 20:21
exactly 48:3 55:16
exam 70:21 75:1,5
examination 1:10
    3:3,6 4:20 22:22
    23:3,9 91:7
examinations 22:8
examine 22:25
examined 4:18
examiner 3:15
    21:19 41:13 42:17
    71:22 93:8
examiners 23:13
example 7:22 8:21
    8:24 9:1 42:2
    90:12
excess 7:17
exclusion 38:21
exclusive 52:12
excuse 49:21 59:13
    59:20
exhibit 3:11 25:18
    33:17 34:2,2,3
    35:19 36:18,20
    41:3 51:25 52:10
    69:12,21,25 70:1
    70:2,5 74:13
    82:14 83:10,13

84:11 85:10,23
    86:7 88:9,12,15
    90:19 91:20,21
exhibits 25:21
    93:23
existed 68:7
existing 71:6
expecting 61:19
expense 8:20,24
    40:16
expenses 8:17
experience 41:1
    57:16 66:3 79:21
expert 20:25 21:1,3
    23:25
expiration 82:20
    91:16
expire 83:3
expired 83:8 92:6
Expires 96:16
explain 58:9 78:16
    83:22 84:5,7,23
    86:24
explanation 8:16
    84:5
extent 7:22 54:10
    72:21 82:22 83:12
extra 44:4

_____

**F**

F 3:1,9
Faber 43:13,14,20
    44:15 47:20
face-to-face 30:17
fact 8:3 26:4 54:3
    60:7 68:12 70:13
facts 38:24,24
fail 75:7
fair 5:18 8:1 15:18
    16:10,19 23:8
    32:7 38:15
Fairbanks 2:4,4
    3:3,6 4:3,12,21
    5:25 18:21 19:20
    19:22 25:19 33:20

33:25 34:5 47:3,5
    47:8 49:17 51:24
    69:15,19,23 72:15
    72:18 80:19 81:18
    81:22 82:2,11,15
    86:2,4,12 89:15
    89:21 90:17 91:5
    91:8 93:11,18,22
Fairfield 12:6,15
    12:19,24 13:9,21
    43:15 77:12
fairly 79:23
fall 7:5 59:5
familiar 5:15 41:11
    41:15 87:1
family 14:5 81:4
far 9:5 80:7,17,20
Farmingdale 27:25
fault 7:18 8:7 39:1
    39:2 86:10 87:12
fax 29:19
February 65:12
    96:16
federal 35:21
fee 23:19
feel 34:11 78:21,23
    89:1
feels 89:3
fees 23:20
fell 12:3,5 49:16
felt 84:5
femoral 88:24
fender 32:3
figure 19:11 27:1
    40:20 56:5,8
    62:23
file 12:10 19:6,7,8
    31:6,8 32:15,16
    32:20 36:5,10
    46:11,15,20 51:4
    58:17 60:16 61:10
    61:16,21 62:24
    63:25 64:4 65:14
    70:17 71:12,16,21
    72:12 76:12,19,23

80:1 87:7,21
    89:23,24 92:5,23
filed 79:25
files 13:6 46:13,20
    57:21 79:25 80:5
filled 66:13
films 92:9,14,16,20
    93:1,1
find 66:19 67:8,23
    67:24 71:8 75:8
    78:6 86:15 87:5
finding 22:3
fine 80:17 83:14
fingers 42:2
finish 15:11
finished 17:7
fire 1:7 4:4,14 14:1
    14:2,11,14,20
    24:14 25:1 39:20
first 4:16 6:8 9:11
    13:3 26:13 28:18
    38:12 79:18 89:10
    95:6
five 59:11,12
five-minute 47:3
flesh 86:15
flip 26:2,23 32:2
    49:9 50:21
Florida 28:2
follow 84:14
follow-up 84:15
follow-ups 91:6
follows 4:19 86:9
footprints 12:3
force 31:20 95:22
foregoing 95:9
form 14:16 15:25
    16:7,12,25 17:24
    18:18 21:7 23:11
    24:19 32:12 33:2
    51:6 52:18 53:17
    54:5,13 56:1 58:3
    58:11 60:9,25
    62:10 63:13,18
    64:7 66:6,21 69:7

Examination of Anthony T. Dale

71:17,23 72:1,8
72:25 73:15,23
74:18 75:17,23
76:7 77:19 79:1
80:11,19 82:11
86:2,12 89:7,15
90:17 92:21
format 41:19
forms 74:16,21,24
75:16 78:16
forward 17:14
48:16 49:9 50:22
Fos 59:9
Foster 1:4 3:14,16
3:17,18,20 4:4,13
6:9 7:2,8 8:3,6
12:10 13:10,18
20:3 22:3 28:19
29:22 30:4,6,7,10
30:16 32:25 34:17
35:4 36:2 39:4,20
39:25 40:16 45:2
45:7,11,12,23
46:22 47:17,25
49:21 50:16,18
52:11,11 53:8,20
53:23 54:8,20,20
55:15 58:6,14
60:1 61:6,11 62:2
62:2,14,14 66:19
67:11 68:10,25
70:6,9 72:20 73:6
74:3,15 75:14,25
77:9,21 78:24
79:25 80:10 82:18
83:18 84:18,19,23
85:7 87:7,16 90:2
91:25
Foster's 7:11,22
11:20 13:25 18:5
18:16 20:12 21:18
22:17 24:8 25:11
28:7,11 32:10
35:19 38:18 47:10
55:24 59:9,16

63:21,24 66:5
67:5 82:7
Fosters 35:12 57:20
58:21 62:8 64:24
76:9 77:17 85:6
86:18 91:11 92:17
92:20
Fosters' 64:11
66:16 93:8
Fosters's 63:10
found 88:22
foundation 89:8,15
four 15:5,6 59:18
59:19
free 34:11
friends 81:6,7
front 5:16 30:25
fruition 21:23
full 44:10,12
full-thickness
88:23
full-time 73:4
further 75:2 94:1
96:1
future 8:23 9:2
53:3,4,9,10,24
54:4,11 55:5,12
58:1 68:23 89:3

---
**G**

G 2:4 3:3,6 4:21
garage 47:13
Gary 28:24
gather 31:7 61:9
62:15,16
gathering 17:3
gears 69:17
general 8:16 10:14
81:1
generally 5:12 7:14
22:22 27:16 81:9
Geoffrey 27:5,7
48:9
getting 22:16,17
29:21 34:17 35:21

72:12 78:10 89:24
give 5:24 8:16
10:13 20:17 36:9
41:6 46:6 49:15
64:15
given 7:9 10:9 35:9
45:23 57:16 62:8
69:9 75:21,24
79:2 84:3 92:17
95:18
gives 10:14
go 10:14,24 12:22
14:16 16:7,12,25
17:24 18:22 21:7
21:14 22:18,24
23:11 24:19 32:12
33:2 34:11 35:23
36:17,22 44:13
45:1,19 47:5 51:6
52:18 57:9 69:19
72:15 74:6 75:25
77:24 84:3 88:15
88:20 93:22
goes 79:24 90:13,16
going 24:14,21 25:2
25:18 26:22 32:4
33:16 36:17,22
38:8 39:5 40:16
42:3 43:2 48:7,16
48:17 53:23 54:20
57:24 60:2 64:5
69:11,25 85:1
91:5,19 92:7,13
good 81:20
graduated 10:1
grandma 84:1
greater 44:10
Greenwood 1:13
1:14,20 4:9 95:10
95:11
gross 44:18 85:19
group 66:12
guess 35:3 59:5
62:1 67:9 74:5,10
76:11 78:9

Guidelines 41:23
guy 81:10,20
guys 23:21 45:8

---
**H**

H 3:9 4:16
half 13:6 49:16
hand 33:16 51:23
69:11,25 88:12
91:19 96:6
handed 69:24
handful 11:6
handing 34:4
handle 5:20,23
8:15 11:13,15,22
12:20 23:16 76:21
79:5,7,13
handled 14:14
27:17,17,20,23,24
80:15,18,24 87:25
handler 17:16
handlers 80:7
handles 79:19 80:3
handling 6:5,23 7:8
9:13 10:12,18,21
11:8,18 12:2,8
13:4,13 15:19
18:12,17 19:3,13
19:14 20:12 21:17
21:22 24:2,8
33:12 41:10,21
72:6 79:23 80:10
87:12
hands 42:2
happen 5:5
happened 18:16
20:19 21:12 30:20
78:4 93:16
Harp 20:13,16 21:3
80:2 93:7
Hatfull 66:8,16
76:2,17
head-to-head 31:1
health 35:6
heard 89:25

help 19:18 84:5
helpful 17:7
helps 86:22
hereunto 96:6
hey 84:20
high 10:1,6 73:6,11
higher 44:19
hired 93:8
hit 30:23
Hold 34:7
homeowners 6:3
homes 6:4
honestly 23:14
54:17 64:8 69:8
hot 72:5
hour 95:13
hundreds 88:1,2

---
**I**

idea 24:5 31:19
identification
36:21 69:22 70:3
88:10 93:24
II 2:9 3:5 82:6
Illinois 11:15
imagine 36:4
immediately 12:15
impact 31:18,19,22
31:25
impairment 9:1
important 32:5
improvement 50:8
include 8:19,21,23
9:1 42:22,24
including 40:21
53:19
income 56:10,13
78:16 85:19,19
incomplete 19:21
increase 60:6
incurred 9:4
indemnify 75:10
Independ 23:5
independent 19:12
22:8,21 23:2,4

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

30:12 70:21 75:1
**independently**
30:11 33:6,14
36:4 37:14 45:15
46:21 51:7 58:16
66:17 69:8 79:2
82:12 89:18
**Indiana** 1:13,14,15
1:20 4:10 11:15
12:4 95:1,4,12,14
**Indianapolis** 12:1
12:14,19 27:14
65:9 81:2 83:1
**indicating** 7:3 34:3
50:5 82:16
**individual** 7:23
87:2
**individually** 87:3
**information** 16:6
17:3 18:2 20:17
34:18,21 35:6
36:15 40:24 45:12
45:20 46:11 53:18
53:22 57:19 70:8
71:2,13 78:23
89:25 90:10,14
**informed** 76:2
**initial** 10:20 30:10
89:22
**injection** 82:9 89:2
**injections** 40:17
**injured** 17:12,14
22:24 31:20,23
32:6 33:5
**injuries** 6:3 7:25
10:15 36:7 42:1,2
63:8 73:18 87:3
**injury** 5:21 6:2
28:22 40:8 44:8
53:1 60:14
**Institute** 15:4
**insurance** 5:15,16
7:19,21,24 13:25
14:6,8,24 15:9
24:17 28:23 29:9

33:9 40:2,12 44:7
52:13 83:1
**insured** 17:20 23:7
28:24 29:18 39:3
51:11 59:11,13,18
59:21 64:17 91:2
91:10
**insurer** 16:18 29:4
**intend** 43:9
**intending** 64:10
**intentionally** 16:1
**interested** 96:3
**internal** 54:21
70:25
**interrupt** 25:17
**introduced** 82:13
**investigate** 5:14
**investigating** 35:24
**investigation** 16:5
17:17
**involved** 6:8 7:3
27:2 28:19 29:21
31:15 33:7 68:2
79:6 83:20
**Iowa** 11:17
**issue** 49:21 63:15
69:5 77:16
**Issued** 59:11,17
**issues** 50:6 63:6

------

**J**

**Jay** 66:8 76:2,17
**Jeff** 81:13,16,19
**Jenkinson** 23:23
24:1
**Jenkinson's** 24:6
**Jo** 3:14,16,18,20
**job** 5:7 6:21 47:11
50:10 51:12 57:17
59:9,14,21 66:19
66:23,24 67:13,23
67:25 68:2,3,7
**jobs** 67:2
**Johnson** 1:13,14
95:2,4,11 96:15

**joint** 88:25
**Joniec** 65:2
**Joyce** 1:12 35:17
95:3 96:11
**joyce@emersonr...**
1:21
**judge** 35:21 60:20
**July** 1:14 4:2,8
48:10 59:15,19,24
60:8 89:16 95:12
**June** 18:9 26:17,20
37:7 39:14 43:3
43:12,20 45:2,17
53:13 59:2,2,8,18
59:19,23 60:8
91:12
**juries** 5:15
**jurors** 81:9
**jury** 5:11 7:15 8:11
22:20 81:16
**jury's** 43:6

------

**K**

**keep** 36:23
**keeping** 43:3 73:7
**Kentucky** 1:1 2:5
2:10 4:6 8:8
11:10,18,20,22
12:2,3,5,8,13,20
13:5 23:15 24:2
27:16 28:4 29:9
54:9 81:4
**Kentucky's** 15:23
**kept** 13:5,11
**kind** 5:16 10:11
11:7 26:23,25
30:25 31:20 41:20
42:2 43:2,8 48:4
51:17 57:14 59:5
61:24 69:16 79:4
81:8 85:6
**kinds** 68:3
**knee** 40:17,24 42:5
42:7,10,13,20
50:11 53:15,24

67:16 68:20,22
73:10,18 74:1
82:9,9 89:12
90:12,14 93:4,9
**kneeling** 50:9
**knees** 30:22
**knew** 40:1,8 57:19
62:1,3 67:15,19
**know** 5:11 7:15
8:12,16 9:6 14:1
15:15 18:4 21:13
22:7,21 23:14,15
23:20,23,24 27:9
27:11,16,19 29:8
31:23,24 32:3
40:6 41:14 42:1
44:4 45:5,7,14,22
46:8,16 47:14,20
47:23 51:21 53:6
53:21 57:23 58:6
60:19 64:18 67:5
68:13,15,16,17
69:13 73:2,3,22
76:9,10,25,25
77:3,4,6,7,10 78:7
79:11 80:3,5,8,20
81:12 82:7,10
85:18 89:14,23
92:25 93:6,12,15
93:16
**knowing** 89:9
**knowledge** 10:16
14:19,22 19:12
28:5 30:24
**knows** 81:11
**Konerman** 76:19
77:11
**Kyle** 65:2 66:9

------

**L**

**L** 2:9 3:5 4:16 82:6
**label** 35:18 82:19
84:11,16 85:23
**labeled** 26:14
**labor** 9:2

**Lake** 27:24
**language** 40:6
**large** 95:4
**late** 7:5 19:4,14
**Laura** 20:13 21:3
80:2
**law** 15:3
**lawsuit** 80:1
**lawyer** 22:10
**lawyers** 2:4 20:10
**leader** 43:17
**leading** 73:4
**leave** 17:11 33:21
33:23
**leaves** 40:13
**leaving** 57:2
**left** 12:23 46:1
**legal** 15:8
**legitimate** 87:19
**let's** 24:13 25:21
33:25 34:1,1 47:3
47:5 48:4 49:9
50:21 54:7,7
55:18 58:23 67:8
69:15,15,19 70:4
72:15 73:6 74:12
76:14 81:22 83:10
87:19 93:22
**letter** 3:17 29:17
35:12 64:19 74:13
74:14,15 75:12
76:4 83:6
**letting** 44:4
**level** 6:22 29:9
79:18,22
**Lexington** 1:2 2:5
3:19 4:7 48:12
81:4 88:17
**liability** 5:22 6:3
16:11,14,15 29:8
38:25
**Liberty** 3:15 5:1,2
5:4,7,20 6:13 7:9
9:8,21 10:18 14:2
14:5,8,14 21:4

Examination of Anthony T. Dale

23:13,25 26:5
27:11,24 28:3
41:10 47:20 65:6
65:23 77:2,4,7
79:11 80:17 87:14
92:25 93:7,7
**license** 11:11
**licensed** 11:9
**licenses** 11:8
**licensing** 14:23
**life** 89:1
**light** 37:10,13,17
**limit** 29:16 39:16
43:5 44:14 64:14
64:18
**limits** 29:22 35:14
44:23 45:1 64:23
85:7
**list** 35:9 71:6 74:17
75:21 81:9
**listed** 42:16,23
74:23
**lists** 23:12
**litigate** 16:18
**litigated** 80:5
**litigation** 79:6,13
79:23,24 80:4
**litigation-only** 80:7
**little** 10:7,25 13:11
20:7 44:19 78:9
**live** 11:2,4,7 86:17
**local** 22:10
**located** 13:20,21
43:14 65:8 77:11
**location** 27:14
**logged** 38:1
**logistically** 23:17
**long** 5:2 6:5 41:17
47:25
**longer** 37:20
**look** 7:25 31:17
32:20 34:11 40:20
41:6 42:4 43:13
51:8 52:4 58:23
60:12,17 70:1

74:12,12 78:11
83:10,13,24 85:24
**looked** 40:4 53:13
89:19 91:9
**looking** 26:13 27:4
31:8 32:9,21,24
36:25 37:4 38:8
43:19 49:12,25
54:22 57:20 58:8
60:1 67:9 70:11
76:14,16 78:7
84:10 85:10 86:8
89:16 90:19
**looks** 28:9,14,21
29:15 34:16 35:1
37:20,21 38:20
39:10,15 40:15
41:25 43:19 44:18
49:8,11,19 59:10
65:22 70:6,14
**Los** 74:5
**loss** 3:13 8:18,20
26:17 33:1,13
36:14 42:24 48:8
50:25 51:2 55:3,5
55:5,7,13,18 58:1
58:9 59:23 60:24
77:25 78:16,25
85:12,14,24 86:11
88:23
**lost** 49:22,22 59:11
59:18 61:3 78:22
86:5
**lot** 41:20 89:21
**Louisiana** 11:11
**Louisville** 2:10

_____
**M**
**M** 3:1
**mad** 35:21
**Madam** 35:17
**Maddox** 27:5,7,9
28:7,10 48:9
**mail** 74:8
**mailed** 64:19

**mailing** 74:7
**majority** 55:19
**making** 17:19
32:14,16 46:18
49:20 50:24 51:15
54:8 55:11 78:4
**manager** 39:17
43:18 47:25 65:3
66:9,11,14
**manuals** 41:9
**March** 50:23
**mark** 33:17 41:2
51:24 69:11,25
76:19 77:11,14
91:19,21
**marked** 36:20
69:21,24 70:2
88:9,12 93:24
**match** 71:5
**materials** 41:10
**math** 25:6
**matter** 4:18 95:8
**maximum** 50:7
**mean** 12:21 23:5
33:3 37:11 65:15
**meant** 86:1
**mechanic** 47:12
51:12 57:10 59:14
59:22 66:20,23
67:12,20
**mechanics** 30:20
**medial** 88:23
**medical** 8:17,20,23
10:7 17:3 21:19
22:8,22 23:2,13
34:18,21 35:9,25
36:14,14 40:16
41:22 45:3,5,12
45:20 46:11,14,20
50:8 53:3,4,9,10
54:3,11 55:3,4,6
61:23 62:6,7,15
69:1 70:21 71:14
71:18,21,22 74:16
74:17 75:1,20,20

76:1 91:15 92:4
92:12 93:8
**medically** 42:19
**medicine** 10:11
**meet** 68:7
**MEHR** 2:4
**Melissa** 13:16,17
**memory** 54:18 58:5
**mentioned** 51:22
56:25
**mentioning** 89:11
**message** 46:1
**met** 13:23 30:16
38:21
**Michigan** 11:16
**mid-Atlantic** 12:6
13:2
**middle** 64:16
**Midwest** 12:5 13:1
13:4
**Miller** 2:9 3:5 4:14
4:14 5:24 14:16
15:25 16:7,12,25
17:24 18:18,22
19:17,21,25 21:7
22:15 23:11 24:19
25:16,20 26:7
32:12 33:2,18,23
34:4,7 35:17 38:5
41:4 46:6 49:15
49:18 51:6 52:1,4
52:18 53:17 54:5
54:13 56:1 58:3
58:11 60:9,20,25
62:10 63:13,18
64:7,15 66:6,21
69:7,13 71:17,23
72:8,25 73:13,15
73:23 75:17,23
76:7 77:19 79:1
80:11 81:16,20
82:6,15 88:7,11
.89:7 91:3,20,24
92:21 93:10,21
**Miller's** 20:18

**mind** 46:6 63:15,20
64:15 68:9 69:6
**minimum** 29:8
**Minnesota** 11:16
**minor** 32:6
**missing** 45:5
**mixed** 32:14
**moment** 89:2
**money** 9:2
**month** 20:15 50:1
59:15
**monthly** 56:7
**months** 50:22 56:6
70:16 76:13 90:21
**morning** 37:23
**motor** 7:23 72:24
**motorist** 7:12,16,17
7:19 8:1 40:10
51:1 55:9 87:15
**move** 9:13 17:14
74:12
**moved** 12:9,23 13:3
**moving** 50:21
**MRI** 72:9 89:16
92:9,16,20 93:1
**multiple** 17:10
**multiplied** 56:8
**Mutual** 3:15 5:1,2
5:4,7,21 6:13 7:9
9:8,21 10:18 14:3
14:5,9,14 21:4
23:13,25 26:5
27:11 28:3 41:10
47:21 65:6,23
77:2,4,7 79:11
80:17 87:14 92:25
93:7
**Mutual's** 93:7

_____
**N**
**N** 2:1 3:1,1,1,9 4:16
4:16
**name** 4:12,22 28:24
28:25 41:18 65:4
**named** 81:13

Examination of Anthony T. Dale

names 14:7
nationwide 74:7
nature 6:24,24
Nebraska 11:17
necessarily 16:20
  26:3 33:3 62:12
necessary 89:4
need 22:6 34:22
  40:17 45:20 53:23
  54:3 60:12 68:22
  71:11,22,25 81:10
  83:13 85:24 86:15
  86:24 87:5 88:25
  93:3,8
needed 29:19 45:12
needs 89:2
negotiated 23:21
net 85:19
neurologist 40:17
never 21:22,25
new 27:25 28:1
  49:21 90:10 92:8
  92:19,22
no-fault 87:11
nod 22:12
noncomplex 79:23
nonlitigation 79:20
normal 35:23 50:10
normally 22:5
  31:10 57:11 78:2
  78:13
North 11:16
notarial 96:7
Notary 1:12 95:3
  96:12
note 27:4 28:9,14
  37:2,20 38:1,8,9
  38:25 43:19 46:3
  48:8,16 49:20,25
  50:23,24 51:8,8
  51:11,15,17,22
  52:4 59:1,8 64:14
  64:17 65:12 67:10
  68:19 76:17 84:12
  85:1 87:1,5,8

88:13,17 89:11
  90:20,21,23 91:9
noted 51:3 59:16
notes 3:13 19:6,7,9
  19:24 21:18 25:24
  26:4,11 28:19
  30:22 32:14,15,22
  32:24 33:3,11,19
  34:1 36:18 37:10
  37:13 43:2,13
  48:4 49:10 54:21
  58:17,23 60:15
  63:10 66:10 70:11
  72:10 76:15 83:13
  86:18 88:3 95:16
notice 1:15 3:13
notified 70:14
  87:13,13
November 49:10
  49:19 56:5,9
number 4:7 35:20
  41:4 52:1 88:7
numbers 49:1,15
nutshell 5:14

―――――――――
          O
―――――――――
O 3:1,1,9 4:16
object 14:16 15:25
  16:7,12,25 17:24
  18:18 21:7 23:11
  24:19 32:12 33:2
  51:6 52:18 53:17
  54:5,13 56:1 58:3
  58:11 60:9,25
  62:10 63:13,18
  64:7 66:6,21 69:7
  71:17,23 72:8,25
  73:13,15,23 75:17
  75:23 76:7 77:19
  79:1 80:11,19
  82:11 92:21
Objection 86:2,12
  89:7,7,15 90:17
obsolete 57:12
obtain 61:15

obviously 11:20
  31:25
occasions 74:20
occur 6:3
occurred 26:20
  31:25
October 58:19
  74:13 76:16 83:7
  88:17 89:10
off-work 63:16,21
offer 16:21,24
  19:25 24:13,23,24
  25:8 45:1 50:15
  52:11,16,20 54:16
  55:11 58:20 60:7
  64:6,10,12,25
  83:16 84:24 86:9
offered 29:16,18,21
offering 23:8 35:14
  52:14 83:19
offers 17:19 24:9
  58:13 91:11
office 1:13 11:3
  12:1,7,14,16,19
  20:18 27:11,16,20
  27:21 88:13 95:10
offices 12:1 28:3
offset 40:9 44:2,3,6
offsets 44:10,23
  83:21
Oh 20:1 46:7 48:25
  49:1,3 52:7
Ohio 12:7,15 13:21
  43:15 77:12 82:25
Okay 6:11,20 7:8
  7:11 9:7 14:19
  15:2,17,22 18:11
  18:22 19:11,16
  20:2,7,14 21:3,13
  21:17 22:9 24:20
  25:4,15,20,25
  26:16,22,24 27:3
  28:1,9 29:1,13,20
  30:3,12,15 33:16
  34:9,14,15 35:16

36:17,19,24 37:1
  37:2,20 39:4 41:2
  41:8,13 42:24
  43:2 44:15 45:17
  47:4,23 48:6,23
  49:5,5,9,25 50:2
  51:21 54:24 55:8
  55:14,18,21 56:19
  56:23 58:19,23,25
  59:1 62:1 67:2,8
  69:11,18 73:3
  74:8,12 80:21
  81:8,14 82:17
  ·83:11,15 84:14
  85:1,4 87:5 88:6
  88:16,19 89:19
  92:15 93:18
old 58:6
omit 53:11
once 15:10,11 17:8
  74:23 79:25
ones 13:10
ongoing 33:13
  55:12 60:24
online 10:13,24
  70:25
open 23:8
opening 89:23
opinion 20:25 21:4
  21:8,9 23:8 63:2,4
  66:18 72:2 73:24
  93:12,13
opinions 19:13
opportunity 17:4,6
oral 1:10
order 61:16 72:1
ordinary 92:12
originally 81:2
orthopaedic 63:11
orthopedic 73:25
outlined 75:8
outlines 74:22
outside 14:23 70:22
  70:23
outstanding 55:3

58:20 85:11
overview 10:14
owned 14:8

―――――――――
          P
―――――――――
P 2:1,1
P-I-P 8:7
P.A 2:9
p.m 38:2 46:7
  48:24 49:12 72:17
  81:25 82:1 94:2
P.O 74:5
page 3:2,10 26:13
  26:15,23 29:18
  35:18,19 36:25
  38:3 42:4 43:19
  48:8,9 49:2,10,17
  50:5,21 59:1
  64:16,22 65:13
  66:25 67:1 76:16
  86:8 88:15 90:19
pages 26:8 42:14
  49:9 50:3
paid 7:21 18:5
  24:14,22 30:1
  40:11,12 55:4,5,6
  57:1 59:11,18
pain 8:21 52:17,20
  52:25 86:5
paper 46:13
paragraph 55:23
  56:25 57:5 85:11
part 15:6,10,11,12
  37:12 55:22
particular 10:4
  14:23 41:22 43:11
  52:20 62:22 72:24
  82:8
parties 95:21,24
parts 15:6
party 17:12,14
  22:24 31:20,23
  33:5 96:3,5
party's 7:20 40:12
  44:7

Examination of Anthony T. Dale

pass 15:10
passed 69:10
patient 17:9
pay 5:14 25:2 29:22 43:9 45:19 75:10 75:15
paycheck 78:10
paying 20:20,21 21:11 32:25 57:1 61:3
payment 5:18 16:19,24 18:9 21:5 52:25
payments 49:22 55:12 59:23 60:8
pending 12:12,13 25:11 39:16
people 7:15 12:18 12:22,23 13:2 83:25
people's 6:4
percent 25:3 52:14 58:14 73:9,10
perfectly 87:19
permanent 50:8 57:10,23 66:23 67:12
permanently 51:11 59:13,21
person 78:1,2 81:12 87:11 96:2
personal 13:17
personally 27:10
persons 78:14
perspective 44:19
PETERSON 2:4
pgf@austinmehr... 2:6
Phil 4:12 25:16 81:16
Philadelphia 24:17 40:2 52:13
Philip 2:4 3:3,6 4:21
phone 83:23 84:7

photographs 31:3
photos 31:9,14,17 32:10
physical 40:18 42:23 46:15 68:1 68:3 75:5 82:7
physician 68:25
picked 13:2,3
picks 7:20
pike 87:15
pindown 27:1
pinpoint 76:14
PIP 8:7,12,12,15 9:4 27:8,17 32:15 32:25,25 33:7,8,9 33:10,13 36:5,9 36:13 40:11 44:1 44:3 46:11,13,19 49:11,19 50:25 51:15 52:12 55:4 55:12 56:25 59:10 59:17 60:3,8,23 61:2 83:20,21 87:12
place 1:16 6:25 19:13 38:22 71:7
placement 88:25
plaintiff 1:5 2:3 4:13 95:10
plan 88:20 90:24
plate 6:1
please 4:23 19:22
PLLC 2:4
plus 44:6
PO 83:1
point 11:21 22:16 25:10 29:24 39:4 39:10,24 40:21 45:17 46:10,13,17 46:18 50:15 51:18 55:22,23 61:6 67:17 68:18 69:14 76:23 85:13,23 90:6 93:10,11
policies 9:16 14:8

14:14 40:6
policy 8:8 9:19 13:25 24:21 29:16 29:22 35:14 39:5 39:16 40:5 43:4 44:14,23 45:1 64:14,18,23 74:23 85:7 87:9
pop 81:9
portion 73:17 85:12
position 5:9 9:10 9:11 43:16 60:23 79:5
positions 12:24,25
possible 68:6 84:2
possibly 28:2
post 80:4
potential 29:25
Practices 15:19,23
pre- 80:4
pre-existing 44:11 63:6 72:11,13
prelitigation 79:7 79:12
preparation 18:19 18:23 23:24 60:17
preparing 19:5
present 95:22
presented 95:19
pressure 73:6,11
presume 45:25 46:3 57:22
pretty 29:20 78:11 79:17
preventing 72:23
previous 74:20
previously 75:24
PRIETO 2:9
primarily 6:2,5,23 30:6 90:1
principles 15:8
print 37:17
printed 25:23
priors 44:11

proactive 17:17
probability 89:12
probable 88:24
probably 12:17 13:6,7 15:16 20:15 25:12 33:20
procedure 1:15 42:16 54:3 67:16 67:16 95:14
proceed 39:10
process 15:14 17:13 22:2 35:23 86:25
processing 35:6
produced 1:12 26:7 60:21
profession 57:11,14
profit 85:14,24
profits 78:16
program 71:2
progress 79:20 88:17
Progressive 28:21 28:23 29:3,6,14 29:20,21 30:1 35:13,13 36:6 37:4,7,22 39:3 46:1
projected 56:13
promotion 6:22,25 7:9
promotions 6:15 79:21
promptly 16:10
property 5:21
proposal 64:24
proven 54:10
provide 65:19 75:15
provided 26:1 35:5 41:9 77:1,7 85:15
provider 17:8 46:5 46:8 74:17 75:20
providers 34:18 35:9

provides 63:2
providing 35:12
psychology 10:5
Public 1:12 95:3 96:12
pulled 32:20
purpose 61:13
pursuant 1:15 95:13
put 41:4 63:8 67:12 86:20 87:19
putting 45:8

**Q**

question 16:15 34:12 54:6 63:19 73:1,16 80:22
Questionnaire 3:19
questions 3:3,5,6 4:21 48:7 81:1 82:3,6 91:8 93:19
QUINTAIROS 2:9

**R**

R 2:1
radiology 88:14
rationale 53:19
reached 50:7
reaching 31:9
reaction 64:11
read 26:3 33:3,5 34:7,10 37:16 82:19 89:5 95:22
realigned 12:2
really 32:3 37:17 93:15
realtime 32:19 51:18
reason 11:24 12:9 45:18 60:6 92:3
reasonable 16:5
reasonably 16:11 75:5
reasons 16:23 21:5 63:7 75:8

Page 9

Examination of Anthony T. Dale

reassigned 76:19
92:23
recall 6:8,10 7:12
13:15,18,19 15:21
19:23 22:19 24:3
24:11,16,20 25:1
25:13 28:25 30:11
30:21,24 31:5
32:9 33:6,14 36:4
37:14 45:6,16
47:12,15 51:7
52:22 53:12,22,25
54:17 58:4,16
60:10 61:5,8
63:14,23 64:8,9
64:20 66:7 67:7
68:24 69:3,5,8
74:2 77:15 79:2
87:6,18 88:4
89:16
receipt 92:19
receive 31:13 74:24
received 28:10
29:15 31:21 32:13
37:6,23 46:14
49:20 59:13,20
63:9 70:13 74:20
74:21 87:7
receiving 37:3
53:22 64:23
recess 47:6 69:20
72:16 81:25
recognize 86:23
recollection 30:12
83:14
recommend 22:7
recommendation
22:17 39:13,15
43:4
recommendations
65:19
recommended
39:22 44:13
record 4:3,22 47:9
69:19,23 72:18

82:2 95:18
records 7:2 17:8
36:5,14 37:9,15
39:24 45:4,5,25
46:2,4,14 61:17
61:23 62:6,8,16
62:19 63:16,22
69:2 71:14,18,21
74:24 77:5,8
92:12 93:3
recover 54:2,10
REDIRECT 91:7
reduced 95:16
Reeves 65:22,23
reference 25:22
26:15 41:21 45:13
53:10 86:14,17
references 72:10
referral 70:25
referring 60:13
84:11 85:22
refresh 54:18 58:5
83:14
refresher 11:7
regard 17:3 22:16
80:22
region 12:3,4,5,6
related 73:10,11,18
relating 4:18
relation 14:2 31:22
relative 93:3 96:2
relaying 43:22 44:1
release 35:5 70:8
76:6
released 48:13
relevant 78:21
reliance 82:22
remember 8:8
11:11 13:13 20:21
21:20 22:13 25:5
25:8 27:19,22,23
28:6,24 29:3,6,7
30:9,19,25 31:9
31:11 32:13 37:18
46:18,21 47:10,16

47:19 48:1,2 61:6
64:11 66:10,15
73:24 91:16 93:4
rendered 67:25
renewed 11:12
repeat 54:6 63:19
rephrase 53:7 72:4
replaced 12:24
replacement 40:18
40:25 42:10,20
50:11 53:15,24
68:20,22 82:9
89:13 90:13,14
93:4,9
replacement/arth...
42:14
report 21:10 24:6
89:17 93:14
reported 12:18
Reporter 35:17
96:12
reporting 1:19
85:19
reports 21:1 88:15
repped 86:19,24
representative 9:12
9:22 82:25 87:4
represented 95:24
request 34:21
45:11 46:5,19
61:23 62:9 64:3
70:16 71:4 74:24
78:3,13 79:3 92:8
92:13,20
requested 45:25
62:21 63:25 74:19
77:4 78:19 92:10
92:15 93:1
requesting 74:15
92:4
requests 17:10
45:22 82:23
require 16:17
60:20 75:5
requirements 68:4

reservation 75:11
76:4 83:6
reserve 39:15,23
42:16,18 43:5,7,8
44:14,16 45:8,18
49:6 52:2,6 53:14
75:9 89:22 90:16
reserves 50:12,19
90:6,9
reserving 75:3,6
Residence 96:15
resolution 5:8
resolving 69:6
resources 41:20
respect 17:19 36:13
38:17 39:1 42:13
48:7 60:24 62:16
response 74:21
75:3 84:10
responsibility 39:6
restrictions 50:8
57:10,24 66:23
67:12 68:5,7
retrieval 92:12
return 74:18
returned 92:23
returns 78:15,18
85:14,25
review 19:5 39:16
58:16 60:10 61:16
65:14,18 69:1
71:11,15 92:14
reviewed 18:15
19:1,2,6,8,18 21:1
24:5 51:22 63:10
reviewing 19:23
30:22 53:21 93:6
reviews 63:2
revocation 82:20
82:23
revoke 82:21,24
83:2
right 5:25,25 7:5,7
8:10 17:15 18:14
20:6 21:24 25:4,6

26:19,22 33:23
34:6 35:7 36:1,3
38:24 39:8,13
40:22 44:20,24
46:12 53:16 57:3
59:6 60:4 62:11
70:18 72:24 75:6
75:9,19 76:4,13
76:24 85:2 87:16
89:14 90:16
right-hand 26:14
rights 75:3,11 76:4
83:6
Road 1:14,20 2:10
95:11
role 6:12 66:2
Room 1:14 95:11
Rules 1:15 95:14

S
S 2:1 3:9
Safeco 5:3,4 9:7,10
9:21 10:18 14:2
SAITH 94:1
sales 5:17
salespeople 84:17
saw 88:3
saying 55:2 75:19
says 26:21 37:9
42:18 44:9 48:12
50:25 51:11 59:17
65:13 70:22 76:19
86:9 89:20,20
SBA 65:14,16
schedule 20:18
85:25
scheduled 21:14
scheduling 70:21
74:25
school 10:1,6
SCLA 14:25 15:1,3
15:13,17
scope 88:22
seal 96:7
second 35:18 41:7

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

49:12,16 55:22 57:5 81:23 85:11 87:6
**section** 15:5,7 38:9 38:24 41:22 50:6
**sections** 15:5 41:25 42:7
**Security** 35:20 61:7 61:10,20,25 62:6 62:20,24 63:1,25 64:3 68:13 70:7 70:17 71:11,20 73:8,20 74:4,18 76:5 77:1,5,8
**see** 22:4,24 26:17 27:5 28:12,16 30:3,4 31:17,21 31:23 32:4,16 36:5 37:23 38:7 38:10 40:18 41:23 42:8,11 48:10,14 48:17 49:3,5,12 49:23 50:3 51:13 53:10 56:14 57:7 57:12,17 58:17 59:3 63:5 64:14 67:8 68:19,25 72:12 74:3 75:25 76:14 78:6 84:6 89:3 92:1
**seeing** 91:16
**seek** 68:14
**seen** 7:2 21:18 31:6 35:10 79:25
**sees** 23:7 44:9
**selected** 23:3,25
**selection** 22:25
**self-employed** 57:9 77:21,25 78:14
**selling** 9:16
**send** 21:19 22:3,11 45:14 46:16,19 70:16 74:4,9 76:1
**sending** 37:9,15 46:2 68:25

**senior** 5:8 15:3 65:16,20,25 66:4
**sent** 11:3 29:17 46:4,24 64:13 70:9 71:19 76:9 77:9 83:6 84:15 89:24
**sentence** 57:5,14 82:20
**separate** 14:20
**September** 48:16 48:19,20 49:6
**series** 15:5
**service** 9:11,22
**services** 23:19
**set** 16:23 23:17,19 23:20 25:23 28:11 39:15 49:6 50:12 50:19 52:3,8 71:8 96:6
**setting** 39:23 43:4 44:15 53:14
**settle** 16:10 40:10
**settled** 21:15
**settlement** 15:19,23 17:19 24:9 52:16 52:20 64:6,25 91:2,10,11
**seven** 26:8
**severe** 6:23
**severity** 31:18
**shared** 52:12
**Shelbyville** 2:10
**shifted** 13:11
**shipped** 13:8
**Short** 2:5
**show** 41:2 82:13 88:5
**showing** 35:13
**shown** 26:8 91:15
**side** 9:15 32:2
**sign** 34:20
**signature** 94:4 95:19,20
**signed** 23:18 35:5

82:18 83:4 89:11 95:23
**Similarly** 16:9
**single** 82:8
**Sir** 4:22
**sit** 10:25 12:19 89:17
**sitting** 31:23,24 87:22
**six** 15:6 26:7 49:22
**skip** 33:4
**Smith** 1:13 95:11
**Social** 35:20 61:7 61:10,20,25 62:6 62:19,24 63:1,25 64:3 68:12 70:7 70:17 71:11,20 73:8,20 74:4,17 76:5 77:1,5,8
**somebody** 32:6 74:8 81:10
**soon** 29:20
**sorry** 34:12 49:1 52:7 67:1
**sort** 15:20 42:25 61:9 66:2 79:16
**sorts** 14:25
**sound** 7:5 26:19
**sounds** 7:7 18:14
**South** 1:20 11:16
**specialist** 5:8
**specific** 16:3,14 17:21,22 20:9 52:22,23 54:7 67:4 68:9 71:4
**specifically** 21:10 55:16
**spent** 89:21
**split** 24:20 86:5
**spring** 51:18
**squatting** 50:9
**SS** 95:1
**staff** 46:4 71:1
**stands** 15:3
**start** 9:10 38:8 70:4

79:22
**started** 5:3 10:21 12:7
**starts** 43:23 56:2 64:22
**state** 1:13,20 4:22 23:14 28:1,1 29:8 38:20 95:1,4
**statement** 5:18
**statements** 85:15 85:24
**states** 1:1 4:5 11:8 11:13,15 12:21 13:5 23:15 57:5
**stating** 28:10 74:19
**status** 28:21 33:10 59:16 63:16,21
**stenographic** 95:15 96:12
**steps** 7:20 48:5
**stood** 65:16
**stop** 58:1
**stopped** 18:17 19:3 19:14
**stopping** 69:14
**straight** 36:23
**strains/tear** 42:8
**Street** 2:5
**study** 10:3
**submit** 70:24 75:5 78:17
**sucking** 69:14
**suffering** 8:21 52:17,21,25 86:5
**suggest** 22:11
**suggested** 53:23
**Suite** 2:5,10
**Suites** 1:13 95:10
**summer** 87:22
**supervisor** 43:11
**supervisors** 80:14 80:22,23
**support** 46:4 61:18 71:1 78:3,21
**supported** 63:16,21

**supporting** 61:23
**supports** 50:25 51:2
**sure** 5:25 9:6 16:15 19:20 34:11,14 42:22 49:17 53:5 53:6 54:7 63:20 73:2 81:24 84:1 86:24
**surgeon** 63:11 73:25
**surgery** 53:15,24 57:7
**surgical** 67:15
**switched** 12:15 13:21
**switching** 69:17
**sworn** 1:12 4:17 95:6
**system** 26:12 70:25 71:7

---

**T**

**T** 1:11 3:1,9 4:16 4:16 94:5 95:5
**take** 6:25 15:9,11 47:3 48:5,5 69:15 81:22 86:11
**taken** 1:13,14 47:6 60:22 69:20 72:16 81:25 82:22 95:9 95:15
**talk** 5:22 8:12 10:25 14:3 20:13 20:14 24:13 55:18 77:14 83:24,25
**talked** 18:25 20:10 37:2 87:7
**talking** 10:10,11 14:24 18:19 21:18 22:21,23 23:2 42:5 43:23 49:1 57:20 69:4 70:20 72:19 83:25 87:2 87:4 89:22 90:25

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

93:6
talks 38:9
tax 78:15,18 85:14
  85:25
Taylor 81:13
tell 4:17 5:12 8:11
  11:21 15:2,22
  18:8,24 20:16,23
  20:24 22:2 29:11
  29:14 31:14 37:6
  39:13 41:16 42:15
  43:7 53:8 54:25
  55:14,23 61:13,19
  62:13 70:4 74:14
  95:6
telling 75:14 90:2
  92:3,7
term 5:15
test 15:9
testified 4:19
testimony 95:18
tests 15:10,12
Texas 11:10
Thank 22:15 49:18
  82:4 91:3,4,24
  93:19,20
therapy 40:18
  42:23
thereof 1:16
thing 15:20 28:18
  30:21 42:25 93:12
things 9:15 10:5
  14:25 19:18 38:12
  41:21 67:8 68:1
  69:4 83:21 86:24
  87:18
think 11:5,10 13:15
  18:8,21 19:8 24:4
  25:4,4,9 30:15
  43:17 65:24 66:11
  70:12 71:10,21
  72:7 73:20 77:17
  80:9 85:25 89:25
thinking 67:2 68:6
thinks 44:23

third 35:19 88:15
Thirteen 5:3
Thomas 4:24
thought 48:25
  62:19
thousands 88:1
three 12:17 90:21
three-week 11:2
tie 24:4
time 1:15 7:8 9:21
  11:12,21 12:25
  13:20 21:17 22:9
  22:9 27:8,18,19
  27:22 29:24 40:22
  41:17,19 43:11,16
  45:17 46:10 48:23
  53:18 66:9 67:17
  68:18 69:9 74:8
  74:10 76:11,11
  82:21 83:5 85:16
  85:18 86:7 88:22
  89:11,21 90:1
  91:12,12
timeframe 5:24
timeline 59:6
times 11:6 13:24
  78:17
timing 27:1
title 5:7
titled 41:13,22
titles 6:21
today 6:12 25:18
  60:18 82:7 89:17
Today's 4:8
told 13:5 20:20,24
  21:3,8,11 39:25
  61:14 62:5 80:20
  87:16
Tony 43:24 81:11
toolbox 3:15 41:13
  42:17
top 26:17 50:5
  65:13 90:25
topic 15:7
total 42:10,13 44:7

44:8 55:2,6 56:10
  64:9
touched 24:4
track 27:1
trained 86:22
training 10:8,9,10
  10:13,17,20 11:2
  11:4,7 15:17,18
transcript 95:17
traumatic 32:1
treating 17:7 73:25
treatment 36:7
  50:7
triage 39:17 65:14
trial 1:15 2:4 21:14
  86:17 95:14
tried 45:13
triggers 65:18
truck 32:10
true 95:17
truth 4:17,17,18
  95:6,7,7
try 31:10 33:3
  35:24 36:22
trying 19:11 26:25
  31:9 54:25 62:23
two 40:6 42:7 49:10
  73:21 74:19 78:6
  78:11 79:14
type 10:8 47:17
  57:16
types 5:20,23 6:6
  10:15 42:1 78:13
typewriting 95:16
typewritten 95:17

__U__

Uh-huh 37:25 42:6
  88:21 90:22
UIM 8:13,19,24
  18:5 21:13 25:11
  28:11 29:25 33:12
  38:18 39:19 40:3
  49:7 54:8 62:25
  76:21

ultimately 18:5
  77:9
unable 78:8
unaltered 85:24
uncompensated
  57:3 60:3
uncooperative
  77:18
underinsured 7:11
  7:16,17,19,25
  40:10 51:1 55:9
  87:14
understand 8:6
  29:24 32:24 33:11
  77:22 83:19 84:2
understanding
  15:22 16:1 18:6
  36:7 37:14 43:7
understood 87:9
underwriting 9:18
unfair 15:19,23
  16:4
unit 43:17
United 1:1 4:5
unsure 48:14
uploads 71:1
use 23:13,18 25:18
  26:5 41:20 70:22
  72:1 82:16 86:16
usually 17:11 33:6
  56:14 61:22 63:1
  78:15 79:22 92:11
  92:13
utilized 24:1

__V__

Valley 1:14 95:11
value 40:8 44:8,10
  44:12
valued 44:18
vehicle 7:23 31:19
  31:22 32:1,11
  72:24
vehicles 31:4,15
venders 71:3

vendor 70:22,23
  71:5,8
vendors 23:16
versus 4:4
video 4:3 47:5,8
  69:23 72:15,18
  82:2 86:16 93:22
videotaped 1:10
  4:10
virtually 57:11
visiting 84:18
visitor 84:20
voicemail 29:15
  37:3,5,6,22
vs- 1:6

__W__

W-2 78:10
wage 8:18,20 33:1
  33:13 36:14 42:24
  48:8 49:22 50:25
  51:2 55:3,4,5,7,13
  55:18 58:1,9
  59:23 60:24 77:25
  78:24 85:11 86:5
  86:11
wages 40:21 59:11
  59:18 61:3
wait 17:7,10
waiting 50:25 51:3
waived 94:4 95:21
Walk 54:15,19
want 16:5,9,17,23
  17:4,13 18:2,24
  19:18,19 23:3,6
  33:18,21 35:21
  36:3 38:13 41:2
  42:4 51:23 71:14
  83:25 84:1 86:15
wanted 61:15 62:16
  72:12 76:1 83:18
wanting 21:19
  28:11 34:15 74:3
wants 17:14 74:8
Washabaugh 28:24

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

29:12
**Washabaugh's**
32:10
**Washington** 27:25
28:1
**wasn't** 34:14 53:23
69:6 72:22,23
73:7
**water** 69:14
**way** 15:21 17:9
34:5 53:7 61:8
62:13 63:23 64:4
64:8 66:18 68:15
68:24 79:15,19
80:18,23 83:24
87:24 89:9,9,9
**we'll** 20:7 33:16
34:2 41:2 51:24
69:11,25 70:1
91:19,21
**we're** 4:3,9 32:21
51:21 60:15 69:4
69:23 72:18 75:3
75:19 82:2 87:21
92:13
**we've** 37:2 54:21
77:21
**week** 56:21 57:2,2
59:12,19 89:23
**weekly** 56:18,20
**weeks** 45:24 49:22
56:17 59:12,12,18
59:19 78:11
**went** 10:20 13:7
19:3 31:21 39:22
**West** 1:13 2:5
95:10
**WHEREOF** 96:6
**Wier** 60:20
**wife** 20:5 28:11
**Wisconsin** 11:16
**wise** 59:6
**witness** 1:12 26:6,9
33:21 34:9 46:7
47:4 69:18 81:21

81:24 82:4 88:8
91:4 93:20 96:6
**wondering** 19:1
31:7 32:19 63:3
**WOOD** 2:9
**work** 22:2,6 23:16
47:17 48:13 56:4
56:9 57:6 63:12
66:20,24 67:19
74:1 78:8,19
79:11 90:23
**worked** 5:2 9:15
27:11 47:12 56:7
81:13 84:18
**working** 9:7,23
24:16 72:23 73:3
73:7 91:2,9
**world** 86:20
**wouldn't** 17:13
42:24 53:21 54:22
81:17
**write** 83:17 84:8
**writing** 82:24
**written** 1:15 13:25
84:4
**wrote** 83:5 86:7
**www.emersonre...**
1:22

**X**

**X** 3:1,1,9,9
**x-ray** 92:15,20 93:1
**x-rays** 92:9,14

**Y**

**Y** 4:16
**yeah** 10:23 19:22
22:8 24:20 25:6
26:11 29:5 35:2
38:5 57:22 65:5
81:20,21 85:3
**year** 13:6 18:7,10
25:12 48:2 56:15
83:3
**years** 5:3 12:17,17

**yesterday** 23:24
30:22 51:23 89:19
**York** 27:25 28:1

**Z**

**0**

**1**

**1** 3:13 5:8 33:17
34:2 51:8 59:1,19
83:13 84:11 85:23
86:8 90:19 93:23
**10** 56:6 74:13
**10,000** 44:3
**10/10/12** 3:17
**10/29/09** 57:7
**10:48** 47:6
**100,000** 39:16,19
39:23 40:13 43:5
44:14,16 45:18
49:8 50:14 52:3,8
**100,000-dollar** 45:8
**1057** 26:15
**11** 25:17 59:24
**11:01** 47:7
**11:18** 48:25
**11:30** 37:23
**11:41** 69:20
**11:55** 69:21
**1111** 76:16
**1113** 64:22 67:1
85:23 90:19
**1115** 64:16 65:13
**1121** 84:16
**1122** 58:24 84:11
**1123** 50:21
**1124** 50:3
**1125** 50:3,5
**1126** 49:10,17
**1128** 48:17 49:2
**1129** 48:17 49:4
**1130** 48:8
**1132** 43:19
**1133** 38:6,8

**1134** 38:3
**1135** 36:25
**1139** 26:23
**12** 56:8 89:16
**12:00** 72:16
**12:01** 72:17
**12:16** 81:25
**12:18** 82:1
**12:37** 94:2
**1200** 59:20
**125,000** 42:18
**13-CV-426** 4:7
**135** 1:20
**14** 48:16,19,20 49:7
88:17 89:10
**150,000** 40:9,15,20
44:10
**1500** 59:12
**1528** 42:4,14
**1529** 42:15
**17,000** 86:10

**2**

**2** 1:14 3:14 34:3
36:20 82:14 91:20
95:11
**2/14/12** 64:16
**2:18** 48:24
**2:51** 38:2 46:7
**20** 13:7 26:20 27:4
28:9 96:16
**200,000** 44:13
**2000** 56:12,12
**2003** 9:9
**2004** 9:14 10:22,23
**2007** 56:12
**2008** 5:6 26:17,20
56:13 89:16
**2009** 6:7,11,16 56:2
56:4,4,6,11,13
85:13
**201** 2:5
**2010** 7:4 27:4 28:9
28:15 32:20 35:3
36:12 37:8 39:14

**43**:4,12,20 45:2
45:17 47:1 48:10
48:16,22 49:7,11
49:19 50:1,13
53:14 62:14 75:22
82:19
**2011** 25:9,10 50:23
51:9,19,21 52:2,6
52:10 53:20 58:2
58:6,10,19 59:2,3
59:8,15,19 60:8
61:4 84:16 85:10
86:7 87:21
**2012** 7:5 11:23
18:13,17 19:4,14
58:19 65:12 68:19
70:10,12,20 74:13
76:2,16 83:6,7
85:22 87:21 91:12
91:25
**2013** 7:1
**2014** 15:16 19:9
88:18 89:10
**2015** 18:9 19:9
**2016** 1:14 4:2,8
87:22 95:12 96:8
**2023** 96:16
**21** 28:15 65:12
**21st** 30:3
**22** 68:19 85:22
**22nd** 64:22
**23** 25:17 50:1,13
52:10 53:20 83:12
85:10 86:7
**23,000** 56:4
**23rd** 76:16
**24** 50:23
**25** 3:13 35:3 82:19
**25,000** 29:10,17
35:14 44:6
**25th** 29:15 36:12
37:2
**28,000** 56:9
**29** 4:2,8 49:10,19
**299** 57:2 60:2

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

| | | |
|---|---|---|
| **29th** 1:14 95:12 | 70:1,2,4 | **9300** 2:10 |
| **3** | **6/10** 45:13 46:7 | |
| **3** 3:15 41:3,4 59:2,2 | **6/11/2012** 90:20 | |
| 59:8 93:23 | **6/30** 52:4 | |
| **3:25** 49:12 | **6/30/2011** 84:12 | |
| **300** 49:22 57:1 | **60** 25:3 52:14 58:14 | |
| 59:12,19,24 60:3 | **60/40** 52:12 | |
| **31** 84:16 | **69** 3:17 | |
| **31,000** 56:16 | **695-3300** 1:21 | |
| **317** 1:21 | **7** | |
| **317-428-2861** 83:2 | **7** 3:19 43:20 88:8,9 | |
| **3209** 1:13 95:10 | 88:11,12 | |
| **34** 3:14 38:6 | **7,500** 52:12 | |
| **4** | **70** 3:18 | |
| **4** 3:3,16 39:14 52:1 | **70,000** 42:18 | |
| 52:10 83:10 85:10 | **704** 1:20 | |
| 86:7 93:23 | **7046** 83:1 | |
| **40,000** 44:22 | **74,000** 55:7 | |
| **400** 2:10 | **75,000** 44:8 | |
| **40222** 2:10 | **75,000-dollar** 55:10 | |
| **40507** 2:5 | **7500** 24:12,14 | |
| **41** 3:15 | 52:14 55:11,15 | |
| **45,000** 40:25 42:18 | 58:14,15 64:10,12 | |
| **4500** 25:5 | **7500-dollar** 24:13 | |
| **46143** 1:20 | 24:23 54:15 | |
| **46207-7046** 83:2 | **8** | |
| **4th** 37:7 43:3 | **8** 3:20 70:10,20 | |
| **5** | 76:2 91:22,23,25 | |
| **5** 3:17 69:12,21,25 | 93:23 | |
| 74:13 | **8/8/12** 3:18,20 | |
| **5/22/12** 67:1 | **800** 2:5 | |
| **5/23/11** 3:16 | **82** 3:4 | |
| **5/25/10** 3:14 | **859.225.3731** 2:6 | |
| **5:13-CV-426-GF...** | **88** 3:19 | |
| 1:2 | **8th** 26:17 | |
| **50** 73:9,10 | **9** | |
| **50,000** 44:1,5 | **9** 48:10 | |
| **502.423.6390** 2:11 | **9:07** 1:15 | |
| **52** 3:16 56:17 | **9:50** 4:1,9 95:13 | |
| **599** 56:17,21 | **90** 35:18 | |
| **6** | **91** 3:6,20 | |
| **6** 3:18 59:15,18 | **92** 35:18 82:19 | |

Emerson Reporting, Inc.
emersonreporting@aol.com