UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(At Lexington)

| | | |
|---|---|---|
| **ERNEST FOSTER,** | : | |
| | : | **Civil Action No. 5:13-cv-426** |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **v.** | : | **PLAINTIFF'S RESPONSE TO** |
| | : | **MOTION FOR SUMMARY** |
| | : | **JUDGMENT (DE 188)** |
| | : | |
| **AMERICAN FIRE AND CASUALTY** | : | |
| **COMPANY** | : | |
| | : | |
| **Defendant** | : | |

Comes the Plaintiff, and for his response to Defendant American Fire and Casualty Company's Motion for Summary Judgment (DE 188), states that the motion should be denied.

**I.      Introduction and Facts**

On the morning of June 8, 2008, plaintiff Ernest Foster, a fifty-three year old self-employed auto mechanic, was driving to take breakfast to his mother in Stanton, Kentucky. Along the route, Foster approached a vehicle that was traveling in the opposite direction. That vehicle, driven by Gary Washabaugh, crossed left of center into Foster's lane of traffic and struck Foster's 1988 Ford Ranger nearly head-on. Both Washabaugh and Foster were injured in the collision. Washabaugh carried only minimum liability insurance limits, $25,000. Fortunately for Foster, Foster was covered for underinsured motorist (UIM) benefits with defendant American Fire and Casualty Company for an additional $100,000. Unfortunately though, it took American Fire about seven years to pay Foster $91,500 to resolve his UIM claim.

American Fire's request for summary judgment contains an incomplete recitation of the facts and a selective review of the evidence. Its suggestion that Foster "suffered no compensable damages and has no valid claim," finds no support in the motion itself or in the facts upon which this case is based. Notably, American Fire fails to disclose that it had internally evaluated Foster's UIM claim at the policy limits of $100,000 all the way back in June 2010, yet ended up paying only $91,500 after delaying the claim for another five years. American Fire never had evidence to suggest that Foster was not injured or that he was not disabled from his job.

Nonetheless, American Fire argues that Foster has suffered no damages as a result of its refusal to pay the UIM claim, and that its conduct does not constitute "outrageous" misconduct under Kentucky's bad faith laws. Tellingly, American Fire argues only select facts, in a light most favorable to itself, while largely ignoring the standard for summary judgment. In considering a motion for summary judgment in a bad faith case, "[t]he central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Phelps v. State Farm Mut. Auto. Ins. Co., 736 F.3d 697, 703 (6th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). There is such a disagreement here, and American Fire's motion should be denied.

During the collision, Foster's right knee was smashed into the dashboard near the steering column. The force of the collision totaled the 1988 Ranger. (Photos attached as Exhibit 1). An MRI taken of Foster's right knee showed "severe edema and subtle cortical indentation in the far medial femoral condyle suggesting an osteochondral impaction fracture." (July 12, 2008, MRI report attached as Exhibit 2). American Fire's hired medical examiner, Dr. Jenkinson, also

reviewed these MRI films a number of years later and agreed with the radiology report. (Deposition of Dr. Jenkinson, p. 71, attached as Exhibit 3).

Before the collision on June 8, 2008, Foster had never had any problems or medical treatment on his right knee. (Deposition of Dr. Jenkinson, pp. 54-56, Exhibit 3  (no complaints about the right knee in records dating from 1971 to the date of accident)); (Office visit note from Dr. David Burandt December 13, 2011, attached as Exhibit 4 ("This all did start out as a result of an injury that he sustained.").  After the collision, Foster began treatment on the right knee with Dr. David Burandt, an orthopedic surgeon.  He continued to attempt to work as a mechanic for a period of time, but eventually, Dr. Burandt performed arthroscopic surgery on the right knee in October 2009.  Foster was scheduled to be off work for about six weeks after the surgery.  Foster provided American Fire with tax records showing his income, at American Fire's request, so that it could pay his PIP lost wage claim.  American Fire's claim notes show it calculated his weekly income at $532.96, based on his income in 2008. (Claim Note dated November 17, 2009, attached as Exhibit 5 under seal).[1]

But the surgery did not provide relief.  Afterwards, Dr. Burandt "explained to him that this is not likely to get better," and that, "[h]e really needs to limit his bending, squatting, kneeling, climbing stairs and ladders." (January 25, 2010, office visit note, attached as Exhibit 6).  Dr. Burandt completed a "work status report" form, indicating Foster was "unable to return to work." (April 26, 2010, note attached as Exhibit 7).  On subsequent reports, Dr. Burandt continued to state Foster had "permanent restrictions" and that he "can't do normal job." (November 23, 2010, note attached as Exhibit 8; February 22, 2011, note attached as Exhibit 9; May 31, 2011, note attached as Exhibit 10).  Dr. Burandt wrote, "[i]t is doubtful that he will ever be able to go back to work as

---

[1] American Fire capped Foster's PIP payments at $300 per week, leaving a large portion of wage loss uncompensated.

a mechanic, given the length of time that he has been gone, since he cannot really bend or squat or get on his knees." (December 13, 2011, note attached as Exhibit 4).

This information was all contemporaneously provided to American Fire. Based on it, American Fire's PIP adjusters determined that Foster was unable to work and was entitled to PIP wage loss benefits under his PIP coverage. By May 2010, Mr. Washabaugh's insurer, Progressive, had offered to pay Foster the $25,000 limits of liability insurance for Mr. Washabaugh. American Fire assigned an adjuster, Anthony Dale, to the UIM claim on May 21, 2010.

Discovery in this case has revealed that American Fire valued Foster's claim in excess of the policy limits as early as June 2010, but never made any offer close to its evaluation until May 2015, just a few days before trial was set to begin. On June 4, 2010, Mr. Dale reviewed all of the information in the file. With respect to coverage, he noted, "no exclusions exist and all conditions met. Coverage in place." (June 4, 2010, claim note attached as Exhibit 11 under seal). He noted that Foster was "not attorney represented" at the time. With respect to the injuries, Mr. Dale noted there were "no prior knee problems." Given the surgery and medical expenses that Mr. Foster already had, his inability to work as a mechanic, and the probability that he would require a knee replacement in the future, Mr. Dale noted that the claim had a value in excess of American Fire's UIM limits of $100,000. (Exhibit 11). This was based on the injuries alone without figures for wage loss.

Mr. Dale's supervisor Allen Faber concurred, indicating in the file that the claim had a value in excess of the $100,000, even considering the offsets for other coverages available to Foster. (June 7, 2010, claim note attached as Exhibit 12 under seal ("full value at least $200,000 appears likely")). A reserve was set at $100,000 in June 2010. But American Fire made no offer at this time and did not disclose its evaluation to Foster. During his deposition, the only reason

Mr. Dale gave for not paying the $100,000 was that he thought he did not have all the medical records, although he could not specifically identify any records that were missing. (Deposition of Anthony Dale, p. 45, attached as Exhibit 13).

Internal notes in American Fire's claim file in the following months continued to show that American Fire agreed Foster was permanently disabled from his job and on permanent restrictions. (E.g., Claim notes dated October 21, 2010, November 29, 2010, attached as Exhibit 14 under seal). Despite the UIM claim being made in May and the evaluation in June 2010, American Fire made no settlement offer to Foster for almost a year.  On May 23, 2011, Mr. Dale offered just $4,500. At this point, American Fire's reserve was set at $100,000.  The $4,500 offer was part of a combined offer that Mr. Dale extended on behalf of American Fire and Philadelphia Indemnity Company, with whom Foster had additional UIM coverage.  Mr. Dale conveyed this offer to Foster with an e-mail. (May 23, 2011, email attached as Exhibit 15).

In the e-mail, Mr. Dale calculated Forster's weekly earnings at approximately $599.  He agreed that Foster was "on permanent restrictions," "mak[ing] his profession virtually obsolete." He also agreed that "it would be difficult for him to do much of anything else, given that all his experience is in this type of job."  Foster has a ninth grade education and had worked as a mechanic since he was a teenager.  Nonetheless, the offer failed to include any amounts for future wage loss or future medical expense.  During his deposition, Mr. Dale agreed that the offer to Foster did not explain why those elements were excluded. (Deposition of Anthony Dale, pp. 52-58, Exhibit 13). He could not explain how he came up with the $4,500 offer, or how it could adequately compensate Foster.  The $4,500 offer was the only offer made to Foster before the lawsuit was filed, and it remained the only offer for the next 3 years and 7 months.

While Mr. Dale refused to consider any future wage loss in his offer, American Fire's PIP adjusters continued to agree that Foster was entitled to ongoing wage loss payments. They paid $300 per week, leaving $299 uncompensated, throughout 2011. Thereafter, Foster received no benefits at all.

After Foster indicated in 2011 that he would not accept the $4,500 from American Fire, American Fire began making additional requests of Foster, including that it needed to send him to see a medical examiner of its choosing. Foster agreed to attend whatever examination American Fire wanted him to go to. American Fire never scheduled the examination and refused to make any additional offer of settlement. In 2012, Foster was approved for Social Security disability benefits because of his inability to work. American Fire then told Foster it could not make an additional offer of settlement until it received his "SSDI file," which contained the same records that American Fire already had.

In relation to these requests for unnecessary information, American Fire sent Foster a reservation of rights letter on October 10, 2012, threatening to deny benefits altogether, unless Foster signed additional medical authorizations and authorizations for his Social Security records. (October 10, 2012, letter attached as Exhibit 16). American Fire either had, or had access to, all of these records already, pursuant to authorizations Foster had already signed for it. Foster nonetheless signed the additional authorizations.

Mr. Dale made no additional offers to Foster, and American Fire reassigned the UIM file to a different adjuster, Mark Konerman, on October 23, 2012. Mr. Konerman never spoke with Mr. Dale. (Deposition of Anthony Dale, pp. 76-77, Exhibit 13). Mr. Konerman noted falsely in the claim file that an offer of $17,264 had been made to Foster. (December 12, 2012, claim note attached as Exhibit 17 under seal). No such offer was ever made. Mr. Konerman also made note

6

of the fact that the reservation of rights letter had been issued to Foster.  Even though Foster "appear[ed] to be willing to cooperate," American Fire was using it to leverage its position.  Mr. Konerman decided not to rescind the reservation of rights letter "until IME is complete or we have a chance to settle." (Exhibit 17). Mr. Konerman made no additional settlement offer.

American Fire reassigned the file to a different adjuster again on January 8, 2013.  Melissa Dearman likewise made no settlement offer to Foster.  Ms. Dearman did not investigate the claim, and as of August 9, 2013, she indicated that American Fire would not be making any additional offers, was going to "sit and wait for a response" from Foster, and "will not be reaching out to the insured on this case." (August 9, 2013, note attached as Exhibit 18 under seal).  Having received no offer, Foster filed suit on November 19, 2013.

After suit was filed, Ms. Dearman made no offer of settlement, and American Fire reassigned a different adjuster to the file on May 6, 2014.  On May 19, 2014, Laura Harp-Biven also falsely noted in the file that $17,264 had been offered to Foster.  During the litigation, Foster provided additional proof that his wage loss and lost earning capacity totaled nearly $300,000. (Dr. Stephanie Barnes report, attached as Exhibit 19).  American Fire did not pay the claim, and instead sought to "obtain[] a vocational report to counter Dr. Barnes' recent report." (July 21, 2014, note attached as Exhibit 20 under seal). At this point, American Fire had yet to develop any defenses to Foster's injury claims, either medically or through a vocational / economic expert.  Also, at this point, American Fire's only offer remained $4,500.

On August 5, 2014, Foster moved for leave to amend his complaint to add the bad faith claims against American Fire.  Even though Foster had always agreed to attend whatever medical examination American Fire wanted to send him to and had specifically agreed to attend an examination in 2012, it was not until October 8, 2014, that American Fire sent Foster for a medical

7

examination with Dr. David Jenkinson.  As it turned out, Dr. Jenkinson was going to be the only witness American Fire planned to call at Foster's UIM trial.

American Fire was not able to obtain a vocational report to dispute Dr. Barnes's report. The PIP adjusters had calculated Foster's weekly wages at $532.96, and Mr. Dale had calculated the wages at $599 per week during his handling of the file.  But during the litigation, American Fire attempted to find a way to lower the calculations of Foster's wages.  It did this two ways. First, one method was to calculate the wages at $100 per day ($500 per week) based on information Foster had provided to the Social Security Administration.  Second, the method that provided the lowest figure was to utilize Foster's "net profit/loss from business," as opposed to the gross income that it had been using in its past calculations.

The first method, $100 per day, would actually have resulted in a claim value far exceeding American Fire's $100,000 policy limits. (Deposition of Laura Harp-Biven, pp. 71-72, attached as Exhibit 21).  American Fire never made any offer consistent with this method.  And although American Fire did not obtain a written vocational report, it did consult with an expert, Dr. William Baldwin.  Dr. Baldwin told American Fire that its second proposed calculation "using the net profit/loss receipts would undervalue the lost income." (Claim file note discussing Dr. Baldwin attached as Exhibit 22 under seal; Deposition of Laura Harp-Biven, pp.70-71 attached as Exhibit 21).[2]  As a result, American Fire "cho[]se not to disclose him because his opinions could possibly help the pla[intiff]'s case." (Exhibit 22)  Despite being advised that the position it was taking against its policyholder was wrong, American Fire continued to pursue the position.

---

[2] American Fire's position was inconsistent with Kentucky law, which holds that evidence of taxability and other personal consumption items is inadmissible. Paducah Area Public Library v. Terry, 655 S.W.2d 19, 23 (Ky. App. 1983).

In December 2014, American Fire made its first offer since May 23, 2011.  It increased its offer from $4,500 to $10,000.  The offer remained at $10,000 until April 6, 2015.  As the case proceeded closer to trial, a settlement conference was held.  American Fire made small increases in its offers that day.

As the trial date approached, American Fire decided to take Dr. Jenkinson's video deposition for use at trial.  Dr. Jenkinson's deposition was unfavorable to American Fire's position in this litigation.  He testified (Deposition attached as Exhibit 3) that all of the treatment provided by Foster's doctors was reasonable.  He testified that it is "highly likely" that Foster will need a knee replacement.  He testified about the costs of the procedure.  He testified that there is absolutely no evidence that Foster ever had a problem with his right knee before the motor vehicle collision on June 8, 2008.  He testified that he believed Foster was truthful about the pain he was experiencing.  He testified that an MRI taken of Foster's knee showed severe edema, joint effusion, and an osteochondral fracture, which Dr. Jenkinson stated would indicate a direct, acute injury to the knee.[3]  Notably, this is the same information that Foster had presented to American Fire, years before it hired Dr. Jenkinson.

Having developed no medical or vocational evidence to dispute Foster's claim in the seven years since the accident, just a few days before the scheduled trial on May 18, 2015, American Fire agreed to pay $91,500 to settle the UIM claim.  Notably, about a month earlier, the offer was just $10,000.  American Fire argues that in accepting the payment, Foster agreed that it was a "disputed" claim.  Of course, American Fire had attempted to dispute Foster's claim for years, but the question in this current case is whether American Fire debated the matter fairly.  Farmland Mut.

---

[3] Dr. Jenkinson also testified about the large number of medical examinations he performs, and the amount of income he receives for doing them.  In the past year alone, he performed approximately 400 medical examinations, all for defendants (zero for plaintiffs), at a cost of $1,850 each.

Ins. Co. v. Johnson, 36 S.W.3d 368, (Ky. 2000) (even if elements of a claim are "fairly debatable," "an insurer must debate the matter fairly.").

## II.    Argument

### A.  Questions of fact prevent the entry of summary judgment.

This case is before the district court on diversity jurisdiction, and accordingly, the substantive laws of insurance bad faith in Kentucky apply. Estate of Riddle v. Southern Farm Bureau Life Ins. Co., 421 F.3d 400, 408 (6th Cir. 2005).   This is a case involving a claim of a policyholder (a "first-party" case) for UIM benefits under a personal automobile policy. See Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521, 526 (6th Cir. 2006) (describing first-party bad faith claims).  Thus, the bad faith claims at issue involve common-law first-party bad faith, violations of the Kentucky Consumer Protection Act, and violations of the Kentucky Unfair Claims Settlement Practices Act. Rawe at 526-27.

As noted by the Kentucky Supreme Court in Farmland Mut. Ins. Co. v. Johnson, 36 S.W.3d 368, 380 (Ky. 2000), a first party "bad faith action is based upon the fiduciary duty owed by an insurance company to its insured based upon the insurance contract."  In Curry v. Fireman's Fund Ins. Co., 784 S.W.2d 176, 178 (Ky. 1989), the Supreme Court noted the special relationship between an insurance company and its insured:

> In this society, first party insurance coverage against a host of risks is recognized as essential.  From cradle to grave individuals willingly pay premiums to insurance companies to obtain financial protection against property and personal loss.  Without a reasonable means to assure prompt and bargained-for compensation when disaster strikes, the peace of mind bought and paid for is illusory.

The Kentucky legislature enacted the UCSPA in 1984, and it was designed to "protect the public from unfair trade practices and fraud." State Farm Mut. Auto Ins. Co. v. Reeder, 763 S.W.2d 116, 118 (Ky. 1988); see also Phelps v. State Farm Mut. Auto Ins. Co., 736 F.3d 697, 703 (6th Cir.

2012) (quoting <u>Reeder</u>).  "The KUCSPA is part of a large statutory scheme entitled, the 'Insurance Code.'  The Insurance Code regulates the insurance industry, and an insurance company derives its right to do business in Kentucky from the Code." <u>Farmland Mut. Ins. Co. v. Johnson</u>, 36 S.W.3d 368, 380 (Ky. 2000).  As a result, the UCSPA "should be liberally construed so as to effectuate its purpose." <u>Reeder</u> at 118; <u>Phelps</u> at 703.

To prevail at trial on a claim for bad faith in Kentucky, a claimant must show 1) that the insurer was obligated to pay the claim under the terms of the policy; 2) the insurer lacked a reasonable basis in law or fact for denying the claim; and 3) the insurer either knew there was no basis for denying the claim or that the insurer acted with reckless disregard for whether such a basis existed. <u>Wittmer v. Jones</u>, 864 S.W.2d 885, 890 (Ky. 1993) (citing <u>Federal Kemper Insurance Company v. Hornback</u>, 711 S.W.2d 844, 846-847 (Ky. 1986) (Leibson, J., dissenting)).

At the summary judgment stage, the "inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." <u>Farmland</u> at 376 (quoting <u>Zilisch v. State Farm</u>, 995 P.2d 276 (Ariz. 2000)); <u>Phelps</u>, 736 F.3d at 704.  As described by the Kentucky Supreme Court in <u>Motorists Mut. Ins. Co. v. Glass</u>, 996 S.W.2d 437, 452 (Ky. 1997), "outrageous" conduct may be inferred from proof of "reckless indifference to the rights of others."  "In other words, there must be proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement…" <u>Id.</u> at 452-53.

Just recently, the Kentucky Supreme Court reaffirmed this standard in <u>Hollaway v. Direct General Ins. Co. of Miss.</u>, ___ S.W.3d ___, 2016 Ky. LEXIS 433 (Ky. Sept. 22, 2016).  American Fire cited <u>Hollaway</u> as additional authority.  <u>Hollaway</u> is, factually, not like Foster's case for a

number of reasons, including that Hollaway was a third-party case, had disputed liability, and unproven injuries. In Hollaway, the Court was considering a case involving a disputed parking lot fender bender where liability for the collision was never reasonably clear. Without clearly proving liability for the accident, or the injuries stemming from it, the plaintiff could not prevail on a claim of bad faith, which requires that an insurer be obligated to pay under the terms of the policy.

But in affirming the lower court, the Court made a number of important points. First, it rejected the idea that a claimant must prove an "evil motive" on the part of the insurance company. The phrase "evil motive," first found in Wittmer v. Jones, was determined to be too inconsistent with the reckless disregard standard. Second, the Court also dispelled the notion that a bad faith claim could only lie if the claimant proved that liability was "beyond dispute." In the lower court's decision in Hollaway, the Court of Appeals had used "beyond dispute" language, but the Supreme Court did not adopt the "beyond dispute" standard. Instead, the Supreme Court discussed whether there was a "genuine dispute as to liability," and whether "fault for the accident [was] debatable." Finally, the Court's decision reaffirmed that bad faith claims under the Unfair Claims Settlement Practices Act are viable in Kentucky when there is proof of "recklessly indifferent" conduct on the part of an insurer.

The Sixth Circuit has recognized, "[t]he issue of the defendant's bad faith turns largely on the inferences to be drawn from the evidence regarding the defendant's motive…(in handling the claim)." Estate of Riddle, 421 F.3d at 408 (applying Kentucky law). "Choosing between two reasonable inferences is the function of the jury." Id. In Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521, 526-27 (6th Cir. 2006), the Sixth Circuit found, "the question of whether an insurer's actions rise to the level of unlawful conduct under [Kentucky's bad faith laws] to be a question of fact." 462 F.3d at 530-31. "'When the evidence creates an issue of fact, that any particular action

is unfair, false, misleading or deceptive [under the KCPA] it is to be decided by a jury.'" Id. at 531 (quoting Stevens v. Motorists Mutual Insurance Co., 759 S.W.2d 819, 820 (Ky. 1988)).  As noted in Phelps, when "the proof…is not 'so one-sided that [the insurer] must prevail as a matter of law,'" summary judgment on a UCSPA claim is inappropriate. 736 F.3d at 707. See also Pedicini v. Life Ins. Co. of Alabama, 682 F.3d 522 (6th Cir. 2012) (sufficient factual dispute existed to warrant reversal of summary judgment on first-party bad faith claim).

**B.  Foster has set forth sufficient evidence for his claims to proceed.**

The reasonableness of American Fire's position is a question for the jury, and there are many facts from which jurors could infer that American Fire acted unreasonably in the handling of this insurance claim.

For example, it took approximately seven years from the date of the collision for American Fire to pay a claim where liability was undisputed. See KRS 304.12-230(6), "not attempting in good faith to to effectuate prompt, fair and equitable settlement of claims in which liability has become reasonably clear"; Phelps, 736 F.3d at 705-06 ("extensive delay of nearly three years before [] claim was settled" raised an inference of bad faith).  Even giving American Fire the benefit of the doubt, and starting its obligation to pay in May 2010 when American Fire assigned a UIM adjuster to the claim, it still took five years to pay the claim.  In June 2010, it internally evaluated the claim well in excess of the $100,000 policy limits, yet made no offer at that time. Instead, it waited nearly a year before offering just $4,500. Phelps at 705 (offer below evaluation can raise inference of bad faith). That was the only offer made before litigation was filed, see KRS 304.12-230(7), "compelling insureds to institute litigation to recover amounts due…," and even then, American Fire did not increase its settlement offer until December 2014, when it offered $10,000.  It delayed the scheduling of a medical examination, despite Foster's agreement to attend

13

whatever examination American Fire wanted. <u>Phelps</u> at 707 ("failing to ask [claimant] to attend an independent medical examination"). American Fire assigned Foster's claim to multiple different adjusters throughout the claim process.

During the claim handling, American Fire requested Foster to sign duplicate authorizations and made unnecessary requests for information it either already had or had access to. <u>Phelps</u> at 706 (requests for duplicate or unnecessary information can be viewed as a "delay tactic"). It sent Foster a reservation of rights letter, despite his cooperation, threatening to pay no benefits at all. American Fire did not withdraw the reservation of rights and instead kept it in place to use to settle the claim. It never developed any proof to dispute Foster's injuries or to dispute his inability to work. In fact, it did not even attempt to dispute Foster's injuries until more than six years after the collision, when it sent Foster to see Dr. Jenkinson. The evidence indicates that American Fire knew that it was undervaluing Foster's wage claim.

In its motion, American Fire suggests that Foster cannot prove that it acted "outrageously." But considering the inferences drawn from the evidence in a light most favorable to Foster, there is evidence supporting a reasonable inference that American Fire acted unreasonably in the handling of the claim. American Fire argues that "Plaintiff is merely alleging American Fire took too long to pay his claim." (DE 188-1, p. 22). By American Fire's telling, it was free to delay payment of Foster's first-party benefits indefinitely, as long as it ultimately paid him something. "While a 'mere delay' does not constitute bad faith, courts have found delays in the range of eighteen months to three years 'may serve as evidence of bad faith.'" <u>Argotte v. Northwestern Mut. Life Ins. Co.</u>, 99 F. Supp. 3d 726, 733 (W.D. Ky. 2015) (quoting <u>Phelps</u>, 736 F.3d at 706-07).

**C.  American Fire's hiring of an expert six and a half years after the injury does not bar Foster's claim.**

In its motion, American Fire argues that its hired medical examiner, Dr. Jenkinson, did not testify as American Fire hoped he would during the UIM case.  But the hiring of a medical examiner alone is not grounds for summary judgment.  This is an unusual position.  American Fire argues that Dr. Jenkinson was the only witness it had, and that his report contained the first medical basis to dispute Foster's injury claim.  Thus, even by American Fire's logic, from June 8, 2008, to October 8, 2014, American Fire had no basis to dispute the claim.   This itself raises a question as to whether American Fire reasonably debated the claim.  In <u>Farmland Mut. Ins. Co. v. Johnson</u>, 36 S.W.3d 368 (Ky. 2000), the Kentucky Supreme Court discussed whether debatable fact issues on an underlying claim could preclude a bad faith claim.  It held that even if an underlying claim was fairly debatable, "an insurer is not thereby relieved from its duty to comply with the mandates of the KUCSPA." <u>Id.</u> at 375.  It must still "investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner." <u>Id.</u>  The existence of fact issues on a contract claim does not eliminate a bad faith cause of action. <u>Id.</u>

This course of events, waiting to consult with any medical provider for more than six years after the injury, raises an inference that American Fire was looking for a reason to not pay the claim.  In <u>Estate of Riddle</u>, an insurer had argued that it had conducted a thorough investigation, noting it had gone through the file with a "fine-tooth comb." 421 F.3d at 408.  The court noted that such a "heightened degree of 'scrutiny might raise an inference that the Defendant sought to be as thorough and fair as possible.  It might just as easily, however, raise an inference that the company was looking for reasons to deny coverage.'" <u>Id.</u> (quoting lower court decision).  There is sufficient evidence here or jurors to infer that American Fire's belated medical investigation was geared toward finding a way to deny his claim. <u>See</u> <u>Phelps</u> at 707.

In Pedicini, the Sixth Circuit addressed arguments about whether a first-party claim was "fairly debatable." 658 F.3d at 528-30. Citing Farmland, it reversed the grant of summary judgment to an insurer that had argued an underlying claim was fairly debatable. Noting that a dispute over an insurance claim is not dispositive of the bad faith claim, the court found that a reasonable jury could conclude that the insurer's actions met the test in Wittmer. Thus, the hiring of a medical examiner is not dispositive of the bad faith claim.

In Shepherd v. UNUM Provident Corp., 381 F. Supp. 2d 608 (E.D. Ky. 2005), an insurer alleged that it was entitled to partial summary judgment on the plaintiff's claims of bad faith because it had obtained an IME that it interpreted as supporting denial of the claim for benefits. But the plaintiff raised a number of issues that called into question the insurer's reliance on the IME. The court found that the issues surrounding the IME "create[d] fact issues for the jury's determination on whether Defendants lacked a reasonable basis for failing to pay." Id. at 614. Even ignoring for sake of argument that American Fire waited six and a half years to consult with a doctor, Dr. Jenkinson's testimony raises similar factual issues about the reasonableness of American Fire's position. Notably, American Fire omits analysis of the facts of the claim before October 8, 2014, when it hired Dr. Jenkinson.[4]

With respect to Foster's bad faith claim under the Consumer Protection Act, the Sixth Circuit has noted that the same test of bad faith applies to claims whether made under common law, the UCSPA, or the CPA. Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521 (6th Cir. 2006), In Rawe, in reversing the grant of summary judgment to an insurer on a first-party CPA claim, the Court held that an insurer's settlement conduct could give rise to a CPA claim and that under

---

[4] It also discusses, briefly, that the parties made legal arguments in the UIM case about the priority of insurance coverage. This, too, is not dispositive, and the case upon which the Court's decision was based on that issue was ultimately reversed by the Kentucky Supreme Court. See Countryway Ins. Co. v. United Fin. Cas. Ins. Co., __ S.W.3d __, 2016 Ky. LEXIS 324 (Ky. Aug. 25, 2016).

Kentucky law, "whether an insurer's actions rise to the level of unlawful conduct under the KCPA [is] a question of fact…" Id. at 531-32.

In Stevens v. Motorists Mutual Insurance Co., 759 S.W.2d 819, 820 (Ky. 1988), the Kentucky Supreme Court held that "the purchase of an insurance policy is a purchase of a 'service' intended to be covered by the Consumer Protection Act."  The Supreme Court stated that the legislature had created the statute with the "broadest application in order to give Kentucky consumers the broadest possible protection…" Id. at 821.  The facts that the Supreme Court found important to the cause of action in Stevens are similar to what has occurred in Foster's case.  For example, some of the allegations in Stevens involved the insurer failing to settle the claim "when there was apparently reasonable grounds," while concealing the contents of information obtained from an expert. Id.  Similarly, American Fire concealed that its own consultant advised it that it had been undervaluing Foster's wage claim.  It also failed to settle Foster's claim despite evidence indicating that it should have.

### D.  There is sufficient evidence of damages.

A party bringing a claim for violations of Kentucky's bad faith laws may seek "damages for anxiety and mental anguish," which are "recoverable in an action for statutory bad faith." Motorists Mut. Ins. Co. v. Glass, 996 S.W.2d 437, 454 (Ky. 1997); see also, Wittmer at 889 (damages for inconvenience, emotional distress, and mental anguish available for time consumed in negotiations for a settlement); FB Ins. Co. v. Jones, 864 S.W.2d 926, 929 (Ky. App. 1993) (damages for anxiety and mental anguish are appropriate in a claim under the UCSPA).  As noted in Glass, such damages may be proven by "either direct or circumstantial evidence from which the jury could infer that anxiety or mental anguish in fact occurred." Id. at 454.  In Craig & Bishop, Inc. v. Piles, 247 S.W.3d 897, 907 (Ky. 2008), the Kentucky Supreme Court approved a trial

verdict for inconvenience damages under the Consumer Protection Act, noting that such damages may be proven by testimony from plaintiffs showing that they had to spend time on the phone or away from work dealing with the circumstances giving rise to their claims. See also Ky. Farm Bureau Mut. Ins. Co. v. Rodgers, 179 S.W.3d 815 (Ky. 2005) (noting jury award of $30,000 for "mental and emotional suffering"); Medical Protective Co. v. Wiles, 2011 Ky. App. Unpub. LEXIS 983, at *6 (Ky. App. 2011) (noting award for $350,000 for "emotional pain and suffering, stress, worry, and inconvenience."); Tenn. Farmers Ins. Co. v. Jones, 2008 Ky. App. Unpub. LEXIS 19, at *3 n.3 (Ky. App. 2008) (noting award for $5,000 for "anxiety, emotional distress and mental anguish, and inconvenience.").

American Fire's suggestions that Foster either has not pled damages or has agreed he has not suffered any damages, are totally without merit.  In fact, its statement that Foster has not alleged any damages in his complaint (DE 188-1, p. 15), is flatly wrong.  The Amended Complaint clearly sets forth the categories of damages sought (see, e.g., DE 17-1, para. 60, 61, 67, 69, 75, and prayer for relief, para. 4, 6), and Foster's disclosures and discovery responses have always included a request for damages for emotional distress, inconvenience, financial distress, and emotional pain and suffering.[5]  Foster has testified in response to questions from American Fire that he has suffered both mentally and financially. See e.g., deposition of Ernest Foster, pp. 32, 34, 36, 45-46, 49, attached as Exhibit 24 (p. 32 - "it changed my whole life when I lost my income and my

---

[5] Foster's answers to interrogatories are attached as Exhibit 23, setting forth a number of items of claimed damages in response to Interrogatories 16-17: "dealing with the claim process for a number of years; dealing with the litigation process for a number of years; attending meetings with lawyers; preparing for and attending depositions; responding to requests for information; feeling like I was being treated like a criminal; not knowing why the insurance company would not pay my claim; not receiving compensation from the insurance company while I was unable to work and not earning income; having to hire lawyers to file a lawsuit against the insurance company; having to involve my friends and family in the litigation process, which was embarrassing and stressful; making myself available for medical examinations for the insurance company, which was embarrassing and stressful; being unsure of planning for the future with respect to unknown finances because no insurance payment was forthcoming; compounding of the pain and suffering I was dealing with from my physical injuries; feeling like my heart would flop or flutter because of stress."

business, and when you don't have money, you don't do things, you change your whole lifestyle";

p. 34 - "seven years of aggravation"; p. 36 - had to hire lawyers to pursue his claim "because we

had no cooperation.  They wouldn't talk to me"; p. 49 -  Foster was hurt "financially and mentally";

p. 51 - "wouldn't have had to worry about paying bills and taking care of my mortgage and paying

health insurance to keep us going").    The record here contains more than sufficient evidence to

allow the jury to assess Foster's damages.

This is not a case like Minter v. Liberty Mut. Fire Ins. Co., 2014 U.S. Dist. LEXIS 137741

(W.D. Ky. 2014).   There, apparently there was an admission that the claimant had suffered no

financial damages, and the claimant had proceeded on a theory that she could recover punitive

damages absent any compensatory damages.   The other allegations offered by the plaintiff were

not proven with any evidence of record.   Similarly, in Smith v. Liberty Mut. Ins. Co., 2015 U.S.

Dist. LEXIS 157732 (W.D. Ky. Nov. 23, 2015), it appears the claimant offered no proof of

damages that could be attributed to the insurance company (claimant had filed bankruptcy before

her insurance claim).   Furthermore, in that case, the policy limits were paid approximately three

months after a demand was made.

In contrast to these cases, in Adkins v. Shelter Mut. Ins. Co., 2015 U.S. Dist. LEXIS 37570,

at *13-14 (E.D. Ky. Mar. 25, 2015), the court denied an insurer's request for summary judgment

based on arguments that a claimant in a bad faith case had not shown any damages.   Citing just

one answer to a question in a deposition of the plaintiff, the court found the evidence "sufficient

to survive summary judgment." Id. at *14.   In Adkins, the court cited to Ind. Ins. Co. v. Demetre,

2015 Ky. App. Unpub. LEXIS 846 (Ky. App. 2015) (discretionary review granted).   In Demetre,

the Kentucky Court of Appeals held, "emotional distress may be proven by direct or circumstantial

evidence, including the plaintiff's testimony alone." Id. at *36.

This is consistent with other caselaw in Kentucky discussing proof for emotional distress damages.  In <u>Banker v. Univ. of Louisville Ath. Ass'n, Inc.</u>, 466 S.W.3d 456, 463-64 (Ky. 2015), the Kentucky Supreme Court discussed an award of emotional distress damages, where the proof consisted of testimony from the plaintiff that she had "felt depressed, and was under extreme stress."  Similarly, in <u>Asbury Univ. v. Powell</u>, 486 S.W.3d 246, 264 (Ky. 2016), the Supreme Court affirmed a jury award of emotional distress damages based on testimony from the plaintiff, and those close to her, that she had "experienced substantial stress."

The record here contains more than sufficient evidence related to damages, and American Fire's claim that Foster has put forth no evidence of emotional distress damages must be denied.

Additionally, Foster has claimed as damages the attorney's fees and costs incurred during the UIM claim.  These types of damages are recoverable in a bad faith action. <u>See</u> <u>Farmland Mut. Ins. Co. v. Johnson</u>, 36 S.W.3d 368, 374 (Ky. 2000) (affirming jury verdict including compensatory damages for "attorney's fees and nontaxable litigation expenses."); <u>Glass</u> at 455 (noting award for "costs and expenses"); <u>Hamilton Mut. Ins. Co. v. Buttery</u>, 220 S.W.3d 287, 291 (Ky. App. 2007) (affirming award of "attorney's fees"); <u>see also</u> <u>Ellis v. Arrowood Indem. Co.</u>, 2015 U.S. Dist. LEXIS 56515, at *26-28 (E.D. Ky. Apr. 30, 2015).  American Fire does not address these damages, but for one statement that Foster "has not even had to pay his lawyers any money out of his pocket." (DE 188-1, p. 15).  Foster has in fact incurred the fees and costs claimed, and such fees and costs were deducted from the amount he ultimately received in the UIM case.

In addition to their relation to Foster's claims under the UCSPA, the attorney's fees and costs also constitute an "ascertainable loss" under the Consumer Protection Act, KRS 367.220(1).  As noted in <u>Stevens</u>, the CPA is meant to "give Kentucky consumers the broadest possible protection for allegedly illegal acts." 759 S.W.2d at 821; <u>see also</u> <u>Ind. Ins. Co. v. Demetre</u>, 2015

Ky. App. Unpub. LEXIS 846 (Ky. App. 2015) (discretionary review granted)[6] (holding that "attorney fees incurred due to unfair, fraudulent or tortious conduct by an insurer is an ascertainable loss.").

### E.  Expert testimony

In addition to the evidence outlined above, Foster has designated Stuart Setcavage as an expert to testify about American Fire's claim handling.  His credentials, report, and testimony are discussed in more detail at docket entry 193.  As noted in <u>Phelps</u>, expert testimony may be used as evidence at trial, and as such, courts should consider it when assessing the totality of the evidence offered in response to motions for summary judgment in bad faith cases. 736 F.3d 697 at 707.  Here, Setcavage's testimony is additional evidence showing that jurors could infer that American Fire acted in bad faith in the handling of Foster's claim.  Setcavage's report is attached as Exhibit 25.

Setcavage will testify that American Fire's refusal to pay Foster's claim was without a reasonable basis; that American Fire's claim handling was inconsistent with and violated industry standards, as well as American Fire's own standards; that the jump in offers from $10,000 to $91,500 was based on no real new information; American Fire's $4,500 offer was a lowball offer maintained for years; that even though liability was clear, American Fire did not make a reasonable attempt to settle the claim; that the claim handling was not proactive and often inactive; American Fire delayed much of its claim handling for no apparent reason; that American Fire has an obligation to assist its policyholder and pay valid claims; and that the delays and periods of inactivity were unreasonable and inconsistent with industry practices.

---

[6] <u>Demetre</u> is currently pending at the Kentucky Supreme Court, and is not final.  The case is cited not as binding authority but as an example of how Kentucky courts address this issue.

Setcavage is qualified to offer such testimony. <u>See</u> DE 193, (discussing qualifications). And his report is thoroughly based on his review of all of the available American Fire discovery documents.  Combine with the other evidence in this case, Setcavage's testimony raises more than an inference of bad faith.

### III.     Conclusion

American Fire is not entitled to summary judgment on Foster's claims against it.  Given the extensive delay in paying his claim, the unreasonably low offers, and the failure to develop any proof to dispute his claims, there is sufficient evidence to allow the bad faith claims to proceed to a jury.  Foster requests that the motion be DENIED.


Respectfully submitted,

/s/ *Philip G. Fairbanks*
M. AUSTIN MEHR
PHILIP G. FAIRBANKS
**Mehr Fairbanks and Peterson**
**Trial Lawyers, PLLC**
201 West Short Street, Suite 800
Lexington, Kentucky 40507
Telephone:  859-225-3731
Facsimile:  859-225-3830
Email:  pgf@austinmehr.com

*Attorneys for Plaintiff*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

- **Michael P. Bartlett**
  mbartlett@covingtonky.com,michaelbartlettlaw@gmail.com
- **Robert D. Bobrow**
  rbobrow@bsg-law.com,jdiorio@bsg-law.com
- **John F. Carroll , Jr**
  jcarroll@qpwblaw.com,julie.laemmle@qpwblaw.com,ppainter@qpwblaw.com,catherine.webb@qpwblaw.com
- **Philip G. Fairbanks**
  pgf@austinmehr.com,amlopsc@yahoo.com,kdw@austinmehr.com,shall@austinmehr.com
- **Bartley K. Hagerman**
  bkh@austinmehr.com,amlopsc@yahoo.com,kdw@austinmehr.com,shall@austinmehr.com
- **Michael Scott Jackson**
  mjackson@bsg-law.com,jdiorio@bsg-law.com
- **Heather M. McCollum**
  hmccollum@qpwblaw.com,kymberli.pelfrey@qpwblaw.com,angela.franklin@qpwblaw.com
- **M. Austin Mehr**
  amehr@austinmehr.com,amlopsc@yahoo.com,pgf@austinmehr.com,kdw@austinmehr.com,shall@austinmehr.com
- **Donald L. Miller , II**
  dmiller@qpwblaw.com,vbarringer@qpwblaw.com,dsears@qpwblaw.com,tbreed@qpwblaw.com,samantha.rodriguez@qpwblaw.com,jmccarthy@qpwblaw.com,msleep@qpwblaw.com,wcase@qpwblaw.com,melanie.beebe@qpwblaw.com,hhigginbotham@qpwblaw.com,mgruner@qpwblaw.com,ppainter@qpwblaw.com,jcarroll@qpwblaw.com,ppullen@qpwblaw.com,kimberly.arvin@qpwblaw.com,klomond@qpwblaw.com,nkissel@qpwblaw.com,jahrens@qpwblaw.com,smccoy@qpwblaw.com,angela.franklin@qpwblaw.com,thickerson@qpwblaw.com,hpfaffenberger@qpwblaw.com,mhackworth@qpwblaw.com
- **Paul J. Painter**
  ppainter@qpwblaw.com,dsears@qpwblaw.com,nichole.priddy@qpwblaw.com
- **Erik David Peterson**
  edp@austinmehr.com,amlopsc@yahoo.com,kdw@austinmehr.com,shall@austinmehr.com
- **David G. Richardson**
  richardson@m-r-law.com
- **Robert Estes Stopher**
  rstopher@bsg-law.com,jdiorio@bsg-law.com,jbusse@bsg-law.com

*/s/ Philip G. Fairbanks*
PHILIP G. FAIRBANKS