Transcript of the Testimony of

# Anthony T. Dale

**Date:** July 29, 2016

**Case:** Ernest Foster v. American Fire and Casualty Company

## 5:13-CV-426-GFVT

Emerson Reporting, Inc.
Phone:317-695-3300
Fax:317-865-8910
Email:emersonreporting@aol.com

Exhibit 13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON
CIVIL ACTION NO. 5:13-CV-426-GFVT

ERNEST FOSTER,                              )
                                            )
          Plaintiff,                        )
                                            )
             -vs-                           )
                                            )
AMERICAN FIRE AND CASUALTY COMPANY,         )
                                            )
          Defendant.                        )


        The videotaped deposition upon oral examination of

                    ANTHONY T. DALE,

        a witness produced and sworn before me, Joyce
Emerson, a Notary Public in and for the County of
Johnson, State of Indiana, taken on behalf of the
Defendant, at Greenwood Office Suites, 3209 West Smith
Valley Road, Conference Room 2, Greenwood, Johnson
County, Indiana, taken on the 29th day of July 2016,
commencing at 9:07 a.m., pursuant to Indiana Rules of
Trial Procedure, and by written notice as to the time
and place thereof.


                    EMERSON REPORTING, INC.
                704 South State Road 135, #D322
                    Greenwood, Indiana  46143
                        (317) 695-3300
                Email: joyce@emersonreporting.com
                    www.emersonreporting.com

Examination of Anthony T. Dale

A P P E A R A N C E S


FOR THE PLAINTIFF:

    Philip G. Fairbanks, Esq.
    MEHR FAIRBANKS & PETERSON TRIAL LAWYERS, PLLC
    201 West Short Street, Suite 800
    Lexington, Kentucky 40507
    859.225.3731
    pgf@austinmehr.com


FOR THE DEFENDANT:

    Donald L. Miller, II, Esq.
    QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
    9300 Shelbyville Road, Suite 400
    Louisville, Kentucky, 40222
    502.423.6390
    dmiller@qpwblaw.com

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

I N D E X   O F   E X A M I N A T I O N

PAGE

DIRECT EXAMINATION ............................    4
  Questions by Mr. Philip G. Fairbanks

CROSS-EXAMINATION...............................   82
  Questions by Donald L. Miller, II

DIRECT EXAMINATION .............................   91
  Questions by Mr. Philip G. Fairbanks

I N D E X   O F   E X H I B I T S

PAGE

Deposition Exhibit No.:

1 - Loss Notice Notes...........................   25
2 - 5/25/10 Email from Billy Jo Foster..........   34
3 - Liberty Mutual Claims Examiner Toolbox......   41
4 - 5/23/11 Email to Betty Jo Foster............   52
5 - 10/10/12 Letter to Ernest Foster...........   69
6 - 8/8/12 Email to Betty Jo Foster.............   70
7 - Lexington Clinic Questionnaire..............   88
8 - 8/8/12 Email to Betty Jo Foster.............   91

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1                                    (9:50 a.m.)
 2                                 July 29, 2016
 3          MR. FAIRBANKS:  We're on the video record in
 4      the case of Ernest Foster versus American Fire and
 5      Casualty Company, United States District Court,
 6      Eastern District of Kentucky, Central Division at
 7      Lexington, Civil Action Number 13-CV-426.
 8          Today's date is July 29, 2016.  It's
 9      approximately 9:50 a.m.  We're in Greenwood,
10      Indiana.  This is the videotaped deposition of
11      Anthony Dale.
12          My name is Phil Fairbanks appearing for the
13      plaintiff Ernest Foster.
14          MR. MILLER:  Don Miller for American Fire and
15      Casualty.
16  A N T H O N Y  T.  D A L E, having been first duly
17      sworn to tell the truth, the whole truth and nothing
18      but the truth relating to said matter, was examined
19      and testified as follows:
20  DIRECT EXAMINATION,
21  QUESTIONS BY PHILIP G. FAIRBANKS:
22  Q   Sir, would you state your name for the record,
23      please.
24  A   Anthony Thomas Dale.
25  Q   Mr. Dale, by whom are you employed?
```

Examination of Anthony T. Dale

```
 1   A   Liberty Mutual.
 2   Q   How long have you worked at Liberty Mutual?
 3   A   Thirteen years.  I started out with Safeco and
 4       Safeco was acquired by Liberty Mutual.
 5   Q   Approximately when did that happen?
 6   A   2008.
 7   Q   What is your job title at Liberty Mutual?
 8   A   Senior claims resolution specialist 1.
 9   Q   Is that a claims adjuster position?
10   A   Yes.
11   Q   For those on the jury who might not know, can you
12       just generally tell us what it is that an adjuster
13       does.
14   A   In a nutshell I investigate and pay claims.
15   Q   Some juries may be familiar with the term "insurance
16       agent".  Insurance agent is on, kind of, the front
17       end, the sales end, and you're on the back end, the
18       claims payment end; is that a fair statement?
19   A   Correct.
20   Q   What types of claims do you handle at Liberty
21       Mutual, injury claims, property claims, commercial
22       liability claims?  Can you just talk about what
23       types of claims you handle.
24           MR. MILLER:  Can you give us a timeframe.
25           MR. FAIRBANKS:  Sure.  Right -- right now.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   What do you -- what -- what's on your plate?
 2   A   Primarily auto accidents with injury and also
 3       homeowners liability claims, injuries that occur in
 4       people's homes.
 5   Q   How long have you been primarily handling those
 6       types of claims?
 7   A   Since 2009.
 8   Q   Do you recall when you first became involved in this
 9       claim of Mr. Foster?
10   A   I -- I don't recall about when.
11   Q   Okay.  If it was sometime after 2009, it would have
12       been in the same role that you're in today with
13       Liberty Mutual?
14   A   Correct.
15   Q   Have you had any advancements or promotions since
16       2009?
17   A   Yes.
18   Q   Can you --
19   A   I -- I've had one.
20   Q   Okay.  Can you describe what that was.
21   A   It was -- essentially our job titles were different
22       then, but it was just a promotion to the next level
23       up primarily handling claims of more of a severe
24       nature, more of a complex nature.
25   Q   Approximately when did that promotion take place?
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   A   That was approximately 2013.
 2   Q   I've seen some records in this -- in this Foster
 3       case indicating that you became involved
 4       approximately May of 2010 through sometime in the
 5       late fall of 2012.  Does that sound about right to
 6       you?
 7   A   That sounds right.
 8   Q   Okay.  So after your time handling this Foster
 9       claim, you were given a promotion at Liberty Mutual?
10   A   Yes.
11   Q   Okay.  Mr. Foster's claim is an underinsured
12       motorist claim.  Do you recall that?
13   A   Correct.
14   Q   Can you just describe again generally for those
15       people on the jury who might not know, what is an
16       underinsured motorist claim.
17   A   Underinsured motorist is considered like an excess
18       coverage.  When someone is at fault and they don't
19       have enough insurance, then underinsured motorist
20       steps in and picks up where the at-fault party's
21       insurance paid out.
22   Q   So for example in Mr. Foster's case to the extent
23       that the individual that caused the motor vehicle
24       collision didn't have enough insurance to cover his
25       injuries, he could look to his own underinsured
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      motorist coverage for benefits; is that fair?
 2  A   Correct.
 3  Q   And that is, in fact, what Mr. Foster did; is that
 4      correct?
 5  A   Yes.
 6  Q   I also understand that Mr. Foster had what's called
 7      no fault -- or what we call PIP, P-I-P, in
 8      Kentucky -- on his policy as well.  Do you remember
 9      that?
10  A   Right.
11  Q   Can you tell again for those on the jury who may not
12      know what PIP is, can you just talk about what PIP
13      is in comparison to the UIM.  How are they
14      different?
15  A   I don't handle PIP claims so it's a very -- I'll
16      give you a general explanation of what I know, but
17      it's essentially more for medical expenses and some
18      wage loss I believe.
19  Q   By comparison a UIM claim would include those same
20      elements of medical expense and wage loss but could
21      also include pain and suffering for example?
22  A   Correct.
23  Q   It could also include an amount for future medical
24      expense, for example, on the UIM claim?
25  A   Yes.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Could also include, for example, an impairment of
 2       the ability to labor and earn money in the future?
 3   A   Yes.
 4   Q   Whereas PIP would just cover what's been incurred
 5       thus far, correct?
 6   A   I don't know for sure.
 7   Q   Okay.  When did you begin working with Safeco and/or
 8       Liberty Mutual?
 9   A   2003.
10   Q   What position did you start in at Safeco?
11   A   My first position was a customer service
12       representative.
13   Q   When did you move into handling claims?
14   A   Approximately 2004.
15   Q   Have you ever worked on the agency side of things in
16       selling policies?
17   A   No.
18   Q   What about in underwriting where you might determine
19       the cost of a policy?
20   A   No.
21   Q   So your time at Safeco and/or Liberty Mutual has
22       been either as a customer service representative or
23       working in claims?
24   A   Correct.
25   Q   Mr. Dale, what's your educational background?
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   A   I graduated from high school and I have attended
 2       some college, but I don't have a degree.
 3   Q   What did you study in college, anything in
 4       particular?
 5   A   Several things:  Education and psychology.
 6   Q   Do you have any -- aside from your high school
 7       education and a little bit of college -- any medical
 8       type training or anything like that?
 9   A   Other than training given through my employer, no.
10   Q   And when you're talking about training through your
11       employer, are you talking about medicine on kind of
12       an as-needed basis for handling claims?
13   A   Yes.  They'll sometimes give us like online training
14       to go through that gives a general overview of
15       certain types of injuries just for background
16       knowledge.
17   Q   What about any training that you might have had at
18       Safeco or Liberty Mutual about claims handling
19       itself?
20   A   There is an initial training that -- that I went
21       through when I started handling claims.
22   Q   That would have been in maybe 2004?
23   A   That would have been, yeah, 2004.
24   Q   Was that an online course or did you go somewhere
25       and sit in on a class?  Can you talk a little bit
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1        more about that.
 2   A    This was a three-week training live classroom, and
 3        they sent us to our Atlanta office for that.
 4   Q    Since then any additional live training or anything
 5        that you can think of?
 6   A    There have been a handful of times where they've had
 7        other live training as kind of a refresher.
 8   Q    Do you have any licenses in any states for handling
 9        claims?  Are you a licensed claim adjuster?
10   A    Kentucky, Connecticut, Texas.  I think I might still
11        have a Louisiana license.  I can't remember if we
12        renewed that the last time or not.
13   Q    In which states do you currently actively handle
14        claims?
15   A    The states I handle now are Indiana, Illinois,
16        Michigan, Wisconsin, Minnesota, North and South
17        Dakota, Iowa and Nebraska.
18   Q    So currently not handling any claims in Kentucky?
19   A    Correct.
20   Q    Obviously Mr. Foster's claim is a claim in Kentucky.
21            Can you tell me at what point in time you
22        ceased to handle claims in Kentucky.
23   A    About 2012.
24   Q    What was the reason for the change?
25   A    There was a change in alignment of employees to
```

Page 11

Examination of Anthony T. Dale

```
1        different offices, and the Indianapolis office had
2        been handling Kentucky.  And they realigned our
3        region footprints and Kentucky then fell into a
4        different region than -- Indiana is considered the
5        Midwest region and Kentucky fell into what's called
6        the mid-Atlantic region which is based in Fairfield,
7        Ohio.  So the adjusters in that office started
8        handling Kentucky.
9    Q   Is that the reason that you were moved off of the
10       Foster file?
11   A   Correct.
12   Q   So all of the claims that were pending, all of the
13       Kentucky claims that were pending in the
14       Indianapolis office, those -- all of them got
15       immediately switched over to the Fairfield, Ohio
16       office?
17   A   There was -- for several years, probably three years
18       or so, there were people who reported to the
19       Fairfield office but did sit in Indianapolis and
20       continued to handle Kentucky claims as well as their
21       other states so that they didn't just -- I mean they
22       didn't just let those people go.  And then as those
23       people moved to other departments or left the
24       company, they replaced those positions in Fairfield.
25            At the same time as positions became available
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1        in the -- in the Midwest department, then they
 2        picked people from the mid-Atlantic department, and
 3        so I was the first one picked and moved over to the
 4        Midwest department to handling claims in those
 5        states that I just told you, and I kept my Kentucky
 6        files for probably about a year and a half.  And
 7        then when I had probably less than 20, they went
 8        ahead and shipped those to someone else in
 9        Fairfield.
10   Q    So was this Foster claim one of the ones that you
11        had kept for a little while and then got shifted?
12   A    I believe so, yes.
13   Q    Do you remember who took over the handling of the
14        claim?
15   A    I -- I don't recall.  I think it might have been
16        Melissa Dearman.
17   Q    Did you have any personal discussions with Melissa
18        Dearman about the Foster claim that you can recall?
19   A    Not that I can recall.
20   Q    Is she located -- or at the time that it got
21        switched was she located in Fairfield, Ohio?
22   A    I believe so.
23   Q    Have you ever met Ms. Dearman before?
24   A    A few times.
25   Q    Mr. Foster's insurance policy is written through
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1       American Fire and Casualty Company.  Do you know the
 2       relation of American fire to Safeco and Liberty
 3       Mutual?  Can you talk about that.
 4   A   It's just another one of the companies in the
 5       Liberty Mutual family.
 6   Q   So there are a bunch of different insurance
 7       companies that have their names on the actual
 8       policies of insurance that are owned by Liberty
 9       Mutual?
10   A   Correct.
11   Q   American Fire being one of those?
12   A   Yes.
13   Q   Are all of the claims that arise under those
14       American Fire policies handled by Liberty Mutual
15       employees?
16           MR. MILLER:  We object to the form.  Go ahead.
17       Answer if you can.
18   A   I believe so.
19   Q   Okay.  There's not, to your knowledge, a -- a
20       separate department or just American Fire Casualty
21       Claims?
22   A   Not to my knowledge, no.
23   Q   Outside of your licensing do you have any particular
24       insurance designations?  And I'm talking about a
25       CPCU or an AIC or an SCLA, those sorts of things.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

1   A   I do have an SCLA.

2   Q   Okay.  Tell me what you did to -- to get that.

3   A   SCLA stands for senior claims law associate.  It's

4       through the American Educational Institute.  And it

5       is a series of four sections, and each section has

6       about anywhere from four to six parts.  Each part of

7       each section has a book about a certain topic such

8       as different legal principles or about auto

9       insurance.  And after each book you take a test, and

10      then once you pass all the tests in one part, then

11      you finish that part.  And then once you take all

12      the tests for each part, then you get the

13      designation of the SCLA.

14  Q   So you've gone through that process and have earned

15      that designation.  Do you know when that was?

16  A   It was probably around 2014.

17  Q   Okay.  In the training for the -- the SCLA

18      designation is there some training about fair claims

19      handling or Unfair Claims Settlement Practices Act,

20      that sort of thing?

21  A   I don't recall one way or the other.

22  Q   Okay.  Tell me what your understanding is of what

23      Kentucky's Unfair Claims Settlement Practices Act

24      is.

25          MR. MILLER:  Object to the form.

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1    A    My understanding is not to intentionally delay or
 2         deny a claim.
 3    Q    Would you agree with me that not specific to any
 4         unfair claims act that as a claims adjuster you
 5         would want to conduct a reasonable investigation of
 6         a claim based upon all available information?
 7              MR. MILLER:  Object to the form.  Go ahead.
 8    A    Yes.
 9    Q    Similarly you would want to make an attempt to
10         settle a claim for a fair amount promptly when
11         liability is reasonably clear?
12              MR. MILLER:  Object to the form.  Go ahead.
13    Q    Do you agree with that?
14    A    Liability as in?  Can you be more specific?
15    Q    Sure.  Liability for the accident in question.
16    A    Yes.
17    Q    You don't want to, as a claims adjuster, require an
18         insurer or a claimant to litigate to get a claim
19         payment; is that fair?
20    A    Not necessarily, no.
21    Q    If you have a -- if you do deny a claim or you offer
22         a compromise amount on it, would you agree that you
23         want to set out all of the reasons for the denial or
24         for the offer of a compromise payment?
25              MR. MILLER:  Object to the form; compound.  Go
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      ahead.
 2   A  Yes.
 3   Q  With regard to gathering medical information, would
 4      you want to do that at the earliest opportunity that
 5      you have?
 6   A  Yes.  The earliest opportunity being sometimes it's
 7      helpful to wait until someone is finished treating
 8      with a certain provider to get the records at once.
 9      Sometimes it's easier for the patient that way so
10      there's not multiple requests that we have to wait
11      for, but it's -- it's -- I usually leave it up to
12      the injured party.
13   Q  And you wouldn't want to delay that process if the
14      injured party wants to move forward, correct?
15   A  Right.
16   Q  Would you agree that your, as a claims handler,
17      investigation should be proactive?
18   A  Yes.
19   Q  With respect to making offers of settlement, would
20      you agree that you should do that even if an insured
21      or a claimant hasn't made a specific demand for a
22      specific amount?
23   A  Yes.
24          MR. MILLER:  Object to the form.  Go ahead.
25   A  Yes.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   And when you do an evaluation of a claim amount, you
 2       would want to consider all available information?
 3   A   Correct.
 4   Q   Mr. Dale, do you know approximately when
 5       Mr. Foster's UIM claim was ultimately paid?
 6   A   My understanding was it was sometime within the last
 7       year or so.
 8   Q   I'll -- I'll tell you that there was, I think, a
 9       payment made in June of 2015, so about -- about a
10       year ago.
11   A   Okay.
12   Q   Am I correct that your handling of the claim ceased
13       in 2012?
14   A   That sounds right.
15   Q   What have you reviewed, if anything, to determine
16       what happened with Mr. Foster's claim after you
17       stopped handling it in 2012?
18           MR. MILLER:  We object to the form.  Are you
19       talking about in preparation for the deposition
20       or --
21           MR. FAIRBANKS:  I think just anything.
22           MR. MILLER:  Okay.  Go ahead.
23   Q   Either in your employment or in preparation for the
24       deposition.  And I don't want you to tell me
25       anything that you and Don talked about, but I'm just
```

Page 18

Examination of Anthony T. Dale

```
 1        wondering what -- what documents have you reviewed
 2        to determine, if you have reviewed anything, what
 3        went on with the claim after you stopped handling it
 4        in late 2012?
 5     A  I didn't review anything until I was preparing for
 6        this deposition; and I reviewed claim file notes,
 7        and that was it, just claim file notes.
 8     Q  Do you think you would have reviewed claim file
 9        notes that were from 2014 or 2015?
10     A  No, just my own.
11     Q  Okay.  And what I'm trying to figure out is whether
12        or not you have any independent knowledge or
13        opinions about the claims handling that took place
14        after you stopped handling the claim in late 2012?
15     A  No, I don't.
16     Q  Okay.
17           MR. MILLER:  There were a couple of other
18        things he reviewed if you want my help.  I don't
19        want to be --
20           MR. FAIRBANKS:  Sure.
21           MR. MILLER:  -- incomplete.
22           MR. FAIRBANKS:  Yeah, please.
23     Q  Do you recall reviewing anything else other than
24        some claims notes?
25           MR. MILLER:  Your May offer you made.
```

Examination of Anthony T. Dale

```
 1    A    Oh, correspondence, yes.
 2    Q    Okay.  Some of the correspondence you had with
 3         Mrs. Foster?
 4    A    Correct.
 5    Q    Ernest's wife?
 6    A    Right.
 7    Q    Okay.  And we'll get into some of those in a little
 8         bit.
 9              Have you -- again not specific to discussions
10         with any of the lawyers, have you talked with any of
11         the other claims adjusters recently about the
12         handling of Mr. Foster's claim?
13    A    I did talk to Laura Harp.
14    Q    Okay.  When did you all talk?
15    A    That was probably about a month ago or so.
16    Q    Can you tell me what you and Ms. Harp discussed.
17    A    She had asked me for my contact information to give
18         to Mr. Miller's office to schedule the deposition,
19         and I asked her what happened with the claim and she
20         told me that they did end up paying -- I don't
21         remember the exact amount but they ended up paying
22         it.
23    Q    Did she tell you when or why?
24    A    She didn't tell me when but she told me that they
25         had an expert that changed his opinion.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Have you reviewed any of the expert reports?

 2   A   No.

 3   Q   Okay.  So Laura Harp had told you that an expert

 4       that Liberty Mutual had had changed his opinion and

 5       that was one of the reasons why the payment was

 6       made?

 7           MR. MILLER:  Object to the form.  Go ahead.

 8   A   She told me that the opinion he gave in his

 9       deposition was different than the opinion he gave in

10       his report.  She didn't specifically say that that's

11       why they ended up paying it, but she just told me

12       that that's what happened with the claim.

13   Q   Okay.  Do you know how many days before this UIM

14       case was scheduled to go to trial that the case

15       settled?

16   A   No.

17   Q   Okay.  During the time that you were handling

18       Mr. Foster's claim I seen some -- some notes talking

19       about wanting to send him to a medical examiner.  Do

20       you remember that?

21   A   Yes.

22   Q   While you were handling the claim that -- that never

23       came to fruition, is that correct --

24   A   Right --

25   Q   -- he never --
```

Examination of Anthony T. Dale

```
 1   A   I don't believe so.
 2   Q   Tell me how that process would work.  How would you
 3       have gone about finding a doctor to send Mr. Foster
 4       to see?
 5   A   Normally I consult with a defense attorney that I
 6       work with in the areas wherever we need it to ask if
 7       they would recommend anyone or know of a doctor that
 8       does independent medical examinations.  We -- yeah.
 9   Q   Okay.  So you may, from time to time, consult with a
10       local defense lawyer about what doctors they may
11       suggest to send one of the claimants to?
12   A   (Affirmative nod).
13   Q   Do you remember ever --
14   A   Correct.
15           MR. MILLER:  Thank you.
16   Q   -- ever getting to that point with regard to
17       Mr. Foster's claim, ever getting a recommendation of
18       who -- who he could go to?
19   A   I don't recall.
20   Q   And when you say -- again, just for the jury to
21       know, when you're talking about an independent
22       medical examination, can you just describe generally
23       what you're talking about.
24   A   That's where we have the injured party go see a
25       doctor of our selection to examine him just like any
```

Examination of Anthony T. Dale

```
 1      other doctor would.
 2   Q  And when you're talking about an independent medical
 3      examination, you do want the doctor that's selected
 4      to be independent, correct?
 5   A  Independ -- what do you mean?
 6   Q  Well, let me ask you this:  Would you want the --
 7      the doctor that sees a claimant or an insured to be
 8      open about offering a fair opinion after the
 9      examination?
10   A  Yes.
11           MR. MILLER:  Object to the form.  Go ahead.
12   Q  Do you all have any lists of approved doctors or
13      medical examiners that you use at Liberty Mutual?
14   A  It differs by state.  I don't honestly know if we do
15      in Kentucky or not.  I know for the other states
16      that I handle we do work with different vendors who
17      logistically set up the appointment and they have
18      doctors signed up with them that have agreed to use
19      their services and have a set fee.
20   Q  Do you know what the -- the set fees are that you
21      guys have negotiated?
22   A  I don't.
23   Q  What about Dr. David Jenkinson, do you know of him?
24   A  I only know from my preparation yesterday that he
25      was the expert that Liberty Mutual had selected.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Have you ever utilized Dr. Jenkinson back when you
 2       were handling the claims in Kentucky?
 3   A   I don't recall.
 4   Q   And I think you've touched on this, but just to tie
 5       this idea up, you have not reviewed either
 6       Dr. Jenkinson's report or his deposition, correct?
 7   A   No.
 8   Q   While you were handling Mr. Foster's claim, did you
 9       make any settlement offers to him?
10   A   Yes.
11   Q   Do you recall the amount?
12   A   I believe 7500.
13   Q   Let's talk about that 7500-dollar offer.  How much
14       of that 7500 was going to be paid by American Fire?
15   A   I believe all of it.
16   Q   Do you recall working together with an adjuster from
17       Philadelphia Insurance Company?
18   A   Yes.
19           MR. MILLER:  Object to the form.  Go ahead.
20   A   Okay.  Yeah, now I recall.  There was a split
21       because they had another policy, so it was going to
22       be paid in conjunction with them.
23   Q   So that 7500-dollar offer that was made was a
24       combined offer?
25   A   Correct.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Do you recall the amount of that that American Fire
 2       was going to pay?
 3   A   I believe 60 percent.
 4   Q   Okay.  And I think that's right.  I think it was
 5       4500.  Do you remember that?
 6   A   If that's what -- yeah, if that's the right math,
 7       then yes.
 8   Q   Do you remember when that offer was made?
 9   A   I think May 2011.
10   Q   And at that point in May 2011 how -- how had
11       Mr. Foster's UIM claim been pending with you?
12   A   Probably about a year.
13   Q   Do you recall the date of the accident itself?
14   A   No.
15   Q   Okay.
16           MR. MILLER:  Phil, before you -- not to
17       interrupt you, do you have that May 23, '11 email?
18       Are you going to use that for an exhibit today?
19           MR. FAIRBANKS:  I am, yes; and I do.
20           MR. MILLER:  Okay.
21   Q   Let's do this, Mr. Dale.  I've got a few exhibits
22       here that we may make reference to.  What I've got
23       printed out here I believe is a complete set of the
24       claim notes that --
25   A   Okay.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
1   Q   -- I've been provided.  And I'll just ask you to
2       just maybe flip through those briefly, not
3       necessarily to read all of them but just to confirm
4       that those, in fact, are claim notes that you all
5       use at Liberty Mutual.
6   A   (Witness complies.)
7           MR. MILLER:  I've got that you produced six or
8       seven pages in addition to what you've shown the
9       witness, but it's all after he got out of the claim,
10      so --
11  A   Yeah.  Yes, these are all claim notes from our
12      electronic system.
13  Q   Now just looking at the -- the first page here, and
14      they're labeled in the bottom right-hand corner so I
15      may make reference to that.  This is Page 1057.
16  A   Okay.
17  Q   You see up at the top loss date is June 8th of 2008.
18  A   Yes.
19  Q   Does that sound right that the -- the collision
20      occurred in June of 20 -- 2008?
21  A   If that's what it says, yes.
22  Q   Okay.  All right.  Mr. Dale, I'm going ask you to
23      flip kind of towards the back to Page 1139.
24  A   Okay.
25  Q   And what I'm trying to do is get us kind of in a
```

Examination of Anthony T. Dale

```
 1        timing track to figure out -- pindown some of the
 2        dates that you got involved in the case.
 3   A    Okay.
 4   Q    And I'm looking at a note that's dated May 20, 2010
 5        made by Geoffrey Maddox.  Do you see that?
 6   A    Yes.
 7   Q    Who is Geoffrey Maddox?
 8   A    He was the PIP adjuster at the time I believe.
 9   Q    Do you know Mr. Maddox?
10   A    Not personally.
11   Q    Do you know which Liberty Mutual office he worked
12        out of?
13   A    I don't.
14   Q    Is he at the same Indianapolis location as you?
15   A    No.
16   Q    Do you know generally out of which office Kentucky
17        PIP claims are handled -- were -- were handled back
18        at this time?
19   A    At that time I don't remember.  I know it's not the
20        same office -- well, they're handled out of a
21        different office than they were then.  I just can't
22        remember which one it was at the time.
23   Q    Do you remember where they're handled now?
24   A    Now I believe they're handled out of Liberty Lake,
25        Washington and Farmingdale, New York.
```

Page  27

Examination of Anthony T. Dale

1  Q   Okay.  So Washington state and New York state?

2  A   And possibly Florida.

3  Q   Are there any Liberty Mutual claims offices in

4      Kentucky?

5  A   No, not to my knowledge.

6  Q   Do you remember having any conversations with

7      Mr. Maddox himself about Mr. Foster's claim?

8  A   No.

9  Q   Okay.  It looks like on this May 20, 2010 note that

10     Mr. Maddox is stating that he received a call from

11     Mr. Foster's wife wanting to set up a UIM claim.  Do

12     you see that?

13 A   Yes.

14 Q   And then it looks like the next note above that is

15     one made by you the next day on May 21, 2010.  Do

16     you see that?

17 A   Correct.

18 Q   What is the first thing that you did according to

19     the notes when you got involved with this Foster

20     claim?

21 A   It looks like I called Progressive to get the status

22     on the bodily injury claim.

23 Q   And Progressive was the insurance company that

24     insured Gary Washabaugh.  Do you remember that name?

25 A   I don't recall the name.

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Okay.  Well, he's the at -- he's the at-fault
 2       driver.
 3           Do you remember that Progressive was the
 4       insurer for the at-fault driver?
 5   A   Yeah, it appears so.
 6   Q   Do you remember how much coverage Progressive had?
 7   A   I don't remember.
 8   Q   Do you know what the state minimum liability
 9       insurance level is in Kentucky?
10   A   I believe it's 25,000.
11   Q   You're -- you're correct, and I'll tell you that's
12       how much coverage Mr. Washabaugh had.
13   A   Okay.
14   Q   What did the adjuster at Progressive tell you?
15   A   It looks like on May 25th I received a voicemail
16       from her that they had offered their policy limit of
17       25,000 and that she had sent a letter and a copy of
18       their dec page to the insured and that she offered
19       to fax it to us if we needed it.
20   Q   Okay.  So Progressive -- pretty much as soon as
21       you're getting involved, Progressive has offered to
22       pay its policy limits to Mr. Foster, correct?
23   A   Correct.
24   Q   And at that point in time do you understand that
25       there is a potential for a UIM claim over and above
```

Page  29

Examination of Anthony T. Dale

```
 1       what's being paid by Progressive?
 2   A   Yes.
 3   Q   Okay.  I see on May 21st you had a conversation with
 4       Mrs. Foster, Betty.  Do you see that?
 5   A   Yes.
 6   Q   Did you primarily communicate with Mrs. Foster
 7       instead of Mr. Foster directly?
 8   A   Yes.
 9   Q   What do you remember about your conversation -- your
10       initial conversation with Mrs. Foster?
11   A   I don't independently recall it.
12   Q   Okay.  Do you have any independent recollection of
13       any of your conversations with her?
14   A   No.
15   Q   Okay.  Have you -- and I don't think you have, but
16       have you ever met either Mr. or Mrs. Foster
17       face-to-face?
18   A   No.
19   Q   What do you remember about the -- the collision
20       itself, the mechanics of how it happened?
21   A   The only thing I recall just from when I was
22       reviewing my notes yesterday is -- is that his knees
23       hit the dashboard.  Other than that, I don't -- I
24       don't recall any other knowledge.
25   Q   Do you remember it being a front end, kind of a
```

Page 30

Examination of Anthony T. Dale

```
 1        head-to-head collision?
 2   A    I believe so, that's correct.
 3   Q    Did you ever get any copies of the photographs of
 4        the vehicles?
 5   A    I -- I don't recall.
 6   Q    I haven't seen any of them in your file, and I'm
 7        just wondering if aside from what I can gather from
 8        looking at the file, if you did -- if you do
 9        remember reaching out and trying to get photos?
10   A    That's normally something that I would try to get if
11        we didn't have them already, but I don't remember if
12        we did -- if they were either -- either available or
13        if we did receive them on this one.
14   Q    Tell me how, if it does, a -- the photos of the
15        vehicles involved in the accident affect your
16        evaluation of a claim.
17   A    I like to look at the photos to see what the
18        severity of the impact was, how -- how damaged the
19        vehicle was from the impact so I can get an idea of
20        what kind of force the injured party would have
21        received or went through.  I also like to see where
22        on the vehicle the impact was in relation to where
23        the injured party was sitting to see, you know, if
24        that -- you know, because if they were sitting where
25        the impact occurred, obviously that would be more
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1        traumatic than maybe somewhere else in the vehicle.
 2   Q    And on the flip side of that if you've got a -- you
 3        know, a fender bender where you can't really even
 4        see if there was much damage, that's going to be
 5        important to you too to determine whether or not
 6        somebody was injured in a minor accident; is that
 7        fair?
 8   A    Yes.
 9   Q    But you -- you don't recall looking at either the
10        photos of Mr. Foster's truck or Mr. Washabaugh's
11        vehicle?
12             MR. MILLER:  Object to the form.  Go ahead.
13   A    I don't remember if we ever received them or not.
14   Q    Mr. Dale, mixed in with the notes that you're making
15        into the file are notes that the -- the PIP
16        adjusters are making into the file.  Do you see
17        that?
18   A    Yes.
19   Q    I'm wondering in -- in realtime if you would have
20        pulled this file up in 2010, would it look the same
21        as it does here when we're looking at it, you would
22        have the -- all those same notes in here?
23   A    Correct.
24   Q    From looking at those notes did you understand that
25        the PIP adjusters had been paying Mr. Foster PIP
```

Examination of Anthony T. Dale

```
 1      benefits for wage loss?
 2           MR. MILLER:  Object to the form.  Go ahead.
 3   A  I don't necessarily read the notes.  I mean I try to
 4      skip past them until I have authorization from the
 5      injured party to read them, but -- and I don't
 6      independently recall a conversation but usually what
 7      I do when there is PIP involved and I don't have
 8      authorization, I contact the PIP adjuster just like
 9      I would a PIP adjuster at another insurance company
10      and ask them what the status is on their PIP claim.
11   Q  Aside from the notes did you understand when you
12      took over the handling of this UIM claim that there
13      was an ongoing PIP wage loss claim?
14   A  I don't independently recall, but I believe that's
15      correct.
16   Q  Okay.  Mr. Dale, I'm going to hand you what we'll
17      mark as Exhibit 1.
18           MR. MILLER:  You don't want to do the claim
19      notes?
20           MR. FAIRBANKS:  I probably will.
21           THE WITNESS:  You want me to just leave them
22      here.
23           MR. MILLER:  Just leave them right here and let
24      him --
25           MR. FAIRBANKS:  Let's do that.  I -- I agree
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      with you, Don, let's -- let's make the claim notes,
 2      that big exhibit, Exhibit 1; and then we'll make
 3      this Exhibit 2 (indicating).
 4           MR. MILLER:  Is that my copy you're handing me?
 5           MR. FAIRBANKS:  Either way.  They're -- yes,
 6      that's your copy right there, that's correct.
 7           MR. MILLER:  Hold on.  Let me read it before
 8      you -- you answer.
 9           THE WITNESS:  Okay.
10   A  Can I read it?
11   Q  Sure.  Go ahead.  Feel free to look through it.
12   A  Did you ask a question, I'm sorry?
13   Q  I have not.
14   A  Okay.  I wasn't sure.
15   Q  Okay.  What I'm wanting to ask you, Mr. Dale, is if
16      this looks like some email correspondence between
17      you and Ms. -- Mrs. Foster about getting some
18      information about Ernest's medical providers?
19   A  Yes.
20   Q  Are you asking Ernest to sign an authorization so
21      that you can request whatever medical information
22      you might need on the claim?
23   A  Correct.
24   Q  And does he do that?
25   A  I believe so, yes.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   And it looks to me --
 2   A   Yeah.
 3   Q   -- like on May 25, 2010, I guess just a few days
 4       after you took over the claim, Mr. Foster has
 5       provided you with a signed authorization to release
 6       health information for claims processing; is that
 7       right?
 8   A   Correct.  That's the date on the authorization.
 9   Q   And he's given you a list of medical providers that
10       he's seen?
11   A   Yes.
12   Q   And the Fosters are also providing you with a letter
13       from Progressive showing that Progressive is
14       offering the policy limits of 25,000?
15   A   Correct.
16   Q   Okay.
17          MR. MILLER:  Madam Court Reporter, Joyce,
18       Page 90 -- the Bates label 92, which is the second
19       or third page back in this exhibit, has Mr. Foster's
20       Social Security Number and date of birth on it.  If
21       you'll -- I don't want a federal judge getting mad
22       at any of us.
23   Q   Is that the normal process that you go through when
24       you begin investigating a claim, try to get a
25       medical authorization from the claimant?
```

Examination of Anthony T. Dale

```
 1   A   Not always right away.

 2   Q   Was there something about the Foster claim that made

 3       you want to get one right away?

 4   A   I don't independently recall, but I would imagine

 5       more to be able to see the PIP file and the records

 6       that Progressive already had so I could get an

 7       understanding of what his injuries and treatment

 8       were to date.

 9   Q   Did this authorization give you access to that PIP

10       file?

11   A   Yes.

12   Q   So at least as of May 25th of 2010 you had access to

13       whatever the PIP adjusters had with respect to

14       medical records, medical bills or wage loss

15       information?

16   A   Correct.

17   Q   Okay.  I'm going to go back to the -- the claim

18       notes exhibit.

19   A   Okay.

20           (Whereupon Deposition Exhibit 2 was marked for

21            identification.)

22   Q   I'm going to try to go through this chronologically

23       so we can keep it all straight.

24   A   Okay.

25   Q   I'm looking at Page 1135.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   A   Okay.

 2   Q   Okay.  We've talked about your May 25th note of your

 3       receiving a voicemail from the adjuster at

 4       Progressive.  What I'm looking at is the next

 5       voicemail.

 6           Tell me about the voicemail that you received

 7       from the Progressive adjuster on June the 4th of

 8       2010.

 9   A   It says that she is sending records to me and that

10       Dr. Cecil's notes are very light.

11   Q   What do you mean by that?

12   A   Which part?

13   Q   That Dr. Cecil's notes are very light?

14   A   I don't independently recall.  My understanding

15       would be that the -- the records she's sending,

16       they -- they might be difficult to read because the

17       print must -- or the copy must be really light.

18   Q   Do you remember who Dr. Cecil was?

19   A   I don't.

20   Q   Okay.  It looks like you make a longer note that

21       same day.  It looks like your conversation with --

22       or the voicemail from the Progressive adjuster was

23       received at about 11:30 in the morning.  Do you see

24       that?

25   A   Uh-huh, yes.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1    Q    And then the next note is one that's logged in at

 2         2:51 p.m.

 3    A    On Page 1134?

 4    Q    It's on --

 5              MR. MILLER:  Yeah.

 6    Q    -- 1133 and 34, yes.

 7    A    Yes, I see that.

 8    Q    I'm going to start looking at that note on 1133.

 9         There's a section in your note that talks about

10         coverage.  Do you see that?

11    A    Yes.

12    Q    As a claims adjuster one of the first things you

13         want to do is determine whether or not there's

14         coverage for the claim that's being made; is that

15         fair?

16    A    Correct.

17    Q    What did you determine with respect to the coverage

18         for Mr. Foster's UIM claim?

19    A    I determined that there was coverage.

20    Q    Now, it looks like you state there there's no

21         exclusion.  All conditions are met.  Coverage is in

22         place --

23    A    Correct.

24    Q    -- right?  Down in the facts -- facts section

25         there's a note about the liability or who is at
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1        fault.  What did you determine with respect to who
 2        was at fault?
 3    A   The claimant; that is, the Progressive insured.
 4    Q   Okay.  So at this point Mr. Foster has a covered
 5        claim under his policy and he is not going to bear
 6        any comparative responsibility for it --
 7    A   Correct.
 8    Q   -- right?
 9    A   Yes.
10    Q   At that point it looks like you proceed to analyze
11        the damages --
12    A   Yes.
13    Q   -- is that right?  Tell me about your recommendation
14        on the damages on June 4, 2010.
15    A   It looks like my recommendation was to set a reserve
16        of the policy limit of 100,000 pending review by my
17        manager and to triage, I believe, with our business
18        analyst.
19    Q   Now the $100,000, that's how much UIM coverage
20        Mr. Foster had with American Fire, correct?
21    A   Yes.
22    Q   What went into your basis that you recommended
23        setting a reserve at 100,000?
24    A   At this point, because I didn't have any records, it
25        was essentially based on what Mrs. Foster had told
```

Page  39

Examination of Anthony T. Dale

```
1         me; and -- and then in addition, I knew about the
2         other insurance company, Philadelphia, that might
3         have other UIM coverage, and so it appears that I
4         looked at that.  It doesn't appear that had any
5         bearing yet because I didn't have their policy
6         language, so I didn't know how those two policies
7         would apply together.  And so I assessed that based
8         on what I knew, the approximate value of his injury
9         was 150,000 but then there is an offset when you
10        settle a claim, an underinsured motorist claim, for
11        whatever is paid by the PIP coverage as well as what
12        is paid by the at-fault party's insurance.  And so
13        that leaves us at $100,000.
14   Q    In coming up with your amount of approximately
15        150,000 it looks like that's based on some
16        additional medical expense that Mr. Foster was going
17        to need for a neurologist, injections, knee
18        replacement, physical therapy.  Do you see that?
19   A    Correct, yes.
20   Q    And it doesn't look to me like your 150,000 figure
21        is including anything for wages at that point in
22        time; is that right?
23   A    I believe so.
24   Q    Where did you get the information that the knee
25        replacement would be approximately $45,000?
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   A   That's just an estimate based on experience.
 2   Q   Okay.  I want to show you what we'll mark as
 3       Exhibit 3.
 4           MR. MILLER:  I'll put a Number 3 on it for you.
 5   Q   And most of this has been -- been blacked out,
 6       Mr. Dale.  I'll give you a chance to look at it for
 7       just a second.
 8   A   Okay.
 9   Q   This has been provided to me along with some manuals
10       and claims handling materials from Liberty Mutual.
11       Is this familiar to you?
12   A   No.
13   Q   Okay.  It's titled Claims Examiner Toolbox.  Do you
14       know what that is?
15   A   That is familiar, yes.
16   Q   Can you tell me what that is.
17   A   It's been a long time since we had that because I
18       believe it's been -- the name has changed and the
19       format has changed, but I believe at that time that
20       was kind of a lot of resources that we could use for
21       reference for different things in claims handling.
22   Q   And this particular section of it is titled Medical
23       Disability and Cost Guidelines.  Do you see that?
24   A   Yes.
25   Q   Now it looks to me like it has different sections
```

Page 41

Examination of Anthony T. Dale

```
 1        for different types of injuries.  You know, for
 2        example, injuries to fingers or hands, elbows, kind
 3        of going through all that, which are all covered up;
 4        but what I want to look at is on Page 1528 when
 5        they're talking about the -- the knee.
 6   A    Uh-huh, yes.
 7   Q    So there are two sections there.  One is for knee
 8        strains/tear, do you see that?
 9   A    Yes.
10   Q    And then the next one is for total knee replacement.
11        Do you see that?
12   A    Yes.
13   Q    And with respect to the total knee
14        replacement/arthroplasty on pages 1528 continuing
15        onto 1529, can you tell me what the -- the cost and
16        the reserve for that procedure is as listed in this
17        claim examiner toolbox.
18   A    It says 45,000 to $70,000, reserve for $125,000
19        medically.
20   Q    And that would be just for the knee replacement
21        itself, correct?
22   A    I believe so.  I'm not sure.  That might include
23        physical therapy as well because that's listed here.
24   Q    Okay.  But that wouldn't include any wage loss that
25        might be associated with it, that sort of thing?
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1    A    I don't believe so, no.
 2    Q    Okay.  Going back to the claim notes, just kind of
 3         keeping this chronologically, on June the 4th of
 4         2010 you make a recommendation of setting the policy
 5         limit reserve at 100,000.
 6              Just for -- again, for the jury's
 7         understanding, can you tell us what a reserve is.
 8    A    A reserve is kind of an estimate, an estimate of
 9         what we intend -- of what we may pay out in that
10         coverage.
11    Q    Who was your supervisor at this particular time,
12         June of 2010?
13    A    I'll have to look at my notes.  Allen Faber.
14    Q    Where was Allen Faber located?
15    A    In Fairfield, Ohio.
16    Q    And what was his position at that time?
17    A    I believe it was unit leader, I think, but he was my
18         manager.
19    Q    I'm looking at Page 1132.  Looks like there's a note
20         that Mr. Faber makes June 7, 2010?
21    A    Yes.
22    Q    What is he relaying to you?
23    A    Are you talking about the one that starts with
24         "Tony"?
25    Q    Yes.
```

Page  43

Examination of Anthony T. Dale

```
 1  A   He's relaying to me that there is $50,000 in PIP
 2      coverage that will have offset.  So I had said that
 3      there was 10,000 in PIP that would be offset and so
 4      he was letting me know that because of the extra
 5      coverage they had, there would actually be a $50,000
 6      offset.  So we -- plus the 25,000 of the at-fault
 7      party's insurance, so we would then have a total
 8      credit of 75,000 off the total value of the injury.
 9          And then he says that he sees the case having a
10      greater full value before the offsets of 150,000 if
11      there are no priors; that is, pre-existing
12      condition.  And he said full value is at least
13      $200,000.  And so he recommended to go ahead and
14      reserve $100,000, the policy limit.
15  Q   Okay.  So Mr. Faber agreed with you on setting the
16      reserve at $100,000?
17  A   Yes.
18  Q   It looks like he valued the case from a gross
19      perspective a little bit higher than you; is that
20      right?
21  A   Yes.
22  Q   And even taking into account an additional $40,000
23      in offsets, he still thinks it's a policy limits
24      case; is that right?
25  A   Correct.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Why didn't you go ahead and offer the policy limits
 2       to Mr. Foster here in June of 2010?
 3   A   We didn't -- I don't believe we had all the medical
 4       records.
 5   Q   Do you know what medical records you were missing?
 6   A   I don't recall, no.
 7   Q   Did you let either Mr. or Mrs. Foster know that you
 8       guys were putting up a 100,000-dollar reserve on the
 9       case?
10   A   No.
11   Q   Did you make any request to Mrs. Foster or
12       Mr. Foster that you needed more medical information?
13   A   There is a reference on 6/10 that I tried to call
14       and that I would send an email; so I -- I don't know
15       what was in that email, but I don't independently
16       recall if I did or not.
17   Q   Okay.  So at this point in time in June of 2010 when
18       you all have the reserve at 100,000, the reason that
19       you just don't go ahead and pay the claim is because
20       you need more medical information?
21   A   I believe so, yes.
22   Q   Do you know what requests you made with the
23       authorization that Mr. Foster had given you a couple
24       of weeks earlier?
25   A   I would presume that I requested the records from
```

Page 45

Examination of Anthony T. Dale

```
 1        Progressive since they called and left a message and
 2        said that they were sending those records to me.
 3        And then there is a note from who I presume is one
 4        of our support staff because they sent a records
 5        request to a provider.
 6             MR. MILLER:  Give us a date if you don't mind.
 7             THE WITNESS:  Oh, 6/10 at 2:51 p.m.
 8   Q    Do you know who that provider was?
 9   A    I don't.
10   Q    And at this point in time you had access to whatever
11        medical information was in the PIP file; is that
12        right?
13   A    At this point we -- we had paper files so PIP would
14        have had any medical records or bills they received
15        in a physical file, so I would have had to have them
16        copy and send it to me.  So I don't know at this
17        point if I actually had those copies or not.
18   Q    Do you remember at some point ever making that
19        request to the PIP department to send you what
20        medical file -- files that they already had?
21   A    Not independently.  I don't remember.
22   Q    And at least with the authorization that Mr. Foster
23        gave you, you could have done that when that
24        authorization was sent to you in May of --
25   A    Correct.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   -- 2010?

 2   A   Yes.

 3           MR. FAIRBANKS:  Let's take a five-minute break.

 4           THE WITNESS:  Okay.

 5           MR. FAIRBANKS:  Let's go off the video.

 6           (Whereupon a recess was taken from 10:48 a.m.

 7            to 11:01 a.m.)

 8           MR. FAIRBANKS:  We are back on the video

 9       record.

10   Q   Mr. Dale, what do you remember about Mr. Foster's

11       job?

12   A   From what I recall, he was a mechanic that worked

13       out of his garage.

14   Q   Do you know what his educational background was?

15   A   I don't recall.

16   Q   Did you have any discussions that you remember with

17       Mrs. Foster about the type of work that Ernest was

18       doing?

19   A   I -- I don't remember.

20   Q   Allen Faber, do you know, is he still with Liberty

21       Mutual?

22   A   He's not, no.

23   Q   Okay.  Do you know what -- where he's at now?

24   A   I don't.

25   Q   How long was he your manager during this Foster
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      claim, do you remember?
 2   A  I believe it was less than a year.  I don't remember
 3      exactly though.
 4   Q  Let's get back into the claim notes and kind of
 5      take -- take some more chronological steps.
 6   A  Okay.
 7   Q  I'm going to ask you a few questions with respect to
 8      the wage loss claim.  There's a note on Page 1130
 9      made by Geoffrey Maddox at the bottom of that page.
10      July 9, 2010, do you see that?
11   A  Yes.
12   Q  It says:  Called Lexington Clinic and was advised
13      that Ernest has not been released back to work,
14      unsure if he ever will.  Do you see that?
15   A  Yes.
16   Q  Going forward you have a note September 14, 2010
17      beginning on 1128 going on to 1129.  Do you see
18      that?
19   A  September 14?
20   Q  September 14.
21   A  At --
22   Q  Of 2010.
23   A  Okay.  At what time did you say?
24   Q  2:18 p.m.
25   A  Oh, I thought you said 11:18.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Oh, sorry.  I'm -- I'm talking about the numbers at
 2       the bottom of the page, 1128 --
 3   A   Oh, I see.
 4   Q   -- and 1129.
 5   A   Okay.  Okay.  Yes, I see that.
 6   Q   And what do you have the reserve set at on September
 7       14, 2010 on the UIM claim?
 8   A   It looks like it's still $100,000.
 9   Q   Okay.  Let's flip forward a couple more pages to
10       Page 1126.  There are two notes made on November 29,
11       2010.  It looks like by the PIP adjuster.  I'm
12       looking at the second one at 3:25 p.m.  Do you see
13       that?
14   A   Yes.
15           MR. MILLER:  Can you give me the numbers again.
16       I fell asleep for a half a second.  I apologize.
17           MR. FAIRBANKS:  Sure.  Page 1126.
18           MR. MILLER:  Thank you.
19   Q   So on November 29, 2010 it looks like the PIP
20       adjuster is making a note that they have received a
21       new doctor's excuse for Ernest Foster and will issue
22       lost -- lost wage payments of $300 for six weeks.
23       Do you see that?
24   A   Yes.
25   Q   Okay.  I'm looking next at a note made by you about
```

Examination of Anthony T. Dale

```
 1        a month later, December 23, 2010.
 2   A    Okay.
 3   Q    Pages 1124 and 1125.  Do you see that?
 4   A    Yes.
 5   Q    At the top of Page 1125 what are you indicating in
 6        the issues section?
 7   A    That he has completed treatment, has reached maximum
 8        medical improvement with some permanent restrictions
 9        of no bending, squatting, kneeling and can't do
10        normal job.  He hasn't decided whether or not to
11        have knee replacement.
12   Q    And what do you have the reserves set at there on
13        December 23 of 2010?
14   A    $100,000.
15   Q    And at that point have you made any offer to
16        Mr. Foster?
17   A    It doesn't appear so.
18   Q    And have you disclosed to Mr. or Mrs. Foster what
19        you have reserves set at?
20   A    No.
21   Q    Let's flip over to Page 1123, and this is moving
22        forward a couple of months again.
23            You have a note on March 24, 2011.  Describe
24        for me what you're making a note of that day.
25   A    It says:  Waiting on wage loss supports from PIP
```

Examination of Anthony T. Dale

```
 1        adjuster to evaluate underinsured motorist claim.
 2   Q    What -- what other wage loss supports were you
 3        waiting for other than what's already noted in the
 4        file?
 5   A    I --
 6             MR. MILLER:  Object to the form.  Go ahead.
 7   A    I don't independently recall.
 8   Q    If we look at the note -- the next note up, April 1
 9        of 2011, are you with me there?
10   A    Yes.
11   Q    The end of that note says:  Insured permanently
12        disabled from doing his job as a mechanic.  Do you
13        see that?
14   A    Yes.
15   Q    And is that the PIP adjuster making that note?
16   A    I believe so.
17   Q    And you would have had access to that note kind of
18        as an -- in realtime at that point in the spring of
19        2011.
20   A    Yes.
21   Q    Okay.  So we're up to April of 2011.  And I know you
22        mentioned that you had reviewed this -- this note
23        yesterday, and I want to hand this to you.
24             MR. FAIRBANKS:  We'll mark this as the next
25        exhibit.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1              MR. MILLER:  Number 4.
 2   Q   So Mr. Dale, in May of 2011 is your reserve still
 3       set at $100,000?
 4              MR. MILLER:  Look at your 6/30 note.
 5   A   No, it's not.
 6   Q   In May of 2011 what was your reserve?
 7   A   Oh, I'm sorry.  In May, yes, it still was.
 8   Q   Still set at 100,000?
 9   A   Yes.
10   Q   And in Exhibit 4, your May 23, 2011 email to
11       Mrs. Foster, how much do you offer Mr. Foster?
12   A   $7,500 exclusive of PIP, and that's shared 60/40
13       with Philadelphia Insurance.
14   Q   So you're offering 60 percent of $7500?
15   A   Correct.
16   Q   How much of your settlement offer did you allocate
17       to pain and suffering?
18              MR. MILLER:  Object to the form.  Go ahead.
19   Q   Let me -- let me back up.  Did you allocate a
20       particular amount of your settlement offer to pain
21       and suffering?
22   A   I don't recall if there was a specific -- what
23       specific amount was.
24   Q   You would agree that he is entitled to a claim
25       payment for the pain and suffering that he's had
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      from his injury, correct?
 2   A  Yes.
 3   Q  What about future medical costs, what had you
 4      allocated for future medical costs?
 5   A  I'm -- I'm not sure.  I don't have the evaluation to
 6      know for sure.
 7   Q  What -- let me rephrase that a different way.
 8          What did you tell Mrs. Foster you were
 9      allocating for Ernest's future medical care?
10   A  I don't see any reference to future medical care.
11   Q  Why did you omit that?
12   A  I don't recall.
13   Q  Because as we had looked at before back in June of
14      2010 you had allocated, in setting your reserve,
15      amounts for knee replacement surgery, correct?
16   A  Right based on --
17          MR. MILLER:  Object to form.
18   A  -- the information I had at the time.
19   Q  What was your rationale for not including that in
20      your May 23, 2011 email to Mrs. Foster?
21   A  I wouldn't know without reviewing my evaluation.
22   Q  Do you recall receiving any information that
23      suggested that Mr. Foster wasn't going to need that
24      knee replacement surgery sometime in the future?
25   A  I don't recall.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   You would agree though that that's an element of
 2       damages that he would be entitled to recover if he
 3       did, in fact, need a medical procedure in the
 4       future?
 5           MR. MILLER:  Object to the form.
 6   A   Can you repeat the question.
 7   Q   Sure.  And let's -- let's make it not specific to
 8       Mr. Foster.  Someone who is making a UIM claim in
 9       Kentucky one of the elements of compensation, to the
10       extent that it's proven, is that they can recover
11       for future medical costs?
12   A   Correct.
13           MR. MILLER:  Object to the form.  It would have
14       to be caused by the accident.
15   Q   Walk me through how you came up with the 7500-dollar
16       offer?
17   A   I honestly don't recall because I don't have my
18       evaluation to refresh my memory.
19   Q   Walk me through what -- what you're describing to
20       Mrs. Foster because Mrs. Foster is not going to have
21       whatever internal notes that you have that we've
22       been looking at.  She wouldn't have access to those,
23       correct?
24   A   Okay.
25   Q   So tell me what -- how you're trying to describe it
```

Examination of Anthony T. Dale

```
 1       to her?
 2   A   So what I'm saying is there is an amount of total
 3       medical bills and outstanding wage loss and then
 4       medical bills that were already paid by PIP, wage
 5       loss that was already paid and then future wage loss
 6       that was paid.  So the total of the medical bills
 7       and the wage loss was approximately 74,000.
 8   Q   Okay.
 9   A   And that under the underinsured motorist coverage we
10       essentially get a 75,000-dollar credit, and so we
11       are making an additional offer of 7500 which doesn't
12       affect any future or ongoing payments by PIP that
13       are being made for the wage loss.
14   Q   Okay.  So what -- what did you tell Mr. -- Mr. and
15       Mrs. Foster the basis of the $7500 was?
16   A   I don't believe I specifically said exactly what
17       that's allocated towards.
18   Q   Okay.  Let's talk about the -- the wage loss element
19       because that seems like where the majority of your
20       calculations are here in the email.
21   A   Okay.
22   Q   There's a bullet point as part of the second
23       paragraph there, and tell me in that bullet point
24       how are you coming up with Mr. Foster's average
25       earnings.
```

Page 55

Examination of Anthony T. Dale

```
 1            MR. MILLER:  Object to form.
 2  A   The one that starts in 2009?
 3  Q   Yes.
 4  A   So in 2009 he made 23,000 but in 2009 he didn't work
 5      November or December.  So I took the figure that he
 6      made in 2009 and divided that by the 10 months that
 7      he worked to -- to determine what he made monthly
 8      and then multiplied that by 12 to get the figure of
 9      28,000 which is, had he been able to work November
10      and December, what his total income would have been
11      for 2009.
12            And then using his 2000 -- 2000 -- 2007 and
13      2008 and then the 2009 projected income took an
14      average of that to see on average what he usually
15      makes in a year and then divided that amount which
16      is -- that was -- the average was about 31,000,
17      divided that by 52 weeks to determine $599 being his
18      average weekly earnings.
19  Q   Okay.  So you had done some calculations to
20      determine his average weekly earnings and it came
21      out to about $599 per week; is that correct?
22  A   Correct.
23  Q   Okay.
24  A   Yes.
25  Q   Then in the next paragraph you mentioned that PIP
```

Examination of Anthony T. Dale

```
 1        had paid some of that.  They had been paying 300 a
 2        week which was leaving essentially $299 a week
 3        uncompensated; is that right?
 4   A    Correct.
 5   Q    The second sentence of that paragraph states:  It
 6        appears that he hasn't been able to work at all
 7        since the surgery on 10/29/09.  Do you see that?
 8   A    Yes.
 9   Q    And you go on:  Since Ernest is a self-employed
10        mechanic, and is on permanent restrictions, that
11        makes his profession he normally has virtually
12        obsolete.  Do you see that?
13   A    Correct.
14   Q    The next sentence:  In this kind of profession, it
15        would be difficult for him to do much of anything
16        else, given that all his experience is in this type
17        of job.  Do you see that?
18   A    Correct.
19   Q    Now, is that information that you knew at -- from
20        talking with the Fosters and from looking at the
21        files?
22   A    I would presume so, yeah.
23   Q    So if -- if you know that he's on permanent
24        restrictions and it's -- he's not -- it's going to
25        be difficult for him to do much of anything else,
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1        why did you stop your future wage loss calculation
 2        at the end of May, 2011?
 3             MR. MILLER:  Object to the form.
 4   A    I don't recall because I don't have my evaluation to
 5        refresh my memory.
 6   Q    Do you know how old Mr. Foster was in 2011?
 7   A    I don't.
 8   Q    At least looking at this email, the email doesn't
 9        explain why you're ending the wage loss calculations
10        at the end of May 2011, correct?
11             MR. MILLER:  Object to the form.
12   A    Correct.
13   Q    Did you ever make any additional offers to Mr. or
14        Mrs. Foster aside from the $7500 or 60 percent of
15        $7500?
16   A    I don't independently recall, but let me review the
17        claim file notes to see.
18             I don't believe I did, no.
19   Q    Okay.  So from May of 2011 until October of 2012
20        that was the only offer that was outstanding to the
21        Fosters?
22   A    Correct.
23   Q    Okay.  Let's look back at -- in the claim notes
24        again.  I'm on 1122.
25   A    Okay.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Okay.  Bottom of the page there's a note on April 1,
 2       2011 and then the next one is June the 3 -- June 3,
 3       2011.  Do you see those?
 4   A   Yes.
 5   Q   And I guess your email would fall kind of in between
 6       there, is that right, timeline wise?
 7   A   Correct.
 8   Q   The June 3, 2011 note, what does it say about
 9       Mr. Fos -- Mr. Foster's disability from his job?
10   A   It looks like that's from the PIP adjuster, and it
11       said:  Issued lost wages for insured.  Paid five
12       weeks.  $300 per week at five weeks equals 1500.
13       Doctor excuse received.  Insured permanently
14       disabled from doing his job as a mechanic.
15   Q   About a month later up on July 6 of 2011 what is the
16       status of Mr. Foster's disability as noted there?
17   A   That's from the PIP adjuster, and that says:  Issued
18       lost wages for insured.  Paid four weeks June 6 to
19       June -- July 1, 2011.  300 per week at four weeks
20       equals 1200 dollars.  Doctor excuse received.
21       Insured permanently disabled from doing his job as a
22       mechanic.
23   Q   And those are wage loss payments being made in June
24       and July of '11 for $300, correct?
25   A   Correct.
```

Examination of Anthony T. Dale

```
 1   Q   And in looking at your email to Mrs. Foster,
 2       there -- there was another 299 that was going
 3       uncompensated because PIP was capping at $300; is
 4       that right?
 5   A   Yes.
 6   Q   Is there any reason why you didn't increase your
 7       offer based on the fact that there were additional
 8       PIP payments being made in June and July of 2011?
 9           MR. MILLER:  Object to the form.
10   A   I don't recall without being able to review my
11       evaluation.
12   Q   Is there -- is there something that you need to look
13       at?  What evaluation are you referring to?
14   A   My evaluation of the injury that would have had my
15       notes as to how we're evaluating the claim.
16   Q   Is it -- is it somewhere in the claim file?  Did you
17       look at that in preparation for the deposition
18       today?
19   A   I did not.  I don't know if it's --
20           MR. MILLER:  Judge Wier didn't require it
21       produced.
22   Q   Does it appear to you that you've taken a different
23       position than what the PIP adjusters were taking
24       with respect to the ongoing wage loss?
25           MR. MILLER:  Object to the form.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1  A   Yes.
 2  Q   Did you have any discussions with the PIP adjusters
 3      about why they were paying lost wages but you were
 4      not considering them beyond the end of May of 2011?
 5  A   Not that I recall.
 6  Q   Do you remember at some point that Mr. Foster was
 7      approved for Social Security Disability benefits?
 8  A   I -- I don't recall one way or the other.
 9  Q   Did you make some attempts to gather up some sort of
10      file from the Social Security Administration about
11      Mr. Foster?
12  A   I believe so.
13  Q   Tell me what the purpose of that was.
14  A   She had emailed me and told me that he had been
15      approved for disability, so we wanted to obtain a
16      copy of the file in order to review the basis for
17      that determination along with the -- the records
18      that were used to support that.
19  Q   So tell me what -- what were you expecting to --
20      there to be in this Social Security Administration
21      file?
22  A   Usually there is a copy of the application as well
23      as medical records supporting the request for
24      disability and then some kind of document from the
25      Social Security Administration approving or denying.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Okay.  So you -- you knew, I guess, already that --
 2       from Mrs. Foster that Mr. Foster had been approved
 3       for disability, so you knew he had been approved,
 4       correct?
 5   A   That's what she told me, yes.
 6   Q   And any medical records that the Social Security
 7       Administration would have would be the same medical
 8       records that the Fosters had given you the authority
 9       to request on your own --
10           MR. MILLER:  Object to the form.
11   Q   -- is that right?
12   A   Not necessarily.
13   Q   Tell me -- well, let me ask that a different way.
14           Back in May of 2010 the Foster -- or Mr. Foster
15       gave you an authorization to gather whatever medical
16       records you wanted to gather with respect to his
17       claim, correct?
18   A   Yes.
19   Q   Were there some records that you thought that Social
20       Security Administration would have that you hadn't
21       requested?
22   A   No.  Nothing in particular.
23   Q   What I'm trying to figure out is how the contents of
24       the Social Security Administration's file would have
25       any bearing on your evaluation of his UIM claim?
```

Page 62

Examination of Anthony T. Dale

```
 1   A   The Social Security Administration usually has a
 2       doctor that reviews those and provides an opinion
 3       for them to make a decision, so we were wondering
 4       what that opinion was and what the decision was
 5       based on; and also to see if there were any
 6       pre-existing issues that it was based on, if there
 7       was any other -- any other ailments or reasons why
 8       he was put on disability aside from the injuries he
 9       received here.
10   Q   Had you reviewed any notes from Mr. Fosters's
11       orthopaedic surgeon, Dr. Burandt, about whether he
12       should be off work?
13           MR. MILLER:  Object to the form.
14   A   I don't recall.
15   Q   Was there any issue in your mind with whether or not
16       his off-work status was supported by the records
17       that you had?
18           MR. MILLER:  Object to the form.
19   A   Can you repeat the question.
20   Q   Sure.  Was there any dispute in your mind about
21       whether Mr. Foster's off-work status was supported
22       in the records that you all already had?
23   A   I -- I don't recall one way or the other.
24   Q   Aside from Mr. Foster's claim have you ever
25       requested a Social Security Administration file
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      before?
 2  A   Yes.
 3  Q   Was your request for the Social Security
 4      Administration file affecting, in any way, whether
 5      or not you were going to make an additional
 6      settlement offer?
 7          MR. MILLER:  Object to the form.
 8  A   I honestly don't recall either way because I don't
 9      recall what the total amount that -- whether we were
10      intending to offer any more than the 7500 or not.
11  Q   Do you remember what the Fosters' reaction was to
12      the offer of $7500?
13  A   I don't have the email that she sent me, but I do
14      see the note that she made a policy limit demand.
15          MR. MILLER:  Give a date if you don't mind.
16  A   On 2/14/12, it's in the middle of Page 1115, I made
17      a note that she recently -- insured recently made a
18      policy limit demand.  And I don't know how she made
19      that, whether she mailed a letter or emailed; and I
20      don't recall the contents of what was in there.
21      There was a conversation that I had with her on
22      May 22nd that starts on Page 1113.
23  Q   Did you make -- after receiving the policy limits
24      proposal from the Fosters did you make any
25      additional settlement offer to them?
```

Page 64

Examination of Anthony T. Dale

```
 1   A   I don't believe so, no.

 2   Q   Who is Kyle Joniec?

 3   A   He was my manager.

 4   Q   Did I say that correctly, the last name?

 5   A   Yeah.

 6   Q   Is -- is he still with Liberty Mutual?

 7   A   He is.

 8   Q   Where is he located?

 9   A   He's here in Indianapolis.

10   Q   Is he still in the same building as you?

11   A   Yes.

12   Q   There's a note from -- from him on February 21, 2012

13       at the top of Page 1115.  It says:  I am escalating

14       file to SBA for review and triage.

15           What does that mean?

16   A   SBA is -- I believe that that stood for senior

17       business analyst; and claims of a certain -- with

18       certain triggers, we had an analyst review those

19       with us to provide their recommendations.

20   Q   And who was that?  Who is the senior business

21       analyst?

22   A   It looks like it was David Reeves.

23   Q   Is David Reeves still with Liberty Mutual?

24   A   I think so.

25   Q   Is a senior business analyst a claim adjuster or
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

1        what is that?

2    A   It's sort of a consultant role.  They have claims

3        adjusting experience.

4    Q   And did the senior business analyst have some

5        concern about Mr. Foster's claim?

6            MR. MILLER:  Object to the form.

7    A   I -- I don't recall if he did or not.

8    Q   Who was Jay Hatfull?

9    A   He, at that time -- he was my manager after Kyle;

10       and I can't remember when he made these notes if he

11       was my manager then.  I think he was but they also,

12       because they were all in the same group, when one

13       was out, the other one filled in for the other; but

14       he was a manager as well.

15   Q   Do you remember having any discussions with

16       Mr. Hatfull about the Fosters' claim?

17   A   Not independently, no.

18   Q   Did you have an opinion one way or the other about

19       whether Mr. Foster could find another job aside from

20       his mechanic work?

21           MR. MILLER:  Object to the form.

22   A   I did discuss with her that it appears he has

23       permanent restrictions for his job as a mechanic but

24       not that he's not able to work any job.

25   Q   What page are you on?

Page 66

Examination of Anthony T. Dale

```
 1   A   I'm sorry, Page 1113, 5/22/12.
 2   Q   Okay.  What jobs were you thinking about that he --
 3       he could do?
 4   A   I didn't have anything specific.
 5   Q   Do you -- did you ever know what Mr. Foster's
 6       educational background was?
 7   A   If I did, I don't recall what it was.
 8   Q   Okay.  So let's see if we can maybe find some things
 9       that we agree on.  I guess from looking at that
10       note, there was -- there was an agreement that -- at
11       least from you to Mrs. Foster that his doctor had
12       put him on permanent restrictions from his mechanic
13       job, correct?
14   A   Correct.
15   Q   And that -- and you knew he had had a surgical
16       procedure on his knee, an arthroscopic procedure, at
17       some point in time, correct?
18   A   Yes.
19   Q   And you knew that he was not able to work as a
20       mechanic?
21   A   Correct.
22   Q   A disagreement that you had was whether or not he
23       could find a different job?
24   A   No, not that whether or not he could find a
25       different job but that the accident rendered him
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1       disabled from being able to do the physical things
 2       that were involved with this job, but that not every
 3       job out there has these kinds of physical
 4       requirements.  So he could do something that was
 5       within his restrictions.
 6    Q  So you were thinking it was possible that another
 7       job existed that would meet his restrictions?
 8    A  Correct.
 9    Q  Although you did not have anything specific in mind
10       for Mr. Foster?
11    A  Correct.
12    Q  The fact that he was on disability with the Social
13       Security Administration, did you know whether or not
14       that would allow him to seek employment elsewhere?
15    A  No, I didn't know that one way or the other.
16    Q  Do -- do you know now?
17    A  No, I don't know.
18    Q  What about at least at this point in time, this May
19       22, 2012 note, I don't see anything in there about
20       his knee replacement.
21            Were you having some disagreement over whether
22       he would need a knee replacement sometime in the
23       future?
24    A  I don't recall one way or the other.
25    Q  Aside from sending Mr. Foster to see a physician,
```

Page 68

Examination of Anthony T. Dale

```
 1       did you have any doctor review any of his medical
 2       records?
 3   A   I don't -- I don't recall.
 4   Q   Aside from the things that we're talking about now,
 5       is there anything that you recall that was an issue
 6       in your mind of why the claim wasn't resolving?
 7           MR. MILLER:  Object to the form.
 8   A   No.  I -- I honestly don't independently recall very
 9       much about this given the amount of time that's
10       passed.
11   Q   Okay.  I'm going to hand you what we'll mark as the
12       next exhibit, 5.
13           MR. MILLER:  Let me know when you get to a
14       stopping point.  I've been sucking this water down.
15           MR. FAIRBANKS:  Well, let's -- let's take a
16       break before we get into this.  I'm kind of
17       switching gears anyway.
18           THE WITNESS:  Okay.
19           MR. FAIRBANKS:  Let's go off record.
20           (Whereupon a recess was taken from 11:41 to
21            11:55 a.m. and Deposition Exhibit 5 was marked
22            for identification.)
23           MR. FAIRBANKS:  We're back on the video record.
24   Q   Mr. Dale, I just handed you what we marked as
25       Exhibit 5.  I'm going to hand you what we'll mark as
```

Examination of Anthony T. Dale

```
 1        Exhibit 6 and maybe we'll look at those together.
 2             (Whereupon Deposition Exhibit 6 was marked for
 3               identification.)
 4   Q    Let's start with 6.  Can you tell me what that
 5        exhibit is.
 6   A    It looks like they're emails to Betty Foster as well
 7        as a Social Security Administration consent for
 8        release of information.
 9   Q    What's the date that you sent that to Mrs. Foster?
10   A    August 8, 2012.
11   Q    In looking at your notes, you all had had a
12        conversation I think back in May of 2012 about the
13        fact that Ernest had received his disability?
14   A    Yes.  It looks like she notified me of that via
15        email.
16   Q    And then a few months later you send the request for
17        an authorization on the Social Security file itself;
18        is that right?
19   A    Correct.
20   Q    August 8, 2012 the email, again, you're talking
21        about scheduling an independent medical exam.  It
22        says you use an outside vendor to coordinate that.
23             Who was your outside vendor?
24   A    There are several.  We have like a -- we submit a
25        referral online through an internal system and then
```

Page 70

Examination of Anthony T. Dale

```
 1        they're -- like our support staff then uploads all
 2        the information into this program that we have and
 3        there are several venders there.  And then depending
 4        on if we have a specific doctor to request, they
 5        then somehow match it with a vendor that has that
 6        doctor already existing on their list.
 7   Q    So you all have a system already in place to contact
 8        a vendor, find a doctor, get that set up?
 9   A    Yes.
10   Q    Why did you think that whoever that doctor was would
11        need to review this Social Security Administration
12        file?
13   A    Just so he has all the information available.
14   Q    The -- the medical records that you would want that
15        doctor to review, was that something that you all
16        already had in the file?
17        MR. MILLER:  Object to the form.
18   A    Yes.  What we -- the medical records that we had we
19        would have sent to the doctor.
20   Q    So what out of that Social Security Administration
21        file, aside from the medical records, did you think
22        that the -- the medical examiner would need?
23        MR. MILLER:  Object to the form; asked and
24        answered.
25   A    I believe he would need the basis of their decision
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      so that then he could use that in order to form his
 2      own opinion as well about the cause for the
 3      disability.
 4           Let me rephrase that.  Whether the accident
 5      caused the disability or hot.
 6   Q  Did you ever, during your handling of the claim,
 7      think that something else had caused his disability?
 8           MR. MILLER:  Object to the form.
 9   A  There was an MRI that he had that apparently,
10      according to my notes, references he has
11      pre-existing conditions of arthritis.  And so in
12      getting the disability file, we wanted to see if the
13      disability was because of his pre-existing arthritis
14      or because of the accident.
15           MR. FAIRBANKS:  Let's go off the video.
16           (Whereupon a brief recess was taken from 12:00
17             to 12:01 p.m.)
18           MR. FAIRBANKS:  We're back on video record.
19   Q  Mr. Dale, you were just talking about some arthritis
20      that Mr. Foster may have had.
21           Would you agree with me that to the extent he
22      did have arthritis, it wasn't -- the arthritis
23      wasn't preventing him from working before this
24      particular motor vehicle accident, right?
25           MR. MILLER:  Object to the form of the
```

Page  72

Examination of Anthony T. Dale

```
 1       question.
 2   A   I don't know that for sure.
 3   Q   Okay.  So you don't know whether he was working
 4       full-time or not leading up to the accident?
 5   A   No.
 6   Q   Let's say that Mr. Foster had high blood pressure
 7       that also wasn't keeping him from working before the
 8       accident.  What if the Social Security
 9       Administration said that 50 percent of his
10       disability is related to his knee and 50 percent is
11       related to high blood pressure, how would that
12       affect --
13           MR. MILLER:  Object --
14   Q   -- your analysis?
15           MR. MILLER:  Object to the form of the
16       question.
17   A   It depends on whether they said the portion of the
18       knee was related to his arthritis or to his injuries
19       from the accident.
20   Q   Do you think that the Social Security Administration
21       would make a differentiation between those two?
22   A   I don't know.
23           MR. MILLER:  Object to the form.
24   Q   Do you remember what Dr. Burandt's opinion was, the
25       treating orthopedic surgeon, about whether the
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      accident caused his knee to be off work?
 2   A  I don't recall.
 3   Q  I see in your email to Mrs. Foster you were wanting
 4      her to send the Social Security authorization back
 5      to, I guess, a P.O. Box in Los Angeles.
 6          Why would it go there?
 7   A  That's our mailing address nationwide for claims.
 8   Q  Okay.  So any time somebody wants to mail something
 9      in, they've got to send it out to California, or
10      they did I guess at that time?
11   A  Correct.  They still do.
12   Q  Okay.  Well, let's look -- move over and look at
13      Exhibit 5.  This is an October 10, 2012 letter.
14          Tell me what this letter is.
15   A  This is a letter to Mr. Foster requesting that he
16      complete the enclosed forms, which are a medical
17      authorization, a medical provider list, the Social
18      Security consent form, and return those; and
19      actually stating that we had requested these on two
20      previous occasions and we haven't received a
21      response or received a copy of the completed forms.
22          And then it outlines the duties in the -- that
23      are listed in the policy; and then that once we
24      receive those forms, we would request the records
25      and then contact him to coordinate scheduling of the
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1        independent medical exam.
 2            And then further, because we haven't had a
 3        response, we're reserving our rights to deny the
 4        claim based on the duty to cooperate and the duty to
 5        submit to physical exam as we reasonably require and
 6        so that we -- we were reserving our right to deny
 7        coverage.  And that if they fail to cooperate as
 8        outlined above or we find any other reasons for
 9        which to deny coverage, we reserve the right to
10        decline any duty to indemnify or to pay the claim.
11   Q    Would you call this the reservation of rights
12        letter?
13   A    Yes, that's what it's called.
14   Q    And basically you're telling Mr. Foster that you
15        might not pay him anything if he doesn't provide you
16        with forms --
17            MR. MILLER:  Object to the form.
18   Q    -- correct?
19   A    We're saying we have the right to do that.
20   Q    The medical authorization and the medical provider
21        list, he had actually given you that back in May of
22        2010, correct?
23            MR. MILLER:  Object to the form.
24   A    He had given us one previously, yes.
25   Q    Mr. Foster had also agreed to go see whatever
```

Examination of Anthony T. Dale

```
 1       medical doctor you wanted to send him to, correct?
 2   A   Yes.  She informed Jay Hatfull on August 8, 2012
 3       that they would agree to that, yes.
 4   Q   So am I right that this reservation of rights letter
 5       boils down to you not having the Social Security
 6       release back?
 7           MR. MILLER:  Object to the form.
 8   A   Yes, that's correct.
 9   Q   Do you know whether the Fosters ever sent that in?
10   A   I don't know.
11   Q   And I guess around this time is around the time that
12       you got off the file?
13   A   Right.  It was a couple of months later.
14   Q   Let's see if we can pinpoint that date looking at
15       your claim notes.
16           I'm looking on Page 1111, October 23rd, 2012
17       note by Jay Hatfull.  Are you with me?
18   A   Yes.
19   Q   It says:  File reassigned to Mark Konerman?
20   A   Correct.
21   Q   To handle the UIM claim?
22   A   Correct.
23   Q   So at that point you're off the file?
24   A   Right.
25   Q   So you don't know -- or do you know whether the
```

Page 76

Examination of Anthony T. Dale

```
 1        Social Security authorization was ever provided back
 2        to Liberty Mutual?
 3   A    I don't know.
 4   Q    Do you know whether Liberty Mutual ever requested
 5        any Social Security records?
 6   A    I don't know.
 7   Q    Do you know whether Liberty Mutual ever provided any
 8        Social Security records to the doctor that they
 9        ultimately sent Mr. Foster to?
10   A    I don't know.
11   Q    Where was Mark Konerman located?  Is he over in
12        Fairfield, Ohio?
13   A    Yes.
14   Q    Did you ever talk with Mark about the claim?
15   A    Not that I recall.
16   Q    Aside from the issue with the authorizations, can
17        you think of anything that the Fosters did that was
18        uncooperative with you?
19            MR. MILLER:  Object to the form.
20   A    No.
21   Q    Mr. Foster was self-employed as we've discussed
22        before.  Do you understand that?
23   A    Yes.
24   Q    How do you go about calculating, as -- as a claims
25        adjuster, wage loss, damages, for a self-employed
```

Page 77

Examination of Anthony T. Dale

```
 1       person?
 2   A   It's different for each person but normally we
 3       request documentation from them to support what they
 4       were making before the accident happened and then
 5       what, if anything, they made after the accident and
 6       then compare the two to see if we can find any
 7       differences while looking at the dates we know that
 8       they were unable to work because of the accident.
 9   Q   I guess that's a little bit different from someone
10       who's a W-2 employee who's getting a paycheck every
11       two weeks.  You can look at that pretty easily?
12   A   Correct.
13   Q   What types of documents do you normally request from
14       self-employed persons?
15   A   Usually copies of tax returns and any -- any
16       additional forms that explain income, profits, loss
17       during those times that they submit it with their
18       tax returns; also any -- any documentation they have
19       of work that was requested that they had to decline
20       doing for customers; and any other documentation
21       they feel would be relevant to support what they
22       didn't make or what they lost.
23   Q   Did you feel like you had enough information about
24       Mr. Foster to do some calculations for his wage
25       loss?
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1              MR. MILLER:  Object to the form.
 2    A   I don't independently recall, but given that I
 3        didn't request anything additional, it appeared I
 4        had enough to make some kind of decision.
 5    Q   Mr. Dale, in your position do you handle any claims
 6        that are involved in litigation or do you just
 7        handle prelitigation claims?
 8    A   Both.
 9    Q   Both?
10    A   Yes.
11    Q   How does that work at Liberty Mutual?  I know some
12        companies have prelitigation adjusters and then
13        adjusters that just handle claims during litigation.
14              Do you all make a distinction between those two
15        in any way?
16    A   Sort of.  We have, at least in my department -- and
17        I believe this is pretty consistent across the
18        country, but we have your first level adjuster, for
19        just an easy way to describe it, that handles
20        nonlitigation claims; and then as you progress up
21        from there in experience and -- and promotions,
22        usually it's the next level up that you'll start
23        handling some litigation, some fairly noncomplex
24        litigation; and then it goes up from there.
25    Q   From the files that I've seen, once Mr. Foster filed
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      a lawsuit in this case, the file was assigned to
 2      Laura Harp.
 3          Does -- do you know whether she handles both
 4      pre- and post litigation or does she just do
 5      litigated files, if you know?
 6   A  I believe she does both.  Most everyone does both.
 7      We don't have any litigation-only handlers as far as
 8      I know.
 9   Q  Can you think of anything that you would have done
10      differently in the handling of this Foster claim?
11          MR. MILLER:  Object to the form.
12   A  No.
13   Q  Have -- has -- have you been -- have you had any
14      discussion with any of your supervisors about how
15      this claim was handled?
16   A  No.
17   Q  As far as you're concerned, is Liberty Mutual fine
18      with the way that you handled the claim?
19          MR. FAIRBANKS:  Object to the form.
20   Q  As far as I know.  I haven't been told otherwise.
21   A  Okay.
22   Q  Same question with regard to your supervisors.  Any
23      of your supervisors had any criticisms of the way
24      that you handled the claim?
25   A  No.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Let me ask just a few general questions.  Are you
 2       from the Indianapolis area originally?
 3   A   Yes.
 4   Q   No family in Lexington, Kentucky area?
 5   A   No.
 6   Q   Any friends that you have down in that area?
 7   A   I do have a few friends.
 8   Q   Okay.  And what I'm doing now is just kind of asking
 9       generally if there's a list of jurors that pop up,
10       is there somebody that I need it say, well, that guy
11       knows Tony Dale?
12   A   The only person I know well enough is an attorney
13       that we worked with down there named Jeff Taylor.
14   Q   Okay.
15   A   Other than that, it's more just acquaintances.
16           MR. MILLER:  Phil would like Jeff on the jury,
17       wouldn't you?
18           MR. FAIRBANKS:  Doubt it.  Although I do like
19       Jeff.
20           MR. MILLER:  Yeah, he's a good guy.
21           THE WITNESS:  Yeah.
22           MR. FAIRBANKS:  Let's take a break for just a
23       second here.
24           THE WITNESS:  Sure.
25           (Whereupon a recess was taken from 12:16 p.m.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1            to 12:18 p.m.)
 2            MR. FAIRBANKS:  We're back on the video record.
 3       Mr. Dale, I don't have any more questions for you.
 4            THE WITNESS:  Thank you.
 5   CROSS-EXAMINATION,
 6   QUESTIONS BY DONALD L. MILLER, II:
 7   Q   Do you know Mr. Foster's physical condition today,
 8       in particular whether he's ever had a single
 9       injection in his knee much less a knee replacement?
10       Do you know anything about that?
11            MR. FAIRBANKS:  Object to form.
12   A   Not independently, no.
13   Q   Let me show you what has been introduced as
14       Exhibit 2 to your deposition.
15            MR. MILLER:  Mr. Fairbanks, and --
16   Q   You can use this one (indicating).
17   A   Okay.
18   Q   It's the authorization that Mr. Foster signed on May
19       25, 2010, Bates label 92.  Could you read the
20       sentence there under Expiration and Revocation.
21   A   "I may revoke this authorization at any time except
22       to the extent that action has been taken in reliance
23       upon it.  Requests for revocation must be in
24       writing.  To revoke the authorization I must contact
25       Anthony Dale, Claim Representative, Ohio Casualty
```

Page 82

Examination of Anthony T. Dale

```
 1         Insurance Company, PO Box 7046, Indianapolis, IN
 2         46207-7046, 317-428-2861.  If I do not revoke it,
 3         this authorization will expire one year after the
 4         date on which the authorization is signed."
 5    Q    So by the time you wrote your -- an email in August
 6         of 2012 and sent the reservation of rights letter in
 7         October of 2012, the authorization you had had
 8         expired, correct?
 9    A    Correct.
10    Q    Let's look at Exhibit 4 --
11    A    Okay.
12    Q    -- which is your May 23 email.  And to the extent
13         you need to look at Exhibit 1, the claim notes, as
14         well to refresh your recollection, that's fine.
15    A    Okay.
16    Q    Now, you made this offer.  Why -- why did you -- why
17         did you write it out in so much detail?
18    A    I wanted Mr. and Mrs. Foster to be able to
19         understand what we were offering and how we
20         calculated it; and because the PIP was involved and
21         there are offsets with the PIP for certain things,
22         it's very complicated to explain to someone over the
23         phone.
24              The way I always look at it is when I talk to
25         people, I want to talk to them like I'm talking to
```

Examination of Anthony T. Dale

```
 1        my grandma, and so I want to make sure it's as clear
 2        as possible so they understand it.
 3             So given all the calculations that had to go
 4        into what was being considered, a written
 5        explanation via email I felt would help explain it
 6        better so they could see everything rather than me
 7        having to explain it over the phone and them
 8        carrying the burden of having to write all that
 9        down.
10   Q    Now, did you get a response to this email looking --
11        referring you to Exhibit 1, Bates label 1122, your
12        note of 6/30/2011?
13   A    I don't believe I did as of that date, no.
14   Q    Okay.  And what did you do?  Did you follow up?
15   A    I sent a follow-up email that day.
16   Q    And then on August 31, 2011, Bates label 1121, you
17        actually got a call from one of the salespeople who
18        was visiting the agency at which Ms. Foster worked
19        and Ms. Foster had said something about this claim
20        to that visitor.  And they called you and said, hey,
21        what's up, didn't they?
22   A    Yes.
23   Q    Did you call Ms. Foster again and explain again what
24        the offer was?
25   A    I believe I did.
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1   Q   Okay.  Well, you say in this note you're going to,
 2       right?
 3   A   Yeah.
 4   Q   Okay.
 5   A   Yes.
 6   Q   Did you ever get any kind of demand from the Fosters
 7       through Mrs. Foster other than a policy limits
 8       demand?
 9   A   I don't believe so.
10   Q   Now looking at Exhibit 4 again, your May 23, 2011
11       email, the second paragraph for the outstanding wage
12       loss portion, you -- when you're doing your
13       calculations in the bullet point there in 2009,
14       you're using the tax returns or profit and loss
15       statements that had been provided to you at that
16       time, correct?
17   A   I believe so, yes.
18   Q   You didn't know at that time that those were
19       reporting only gross income and not net income, did
20       you?
21   A   No.
22   Q   And then later in May 22, 2012 referring to
23       Exhibit 1, Bates label 1113, at that point you said,
24       look, I need unaltered profit and loss statements,
25       the Schedule C on your tax returns I think is what
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

1     you meant there and -- is that correct?

2         MR. FAIRBANKS:  Objection to form.

3  A  Let me double-check.  Yes, that's correct.

4  Q  Now, Mr. Fairbanks asked you if there was any

5     consideration to lost wage pain and suffering split

6     out or anything.

7         At the time you wrote Exhibit 4 on May 23, 2011

8     looking down to the bottom of Page 1 under where it

9     says, "Our offer is broken down as follows," he

10    still had almost $17,000 in no fault coverage to

11    take care of his wage loss, correct?

12        MR. FAIRBANKS:  Objection to form.

13  A  Correct.

14  Q  There was a reference in one of your emails.  I can

15    find it if I need to.  I just want to flesh this out

16    just in case we have to use the video instead of you

17    coming live to trial.  There was a reference in one

18    of your claims notes about the Fosters not being

19    attorney repped.

20        Why in the world would you put something like

21    that in there?

22  A  That's what I was trained to do.  For me, it helps

23    me recognize that because they are not attorney

24    repped, that I need to make sure and explain things

25    more clearly to them because it's not a process

Page 86

Examination of Anthony T. Dale

```
 1        they're familiar with.  So I note that so that I'm
 2        aware that I'm talking with some individual --
 3        someone individually about their own injuries and
 4        I'm not talking to a representative for them.
 5    Q   Okay.  I can again find this claim note if I need
 6        to, but do you recall also on the second day after
 7        you received the file, you talked to Ms. Foster and
 8        it was -- it was clear to you from your note she
 9        understood the coverages in the policy, correct?
10    A   Yes.
11    Q   Did -- one of the no-fault adjusters, the person who
12        was handling the no fault or PIP claim, was the one
13        that notified you that there was -- or notified
14        Liberty Mutual that there was an underinsured
15        motorist claim coming down the pike because
16        Ms. Foster told them that, right?
17    A   Correct.
18    Q   You've said "I don't recall" to several things, and
19        that's a perfectly legitimate answer, but let's put
20        it in context.
21            You're in this file in 2011, 2012 and we're
22        sitting here in the summer of 2016, correct?
23    A   Yes.
24    Q   Is there any way you can estimate to us how many
25        claims you've handled since then?  Would it be
```

Examination of Anthony T. Dale

```
 1       hundreds if not thousands?
 2   A   I would say hundreds, yes.
 3   Q   You were asked whether you ever saw any notes from
 4       Dr. Burandt and you answered no, that you recall.
 5       Let me show you one since you were asked.
 6   A   Okay.
 7           MR. MILLER:  What's the next number there?
 8           THE WITNESS:  7.
 9           (Whereupon Deposition Exhibit 7 was marked for
10            identification.)
11           MR. MILLER:  7.
12   Q   I'll hand you what's been marked Exhibit 7 to your
13       deposition.  It's a -- it's an office note entry
14       from Dr. Burandt with some attached radiology
15       reports.  Go to the third page of this exhibit.
16   A   Okay.
17   Q   The Lexington Clinic progress note dated October 14,
18       2014.
19   A   Okay.
20   Q   Go down to the plan.
21   A   Uh-huh.
22   Q   However, at the time of his scope we found that he
23       had full-thickness cartilage loss along the medial
24       femoral condyle and that it makes it very probable
25       that he will need a joint placement sometime in his
```

Page 88

Examination of Anthony T. Dale

```
 1        life, although not now.  He certainly does not feel
 2        like he needs a cortisone injection at the moment.
 3        We will see him back in the future as he feels
 4        necessary.
 5            Did I read had a correctly?
 6    A   Yes.
 7            MR. MILLER:  Objection.  Objection to form;
 8        foundation.
 9    Q   Now, you have no way of knowing one way -- one way
10        or the other whether October 14, 2014 is the first
11        time there is a note signed by a doctor mentioning
12        the probability, from whatever cause, of a knee
13        replacement?
14    A   Right.  I don't know.
15            MR. FAIRBANKS:  Objection to form; foundation.
16    Q   Do you ever recall looking at the July 12, 2008 MRI
17        report yourself as you sit here today?
18    A   Not independently, no.
19    Q   Okay.  It's not something we looked at yesterday, so
20        I'll -- it says what it says.
21            Now, a lot of time was spent by Mr. Fairbanks
22        talking to you about your initial reserve when --
23        you know, within a week of you opening the file or
24        getting the file sent to you.
25            The information I think I heard you say that
```

Examination of Anthony T. Dale

```
 1        you primarily had back at that time was what
 2        Ms. Foster was telling you?
 3   A    Correct.
 4   Q    Though you believed her?
 5   A    Yes.
 6   Q    And at some point later you adjusted the reserves
 7        down?
 8   A    Correct.
 9   Q    Is it common to adjust reserves up and down based
10        upon what new information does or does not come in?
11   A    Yes.
12   Q    So in this example if you're assuming knee
13        replacement is coming and then the claim goes on and
14        you've got no information that a knee replacement is
15        more likely than not and caused by this accident,
16        the reserve goes down, right?
17            MR. FAIRBANKS:  Objection to form.
18   A    Correct.
19   Q    Back to Exhibit 1 looking at Page 1113 on the bottom
20        which is your 6/11/2012 note which is close to your
21        last note, within a couple three months --
22   A    Uh-huh.
23   Q    -- of your last note, what is -- what is your work
24        plan there?
25   A    Are you talking about the very top?
```

Examination of Anthony T. Dale

```
 1   Q   Yes.

 2   A   "Continue working towards settlement with insured."

 3          MR. MILLER:  Thank you, Mr. Dale.

 4          THE WITNESS:  Thank you.

 5          MR. FAIRBANKS:  I'm going to have just a few

 6       follow-ups, Mr. Dale.

 7   REDIRECT EXAMINATION,

 8   QUESTIONS BY MR. FAIRBANKS:

 9   Q   The note you just looked at, "Continue working

10       towards settlement with insured," you did not make

11       any additional settlement offers to the Fosters at

12       that time in June 2012 or any time after that,

13       correct?

14   A   Correct.

15   Q   The medical authorization that you were shown with

16       an expiration date on it, do you remember seeing

17       that?

18   A   Yes.

19   Q   I'm going to hand you what we'll mark --

20          MR. MILLER:  It's Exhibit 2.

21   Q   -- we'll mark as the next exhibit, which I believe

22       is 8.

23   A   8.

24          MR. MILLER:  Thank you.

25   Q   August 8, 2012 email from you to Mrs. Foster, do you
```

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

```
 1      see that?

 2  A   Yes.

 3  Q   What are you telling her the reason is that you're

 4      requesting another medical authorization from her?

 5  A   Because the authorization we have had on file

 6      expired.

 7  Q   Correct.  And what are you telling her you're going

 8      to request with the new one?

 9  A   X-rays and MRI films.

10  Q   Why hadn't you requested those yet?

11  A   They're usually not something that we get as

12      ordinary retrieval of medical records.  We only

13      usually request them when we're going to have a

14      doctor review those films or x-rays.

15  Q   Okay.  So you just had not yet requested any x-ray

16      or MRI films using the authorization that the

17      Fosters had already given you?

18  A   Correct.

19  Q   Did you, upon receipt of a new authorization from

20      the Fosters, request the x-ray and MRI films?

21          MR. MILLER:  Object to the form.

22  A   I don't believe an authoriz -- a new authorization

23      was returned before the file was reassigned to

24      someone else.

25  Q   Do you know whether anybody at Liberty Mutual ever
```

Page 92

Examination of Anthony T. Dale

```
 1      requested MRI films or x-ray films?
 2   A  I don't.
 3   Q  You were asked about records relative to the need
 4      for a knee replacement.  Do you remember that?
 5   A  Yes.
 6   Q  Do you know from reviewing it or from talking with
 7      Ms. Harp what Liberty Mutual -- Liberty Mutual's
 8      hired medical examiner said about Mr. Fosters' need
 9      for a knee replacement?
10         MR. MILLER:  At which point?
11         MR. FAIRBANKS:  At any point.
12   A  The only thing I know is that his opinion in his
13      deposition changed then from what his opinion was in
14      his report.
15   Q  Do you know why -- if it did really change, do you
16      know why that happened?
17   A  I don't.
18         MR. FAIRBANKS:  Okay.  Mr. Dale, I don't have
19      any more questions for you.  Thank you.
20         THE WITNESS:  Thank you.
21         MR. MILLER:  I'm done.
22         MR. FAIRBANKS:  Let's go off the video.
23         (Whereupon Deposition Exhibits 1, 3, 4 and 8
24          were marked for identification.)
25
```

Examination of Anthony T. Dale

```
 1              AND FURTHER DEPONENT SAITH NOT

 2                                          (12:37 p.m.)

 3

 4                      (Signature Waived)
        _____
 5               ANTHONY T. DALE

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 94

Examination of Anthony T. Dale

```
STATE OF INDIANA          )
                          )  SS:
COUNTY OF JOHNSON         )
```

I, Joyce Emerson, a Notary Public in and for the County of Johnson, State of Indiana at large, do hereby certify that ANTHONY T. DALE, the deponent herein, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiff at Greenwood Office Suites, 3209 West Smith Valley Road, Conference Room 2, Greenwood, Johnson County, Indiana, on the 29th day of July 2016, commencing at the hour of 9:50 a.m., pursuant to the Indiana Rules of Trial Procedure;

That said deposition was taken down in stenographic notes and afterwards reduced to typewriting under my direction, and that the typewritten transcript is a true record of the testimony given by said deponent; and thereafter presented to said deponent for his signature; and that the signature of said deponent to his deposition was waived by the deponent and all parties present, the deposition to be read with the same force and effect as if signed by him.

That the parties were represented by their aforementioned counsel.

Emerson Reporting, Inc.
emersonreporting@aol.com

Examination of Anthony T. Dale

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney of either party, or otherwise interested in the event of this action, and am not in the employ of the attorneys for either party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this _____ day of _____, 2016.

_____
                    Joyce Emerson
            Notary Public, Stenographic Reporter

My County of Residence is:  Johnson

My Commission Expires:  February 20, 2023

Emerson Reporting, Inc.
emersonreporting@aol.com