

KENTUCKIANA
COURT REPORTERS

**CIVIL ACTION NO. 15:13-CV-426-GFVT**

**ERNEST FOSTER,**
**PLAINTIFFS**

**V.**

**AMERICAN FIRE AND CASUALTY COMPANY,**
**DEFENDANTS**

**DEPONENT:**
**LAURA HARP-BIVEN**

**DATE:**
**August 8, 2016**

Exhibit 21

Page 1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF KENTUCKY

3          CENTRAL DIVISION AT LEXINGTON

4       CIVIL ACTION NO 15:13-CV-426-GFVT

5

6              ERNEST FOSTER,

7               PLAINTIFF

8

9                  V.

10

11    AMERICAN FIRE AND CASUALTY COMPANY,

12              DEFENDANT

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:   LAURA HARP-BIVEN

24   DATE:       AUGUST 8, 2016

25   REPORTER:   BRITTANY KENDALL

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LAURA HARRISON, taken on August 8, 2016

Page 2

```
 1                         APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, ERNEST FOSTER:

 4   PHILLIP G. FAIRBANKS

 5   MEHR, FAIRBANKSS, & PETERSON

 6   201 WEST SHORT STREET, SUITE 800

 7   LEXINGTON, KENTUCKY 40507

 8   TELEPHONE NO.: (859) 225-3731

 9   FACSIMILE NO.: (859) 225-3830

10   E-MAIL: PGF@AUSTINMEHR.COM

11

12   ON BEHALF OF DEFENDANT, AMERICAN FIRE AND CASUALTY:

13   HEATHER M. MCCOLLUM

14   QUINTAIROS, PRIETO, WOOD & BOYER, PA

15   2452 SIR BARTON WAY, SUITE 300

16   LEXINGTON, KENTUCKY 40509

17   TELEPHONE NO.: (859) 226-0057

18   FACSIMILE NO.: (859) 226-0059

19   E-MAIL: HMCCOLLUM@QPWBLAW.COM

20

21

22

23

24

25
```

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LAURA HART BRAZEN, taken on August 8, 2016

Page 3

1                               INDEX

2                                                  Page

3      PROCEEDINGS                                  5

4      DIRECT EXAMINATION BY MR. FAIRBANKS          5

5      CROSS EXAMINATION BY MS. MCCOLLUM            99

6      REDIRECT EXAMINATION BY MR. FAIRBANKS        105

7

8

9                             EXHIBITS

10                                                 Page

11     1     EVALUATION SHEETS                      18

12     2     OBJECTIVE AND PERFORMANCE EVALUATIONS  24

13     3     2012 EVALUATIONS                       30

14     4     2013 EVALUATIONS                       40

15     5     FOSTER CLAIM 1057-1153                 77

16     6     CLAIM NOTE                             78

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 4

STIPULATION

The deposition of LAURA HARP-BIVEN, TAKEN AT 9300
SHELBYVILLE ROAD, SUITE 400, LOUISVILLE, KENTUCKY on
MONDAY, the 8TH day of AUGUST, 2016 at approximately
10:00 a.m.; said deposition was taken pursuant to the
FEDERAL RULES OF CIVIL PROCEDURE.

It is agreed that BRITTANY KENDALL, being a Notary
Public and Court Reporter for the State of KENTUCKY, may
swear the witness.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 5

1                    PROCEEDINGS

2

3           MR. FAIRBANKS:  We are on the video record in

4      the case of Ernest Foster versus American Fire and

5      Casualty Company.  United States District Court,

6      Eastern District of Kentucky, Central Division at

7      Lexington, Civil Action number 13-CV-426.  This is

8      the deposition of Laura Harp-Biven.  It's August 8,

9      2016, approximately 10:00 a.m.  We are at the

10     offices of Quintairos, Prieto, Wood, & Boyer in

11     Louisville, Kentucky.  My name is Phil Fairbankss.

12     I'm operating the video and appearing for Mr.

13     Foster.  Heather, do you want to introduce

14     yourself?

15          MS. MCCOLLUM:  Heather McCollum on behalf of

16     the defendant, American Fire.

17          MR. FAIRBANKS:  Could you swear the witness

18     in, please?

19          COURT REPORTER:  Would you please raise your

20     right hand?  Do you solemnly swear or affirm that

21     the testimony you are about to give will be the

22     truth, the whole truth, and nothing but the truth?

23          THE WITNESS:  I do.

24               DIRECT EXAMINATION

25   BY MR. FAIRBANKS:



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1      Q      Ma'am, will you state your name for the

2   record, please.

3      A      Sure.  It's Laura Harp-Biven.

4      Q      Ms. Harp-Biven, who are you currently employed

5   by?

6      A      Liberty Mutual Insurance.

7      Q      How long have you been employed with Liberty

8   Mutual?

9      A      Approximately -- let's see.  15 years.

10     Q      What's your job position?

11     A      I'm a Senior Claims Resolution Specialist II.

12     Q      Is that what a juror might understand to be a

13  claims adjustor?

14     A      Yes.

15     Q      Can you describe, just in general terms, what

16  you do in that job position?

17     A      Sure.  I evaluate and negotiate claims

18  thoroughly and efficiently.

19     Q      So in that position, you're responsible for

20  settling claims that rise under insurance policies?

21     A      Yes.

22     Q      What is your business address?

23     A      Post office box 515097, Fairfield, Ohio, and

24  I'm not sure what the ZIP code is.

25     Q      Do you reside here in the Jefferson County

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 7

1    area?

2         A    I do.

3         Q    And I'm going to ask you for your home

4    address.  I'm not trying to pry.  I'm just doing that

5    for purposes of where we would need to serve you with a

6    trial subpoena if that --

7         A    Sure.

8         Q    -- would be...

9              MS. MCCOLLUM:  And that needs to be redacted

10        from the record, please.

11        A    (REDACTED.)

12        Q    Thank you.

13        A    Uh-huh.

14        Q    What do you remember about the UIM claim for

15   Ernest Foster?

16        A    Not a whole lot.  I do remember that Mr.

17   Foster had some treating physicians and diagnostic

18   reports that showed degenerative changes, and Dr.

19   Jenkinson was an IME doctor that we had that agreed with

20   that until his deposition.

21        Q    Okay.  So you think that Mr. Foster had some

22   degenerative changes?

23        A    Yes.

24        Q    Whereabouts?

25        A    In his right knee.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 8

1    Q    What was the condition of his right knee that

2  was degenerative?

3    A    It was osteoarthritis, spurring, fraying.

4    Q    Do you recall that Mr. Foster was injured in a

5  motor vehicle accident in June of 2008?

6    A    I remember his complaints at the ER was --

7  bruised his kneecap, and I believe it bruised his arm --

8  his left arm maybe?

9    Q    And that was in June of '08?

10   A    Yes.

11   Q    What injuries do you think Mr. Foster

12  sustained in that June 2008 motor vehicle accident?

13   A    Well, the injuries that were listed in the

14  emergency room, like I said, were bruising to the right

15  kneecap and the right arm.  And that's what Dr.

16  Jenkinson's report said.

17   Q    So you think he had a bruised knee and a

18  bruised right arm?

19   A    Yes.

20   Q    What documents have you reviewed to prepare

21  for your deposition today?

22   A    Dr. Jenkinson's report and just the claim file

23  notes.

24   Q    I'm going to just kind of briefly flip

25  through.  These claim file notes that you're talking



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    about that you would've reviewed?

2        A    I only reviewed mine, so I don't know --

3        Q    Okay.

4        A    -- if that's all of them or not, and that

5    looks like a lot, so I don't know.

6        Q    Yes, and that's what I'm trying to figure out.

7    Have you reviewed only the claim file notes that pertain

8    to the time period during which you were handling Mr.

9    Foster's claim?

10       A    Yes.

11       Q    Okay.  Approximately when did you begin being

12   the primary adjustor on Mr. Foster's claim?

13       A    I'd have to look in the file, but I think it

14   was May of 2014.  May or June, something like that.

15       Q    And how did it be that you came in to be

16   involved in Mr. Foster's claim?

17       A    It was just reassigned to me.  I don't...

18       Q    Do you know who reassigned it to you?

19       A    I have no recollection of who that would've

20   been, no.

21       Q    Do you know who was handling the claim before

22   you?

23       A    I -- I'm not sure.  I think Tony Dale had it

24   at one point.  I don't know if there was somebody in the

25   meantime or not, but I know he had it at one point.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Have you had any discussions with Tony Dale
 2    recently about the Foster claim?
 3        A     Not about the claim.  I contacted him for some
 4    dates so that he could be deposed.
 5        Q     And you and Tony didn't talk about anything
 6    related to the UIM claim itself?
 7        A     No, just dates and times of the deposition.
 8        Q     You guys didn't discuss anything about Dr.
 9    Jenkinson?
10        A     Not that I remember, no.  Other than maybe
11    just that -- I think he -- oh, I know.  I take that
12    back.  I think he asked me what happened, and I told him
13    Dr. Jenkinson did not testify consistent with his
14    report.  I do take that back.
15        Q     Have you read Dr. Jenkinson's deposition?
16        A     No.
17        Q     I didn't see it in the claim file anywhere. Do
18    you think you would've ever received a copy of it?
19        A     I don't know.  I don't think so.  I received a
20    phone call from my defense attorney after the -- after
21    the deposition.
22        Q     Okay.  So everything that you know about Dr.
23    Jenkinson's deposition would've come from the defense
24    lawyer that was hired to represent American Fire?
25        A     Yes.
```

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 11

1      Q      And who was that lawyer?

2      A      I believe it was Dave Richardson.

3      Q      Do you have any other cases right now where

4  you're working with Mr. Richardson?

5      A      I'm sure I do.

6      Q      Is Mr. Richardson's firm a firm that still

7  gets business from American Fire?

8      A      Yes.

9      Q      And let me just back up.  When I say "American

10  Fire," I don't mean to differentiate it from Liberty

11  Mutual or Safeco, but I wanted to ask you, maybe, if you

12  can explain the relationship between American Fire and

13  Liberty Mutual?

14          MS. MCCOLLUM:  If you know.

15      A      I think it's just a subsidiary company.  I

16  think Liberty Mutual is kind of an umbrella, and there

17  are subsidiary companies underneath is the way I

18  understood it.

19      Q      And you, in fact, are employed by Liberty

20  Mutual; is that fair?

21      A      My paycheck says, "Liberty Mutual," yes.

22      Q      I asked you about Dr. Jenkinson's deposition.

23  Any other depositions that you would've actually

24  reviewed from the UIM case?

25      A      There wouldn't have been any deposition

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 12

1    transcripts given to me, no.

2        **Q      Why not?**

3        A      Because usually, I would get a summary from

4    the defense attorneys.

5        **Q      And is that what, in fact, happened in this**

6    **Foster case?  You got summaries from the defense**

7    **lawyers?**

8        A      I would imagine so, yes.

9        **Q      What about medical records?  I've seen some**

10   **medical records within the claim file, but I'm not sure**

11   **that they're all in there.  Did you, in fact, review all**

12   **of Mr. Foster's medical records yourself?**

13       A      All the ones that were in the file, yes.

14       **Q      Did you also get summaries of those medical**

15   **records from the defense lawyers?**

16       A      Yes.

17           MS. MCCOLLUM:  And I just wanted to interject

18       here.  The Court has upheld the attorney-client

19       privilege in this case, and you're getting close to

20       it but not breached it yet, but we don't intend to

21       waive anything the Court has said we don't have to

22       disclose. But go ahead and continue, please.

23   BY MR. FAIRBANKS:

24       **Q      Thank you, and I understand.  And I am not,**

25   **Ms. Harp-Biven, intending to ask you any questions about**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 13

1    conversations or communications that the Court has said

2    that I can't ask you about.  So if I get there, just

3    tell me.  I'm not trying to.

4         A    Sure.  No problem.

5         Q    Were those summaries of the medical records,

6    regardless of what was contained in them -- did those

7    form partially the basis of the evaluation that you were

8    doing on Mr. Foster's claim?

9         A    Sure.

10        Q    Similarly, did the defense lawyers send you

11   letters that summarized Mr. Foster's wage loss claim?

12        A    Yes.

13        Q    And did those letters, at least, in part, form

14   the basis of your evaluation of Mr. Foster's claim?

15        A    Yes.

16        Q    Did you watch any of the videos of the

17   depositions during the UIM case?

18        A    No, I did not.

19             MS. MCCOLLUM:  I'm going to interject there.

20             And I don't know the answer to this question:

21   Was Dr. Jenkinson's video available?  Because I -- it's

22   my recollection that the case was settled shortly after

23   the deposition, and I'm not for sure if there was a

24   transcript for Ms. Harp-Biven to read --

25             THE WITNESS:  That's right.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW   Doc #: 195-21   Filed: 10/05/16   Page: 15 of 126 - Page
ID#: 3122
The deposition of LAURA HARRIS-GIVEN, taken on August 8, 2016

Page 14

1          MS. MCCOLLUM:  -- or even if there was a video

2      for her to review of that.

3          MR. FAIRBANKS:  Okay.

4  BY MR. FAIRBANKS:

5      **Q      Same question, if you need to rely on the**

6  **objection:  Did you review Dr. Jenkinson's video**

7  **deposition at any time?**

8      A      No.

9      **Q      And you have not reviewed it since?**

10      A      No.

11      **Q      What about Mr. Foster's Social Security file?**

12  **Do you remember that being an issue in the case?**

13      A      I -- I remember trying to obtain a copy of

14  that, yes, and we did.

15      **Q      You did get a copy of that?**

16      A      We did.

17      **Q      And did you actually review that yourself?**

18      A      I did.

19      **Q      I haven't seen his Social Security file within**

20  **your claim file.  How would you have reviewed it?**

21      A      It might've been sent directly over to

22  defendant's counsel.  That might not be why it's in the

23  -- in the file.  But I do remember we received the award

24  paperwork, not the entire file.  The award paperwork is

25  what -- we wanted the whole file, and I believe we just

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   got the award, the opinion and the award.

2       Q    At some point did, to your knowledge, the

3   defense lawyers for American Fire obtain something more

4   than the award letter in relation to --

5       A    Yes.

6       Q    -- his Social Security file?

7       A    Yes.

8       Q    And what I'm wondering is:  Aside from whether

9   or not the defense lawyers reviewed that file, did you

10  actually review that file?

11      A    It's hard for me to remember, it's been so

12  long ago, to be honest.  Probably relied on them.

13      Q    Okay.  Do you remember, at some point, in

14  addition to the tax returns of Mr. Foster, that the

15  defense lawyers for American Fire had requested some old

16  business invoices --

17      A    Yes.

18      Q    -- for Mr. Foster's business?

19      A    I do remember that, yes.

20      Q    I have not seen those in your claim file. Have

21  you actually reviewed those yourself?

22      A    I don't think we ever received those.  I think

23  we kept asking for them, and I don't think they ever

24  supplied those.  They gave us -- they said they got rid

25  of those records, or I can't remember what the reasoning



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 16

1   was, but they couldn't produce the records.  Or at least

2   I remember asking for quite a long time and them saying

3   that.

4        **Q    So you don't think that any of the old**

5   **business invoice tickets were ever produced?**

6        A    I'm not sure.

7        **Q    Okay.**

8        A    I really don't remember.

9        **Q    And even if they were, not something that you**

10  **actually reviewed, correct?**

11       A    I'd say I can't -- I can't remember at this

12  point, it's been so long ago.

13       **Q    Ms. Harp-Biven, I want to ask you about an**

14  **insurance term, the term "reserve;" do you know what**

15  **that is?**

16       A    I do.

17       **Q    Can you tell the jury what a reserve is?**

18       A    The way I understand reserve, it's an

19  accounting procedure where you set a number, based on

20  the information that you have at that time, for what you

21  would likely pay out on a claim.  And that can fluctuate

22  based on new evidence that's come in.

23       **Q    Is that kind of the best guess of what the**

24  **claim value is?**

25       A    I'd say, yeah, a guesstimate.  Uh-huh.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    **Q    And that's something that's not disclosed to a**

2    **claimant while the claim is ongoing, correct?**

3    A    Correct.

4    **Q    For example, you wouldn't have informed Mr.**

5    **Foster of what the reserve was on his UIM claim at any**

6    **time?**

7    A    No.

8    **Q    Ms. Harp-Biven, did you work for any other**

9    **insurance companies before you began working for Liberty**

10   **Mutual?**

11   A    I worked for the subsidiary, Safeco.

12   **Q    Okay.  And I'm not intending to differentiate**

13   **between those with the Liberty Mutual group that now**

14   **exists, but any other insurance companies before that?**

15   A    No, sir.

16   **Q    Okay.  What did you do occupation-wise before**

17   **beginning to work for the Liberty Mutual group of**

18   **companies?**

19   A    I worked for a law firm.

20   **Q    What law firm did you work for?**

21   A    Hargadon, Lenihan, Harbolt, and Herrington.

22   **Q    Sorry, can you say that more slowly?**

23   A    Sorry.  Hargadon, Lenihan, Harbolt, and

24   Herrington.

25   **Q    What did you do there?**

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1       A      I was a legal secretary/paralegal.

2       **Q      What type of work did that law firm do?**

3       A      Claims work.

4       **Q      Are they in Louisville?**

5       A      They are.

6       **Q      To your knowledge, is that firm still in**

7       **operation one form or another?**

8       A      It is.

9       **Q      During your employment with Liberty Mutual,**

10      **has your performance been reviewed on a yearly basis?**

11      A      It has.

12      **Q      I'll tell you that we've received, in**

13      **discovery in this case, documents from some of your**

14      **performance reviews, and I'm going to hand you some of**

15      **the ones we have some questions about.**

16      A      Sure.

17      **Q      What I have here are labeled Foster Harp-Biven**

18      **34 through 39, which I believe is your 2007 performance**

19      **review.  I'll hand that to you.**

20      A      Okay.  Sure.

21      **Q      You can mark that as Exhibit 1.**

22              **(EXHIBIT 1 MARKED FOR IDENTIFICATION)**

23          MS. MCCOLLUM:  And just for clarification,

24      you're going to see redactions, and the redactions

25      will remain consistent with the Court's order.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Case: 5:13-cv-00426-GFVT-REW Doc #: 195-21 Filed: 10/05/16 Page: 20 of 126 - Page
ID#: 3127
The Deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 19

```
 1              THE WITNESS:  Okay.

 2              MS. MCCOLLUM:  They -- that information did

 3        not have to be disclosed.

 4              THE WITNESS:  Okay.

 5    BY MR. FAIRBANKS:

 6        Q    Does that look familiar to you, Ms. Harp-

 7    Biven?

 8        A    It does.

 9        Q    For your 2007 performance review, it looks

10    like your manager was Lisa Thibodaux; is that correct?

11        A    It is, correct.

12        Q    Do you know if Ms. Thibodaux is still employed

13    by Liberty Mutual?

14        A    She is.

15        Q    What does she do?

16        A    I'm not sure what her current job title is

17    now.

18        Q    Where does she work?

19        A    Gosh, I think she lives in Virginia or

20    Maryland.  I'm not sure.  I haven't worked with her in a

21    long, long time.

22        Q    Okay.  Ms. Harp-Biven, it looks like you had

23    four different goals on this performance review; do you

24    see that?

25        A    I do.
```

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

The Deposition of LAURA CHARLTON, taken on August 18, 2016

Page 20

```
 1        Q     Goal number 1, it looks like it has a weight

 2   of 45 percent.  Goal number 2 has a weight of 25

 3   percent.  3, 20 percent and 4, 10 percent; does that

 4   look right?

 5        A     Uh-huh.  Sure.

 6        Q     And I wanted to ask you about goal number 1

 7   that has the most weight, the 45 percent.  What is the

 8   goal statement listed there on goal number 1?

 9        A     Do you want me to just read what it says?

10        Q     Yes, please do.

11        A     Sure.  "Profitable growth.  We will capitalize

12   on our momentum in mitigating loss costs while

13   continuing to improve our work product.  In doing so

14   provide a loss ratio and LAE advantage that improves our

15   market position.  We will protect Safeco's reputation

16   through prompt and proper claims adjudication."

17        Q     Would you agree with me that during the time

18   that your performance was being reviewed on a yearly

19   basis that one of the focuses was the amount that you

20   were paying on claims?

21             MS. MCCOLLUM:  Objection.  Form.

22             THE WITNESS:  Can I answer?

23             MS. MCCOLLUM:  Yeah, you can go ahead and

24        answer.

25   BY MR. FAIRBANKS:
```



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 21

```
 1          A    I don't take it that way, but -- I just take
 2   it to mean we pay what we owe is the way I kind of
 3   interpret that goal.
 4          Q    Right.  And I'm not necessarily anchoring my
 5   question to that particular goal statement, but just in
 6   more general terms, was the amount that you were paying
 7   on claims ever something that was discussed during your
 8   performance review process?
 9          A    Not really.
10          MS. MCCOLLUM:  Same objection.  If you want to
11      give me a continuing objection so I don't have to
12      interrupt you every time.  I'd be happy to --
13          MR. FAIRBANKS:  Sure.  Yeah.
14          MS. MCCOLLUM:  -- do that.  Or I can object
15      every single time.  And I also object at this
16      particular time, because this is 2007.  I think
17      that this is outside this -- this is before Mr.
18      Foster's accident so...
19   BY MR. FAIRBANKS:
20          Q    Do you need me to ask again?
21          A    Please.
22          Q    And, again, I'm not anchoring it to this 2007
23   performance review or this particular statement that you
24   just read, but was one of the things that was discussed
25   with you, during your yearly performance reviews, the
```



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 22

1    amount that you were paying on claims?

2        A    No.

3        Q    Okay.  Let's flip over to page 37 of this

4    exhibit.

5        A    What would that start with for me?

6        Q    It's the 37 there on the bottom right-hand

7    corner of the page.

8        A    Okay.  It starts with -- number 2?

9        Q    Yeah, it says, "Collaborative," at the top,

10   and there are, it looks like, six different categories

11   that are listed in "leadership traits;" do you see that?

12       A    Uh-huh.

13       Q    And I wanted to ask you about number five

14   which is titled "Externally Focused."

15       A    Uh-huh.

16       Q    And that's listed as a strength for you; do

17   you see that?

18       A    Uh-huh.  I do.

19       Q    Number 4, it says, "Excellent work by Laura

20   Harp yesterday on resolving a case at mediation for

21   $3,750.  The demand was $75K, and bad faith was being

22   threatened.  The mediator complimented Laura on her

23   legal handling and was shocked to learn that she was not

24   an attorney;" do you see that?

25       A    I do.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 23

1    Q    Would you agree with me, at least looking at

2  that, that Ms. Thibodaux is giving you a positive

3  accomplishment for resolving a case for less than what

4  was being demanded?

5    A    I don't take it that way.

6    Q    How do you take it?

7    A    Just that I paid what I owed on the claim.

8  Just because a demand is a certain amount doesn't mean

9  that's what the case is valued at.

10    Q    Okay.  Let's look at number six.  It says,

11  "Good results on blank reserve was $100K and settled for

12  $39K;" do you see that?

13    A    I don't see where it says, "Settled for $39K."

14  Oh, okay.  It's blended in with the rest of the stuff,

15  yes.

16    Q    That one, would you agree with me that Ms.

17  Thibodaux is giving you a positive accomplishment for

18  settling a case for $61000 less than the reserve?

19    A    Again, I just take that -- that it's -- I had

20  a good result.  I paid what I owed on the claim.

21    Q    So you think $39K was owed on that one despite

22  the reserve being set at 100?

23    A    Yes.

24    Q    Okay.  Let's look over to the next page.  I'm

25  looking at eight.  It says, "Good settlement on claim

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 24

1      TSV was $25K, and it resolved for $7500."

2           A     Uh-huh.

3           Q     What's a TSV?

4           A     I think it's total settlement value, I think

5      is what it -- the acronym was for at that time.

6           Q     Okay.  So someone had placed a total

7      settlement value at $25,000?

8           A     Based on -- at that time, yes.

9           Q     Okay.  And you were able to get that resolved

10     for $7,500?

11          A     Right.  So it could've been something that

12     changed in the meantime, yes.

13          Q     Okay.  And that was a positive accomplishment

14     for you on your performance review, --

15          A     Yes.

16          Q     -- correct?

17          A     Uh-huh.

18                MS. MCCOLLUM:  I'm sorry.  What page are you

19          on?

20                MR. FAIRBANKS:  That's Foster Harp-Biven 38.

21     BY MR. FAIRBANKS:

22          Q     Ms. Harp-Biven, I'm going to hand you next

23     what we have labeled Foster Harp-Biven 125 through 138.

24          A     Okay.

25          Q     And we'll mark this as Exhibit 2.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 25

        (EXHIBIT 2 MARKED FOR IDENTIFICATION)

1           (EXHIBIT 2 MARKED FOR IDENTIFICATION)

2       A    Sure.

3       Q    And correct me if I'm wrong, but I believe

4   that is a performance evaluation form for you throughout

5   the calendar year of 2010?

6       A    It appears so, yes.

7       Q    And this has a little bit different format

8   than the one we just looked at.  It looks like you now

9   have six different objectives as opposed to four?

10      A    Sorry.  Bear with me.

11      Q    Sure.

12      A    Yes, that's -- that's correct.

13      Q    And there's a box that lists the degree of

14  importance for each of those objectives; do you see

15  that?

16      A    I do.

17      Q    And objectives one through three are listed as

18  "critical," and then four through six are just listed as

19  "important;" do you see that?

20      A    That's correct.

21      Q    Who is it that was reviewing your performance

22  in 2010?

23      A    It would be Jennifer Rennick (phonetic).

24      Q    Is Jennifer still with Liberty Mutual?

25      A    She is.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 26

```
 1        Q     What is her job position?

 2        A     I have no idea what her job position is now.

 3        Q     What was her job position at this point in

 4   time?

 5        A     She was Claims Manager.

 6        Q     Do you know where she's located?

 7        A     She's in Fairfield, Ohio.

 8        Q     For objective number 1, what was the degree of

 9   achievement that you were given for objective 1?

10        A     Exceeded.

11        Q     And is that the highest degree of achievement

12   you could get there?

13        A     Yes.

14        Q     And what is objective number 1?

15        A     Just read it again?

16        Q     Sure.  Please.

17        A     "Improve the quality of file work being done

18   in the PL casualty department."

19        Q     What does "PL" mean?

20        A     Personal lines.

21        Q     Let's look over to the next page, 126.  And

22   over in the results column, the first full paragraph, it

23   says, "Laura has had some very successful mediations in

24   first and second queue which demonstrated her strong

25   evaluation and negotiation skills.  She's been able to
```

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 27

1   resolve claims at or below her settlement authority;" do

2   you see that?

3        A    I do.

4        Q    And is that a positive accomplishment for you

5   to settle claims below your settlement authority?

6        A    Again, I settle based on what the information

7   is at the time, so...

8        Q    That's what I'm wondering.  Why would it be a

9   positive goal to settle below your authority if you're

10  just needing to settle based on the information you have

11  at the time?

12       A    I just think it's important that you change

13  your skills or your evaluation based on the information

14  you get.  Like, if you go to a mediation, sometimes

15  you're given new information that changes.  Sometimes it

16  actually increases what you pay.  Sometimes it

17  decreases.  It just depends on the information you get

18  at the time.

19       Q    And that's not what it says there in the

20  results column.  It doesn't talk about changing your

21  evaluation based on new information.  It simply --

22       A    Right.

23       Q    -- talks about resolving claims at or below

24  settlement, correct?

25       A    Right.  So yeah, you don't know really what



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 28

1    that situation is without looking at the file.

2              MS. MCCOLLUM:  And, again, just continuing

3         reminder that I have a standing objection as to

4         form.

5         Q    Continuing on, it says, "Our defense counsel

6    even said the following," and then it has -- it looks

7    like a part of an e-mail; do you see that?

8         A    Yes.

9         Q    And I don't know who it's from.  The "from" is

10   blacked out, but on January 21, 2010 it says, "If PC,"

11   and I assume that's plaintiff's counsel?

12        A    It is.

13        Q    "If plaintiff's counsel has any

14   familiarization with Laura, he should know there won't

15   be money coming.  I have heard some plaintiff's counsel

16   say it is easier to get an extra nickel out of a crack

17   in the sidewalk than out of Laura's hand;" do you see

18   that?

19        A    I do.

20        Q    Do you know who wrote that?

21        A    I don't have any recollection who that

22   would've been from, but...

23        Q    And that's something that's listed in the

24   positive results column in your performance review,

25   correct?



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 29

1      A     Correct.

2      Q     Is that true?  Are you known to be difficult

3  to get settlement money from?

4      A     That's not the way I took it.  I just -- I

5  think that I'm known for, you know, working my claims,

6  evaluating my claims fairly, and when I put a value on

7  it I pay what we owe.  No more, no less.  Just what we

8  owe.  I try to be as fair as I can.

9      Q     Okay.  Let's flip over to page 138, which may

10  be the last page.  This page is titled, "Section 3

11  Overall Summary of Performance;" do you see that?

12      A     Yes.

13      Q     And then there's a mid-year and year-end

14  statement, and my assumption is that would be written by

15  your manager at the time; is that correct?

16      A     Yes.

17      Q     The first sentence of the mid-year summary

18  states, "Laura is meeting her goals and contributing

19  positively to the bottom line;" do you see that?

20      A     Uh-huh.

21      Q     How is it that a claims adjuster can

22  contribute to the bottom line?

23      A     By paying what we owe.

24      Q     What do you mean by that?

25      A     When you get the information to evaluate the



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

claim, you do it quickly and effectively and fairly.

 Q    Would you agree with me, not specific to this document, but just in general terms, that a claim adjuster could contribute to the bottom line by paying less on claims?  That would increase the bottom line, correct?

            MS. MCCOLLUM:  I'm going to object as to
       speculation.  She's already testified as to what
       she did.

BY MR. FAIRBANKS:

 A    I just -- I pay what I owe, so it's -- the bottom line is the bottom line.  I mean, I pay what I owe.  It doesn't matter to me more or less.  I pay what I'm supposed to pay.

 Q    And in follow-up to that objection, do you understand what I'm asking?  How the amount of money being paid by a claim adjuster can affect the bottom line of the insurance company?

            MS. MCCOLLUM:  Continue objection.  Go ahead
       and answer if you can.

 A    Okay.  I don't really understand what, I guess, the bottom line for the company is.  I just -- I know what my job is, and my job is, you know, evaluate a claim fairly and pay what we owe on it.

 Q    I'm going to hand you what we'll mark as



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW Doc #: 195-21 Filed: 10/05/16 Page: 32 of 126 - Page ID#: 3139

1    Exhibit 3.  These are pages Foster Harp-Biven 164

2    through 173.

3                    (EXHIBIT 3 MARKED FOR IDENTIFICATION)

4         A     Okay.

5         Q     Does this look like your performance

6    evaluation for the calendar year 2012?

7         A     It does.

8         Q     Who was your manager that year?

9         A     Jennifer Rennick.

10        Q     So is that the same one that was reviewing you

11   back in 2010?

12        A     Yes.

13        Q     Okay.  Does it look like you still have --

14   well, tell me if you can.  How many objectives did you

15   have that year?

16        A     Let's see.  It looks like two objectives.

17   Well, you're right.  You can't really tell.

18        Q     It looks like you have letters A through D,

19   and then part A is broken down into one and two; does

20   that look right?

21        A     That looks correct, uh-huh.

22        Q     A, B, and C are listed as critical objectives;

23   do you see that?

24        A     I do.

25        Q     And then D is listed as important, and it

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 32

1    looks to me like that deals with kind of an ergonomic

2    work environment, that sort of thing; is that right?

3        A    That's correct.

4        Q    Okay.  I want to look again at that first

5    objective, and I'm looking particularly at objective A1.

6        A    Okay.

7        Q    Can you tell us what objective A1 was in 2012?

8        A    It says, "Produce best-in-class loss cost

9    management through quality and accuracy."

10       Q    And what was your degree of achievement in

11   2012 on that goal?

12       A    She marked, "Do not -- did not meet."

13       Q    And I'm looking over in the mid-year results,

14   and it looks like you're being graded on a numeric scale

15   on certain things.  For example, investigation,

16   evaluation, settlement, reserving; is that right?

17       A    That's correct.

18       Q    How, if you know, are those numerical values

19   calculated?

20       A    From what I understand, they just pull a file

21   or several files, it depends.  And they have a list of

22   questions that they answer, and then they do a

23   percentage that way of the number of files based upon

24   your -- so sometimes they may pull one, and if you don't

25   do well on that one, it'll bring your grade way, way



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 33

1    down, or if they do two or three.  And that's how it's

2    done.

3        Q    After the numeric values are written in the

4    mid-year outcome it says, "The investigation evaluation

5    and settlement phases stood out in these two months."

6    And those months are May and June of 2012; is that

7    right?

8        A    Yes, that's what she said.  That's the

9    sentence before, uh-huh.

10       Q    And then it says, "Settlement due to some

11   mistakes on releases.  Evaluation due to high

12   consideration of general damages and no trends noted in

13   investigation."

14       A    Uh-huh.

15       Q    When it's talking about "evaluation was due to

16   high consideration of general damages," can you tell us

17   what general damages are?

18       A    I believe what she was referring to is the

19   amount of money for pain and suffering.

20       Q    And that's what I was thinking, too.  General

21   damages usually refers to pain and suffering.

22       A    Which means yes.

23       Q    So your supervisor was discussing with you

24   that you were giving a "high consideration of general

25   damages," high on pain and suffering?



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 34

```
 1       A     Not in general, just on whatever, like, she
 2   read -- reviewed one file or two files or ten files. I'm
 3   not sure how many files she reviewed at that time. So
 4   maybe if it was just one file she felt, in her opinion,
 5   it was too high.
 6       Q     Okay.  If you flip over to the next page, 165,
 7   it says, "If scores continue to trend downward through
 8   third and fourth quarter and overall quality does not
 9   improve, progressive discipline would need to be
10   considered;" do you see that?
11       A     Uh-huh.
12       Q     And when I read this, I'm thinking that if, in
13   part, your general damages, your pain and suffering
14   evaluations continue to be too high, it's possible that
15   you could be subject to some sort of progressive
16   discipline throughout the rest of the year; is that the
17   way you understand it?
18       A     No, I read it in its -- in its entirety --
19   that whole block is in its entirety to read that.  It's
20   not just that.  It's the investigation, evaluation,
21   reserving, all of that that they list in the first part
22   of the first box.
23       Q     Okay.  And so that's what I said, that in
24   part.
25       A     Yeah, sorry.
```



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 35

 1      Q     So yeah, it -- general damages and then
 2  investigation and reserving, too.  Those are the things
 3  that are going into the potential for progressive
 4  discipline, at least as listed on your performance
 5  review?
 6      A     Right.
 7      Q     In the next paragraph down, the second
 8  sentence says, "Laura could benefit from scaling back
 9  her general damages consideration on soft tissue
10  injuries and not adding money to claims to avoid
11  litigation expense;" do you see that?
12      A     I do.
13      Q     And is that Ms. Rennick evaluating your
14  performance as to how you were paying claims?
15      A     I didn't take it in general, I just meant
16  whatever file she reviewed.  I -- I took that to mean
17  the files that she reviewed she thought I paid -- or I
18  put too much money on the general damage portion of
19  whatever she found, in her opinion.
20      Q     And that led, I guess, in part to you not
21  meeting that goal for 2012?
22      A     That was in part, yes.
23      Q     The -- in the very last sentence of the
24  results in that first objective -- and this is on page
25  166.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 36

1    A    Uh-huh.

2    Q    It says, "Laura still has the opportunity to

3    embrace the litigation philosophy;" do you see that?

4    A    I do.

5    Q    What does that mean?

6    A    That just means at that time we did not

7    include defense counsel's -- how do I say this?

8    Additional work.  So for example, let's say we were $500

9    apart on a claim, and we were going to have to take four

10   depositions and mediation costs and things like that.

11   Sometimes we would use that and say, "Well, rather than

12   go through this, we would go ahead and compromise and

13   pay $200 extra or something like that.  And we weren't

14   doing that at that time.  Everything's independent of

15   itself.

16   Q    So that has to do with compromising cases

17   considering litigation; is that what you're saying?

18   A    Not compromising them, no, just taking that

19   expense into consideration.

20   Q    Does that deal at all with Liberty Mutual

21   wanting to litigate more cases?

22   A    I don't take it that way, no.

23   Q    Okay.

24        MS. MCCOLLUM:  And, again, she's not here as a

25   representative of Liberty Mutual to identify what



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 37

 1            the mindset is, and this is just what her

 2            understanding is. There may be a completely

 3            different one, so I just want to make it clear that

 4            she's not testifying on behalf of Liberty Mutual in

 5            that capacity.

 6       BY MR. FAIRBANKS:

 7            Q    Let's flip towards the back of the 2012

 8       evaluation.  I'm on page 173.

 9            A    Okay.

10            Q    Looking at the overall summary of performance

11       here, mid-year.  The first sentence says, "As of mid-

12       year Laura is producing mixed results;" do you see that?

13            A    Uh-huh.

14            Q    Okay.  Do you know what your manager meant by

15       "mixed results?"

16            A    I think some results showed one thing, and

17       some results showed something else and maybe the

18       different criteria that she had that she was using to

19       review me, so it didn't show a trend.

20            Q    Okay.  In the last sentence of the mid-year

21       summary states, "I look forward to taking a more

22       aggressive approach on her evaluations and contributing

23       positively to our quality results."  What was your

24       understanding of what was meant by "taking a more

25       aggressive approach on your evaluations?"



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW   Doc #: 195-21   Filed: 10/05/16   Page: 39 of 126 - Page
ID#: 3146
The Deposition of LAURA CHARLTON taken on August 8, 2016

Page 38

1    A    Maybe getting to them quicker.  I don't know

2  exactly what she meant by that at that time.

3    **Q    Okay.  Have anything to do with the amount of**

4  **settlement money you were putting on claims?**

5    A    You'd really have to ask her.  I don't really

6  know.

7    **Q    Well, there's a section at the bottom that has**

8  **employee comments; do you see that?**

9    A    I do.

10    **Q    And I'm looking at the third sentence in**

11  **employee comments.  It says, "I have already discussed**

12  **some ideas with my new manager and feel confident that**

13  **these approaches suggested will reap quality results;"**

14  **do you see that?**

15    A    Uh-huh.

16    **Q    Now, that's a statement that was written by**

17  **you, correct?**

18    A    It is.

19    **Q    What did you mean by that?**

20    A    Gosh, I don't really know.  There were so many

21  different changes just systems-wise and things that we

22  had to use at the company at that time, because we had

23  just been purchased by another company.  It may have

24  been, like, a diary issue.  I don't know.

25    **Q    Do you remember, in fact, having face-to-face**

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 39

1    discussions with your manager about the amount of

2    general damages you were putting on your evaluations?

3         A    Not a face-to-face, no.

4         Q    Okay.  How would that have happened?

5         A    Probably over the phone.

6         Q    Okay.  Do you remember having those

7    discussions with her?

8         A    Not per se the general damages.  Just in

9    general, you know.  I guess, I -- when -- when you do

10   your evaluations, you put a range in.  It wouldn't be

11   unusual for somebody else to either agree with that

12   range or think it's a little high or a little low. Just,

13   you know, I'm sure, you know, you could look at it and

14   see something different than I would or Heather.

15        Q    Have you ever had, I guess, as a negative

16   result on your evaluation, putting too little money on a

17   claim?

18             MS. MCCOLLUM:  I'm sorry.  Can you clarify the

19        question?  Negative result?  Do you mean a trial?

20        Do you mean --

21             MR. FAIRBANKS:  No, I'm talking about

22        performance reviews.

23   BY MR. FAIRBANKS:

24        Q    Do you understand what I'm asking?  I'm

25   talking about the performance review process.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 40

1       A    I don't know if anybody's ever put anything on

2   the performance review about it.

3       Q    **And on the flip side, we've looked and seen**

4   **where putting too much money on files could result in a**

5   **"did not meet" on a performance appraisal?**

6       A    Yeah, I -- I just try every day to do the

7   right thing and pay what I owe on a claim.  So I don't -

8   - I don't really know how to answer that question,

9   honestly.

10      Q    **I'm going to hand you what we'll mark as the**

11  **next exhibit.  Are we on 4?**

12           COURT REPORTER:  Yes.

13               (EXHIBIT 4 MARKED FOR IDENTIFICATION)

14      Q    **This is what's been produced to me as your**

15  **2013 performance evaluation.  These are labeled Foster**

16  **Harp-Biven 157 through 162.  Who was your manager that**

17  **was reviewing your calendar year 2013 performance?**

18      A    Sonya Williams.

19      Q    **Is Sonya still with Liberty Mutual?**

20      A    I believe she is, yes.

21      Q    **Is she still your manager?**

22      A    No, she's not.

23      Q    **Do you know what her job position is?**

24      A    I do not.

25      Q    **Do you know where she's located?**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 41

1        A      I think she's still in Fairfield, Ohio.  I'm

2  not sure.

3        **Q      Do you-all have a physical office there in**

4  **Fairfield?**

5        A      We do.

6        **Q      Are you -- I understand from looking at some**

7  **of the files that you telecommute or work from home most**

8  **of the time; is that right?**

9        A      Majority of the time, yes.

10       **Q      If you were to go to an office, would**

11 **Fairfield be your office location?**

12       A      Yes.

13       **Q      Does Liberty Mutual have any offices in**

14 **Kentucky?**

15       A      I don't --

16       **Q      Claims offices?**

17       A      I don't know if they do anymore or not.  Not

18 that I'm aware of.

19       **Q      Was there any point in time when you worked at**

20 **a physical location in Kentucky during your time with**

21 **Liberty Mutual?**

22       A      My home is the physical location I've always

23 worked at.

24       **Q      Never in your 15 years there has there been an**

25 **actual location somewhere within Kentucky, a claims**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1    office?

2         A    That I've reported to?

3         Q    Correct.

4         A    No, not that I reported to, no.

5         Q    Is there one that you haven't reported to?

6         A    Not that I'm aware of, no.

7         Q    I'm on the second page of this evaluation.
8    There's a section that says, "Areas of improvement;" do
9    you see that?

10        A    I do.

11        Q    And then there's a subsection that says, "Seek
12   excellence and execute thoroughly."

13        A    Uh-huh.

14        Q    And I'm looking at the first sentence of the
15   second paragraph in there.  It says, "Earlier this year,
16   we discussed Laura's evaluations needing to be tighter
17   with our ranges instead of having more money added to
18   the top of our range.  Laura immediately worked on this,
19   and through our discussions, found that she could
20   evaluate the claim and end up with a fair range in
21   sticking to this;" do you see that?

22        A    I do.

23        Q    Do you remember having that discussion with
24   Sonya Williams sometime in 2013?

25        A    I do.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW   Doc #: 195-21   Filed: 10/05/16   Page: 44 of 126 - Page ID#: 3151
The deposition of LAURA HART-BIVEN, taken on August 4, 2016

Page 43

    1        Q    And what did Sonya mean -- or what did you

    2    understand her to mean that "you needed to be tighter

    3    with your range?"

    4        A    I needed to have the range more pinpointed. In

    5    other words, don't start here and end up here, but have

    6    it more pinpointed to the exact where you wanted --

    7    where you think that the claim value is.

    8        Q    Okay.  And she's making reference to a range.

    9    And is a range -- just so the jury knows.  What do you

   10    mean by "range?"

   11        A    It's usually referring to general damage

   12    figures.

   13        Q    Okay.  And Sonya's asking you to be "tighter

   14    with your range instead of having more money added to

   15    the top;" is that right?

   16        A    Yeah, that's what the sentence says, yes.

   17        Q    She's not asking you to tighten the range by

   18    adding more money to the bottom, correct?

   19        A    She's -- the way I -- the way I interpret it

   20    was in -- to the range being, say, five to ten it was,

   21    like, 7,500 to ten -- is the way I took it.  In other

   22    words, have the amounts, the range itself, be closer

   23    together.

   24        Q    Well, your example there is the exact opposite

   25    of what she's saying, correct?



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 44

1      A     That's --

2      Q     You were -- you just added money to the bottom

3   range to go from five to 7,500 while keeping ten at the

4   top; is that right?

5      A     The way I just described it to you?

6      Q     Yes.

7      A     I just -- I described the range to be a

8   tighter -- a closer number rather than, like I said,

9   five to ten, make it more, like, 7,500 to ten so that

10  there's not such a distance between the first offer and

11  the last offer.

12     Q     Right.  And if your top range was ten, she's

13  actually asking you to reduce the ten as opposed to

14  adding from the bottom, correct?

15     A     That's not -- let me read it again.  You'd

16  have to ask her.  That's -- when we had the discussion,

17  that's what I did was try to narrow the distance.

18     Q     Okay.  Ms. Harp-Biven, who currently is your

19  manager right now?

20     A     It's Melissa Dearman.

21     Q     Where does Ms. Dearman work?

22     A     The Fairfield, Ohio office.

23     Q     Is she there every day?

24     A     She is.

25     Q     And what's her job title?

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW   Doc #: 195-21   Filed: 10/05/16   Page: 46 of 126 - Page ID#: 3153

Page 45

```
 1        A    She's -- Claims Team Manager is what her title
 2   is.
 3        Q    Do you know how many employees she manages?
 4        A    Currently she has -- let's see.  Me -- I think
 5   six.
 6        Q    Okay.  How long has she had that position?
 7        A    As being my manager or being a manager?
 8        Q    Well, let's break that into two different
 9   ones.  Do you know how long she's been a manager in
10   general?
11        A    I do not.
12        Q    Okay.  What about how long she's been your
13   manager?
14        A    Approximately two years, I think.
15        Q    Do you know what she was doing before she
16   became a manager?
17        A    She was a claims handler.  I'm not sure what
18   her actual title was, but she was a claims handler.
19        Q    Right.  And I guess you all have different
20   ranges of claims specialists, --
21        A    Right.
22        Q    -- but you're all doing the adjusting job --
23        A    Yes.
24        Q    -- at the different --
25        A    Yes, that's correct.
```

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 46

1  Q  And I've seen that Ms. Dearman was involved in

2 the Foster claim as a claims handler, actually; did you

3 know that?

4  A  At some point much before my handling it.

5  Q  Have you reviewed any of the file related to

6 Ms. Dearman's handling of the Foster claim?

7  A  I have not.

8  Q  And I guess, after her handling of the Foster

9 claim she was promoted?

10  A  I have no idea.

11  Q  Is it a promotion to go from being a claims

12 handler to a claims manager?

13  A  It is if that's what happened.  I'm just not

14 sure in the timeframe when that happened for her.

15  Q  Have you had any discussions with her recently

16 about the Foster case?

17  A  No, just that she also told me she may be

18 deposed.  Same thing.

19  Q  What about while the claim was ongoing?  Did

20 you have any discussions with her?

21  A  Gosh, I would have no idea.

22  Q  Nothing that you remember?

23  A  Nothing that I remember off the top of my

24 head, no.

25  Q  In your position that you hold at Liberty

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 47

1    Mutual, is there a certain dollar amount that you're

2    permitted to offer before you have to seek approval from

3    somebody above you?

4         A    Yes.

5         Q    What is that?

6         A    Currently, I believe it's $100,000.

7         Q    When you were handling the Foster claim did

8    you have that same $100,000 approval?

9         A    I have no idea what it was at that time.

10        Q    Okay.  Do you know when -- at some point did

11   it switch?  Did it increase to go up to $100,000?

12        A    It's gone up, it's gone down, it's -- I

13   couldn't possibly tell you.  I have no idea.

14        Q    And what I'm trying to figure out is:  Were

15   you the one who had the final say on the settlement on

16   the Foster claim, or did you have to go to somebody else

17   to get the authority to make that --

18        A    Oh, no.  We had a -- we had a triage with that

19   file.

20        Q    And why is that?

21        A    I'm sure it was over my authority at the time.

22        Q    Who did you triage with?

23        A    It would've been probably my manager, my

24   manager's manager, and probably the home office

25   examiner, yeah.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 48

1    Q    **Where's home office?**

2    A    Fairfield, Ohio.

3    Q    **What's a home office examiner?**

4    A    It's a person who you triage cases that are

5    over the authority of yourself and possibly your

6    immediate manager.

7    Q    **Do you know who your -- was it Ms. Dearman who**

8    **was your immediate manager during that triage in the**

9    **Foster case?**

10   A    I don't think so.

11   Q    **Do you know who it was?**

12   A    I don't remember.  I don't know.  I'd have to

13   go back.  If you've got my performance review for 2014,

14   I could tell you.

15   Q    **I do, and --**

16   A    Okay.

17   Q    **-- it looks like the reviewer is Melissa**

18   **Dearman for --**

19   A    Okay.  Them maybe it -- she was.

20   Q    **You think it would've been her?**

21   A    Yeah, maybe she was, yeah.  So sorry.

22   Q    **I've seen the name Mechley (phonetic), M-E-C -**

23   **-**

24   A    Kurt Mechley, yeah.  Uh-huh.

25   Q    **Kurt Mechley?**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Kurt Mechley, he was the home office examiner
 2   at that time.
 3        Q    So he's the home office examiner?
 4        A    Uh-huh.
 5             MR. FAIRBANKS:  Let's take about a five-minute
 6        break.  We've been going for about an hour.
 7             MS. MCCOLLUM:  Sure.  Sure.
 8                  (OFF THE RECORD)
 9             MR. FAIRBANKS:    We're back on the video
10        record.
11   BY MR. FAIRBANKS:
12        Q    Ms. Harp-Biven, I wanted to ask you some
13   questions about some of the claim notes.  So what I'm
14   going to do is hand you a collection of documents that
15   are labeled Foster Claim 1057 through 1153.
16        A    Okay.
17        Q    Now, I held these up earlier when we were
18   getting started to talk about things that you would've
19   reviewed.  Are these what you were referring to as
20   "claim notes?"
21        A    Yes.
22        Q    And I think you stated that you didn't review
23   anything other than the notes that you were involved in,
24   at least in preparation for today; is that correct?
25        A    That's correct.
```



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

 1    Q    Along those lines, do you have any opinion one

 2  way or the other about the manner in which the claim was

 3  handled prior to your involvement?

 4    A    I have no comment.

 5    Q    Okay.

 6    A    I mean --

 7    Q    And that's all I needed to know is whether you

 8  do or you don't.  If you don't, that's fine.  I figured

 9  I have to ask you about it.  Why don't we flip to page

10  1100, and I'm trying to pinpoint the time when you

11  became involved in the Foster claim.

12    A    Okay.  Oops.  Okay.

13    Q    And on page 1100, I see a note made by Melissa

14  Dearman on March 28, 2014; do you see that?

15    A    No.  March 28th?  Oh, yes.

16    Q    Towards the top.

17    A    I'm so sorry.  Yeah.

18    Q    Do you see that one?

19    A    I do.

20    Q    And the very next note chronologically right

21  above that is one made by you on May 6, 2014; do you see

22  that?

23    A    I do.

24    Q    Do you think that's when you would've been

25  first involved in this Foster claim?



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The deposition of LAURA CHARLTON-BYVEN, taken on August 25, 2016

Page 51

1     A     Probably, yes.

2     Q     Okay.  And at that point in time, there was

3  already a lawsuit filed by Mr. Foster against American

4  Fire; is that correct?

5     A     That's correct, uh-huh.

6     Q     And I asked you this, I think, just generally,

7  but do you think any point in time March, April, or May

8  of 2014 you would've discussed the claim with Melissa

9  Dearman?

10    A     I said I don't have any independent

11 recollection of it.  I may have called her and said, you

12 know, "Thanks for the file," or, "Are you mailing me the

13 file," or something like that.  I just -- I don't have

14 any independent recollection.

15    Q     The next note that you make is on May 19,

16 2014, and it starts at the very bottom of page 1097.  It

17 looks like it continues onto 1098 and 99.

18    A     I see that.

19    Q     Okay.  When you first looked at this file,

20 what was your analysis of how much coverage the Fosters

21 had?

22    A     For UIMBI?

23    Q     Yes.

24    A     $100/$300.

25    Q     All right.  So that means he had -- in



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 52

1    relation to this particular accident -- he had $100,000

2    of coverage available with American Fire; is that

3    correct?

4       A    That's correct.

5       Q    What was your analysis of the liability on

6    this case?

7       A    You mean fault?

8       Q    Yes.

9       A    That the other party was at fault for the

10   accident.

11       Q    Okay.  So there was never -- as far as I know,

12   there was never really any dispute that the other driver

13   was at fault for causing the motor vehicle collision,

14   itself; is that correct?

15       A    Correct.

16       Q    It looks like you have a section on

17   "Damages/injuries/reserve analysis;" do you see that?

18       A    I do.

19       Q    Where do you think you would've gotten the

20   information to come up with the analysis there in your

21   damages section?

22       A    Whatever documentation was in the file at the

23   time that I got the file.

24       Q    Okay.  So at this point in time, did you know

25   that Mr. Foster had had an arthroscopic surgery on his

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 53

1    knee in October of 2009?

2        A    That's what it says, yes.

3        Q    And did you also know that Mr. Foster's

4    orthopedic surgeon was indicating that he did not think

5    that Mr. Foster was ever going to be able to return to

6    work as a mechanic?

7        A    Yes.

8        Q    Okay.

9        A    I'm not sure how that information was relayed.

10   I'm not sure if the doctor sent us something or Mrs. --

11   Mr. Foster or Mrs. Foster told us that or the attorney,

12   but yes.

13       Q    You also have listed in there that -- an

14   approximate amount of Mr. Foster's medical bills up to

15   the point in time.

16       A    I see that.

17       Q    And what do you have?  What's the number for

18   that?

19       A    Medical bills are $17,154.50, and his wage

20   loss claim is approximately $4,536.

21       Q    I wanted to ask you about that wage loss

22   claim.  How did you come up with the $4,536 for his wage

23   loss claim?

24       A    I'm not sure.  It may have come from the

25   attorney.  It may have come from documentations in the



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1   file.  He may have told a doctor that.  It may have been

2   on the medical records.  I'm not sure.

3        Q    And it says, "Total $21,690.50."

4        A    Uh-huh.

5        Q    **Is that you just adding that wage loss to the**

6   **medical bills?**

7        A    Hopefully correctly, yes.

8        Q    **And just again, asking about that wage loss**

9   **claim, did you understand that Mr. Foster, or at least**

10  **his orthopedic surgeon, was saying he was not going to**

11  **be able to work ever again as a mechanic?**

12       A    That -- well, I guess I'm not sure if that was

13  from the doctor saying that or maybe someone else

14  telling us that's what the doctor told him.  I'm not

15  sure.

16       Q    **Do you know if you did any calculations**

17  **yourself to come up with $4,536 for his wage loss claim?**

18       A    Like I said, I don't know how that information

19  came to me.  It may have come to me through the

20  attorney.  I don't know.

21       Q    **And when you say "the attorney," are you**

22  **talking about somebody from Mr. Richardson's firm?**

23       A    No, I'm -- it would be saying somebody from

24  Mr. Foster -- representing Mr. Foster.

25       Q    **Okay.  Tell me --**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 55

1    A    Can I just -- I'll just --

2    **Q    Yeah, go ahead.**

3    A    -- clarify for you.

4    **Q    Sure.**

5    A    Typically, what I'll do when I get a claim

6    file is I'll call the attorney and say, "Hey, can you

7    give me an update on your client?  Tell me are they done

8    treating.  What are they treating for?  What are their

9    injuries?  Do you know how much their medical bills are

10   to date?  How much was their wage loss claim?"  So that

11   information could've come directly from plaintiff's

12   counsel.  I'm really not sure.  But I do try to make

13   those kind of contacts so I get an accurate account of -

14   - of what they know from their clients, because I can't

15   contact the client at that time.

16   **Q    Right.  And at least at this point, in**

17   **fairness to you, you're getting involved in a claim**

18   **where a lawsuit is already pending, correct?**

19   A    Correct.

20   **Q    So in this instance, you may not have reached**

21   **out directly to either me or somebody at my firm; is**

22   **that fair?**

23   A    That's fair, or it could've even been in

24   discovery responses for all I know.

25   **Q    Well, at least in the next paragraph down, it**

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 56

1   looks like you haven't received any discovery responses

2   yet.  So it wouldn't have been something that would've

3   come from the discovery responses from Mr. Foster; is

4   that right?

5       A     Where do you see that?  I'm sorry.

6       Q     In the second full paragraph there on page

7   1099.

8       A     Oh.  You're correct.

9       Q     Did you know that Mr. Foster also had PIP

10  coverage with American Fire?

11      A     I -- I'm aware that he had it, yes.  I didn't

12  handle it, but, yes.

13      Q     Right.  Did you ever talk with any of the

14  adjusters that were handling his PIP claim?

15      A     No.

16      Q     Did you understand in April of 2014 that PIP

17  had already paid out a lot more than $4,536 for wage

18  loss?

19      A     I don't review the PIP file.

20      Q     Are you saying that you did not review the PIP

21  file at all during the handling of Mr. Foster's claim?

22      A     No, because -- it -- they're separate --

23  separate handlers.  So I don't review that unless I have

24  permission to do that, so no.

25      Q     Whose permission would you need to get to look



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 57

1   at the PIP file?

2       A    The attorney and his client or her client.

3       Q    **Do you know of anybody, either Mr. Foster or**

4   **any of his attorneys, saying that they didn't want you**

5   **looking at the PIP file?**

6       A    I don't have any recollection of that one way

7   or the other.

8       Q    **Okay.  In your note here on May 19th, what do**

9   **you document the current situation as to settlement**

10  **offers with Mr. Foster?**

11      A    Are you referring to a certain paragraph or --

12      Q    **Yes, I'm just looking at that first paragraph.**

13  **You have a figure there.**

14      A    Okay.  The last sentence?  Is that what you're

15  referring to?

16      Q    **Yeah.**

17      A    Uh-huh.  It just says, "It appears the last

18  offer was $17,264, which has been refused by insured,

19  and they have continued to reiterate their full policy

20  -- their full policy limit demand."

21      Q    **At some point did you come to realize that**

22  **$17,264 had never actually been offered to Mr. Foster?**

23      A    I would have to go through the file and see if

24  that's what it says.  It may have just been a typo.

25      Q    **Do you remember at some point that there had**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LAURA HARTZ-RIVEN, taken on August 8, 2016

Page 58

1  been a $7,500 combined offer by both American Fire and

2  Philadelphia Insurance Company?

3       A    At some point prior to my handling, you mean?

4       Q    Yes.

5       A    I think so, and I think maybe that would've

6  been -- maybe that's the typographical error, or maybe

7  it was only 7264 or something like that instead of 17.

8       Q    Okay.  Well, I'll just tell you that no one

9  ever offered $17,264 to Mr. Foster.

10      A    Uh-huh.

11      Q    Was that you impression during the handling of

12  the claim, that that actually had been offered to him?

13      A    Like I said, I think it's probably a typo, to

14  be honest, because I do remember that $7,500 number

15  being the actual offer.  Yeah, I think it's just a

16  typographical error, typing.

17      Q    I'm also looking in this paragraph, and

18  there's a sentence in there that says, "We are waiting

19  for the recs," and I guess that's medical records, "from

20  Dr. Cecil and OpenMRI along with a complete copy of the

21  SSDI file;" do you see that?

22      A    I do.

23      Q    And it says, "Once this has been received, we

24  will likely be scheduling IME."

25      A    Uh-huh.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 59

1    Q    What's an IME?

2    A    An independent medical evaluation or

3    examination.

4    Q    Do you know why that hadn't been done yet?

5    A    Because we didn't have all the records.

6    Q    And you're waiting on Dr. Cecil?

7    A    Dr. Cecil and the SSDI file and the OpenM --

8    OpenMRI, yes.

9    Q    Do you know why -- well, do you know whether

10   or not you actually had the Dr. Cecil records at that

11   point in time?

12   A    I don't believe we had all of them, no.

13   Q    Okay.  What about the OpenMRI records?  Do you

14   know whether you had those or not?

15   A    I don't believe we had all of them.

16   Q    Why hadn't there been a request for those

17   earlier than May of 2014 if you didn't have them?

18   A    I can't comment on -- they might not have even

19   been aware of them.

20   Q    Okay.  What about the SSDI file?  Do you know

21   whether or not anybody had requested that yet?

22   A    I'm fairly certain we kept asking plaintiff's

23   counsel for it, and for whatever reason it just wasn't

24   supplied.  So I think we had to get a -- maybe a release

25   or a subpoena or something like that possibly.  I'm not

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   sure.
 2       Q    Tell me what you thought was going to be
 3   important in that SSDI file.
 4       A    Well, we would make sure we'd have a complete
 5   copy of all of his prior records and his pertinent
 6   records relating to when he was claiming for his SSDI
 7   case.  Because he was telling us that this accident was
 8   part of the reason why he was being -- or the reason why
 9   he was being deemed disabled.
10       Q    Couldn't you have gotten those records
11   yourself outside of the SSDI file?
12       A    Well, we could have, as long as he disclosed
13   all of them.
14       Q    Why hadn't Mr. Foster given you an
15   authorization to get whatever records you all wanted?
16       A    Well, it's more than just having the release.
17   You also have to know what vendors you're ordering them
18   from.
19       Q    Do you remember whether or not he had provided
20   you a list of the places that he had been to the doctor?
21       A    I'm not -- I'm not sure.  I don't remember a
22   list from him, no.
23       Q    Okay.  And is that why the IME hadn't been
24   scheduled yet?  You-all were still waiting on records?
25       A    I know that, you know, we don't want to
```



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 61

1    schedule an IME until we have all the records, because

2    we want to make sure that the -- the doctor who's

3    performing the IME has all the information available to

4    them and can give us, you know, the most accurate

5    opinion of, you know, what they're trying to discuss for

6    us.  Because we just want to know the truth, and if they

7    don't have all the information, they can't necessarily

8    give us a, you know, a good report to tell us what the

9    truth actually is.

10        **Q    Why was it taking you so long to gather up**

11   **medical records?**

12        A    From what I -- I just remember records in

13   general being difficult in this case.  You know,

14   employment records, medical records.  I just remember in

15   general asking for things and just not getting them for

16   whatever reason, or getting redacted documentation or

17   part of it, and I don't know why that was.  That just --

18   I think that's just a little immediate recollection that

19   I have.

20        **Q    Okay.  Let me explore that a little bit.  What**

21   **did you get that was redacted?**

22        A    I don't remember.  I just remember getting

23   documentation and everything not being there, like, it's

24   SSDI records or maybe not all of them.  Maybe just,

25   like, the opinion and the award and not all the actual

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW   Doc #: 195-21   Filed: 10/05/16   Page: 63 of 126 - Page
ID#: 3170
The Deposition of LAURA HARRIS-BIVEN, taken on August 6, 2016

Page 62

1  file itself.  I can't remember but I just remember it

2  not being complete.

3      **Q**    **Okay.  And once you did get that SSDI file,**

4  **that did not make it into your claim file?**

5      A    I think --

6      **Q**    **Is that right?**

7      A    I think defense counsel obtained that.

8      **Q**    **Do you know if you provided that file to the**

9  **IME doctor you-all eventually hired?**

10     A    I'm sure -- I'm sure he gave everything that

11  we had to the IME doctor.

12     **Q**    **So you think you gave him the whole SSDI file?**

13     A    I would think we gave him every medical record

14  that we had ever obtained for him.

15     **Q**    **Okay.  So you think that Dr. Jenkinson, who's**

16  **the IME doctor, had every piece of medical documentation**

17  **that he needed on Mr. Foster?**

18     A    I would not have given those to him

19  personally, but I would assume that defense counsel

20  would've given him everything, yes.

21     **Q**    **And at this point, we're, you know, just**

22  **looking at the dates we're in May of 2014.  The accident**

23  **took place in June of 2008.  So we're almost six years**

24  **after the accident, and would you agree with me that six**

25  **years is too long for it to take for medical records to**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 63

1    be gathered by a claims handler?

2            MS. MCCOLLUM:  Objection.  Form.

3        A    I would -- I would say as long as the adjuster

4    is aware of needing them and trying to get them.  I

5    mean, once -- once an attorney is involved, the

6    attorney, you know, needs to help provide that

7    information to us.  So we would've asked for it, and if

8    we wouldn't have gotten it -- you know.

9        Q    Well, what about before the lawsuit was filed?

10   Do you know whether or not Mr. Foster had given an

11   authorization to American Fire to get medical records?

12       A    I have no -- no idea.  Like I said, I don't

13   remember, because I didn't review that part of the file.

14       Q    Let's flip kind of forward in time to page

15   1095.

16       A    Okay.

17       Q    I'm looking at -- there's a series of notes on

18   July 21, 2014, and I'm looking at one that's dated

19   9:57 a.m.; do you see that?

20       A    Yes.

21       Q    And it's talking about a vocational expert

22   named Dr. Barnes.

23       A    Uh-huh.  I see that.

24       Q    Do you remember Dr. Barnes?

25       A    I remember it was a female.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 64

1    Q    Okay.

2    A    And I'm not even sure she's a doctor,

3  actually, but she was the vocational expert that

4  plaintiff's counsel obtained.

5    Q    And I'll tell you, she's not a medical doctor.

6    A    Yeah.

7    Q    What do you remember her opinion was about Mr.

8  Foster's work loss, the amount of it?

9    A    The amount that she put in her report?

10   Q    Correct.

11   A    Or the amount that she did -- in -- she put in

12  her deposition?

13   Q    Well, I guess, both.

14   A    I remember that her deposition testimony was

15  different than what her report said.

16   Q    Okay.  Tell me about that.  What was

17  different?

18   A    I remember that her -- when she was, I guess,

19  cross examined, it came out that she didn't use

20  plaintiff's actual wage loss.  She used plaintiff and

21  his wife.  She didn't review any of his prior tax

22  returns to get a, maybe, more accurate account of what

23  he actually made himself.  And I think they used gross

24  rather than net in order to determine his wage loss.

25   Q    Okay.  So what was different between the



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 65

1    report and the deposition?

2         A    Her report numbers were considerably higher

3    than what she testified to.

4         Q    What --

5         A    And she even -- I think she even said in her

6    deposition that, you know, she was in error by using the

7    wife's -- the wife's wages along with Mr. Foster's.

8         **Q    How did you come to know that, that she was in**

9    **error?**

10        A    My defense attorney told me after the

11   deposition that's what she said.

12        **Q    You haven't reviewed Dr. Barnes' deposition**

13   **yourself?**

14        A    No, I have not.

15        **Q    You have not watched the video of that either?**

16        A    I have not.

17        **Q    So anything that -- any notes that you're**

18   **making, I guess, about Dr. Barnes' testimony all**

19   **would've come from conversations or letters with the**

20   **defense lawyers hired by American Fire; correct?**

21        A    Correct.

22        **Q    Who was the economist that American Fire**

23   **consulted with in this case?**

24        A    I don't remember who it even was at this

25   point.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

```
 1        Q     You-all did consult with an economist about
 2   the wage loss claim, did you not?
 3        A     We did consult with someone, yes.
 4        Q     Do you know Dr. William Baldwin; does that
 5   ring a bell?
 6        A     That, perhaps, could be who it was, yes.
 7        Q     Did you have any discussions with Dr. Baldwin?
 8        A     Personally?
 9        Q     Yes.
10        A     No, I did not.
11        Q     Tell me what you know about Dr. Baldwin's
12   opinion about the wage loss.
13        A     Well, I remember that they -- he said that
14   they weren't using gross -- they were using the gross
15   numbers rather than net income.  I do remember that.
16        Q     Let me stop you there for a second.  Did he
17   say -- well, he didn't say that that was the incorrect
18   way to do it, correct?
19              MS. MCCOLLUM:  I'm going to object, because I
20        think that Dave Richardson said that he was
21        consulted as a consulting expert and not for sure
22        if we have to disclose those in federal court, but
23        that his purpose of being contacted was to assist
24        with preparation of cross exam and not to really
25        render an opinion.
```



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 67

1          THE WITNESS:  That's exactly right.

2    BY MR. FAIRBANKS:

3          **Q     Well, let me state that question again.  Dr.**

4    **Baldwin wasn't telling you that Dr. Barnes' calculation**

5    **was incorrect, was he?**

6          A    I just -- I don't think he said that.  I just

7    think he said that the proper way to do it would be to

8    use the net rather than the gross to get an accurate

9    account.  Not necessarily an error, just maybe not as

10   accurate.

11         **Q     Well, he actually told you that using the net**

12   **was too low, didn't he?**

13         A    I don't remember it being too low.  I think he

14   said there was a range, if I remember correctly. There's

15   a -- is there a particular document that you remember me

16   reporting that, --

17         **Q     Yeah, let me show you what I've got.**

18         A    -- that maybe can refresh my memory?  Yeah, I

19   don't mean necessarily that.  I mean, in the claim file

20   that I reviewed already.  Because this is --

21         **Q     I think this is part of the claim file.**

22         A    Okay.

23         **Q     This is page -- Foster claim 15.**

24         A    Okay.

25         **Q     And I'll just tell you, Ms. Harp-Biven --**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 68

```
 1        A    Okay.

 2        Q    I think that you had, at one point, wrote a

 3   narrative note because your system was down or something

 4   like that.

 5        A    Okay.

 6        Q    Do you remember that?

 7        A    I'm sure my system's been down, yes.

 8        Q    Okay.  Well, this was in the claim file --

 9        A    Okay.

10        Q    -- in the first paragraph on page 15.  This is

11   what I'm asking you about.

12        A    Okay.  Sure.

13        Q    It says, "We also retained Dr. Baldwin

14   regarding the alleged wage loss claim;" do you see that?

15        A    Correct.

16        Q    And you guys did not ask him to provide a

17   written report; is that right?

18        A    That's correct.

19        Q    Nor did you disclose him to Mr. Foster?

20        A    That's correct.

21        Q    And that was because his opinions were going

22   to help Mr. Foster's case, correct?

23        A    Well, they could possibly.  We just wanted

24   really his in -- his help in determining how to cross

25   examine their expert.  Make sure we had a good
```



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 69

1    understanding of how they arrived at the numbers that

2    they did.

3        Q    Well, in fact, his opinions were possibly

4    going to help Mr. Foster's claim?  That's true, isn't

5    it?

6        A    That's not necessarily true.  I just said it

7    possibly could.

8        Q    Well, your note here says, "We choose not to

9    disclose him because his opinions could possibly help

10   the plaintiff's case."

11       A    Correct, "could possibly."  Not that they

12   would.

13       Q    Okay.  And then the next sentence it says, "He

14   advises that plaintiff's economic expert used the gross

15   receipts rather than the net profits/loss for self-

16   employed individuals, which tend to exaggerate income

17   level;" do you see that?

18       A    Correct.  Uh-huh.

19       Q    The next sentence says, "However, using the

20   net profits/loss receipts would undervalue the lost

21   income;" do you see that?

22       A    I see that.

23       Q    So he was telling you that using the net

24   profit and loss receipts was going to undervalue Mr.

25   Foster's lost income claim, correct?

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1    A    I'm not sure if that should've said would or

2    could, but --

3    **Q    Well, it says "would."**

4    A    Yeah, it says "would," but...

5    **Q    What number did Dr. Baldwin tell you was the**

6    **correct one for the wage loss claim?**

7    A    I don't believe he ever told me a number that

8    was -- I know he didn't tell me anything directly.

9    **Q    Did you ever hear a number disclosed to you at**

10   **all from Dr. Baldwin?**

11   A    No, I just -- I believe they had just some

12   real concern with the gross receipts rather than the net

13   profits, because he was self-employed, and I believe he

14   was a mechanic.  So you're using parts, you know, in

15   there, and parts is not a profit for him in his wage

16   loss claim.

17   **Q    Do you know the position that American Fire**

18   **was going to take at trial related to Mr. Foster's lost**

19   **income claim?**

20   A    Before or after Dr. Jenkinson's deposition?

21   **Q    Did it change?**

22   A    It did.  Dr. Jenkinson's --

23   **Q    Okay.  Tell me how it changed.**

24   A    -- deposition changed our handling of the

25   file, because he's -- he didn't testify consistent with

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW Doc #: 195-21 Filed: 10/05/16 Page: 72 of 126 - Page ID#: 3179
The deposition of LAURA CHARLES-BIVEN, taken on August 3, 2016

Page 71

1  his report.

2      Q    Well, I'm asking specific to the lost income

3  claim.  What was the position that American Fire was

4  going to take at trial on the lost income claim?  And if

5  it's different before or after Jenkinson, tell me.

6      A    I believe it was that they -- he was already

7  indemnified through PIP.  If I remember correctly, I

8  think he was overpaid under his PIP claim.

9      Q    Were you-all going to use the net profit loss

10  calculation?

11      A    I think we were -- I remember in -- at some

12  point, we received information.  He told the doctor or

13  told someone he made $100 a day at his job, and I don't

14  know what document that came from.  It may have been

15  from his Social Security file.  I'm not sure.  Where he

16  said he made $100 a day, which would've equated to,

17  like, $26,000 a year.  $25, $26,000 a year.  And I think

18  that along with our tax returns that we had for him

19  previous were the numbers we were going to use for him,

20  not the numbers that they were using.

21      Q    So you were going to use the $100 a day

22  figure?

23      A    That, maybe, along with whatever his prior tax

24  return showed that were separated from his wife.

25      Q    Well, let's say you did use that $100 a day



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    figure, $26,000 a year.

2        A    Okay.

3        Q    **His claim's going to clearly exceed the policy**

4    **limits then, isn't it?**

5        A    Well, that's if you accept that the -- his --

6    his injuries are related to the car accident.

7        Q    **Okay.  Assuming you do -- assuming you accept**

8    **his injuries --**

9        A    We didn't.

10       Q    **I'm not saying you did.**

11       A    So -- yeah.  Yeah.

12       Q    **Assuming you did, $26,000 a year.  Easy policy**

13   **limits case, correct?**

14            MS. MCCOLLUM:  Objection.  Form.

15       A    Well, that's also if he's not able to return

16   to work, and it's based upon those injuries

17   specifically.  He had other problems, too.  Because from

18   what I remember, his Social Security file -- he wasn't

19   deemed disabled right after our accident for car

20   accident related injuries.  He had, like, heart problems

21   and I'm thinking a shoulder problem or something else,

22   too.  And he was obese, so all those things can come

23   into play along with, you know, your disability, not

24   just this car accident.

25       Q    **Well, do you know that he wasn't considered**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 73

disabled right after the accident, because he tried to
go back to work for a while; do you know that?

    A    I do know that, yes.  I think the doctor at
one point told him not to work, and he did anyway.

    Q    So -- okay.  So you were thinking about the
$100 a day as maybe one way to calculate it.  Another
way is to use the net figure from his tax returns?

            MS. MCCOLLUM:  I would just like to interject.
        I think this was -- issue was fully briefed for the
        Court.  So there may be other legal basis argued to
        the Court, and I don't think there was yet a ruling
        on that prior to resolution of the case.  So I
        would just argue that this may be a more
        appropriate -- or an appropriate question for
        counsel as well.  Underlying counsel -- excuse me,
        Mr. Richardson.

BY MR. FAIRBANKS:

    Q    Do you know whether you-all were planning to
use the net figure from the tax returns as the basis for
calculating the lost income claim?

    A    Like I said, that would be a Dave Richardson
question.

    Q    Let me ask you this --

    A    Because what his plan was at trial, I don't
know.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1       Q    Okay.  Let me ask that a different way:
2   Regardless of what you were planning to do at trial, in
3   your evaluations, you were using the net income figures
4   off of the tax returns, correct?
5       A    I'd have to look and see.  Do you have my
6   evaluation anywhere in the file?
7       Q    I think a lot of that's redacted.
8       A    Okay.  Sorry.
9       Q    I'm wondering:  Do you know?
10      A    I don't remember.
11      Q    Okay.
12      A    Like I said, if I could look at the document,
13  I could tell, perhaps.
14      Q    We know at least from looking at this note
15  that Dr. Baldwin had advised that using that would
16  undervalue his claim, correct?
17      A    That's what it says.  I'm not sure that's what
18  I meant, but, yes.  I think it could've been could
19  rather than would, but...
20      Q    Do you know which witnesses you-all were
21  planning to call at trial?
22      A    No, that's a Dave Richardson question, too.
23  Sorry.
24      Q    Let's talk a little bit about Dr. Jenkinson.
25      A    Okay.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 75

1      Q    I think we've alluded to him a couple of
2  times, and just to refresh everybody's memory, he was
3  the medical examiner that was hired by the defense to
4  examine Mr. Foster; is that correct?
5      A    That's correct.
6      Q    Is this the first case that you ever had Dr.
7  Jenkinson involved in?
8      A    Gosh, I have no idea.
9      Q    Okay.
10     A    I have no memory --
11     Q    Any other cases right now where he's involved?
12     A    That I have, personally?
13     Q    Yes.
14     A    I don't know.  I don't think so.  I don't
15 know.
16     Q    Okay.  Tell me what you know about Dr.
17 Jenkinson.
18     A    I know he's a Board Certified Orthopedic
19 Surgeon.
20     Q    Do you know where he's located?
21     A    I do not.
22     Q    Do you know how many medical examinations he
23 does each year?
24     A    I have no idea.
25     Q    Did anybody ever tell you that?



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 76

1      A      No.

2      Q      Do you know how much he charges for the

3   medical examinations?

4      A      No idea.

5      Q      Would you agree with me that in hiring a

6   medical examination -- examiner, you want somebody who's

7   going to be fair to both sides?

8      A      Absolutely.

9      Q      You want somebody who is truly independent?

10     A      Yes.

11     Q      Why did it take so long to send Mr. Foster to

12  see Dr. Jenkinson?

13     A      Because we didn't have all the medical

14  records.

15     Q      Okay.  So it took until October of 2014 to

16  send Mr. Foster to Dr. Jenkinson because you did -- guys

17  didn't have all the medical records?

18     A      Correct.

19     Q      And you don't know what access anybody had to

20  the medical records before the time you were involved in

21  the file?

22     A      Correct.  I have no idea.

23     Q      And at that point in time -- and just, you

24  know, using the math, from June of '08 to October of

25  2014 was six years and four months after his accident?



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 77

1    A    Correct.  Yeah, I don't think he applied for

2    Social Security until, like...

3         MS. MCCOLLUM:  And I'd like to object there

4         that even if the accident occurred in 2008, he did

5         not make a UIM claim until many years afterwards,

6         and it may be 2010.  And I may be incorrect about

7         it, but I think it's 2010.

8    BY MR. FAIRBANKS:

9         **Q    Yep.  Let me ask it that way, too.  Assuming**

10   **that Mr. Foster formally made a UIM claim in May of**

11   **2010, we're still four years and five months after the**

12   **UIM claim was asserted?**

13        A    If your math's correct, yes.

14        **Q    Let's flip over and flip forward in time again**

15   **to page 1094.**

16        A    Mr. Fairbankss, do you want this to be an

17   exhibit?

18        MR. FAIRBANKS:  Oh, let's -- yeah.  Let's do

19        that.  Thank you.  What is the next exhibit?  It's

20        5?

21        COURT REPORTER:  This one right here will be

22        6.  The next one will be 7 after that.

23        MR. FAIRBANKS:  Okay.  Let's make that 6.

24        That's 5.  Okay.  Thank you.

25             (EXHIBIT 5 MARKED FOR IDENTIFICATION)

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1             (EXHIBIT 6 MARKED FOR IDENTIFICATION)

2           THE WITNESS:  You're welcome.

3  BY MR. FAIRBANKS:

4      Q    I'm on 1094, and I want to ask you just a

5  couple of questions about a note on August 14, 2014.  Do

6  you remember, at some point when you were handling the

7  claim, that there was an amended complaint filed against

8  American Fire?

9      A    Against both UIM carriers, yes.

10     Q    And that was the bad faith unfair claims

11  practices case that we're here talking about today?

12     A    Correct.

13     Q    At that point, in August of 2014, you had not

14  made any offers to Mr. Foster on the UIM claim, correct?

15     A    I'm not sure.  I think we may have reiterated

16  our offer.  I'm not sure.

17     Q    To the extent that a prior offer had been

18  reiterated, that would've been $4,500, correct?

19     A    I don't know.  I'd have to --

20     Q    And that would've --

21     A    I wish we had our computer.  That would be

22  easier to tell you that information, quite honestly.

23     Q    Sure.  Do you know when that $4,500 offer from

24  American Fire was first made?

25     A    I couldn't -- I have no idea.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And I'll tell you --

2    A    It could be --

3    Q    -- it was made in May of 2011.

4    A    Okay.

5    Q    Do you remember, yourself, reiterating that

6    $4,500 offer at any point in time?

7    A    I don't recall that, no.

8    Q    Okay.  At this point in time also in August of

9    2014, American Fire had not sent Mr. Foster to see Dr.

10   Jenkinson yet, correct?

11   A    I'm not sure.  I don't know what the date was.

12   Q    I think he went on October 8, 2014.

13   A    Okay.

14   Q    And I'll just show you a copy of his report.

15   A    Sure.

16   Q    I don't want to put words in your mouth.

17   A    Sure.  No.  No.  That's fine.  Yeah, October

18   8, '14.  You're right.

19   Q    And I don't need to mark this as an exhibit.

20   A    You're right, okay.

21   Q    Was the fact that this amended complaint was

22   filed one of the reasons why you guys went ahead and

23   scheduled the IME?

24   A    I don't know.

25   Q    Okay.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 80

1      A      No.

2      Q      Did this affect the way that you handled the

3   claim at all?  This amended complaint?

4      A      No, didn't change anything for me.

5      Q      Let's flip over to page 1091.

6      A      Okay.

7      Q      There's a note near the top, September 3,

8   2014.

9      A      Uh-huh.

10     Q      It says, "Have you called Bob Stouffer and

11  made the combined offer to plaintiff's counsel that we

12  discussed?  What's the status?"

13     A      I see that.

14     Q      Who is that note meant for?  Who were those --

15  are these just questions that you're having in your own

16  mind to remind yourself to do something?

17     A      I think it's probably a -- it's probably a

18  call that I probably made to defense counsel.

19            MS. MCCOLLUM:  And I object to form.

20     Q      Is that a note that you made?

21     A      Yes, it is.

22     Q      Who is Bob Stouffer?

23     A      Bob Stouffer, I believe, was the attorney

24  representing Philadelphia Insurance.

25     Q      Do you know what the combined offer was that



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 81

1   you-all were discussing?

2       A    No, because it's probably contained in these

3   black boxes, and I can't see in there.

4       Q    Do you know why there was no combined offer

5   made?

6       A    I -- I didn't know if a combined offer was

7   made or not to -- based on this information.

8       Q    Okay.  Well, let's just flip forward enough to

9   get our bearings here.

10      A    Sure.

11      Q    Let's flip over to page 1084.

12      A    Okay.  Okay.

13      Q    And I'm looking at -- this is a few months

14  after that September note we were just looking at.  I'm

15  looking at a note December 19, 2014; are you with me?

16      A    I am.

17      Q    It says, "Approved defense counsel's letter

18  confirming our offer of $10,000."

19      A    Okay.

20      Q    Do you see that?

21      A    I do.

22      Q    That was not a combined offer, that $10,000,

23  correct?

24      A    I'm not sure.  I would think it would just be

25  our offer.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1     Q     Does that refresh your memory as to why a
2  combined offer wasn't made back in September?
3     A     No, it doesn't really help me.  I'm sorry.  My
4  computer would help me more.
5     Q     Would you agree with me that that $10,000
6  offer was the first offer that you made to Mr. Foster?
7     A     That, I don't know for sure, either, without
8  my computer.
9     Q     Do you know how you came up with that $10,000
10  figure?
11    A     It would've been whatever my evaluation said
12  at the time.  And it would've included the medical
13  records that we had, wage loss, docket -- Dr.
14  Jenkinson's report.
15    Q     Yeah, let me ask you about that.  You-all were
16  relying on Dr. Jenkinson as a basis for making the
17  settlement offer that you did, correct?
18    A     He definitely was part of it, yes.
19    Q     Did you, yourself, have any discussions with
20  Dr. Jenkinson?
21    A     I did not.
22    Q     Do you remember at some point his deposition
23  was taken?
24    A     Yes.
25    Q     And he did not perform well for American Fire

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 83

1    in the deposition; is that fair?

2        A    I wouldn't say that.  Just he was inconsistent

3    with what his report...

4        Q    **Tell me what was inconsistent.**

5        A    Well, in his report, he was very strong that

6    the plaintiff only sustained a bruise to his kneecap and

7    a bruise, I believe, to his shoulder -- his arm.  His

8    injuries weren't permanent.  The surgery wasn't related.

9    Everything was degenerative.  It was related to his

10   morbid obesity.  And then I received a call from defense

11   counsel after the deposition and said he completely

12   reneged on all of that.  He said that it was not

13   possibly related, and surgery could've been related to

14   the accident as well.  So he was completely inconsistent

15   with what he told us in the report.

16       Q    **And he didn't -- let me back up.  Did you ever**

17   **find any prior medical records where Mr. Foster had any**

18   **problems with his right knee before the accident?**

19       A    I would have to review the file to know that

20   for sure.  I just know that his diagnostics all said,

21   "Degenerative conditions."

22       Q    **Do you know how old Mr. Foster was when he was**

23   **having those studies done?**

24       A    I think he was in his 50s, I think.

25       Q    **You handle a lot of claims, correct?**

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 84

1        A    Uh-huh.  Yeah.

2        **Q    Would you agree that it's not uncommon for**

3  **somebody in their 50s to have some degree of**

4  **degeneration in their joints?**

5        A    I would agree with that statement.

6        **Q    And actually, you would be surprised if there**

7  **was no degeneration, correct?**

8        A    There's differing ranges.  Mild, medium,

9  severe.  So yeah, I would -- I would be surprised a 50-

10  year-old person would have at least some mild

11  degenerative changes, probably.  It also depends on what

12  you do for a living, you know.

13       **Q    And anything that was showing up on Mr. Foster**

14  **was mild; is that right?**

15       A    I don't believe that's true.

16       **Q    Okay.  Tell me what you believe it was.**

17       A    Oh, I remember at one point, they talked about

18  some fraying and some tearing, and that's not mild.

19  That's usually the next level.  And he had -- was it

20  tendonitis, I believe.  I'm trying to think what all the

21  report said since it's been so long.  But I know he was

22  morbidly obese, and I remember Dr. Jenkinson said that

23  would have a lot to do with his condition along with his

24  job as an auto mechanic.

25       **Q    Do you also remember seeing that he had**



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  sustained a -- an impaction fracture on his knee?  Do
2  you remember that at all?
3       A    Are you referring to a certain date on
4  something?  A report or something I can look at?  Or a
5  note in my file?
6       Q    Give me just a second.  I'll see what I can
7  pull up for you.
8       A    Sure.
9       Q    I'm going to flip this around.
10      A    Okay.
11      Q    I have a copy.  This is actually page 1 of
12 your claim file.  And I'll zoom out so you can get your
13 bearings and see what this is.
14      A    Do you know what the date of that is, by
15 chance?
16      Q    Yeah.
17      A    There we go.
18      Q    Date of exam is July 12, 2008.
19      A    Okay.
20      Q    So that's an MRI report from about a month
21 after the motor vehicle collision, correct?
22      A    Uh-huh.
23      Q    Okay.  The summary says, "He's got sever edema
24 and subtle cortical indentation in the far medial
25 femoral condyle, suggesting an osteochondral impaction



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1    fracture;" do you see that?

2        A    Uh-huh.

3        Q    **What did you make of the fact that the MRI**

4    **report was showing an osteochondral impaction fracture**

5    **on the right knee?**

6        A    Osteo usually means arthritis.  So it's

7    arthritic.

8        Q    **Well, osteo means bone, doesn't it?**

9        A    It could, yes.

10       Q    **It doesn't mean arthritis.**

11       A    That's true.  That's true.

12       Q    **So you've got this record showing that he's**

13   **got an impaction fracture there.  Why did you think that**

14   **he just sustained a bruise to his right knee?**

15       A    Edema.

16       Q    **Okay.  So he could have bruising and an**

17   **impaction fracture, could he not?**

18       A    He could, and I think the doctor that did this

19   was not a -- who's Dr. Cecil?  Oh, you know what?  Dr.

20   Cecil, didn't we get those records later?  I don't think

21   we got Dr. Cecil's records until later.

22       Q    **Dr. Cecil was his primary care physician --**

23       A    Yes.

24       Q    **-- dating back to the 1970s.**

25       A    Yes, and he didn't disclose that information



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LAURA HART BEVEN, taken on August 8, 2016

Page 87

1    to us.  I remember.

2        **Q    Who didn't disclose it?**

3        A    The plaintiff.  We didn't have Dr. Cecil's

4    records until, I think, later on.  Because I remember we

5    had to give those records to Dr. Jenkinson, who did an

6    addendum to his report because of those records.

7        **Q    You-all had those records all the way back in**

8    **December of 2010, didn't you?**

9        A    I'm trying to think.  I'm sorry.  I do

10   remember getting some additional records, and I thought

11   they were Dr. Cecil's records; is that not right?  Can I

12   see Dr. Jenkinson's report again?  I remember there was

13   an addendum to that report, and I thought the addendum

14   lists some additional records from Dr. Cecil, so I don't

15   know which they were -- what they were, but...

16           MS. MCCOLLUM:  And I may be confusing cases,

17       but wasn't doctor -- didn't Dr. Cecil retire?

18           MR. FAIRBANKS:  Yeah, he did.

19           MS. MCCOLLUM:  And then there was a problem

20       with location of where the actual records were?

21           MR. FAIRBANKS:  Let me see if we can show you

22       where you guys had Dr. Cecil's records.

23               (OFF THE RECORD)

24           MR. FAIRBANKS:  We're back on the video

25       record.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 88

BY MR. FAIRBANKS:

1  

2      Q    Ms. Harp-Biven, I took a little break there so

3  that I could pull up the correspondence where American

4  Fire received Mr. Foster's prior records from Dr. Cecil.

5  I'm going to show you this.  And this is before you were

6  handling the claim.  I've got an e-mail pulled up here,

7  December 31, 2010, and I'm going to zoom out.  And Mrs.

8  Foster is telling Tony Dale that she has a copy of Dr.

9  Cecil's records and, in fact, is sending them to them.

10 Do you see that, December 31, 2010?

11     A    I see that.

12     Q    And I'll just scroll down a couple of pages,

13 just so we can kind of see where we are.  And then we

14 actually have the records going back from the 1970s all

15 the way up to the accident.  Do you know why you hadn't

16 seen these yet when you were handling the claim?

17          MS. MCCOLLUM:  Hold on.  Can you keep

18     scrolling down, because we see the record that you

19     were referencing previously, the MRI record.

20 BY MR. FAIRBANKS:

21     A    Uh-huh.  I don't think that was part of the

22 record.

23     Q    Okay.  Do you know when you would've gotten

24 the Richmond MRI record?

25     A    Whatever my file says.  I do remember we



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 89

1    didn't have all of Dr. Cecil's records, so that may have
2    been one of the records that we didn't have.
3         **Q    Well, that was not a record of Dr. Cecil, the**
4    **Richmond MRI record.**
5         A    Well, he should have that in his file, though.
6    It was not in his file.  If he wrote it, he was -- on
7    that previous documents you showed me, it said,
8    "Referring physician, Dr. Cecil," so it should be in his
9    record.
10        **Q    Do you know whether you had requested that**
11   **record from Richmond MRI?**
12        A    I'm not sure we would know it existed, because
13   we would be asking for Dr. Cecil's records and assume we
14   got everything, and then found out we didn't have
15   everything.
16        **Q    Okay.  Let me explore that a little bit more,**
17   **because I don't see in your file where you requested**
18   **that record from Richmond MRI.  Do you remember doing**
19   **that?**
20        A    Like I said, I'm not sure I would know it
21   existed, because if this is the documentation that we
22   had in our file, we would assume that's everything, and
23   now we find out there's an MRI with Dr. Cecil's name on
24   it that wasn't part of this record.
25             MS. MCCOLLUM:  And if I could just interject



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

 1      as a possible explanation, sometimes when you

 2      request medical records from especially Eastern

 3      Kentucky physicians, they will not include all

 4      diagnostics with their record for some reason or

 5      another, and they just don't deem it as part of the

 6      record, and that may have been what occurred here,

 7      because it does not appear as though it was

 8      forwarded by Mrs. Foster.

 9              THE WITNESS:  Uh-huh.

10   BY MR. FAIRBANKS:

11      Q    Well, do you know whether you-all had that

12   before December of 2010, the Richmond MRI record?

13      A    I don't -- I would know if I could look in my

14   computer.  I don't know.

15      Q    Do you know whether that was paid by PIP back

16   in 2008?

17      A    You'd have to ask PIP.  I have no idea.

18      Q    Assuming that PIP paid that bill back in 2008,

19   would you agree with me that somebody at American Fire

20   knew that Mr. Foster had an MRI done at Richmond MRI?

21      A    I would say if PIP paid it, PIP would know of

22   it, yes.

23      Q    Uh-huh.

24      A    Do you want to attach this?

25      Q    No, I was just showing you that so you knew



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 91

1    when those records were sent, because that was before

2    you were involved in handling the claim.

3          A    Sure.

4          Q    Ms. Harp-Biven, what went into your analysis

5    of the claim payment of $91,500 that was ultimately

6    paid?

7          A    Dr. Jenkinson's deposition testimony.  We had

8    a triage with myself, my boss, home-office examiner,

9    likely the CSM, and just the information we had at the

10   time.  Things had changed, like I said, due to Dr.

11   Jenkinson's deposition testimony.

12         Q    Okay.  Would you agree with me that you all

13   had some concerns that the value of the claim was

14   actually more than $100,000?

15              MS. MCCOLLUM:  Objection.  Form.

16         A    I'm not sure we had concerns.  I think, you

17   know, there was ranges.  So the range possibly could've

18   been more than $100.  I'm not sure.

19         Q    Well, let me ask you that:  After Dr.

20   Jenkinson's deposition the range of settlement was more

21   than $100000; is that right?

22         A    I thought it was 90 -- up to $93,000, I

23   thought.  I can't remember, but I thought the -- I

24   thought the top end -- it was $93000, I thought.

25              MS. MCCOLLUM:  Do you have a specific note you



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 92

1      can refer to?

2            MR. FAIRBANKS:  Well, that's the problem.  I

3      don't have any notes that show how -- what

4      happened.

5            MS. MCCOLLUM:  I agree with you.

6            THE WITNESS:  Sorry.

7      BY MR. FAIRBANKS:

8        **Q     Let's look at, you know, the first few pages**

9      **of your claim notes.**

10       A     Okay.

11       **Q     Maybe I can tell you when Dr. Jenkinson's**

12     **deposition was taken.  All right.  So Dr. Jenkinson's**

13     **deposition was taken April 28, 2015.**

14       A     Okay.

15       **Q     And I'm looking on page 1059.**

16       A     Uh-huh.

17       **Q     And the note at the bottom of that's an April**

18     **27th note, so I don't see anything in your notes at all**

19     **about what you thought the range of value was on this**

20     **claim after Dr. Jenkinson's deposition.**

21       A     Well, there is.  It's just not detailed

22     probably.  It looks like that meeting that I'm referring

23     to happened on 04-30-15, because it's entered by Kurt

24     Mechley, and that's -- he would've put the note in the

25     file after we had that discussion.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 93

1    Q    What page are you on?

2    A    I'm sorry, 1058.  Down at the very bottom it

3    says, "05-11 at 7:39 a.m."  It says, "File was last

4    discussed on 04-03-15."  So that means that would've

5    been right at the time span where I would've received

6    the call from defense attorney saying, you know, Dr.

7    Jenkinson's testified inconsistent with his report.  And

8    then I would've contacted my boss to tell her that, and

9    she would've set up a triage for us to talk to Mr.

10   Mechley.

11   Q    Did you have authority to pay up to $100,000

12   if that's what it took to settle the claim?

13   A    Personal authority, you mean, or just --

14   Q    On this claim.

15   A    -- people?  I don't believe so.  I think -- I

16   think I had up to $93,000.  For some reason, I remember

17   seeing that number somewhere.  Or maybe I'm wrong.  I

18   don't know.

19   Q    I haven't seen the figure $93,000.  Do you

20   just remember that from your discussions?

21   A    For some reason that number sticks out.  I may

22   be thinking of another claim.

23   Q    Well, at this point in time, before Dr.

24   Jenkinson's deposition, Mr. Foster had reduced his

25   demand below policy limits, correct?



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW  Doc #: 195-21  Filed: 10/05/16  Page: 95 of 126 - Page
ID#: 3202
The Deposition of LAURA HART-BEVEN, taken on August 8, 2016

Page 94

1      A    He did.

2      Q    And part of the reason that American Fire was

3   urging Mr. Foster to do so was because they had this

4   report from Dr. Jenkinson, correct?

5      A    Correct.  Correct.

6      Q    Okay.  Do you know, other than Dr. Jenkinson,

7   what medical doctors were going to support American

8   Fire's position at trial?

9      A    I think the doctor that did the surgery also

10  agreed that his conditions were degenerative.  He may

11  have placed some -- a little bit more emphasis on the

12  car accident, but I think his testimony -- and I believe

13  some of the radiologists and people who had taken x-rays

14  and MRIs before, their notes might've been helpful to

15  that as well.

16     Q    Shows a little bit of wear and tear on that

17  knee?

18     A    I don't know.  A little bit, a lot, but wear

19  and tear, yes.

20     Q    You think there was a lot of wear and tear?

21     A    Well, I think that -- I think that there was

22  enough that he needed to have surgery.

23     Q    And he didn't need surgery before the

24  accident, correct?

25          MS. MCCOLLUM:  Objection.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of LAURA HART-BIVEN, taken on August 9, 2016

Page 95

```
 1        A     I have no idea.  He -- if he had been to the
 2   doctor or not, I don't know.
 3        Q     He didn't have any complaints on his right
 4   knee before the accident, did he?
 5        A     Not any complaints to any of the doctors whose
 6   notes that we received probably.  I don't know.  I know
 7   he continued to try to work, too.  The doctor told him
 8   not to do that.
 9        Q     How does that -- are you faulting him some
10   kind --
11        A     No, not faulting him.  Just, you know, when
12   you're doctor usually tells you, you know, "Hey, stay
13   off your leg for a little while or get some bedrest,"
14   you know, you want to comply with your doctor's orders,
15   because they're trying to help you heal faster, or...
16        Q     So you think maybe -- and I'm just trying to
17   figure this out, because I'm not following you.
18        A     Sure.
19        Q     You think maybe him trying to work after the
20   accident hurt his knee more?
21        A     I don't think it would help, probably.
22        Q     Okay.
23        A     I think whenever you hurt yourself, you know,
24   usually you try to take it easy for a couple days no
25   matter what your injury is, and usually, if you do that,
```



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 96

1   it does help with at least pain levels and -- the doctor

2   just, you know, that's just personal examples, when I've

3   sprained ankles and things like that.

4       **Q    Would you agree with me that when you're**

5   **handling insurance claims, you want to conduct a prompt**

6   **investigation?**

7       A    Yes.

8       **Q    When you're making settlement offers, you want**

9   **those offers to be fair?**

10      A    Absolutely.

11      **Q    You don't want them to be unreasonably low?**

12      A    Absolutely not.

13      **Q    Would you also agree with me that you don't**

14  **want to make a claimant file a lawsuit to get a claim**

15  **payment?**

16      A    They should never do that, no.

17      **Q    Do you think the $4,500 settlement offer that**

18  **was on the table for Mr. Foster was fair?**

19          MS. MCCOLLUM:  Objection.  Form.

20      A    I think based on the information we had at the

21  time, yes.  Like I said, this file definitely changed

22  considerably over time, so...

23      **Q    Well, that $4,500 was on the table before you**

24  **got Jenkinson's report, right?**

25      A    Correct.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    It turns out Jenkinson's report was not good

2    for you in the end, correct?

3        A    The report was good.  The deposition was not.

4        Q    The $10,000 --

5            MS. MCCOLLUM:  I'm going to object to the word

6        "good," because it makes it seem like American

7        Fire's trying to somehow manipulate the process.

8            THE WITNESS:  Right.

9            MS. MCCOLLUM:  That his opinions were not

10       consistent with his report or that that's good or

11       bad for the company, I don't think really can be

12       testified to.

13   BY MR. FAIRBANKS:

14       Q    Did you understand what I was asking you, or

15   do you need me to ask that again?

16       A    I agree with what Heather is saying.  Yeah,

17   the way I would take "good" would be consistent, and he

18   was not consistent.

19       Q    Okay, so he was inconsistent?

20       A    Correct.

21       Q    Okay.  And he was your only medical witness?

22       A    He was our only medical expert.

23       Q    Okay.  And before October of 2014, you-all

24   didn't have anything from Jenkinson; is that right?

25       A    No, not that I'm aware of anyway.

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1    Q    What about the $10,000 offer you made in
2  December of 2014; you think that's fair?
3          MS. MCCOLLUM:   Objection.   Form.
4    A    Based on the information we had at that time,
5  yes.
6    Q    Do you think Mr. Foster's UIM claim settled
7  and settled promptly?
8          MS. MCCOLLUM:   Objection.   Form.
9    A    How do I say this?   It -- it takes some
10 cooperation from the other side to get all the
11 information, so that process took quite some time to get
12 the information that we kept asking for.   Like I said,
13 just the business records.   I remember that.
14   Q    Okay, business records?
15          MS. MCCOLLUM:   I'm a little confused by the
16         question.   Do you mean promptly after Dr.
17         Jenkinson's change in opinion, or do you mean --
18          THE WITNESS:   That's true.
19          MR. FAIRBANKS:   Heather, I interjected, but
20         your objections are speaking objections, and you're
21         coaching the witness how to answer the questions.
22         I don't mind if you object to the form, but I
23         prefer if you did not make speaking objections that
24         suggested answers to the witness.
25 BY MR. FAIRBANKS:

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 99

1    Q    And, no, I wasn't asking if it was prompt in

2  relation to Dr. Jenkinson.  I'm asking if it was prompt

3  in relation to a UIM claim being made in May of 2010 and

4  it gets settled in May of 2015.

5    A    I think it was prompt in my handling, because

6  I can only testify to, you know, what I did on the file.

7    Q    Would you use Dr. Jenkinson again as a medical

8  examiner?

9    A    Sure.

10   Q    You would?

11   A    I'd just want to make sure that he's solid in

12  his, you know, information before we would take him

13  again.

14        MR. FAIRBANKS:  Okay, Ms. Harp-Biven, I think

15     those are all the questions I had for you.

16              CROSS EXAMINATION

17  BY MS. MCCOLLUM:

18   Q    I just have a few questions for you.  In

19  obtaining records in a bodily injury case, you have to

20  depend upon someone else in those cases; is that

21  correct?

22   A    Correct.

23        MR. FAIRBANKS:  Objection to form.  Leading.

24        MS. MCCOLLUM:  If you want to have a standing

25     objection to form, I'm okay with that.



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of LAURA LAMPTON, taken on August 18, 2016

Page 100

BY MS. MCCOLLUM:

Q    And in that case, you'd actually depend upon the medical facility in which to provide you records, correct?

A    Correct.

Q    So you can call and request records, but you're really at their whim as to when they would respond; is that correct?

A    Correct.

Q    In making an evaluation of Mr. Foster's wage claim, were you able to review any W-2s?

A    Not until much later.  Much, much, much later.

Q    And in fact, the information that had previously been provided, half of it was redacted, correct?

A    Correct.

Q    On his W-2.  And Mr. Foster was self-employed, correct?

A    He was.

Q    Which means that the net value of his income would be especially important, correct?

A    Correct.

Q    Is it your understanding that if you're self-employed, and in this case Mr. Foster was employed at -- in a repair -- vehicle repair business, that his gross



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 101

1    income would include purchase of parts?

2        A    Yes.

3        Q    And things necessary to the daily operation of

4    the business; is that correct?

5        A    Yes, correct.

6        Q    Okay.  And it is your understanding -- or

7    would it be best if we just looked at Dr. Barnes'

8    testimony as to whether she agreed with defense's

9    evaluation -- a possible evaluation of the wage loss?

10       A    I think they should just look and see what she

11   said, sure.

12       Q    All right.  If -- and we agree that Dr.

13   Jenkinson's report was not consistent with his previous

14   written report to you, correct?

15       A    Not at all.

16       Q    It -- do you rely on IME reports?

17       A    I do, in some part, yes.

18       Q    Is it fair to say you don't care what the

19   report says, you just want the answer?

20       A    I just want the truth, absolutely.

21       Q    If Dr. Jenkinson had told you, when he

22   initially did the report, what eventually he testified

23   to that was completely contrary to his report, would

24   that have changed you evaluation in -- when he made the

25   report?

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW Doc #: 195-21 Filed: 10/05/16 Page: 103 of 126 Page
ID#: 3210
The Deposition of LAURA HARP, Taken on August 03, 2016

Page 102

1    A    Absolutely.  Sure.

2    Q    And I'm sorry, what was the date of his

3    report?  I think you still have it in front of you.

4    A    I don't anymore.

5         MR. FAIRBANKS:  October 8.

6    Q    October 8.  I knew it was sometime in October.

7    October 8, 2014.  So if he had told you on October 8,

8    2014 that, "Yeah, this all could be related," would you

9    have evaluated the claim differently?

10   A    Oh, absolutely.  Sure.

11   Q    And after you were aware of his deposition

12   testimony, did you immediately re-evaluate the claim?

13   A    I did.

14   Q    And is that when it was settled?

15   A    It was.

16   Q    Do you recall that the plaintiff refused to

17   provide Social Security records?

18   A    Yes.

19   Q    And we don't know if that changed at some

20   point, but at least there was some back and forth of

21   initially refusing to provide.  As far as -- are you

22   aware what discovery is in a case?

23   A    I am.

24   Q    Are you aware if the plaintiff timely

25   responded to discovery request or if there were



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 103

1     additional requests for time?

2         A    There were -- there was an extension requested

3     for time.

4         Q    And American Fire consented to that, correct?

5         A    We did.

6         Q    And that could delay the evaluation of the

7     claim as well, correct?

8         A    It can, yes.  Or I should say it will, because

9     we don't have all the information.

10        Q    What do you deem to be the defining factor in

11    evaluation of his claim?

12        A    Dr. Jenkinson's deposition testimony,

13    absolutely.

14        Q    And, again, that was the first time you were

15    aware of some of his opinions?

16        A    Oh, yes.

17        Q    And those opinions were diametrically opposed

18    to his written report, correct?

19        A    Completely, yes.

20        Q    And in this case, were you aware that the

21    plaintiff received $25,000 underlying settlement --

22    underlying port feasure --

23        A    Yes, from the port feasure money, yes.

24        Q    And then even though you were not aware of the

25    particulars of the PIP file, were you aware the $60,000



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 104

1    payment PIP had been made?

2        A    Yes.

3        Q    Do you know Mr. Foster's current medical

4    condition?

5        A    Currently, I do not.

6        Q    You don't know anything about him since his

7    case settled, --

8        A    No.

9        Q    -- correct?

10       A    Absolutely not.

11       Q    There were some numbers I wanted to go

12   through.  Do you know if there was anything that

13   American Fire did not do to comply with the scheduling

14   order entered by the Court?

15       A    As far as I know, no, nothing.

16       Q    And the scheduling order with the Court would

17   identify when depositions had to be taken and when

18   discovery had to be completed; is that fair, to your

19   understanding?

20       A    Sure.  Uh-huh.

21           MS. MCCOLLUM:  I think that that's all I have

22       for you, Laura.

23           MR. FAIRBANKS:  I have a few follow-ups.

24           MS. MCCOLLUM:  Sure.

25                   REDIRECT EXAMINATION



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW  Doc #: 195-21  Filed: 10/05/16  Page: 106 of 126 Page
ID#: 3213
The Deposition of LAURA RAE HAVEN, taken on August 6, 2015

Page 105

BY MR. FAIRBANKS:

Q    Just so we're clear on Dr. Jenkinson.  He was
selected by American Fire's lawyers, correct?

A    Yes.

Q    And his bills were all paid by American Fire,
correct?

A    I would assume so, yes.

Q    He was your-alls guy?  He wasn't one of Mr.
Foster's treating physicians, correct?

A    Correct.  He was an independent medical
examiner.

Q    You were asked a few questions about W-2s?

A    Uh-huh.

Q    You understand that Mr. Foster doesn't have
any W-2s because he's self-employed?

A    Well, he was filing tax returns with his wife.

Q    But he doesn't have any W-2s; do you
understand --

A    I understand that, but he has tax returns,
yes.

Q    Something about the gross income including the
purchase of parts.  What do you mean by that?

A    Well, when you own a repair business, or say
an automobile company, like he does, maybe you would be
repairing somebody's bumper.  So you have to buy the





Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 106

1  bumper and then put it on.  Well, the price of the

2  bumper is not -- would not be his wage loss.  It's the

3  labor involved in putting the bumper on.

4      Q    So you think that parts were included in gross

5  income?

6      A    I think they were, yes.  I think his wife's

7  income was also included, because that's what Dr. Barnes

8  testified to.

9      Q    Parts would not just be a deduction?

10     A    I'm not sure how he would do it, because that

11 was never explained to us, and those documents were

12 never given to us for us to even figure that out.

13     Q    Well, you got, at some point, all of these

14 business invoices.  Didn't the lawyers get them?

15     A    Those were after the fact, and they -- they

16 still didn't clarify anything.

17     Q    Well, you didn't look at them, right?

18     A    I can't remember if I looked at them

19 specifically or not.

20     Q    Dr. Barnes' testimony, I think you mentioned

21 it would be best to look at that.  You've not looked at

22 that, have you?

23     A    Her testimony itself?  No.

24     Q    So how would you know that that would be the

25 best place to look?



Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW  Doc #: 195-21  Filed: 10/05/16  Page: 108 of 126 Page
ID#: 3215
The deposition of LAURA BAIVEN, taken on August 08, 2016

Page 107

1    A    I received a summary, I believe, from the --

2    Q    Okay.  So it's all --

3    A    -- defense attorney.

4    Q    -- from Mr. Richardson's office?

5    A    Yes.

6    Q    And let me just ask you that:  If Mr.

7  Richardson was not the lawyer there primarily handling

8  this file, was he?

9    A    I think his firm was, yes.

10   Q    You were dealing with Michael Bartlett,

11 correct?

12   A    He would've been one of the attorneys, yes.

13   Q    What do you think the first time was that you

14 spoke with Mr. Richardson about this file?

15   A    I have no idea.

16   Q    I'll tell you the first time I spoke with him

17 was at the pretrial conference in April of 2015.

18   A    Yeah, I would have no way of -- I have other

19 cases with him, so I couldn't possibly tell you which --

20 what date it was.

21       MR. FAIRBANKS:  Okay.  No more questions.

22    Thank you.

23       (DEPOSITION CONCLUDED AT 12:17 P.M.)

24

25

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 108

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE

 1
 2
 3
 4   I do hereby certify that the witness in the foregoing
 5   transcript was taken on the date, and at the time and
 6   place set out on the Title page hereof by me after first
 7   being duly sworn to testify the truth, the whole truth,
 8   and nothing but the truth; and that the said matter was
 9   recorded stenographically and mechanically by me and
10   then reduced to typewritten form under my direction, and
11   constitutes a true record of the transcript as taken,
12   all to the best of my skill and ability. I certify that
13   I am not a relative or employee of either counsel, and
14   that I am in no way interested financially, directly or
15   indirectly, in this action.
16
17
18
19
20
21
22   BRITTANY KENDALL,
23   COURT REPORTER / NOTARY
24   MY COMMISSION EXPIRES: 01/07/2020
25   SUBMITTED ON: 08/19/2016

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**A**

**a.m** 4:6 5:9
   63:19 93:3
**A1** 32:5,7
**ability** 108:12
**able** 24:9 26:25
   53:5 54:11
   72:15 100:11
**absolutely** 76:8
   96:10,12
   101:20 102:1
   102:10 103:13
   104:10
**accept** 72:5,7
**access** 76:19
**accident** 8:5,12
   21:18 52:1,10
   60:7 62:22,24
   72:6,19,20,24
   73:1 76:25
   77:4 83:14,18
   88:15 94:12,24
   95:4,20
**accomplishme...**
   23:3,17 24:13
   27:4
**account** 55:13
   64:22 67:9
**accounting**
   16:19
**accuracy** 32:9
**accurate** 55:13
   61:4 64:22
   67:8,10
**achievement**
   26:9,11 32:10
**acronym** 24:5
**action** 1:4 5:7
   108:15
**actual** 41:25
   45:18 58:15
   61:25 64:20
   87:20
**added** 42:17
   43:14 44:2
**addendum** 87:6
   87:13,13
**adding** 35:10

43:18 44:14
   54:5
**addition** 15:14
**additional** 36:8
   87:10,14 103:1
**address** 6:22 7:4
**adjudication**
   20:16
**adjuster** 29:21
   30:4,17 63:3
**adjusters** 56:14
**adjusting** 45:22
**adjustor** 6:13
   9:12
**advantage** 20:14
**advised** 74:15
**advises** 69:14
**affect** 30:17 80:2
**affirm** 5:20
**aggressive** 37:22
   37:25
**ago** 15:12 16:12
**agree** 20:17 23:1
   23:16 30:2
   39:11 62:24
   76:5 82:5 84:2
   84:5 90:19
   91:12 92:5
   96:4,13 97:16
   101:12
**agreed** 4:9 7:19
   94:10 101:8
**ahead** 12:22
   20:23 30:19
   36:12 55:2
   79:22
**alleged** 68:14
**alluded** 75:1
**amended** 78:7
   79:21 80:3
**American** 1:11
   2:12 5:4,16
   10:24 11:7,9
   11:12 15:3,15
   51:3 52:2
   56:10 58:1
   63:11 65:20,22
   70:17 71:3

78:8,24 79:9
   82:25 88:3
   90:19 94:2,7
   97:6 103:4
   104:13 105:3,5
**amount** 20:19
   21:6 22:1 23:8
   30:16 33:19
   38:3 39:1 47:1
   53:14 64:8,9
   64:11
**amounts** 43:22
**analysis** 51:20
   52:5,17,20
   91:4
**anchoring** 21:4
   21:22
**ankles** 96:3
**answer** 13:20
   20:22,24 30:20
   32:22 40:8
   98:21 101:19
**answers** 98:24
**anybody** 57:3
   59:21 75:25
   76:19
**anybody's** 40:1
**anymore** 41:17
   102:4
**anyway** 73:4
   97:25
**apart** 36:9
**appear** 90:7
**APPEARAN...**
   2:1
**appearing** 5:12
**appears** 25:6
   57:17
**applied** 77:1
**appraisal** 40:5
**approach** 37:22
   37:25
**approaches**
   38:13
**appropriate**
   73:14,14
**approval** 47:2,8
**Approved** 81:17

**approximate**
   53:14
**approximately**
   4:5 5:9 6:9
   9:11 45:14
   53:20
**April** 51:7 56:16
   92:13,17
   107:17
**area** 7:1
**Areas** 42:8
**argue** 73:13
**argued** 73:10
**arm** 8:7,8,15,18
   83:7
**arrived** 69:1
**arthritic** 86:7
**arthritis** 86:6,10
**arthroscopic**
   52:25
**Aside** 15:8
**asked** 10:12
   11:22 51:6
   63:7 105:12
**asking** 15:23
   16:2 30:16
   39:24 43:13,17
   44:13 54:8
   59:22 61:15
   68:11 71:2
   89:13 97:14
   98:12 99:1,2
**asserted** 77:12
**assist** 66:23
**assume** 28:11
   62:19 89:13,22
   105:7
**assuming** 72:7,7
   72:12 77:9
   90:18
**assumption**
   29:14
**attach** 90:24
**attorney** 10:20
   22:24 53:11,25
   54:20,21 55:6
   57:2 63:5,6
   65:10 80:23

93:6 107:3
**attorney-client**
   12:18
**attorneys** 12:4
   57:4 107:12
**August** 1:24 4:5
   5:8 78:5,13
   79:8
**authority** 27:1,5
   27:9 47:17,21
   48:5 93:11,13
**authorization**
   60:15 63:11
**auto** 84:24
**automobile**
   105:24
**available** 13:21
   52:2 61:3
**avoid** 35:10
**award** 14:23,24
   15:1,1,4 61:25
**aware** 41:18
   42:6 56:11
   59:19 63:4
   97:25 102:11
   102:22,24
   103:15,20,24
   103:25

**B**

**B** 31:22
**back** 10:12,14
   11:9 31:11
   35:8 37:7
   48:13 49:9
   73:2 82:2
   83:16 86:24
   87:7,24 88:14
   90:15,18
   102:20
**bad** 22:21 78:10
   97:11
**Baldwin** 66:4,7
   67:4 68:13
   70:5,10 74:15
**Baldwin's** 66:11
**Barnes** 63:22,24
   106:7
**Barnes** 65:12

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502-589-2273 Phone
502-584-0119 Fax

schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:13-cv-00426-GFVT-REW  Doc #: 195-21  Filed: 10/05/16  Page: 111 of 126 - Page ID#: 3218
The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 110

65:18 67:4
101:7 106:20
**Bartlett** 107:10
**BARTON** 2:15
**based** 16:19,22
24:8 27:6,10
27:13,21 32:23
72:16 81:7
96:20 98:4
**basis** 13:7,14
18:10 20:19
73:10,19 82:16
**Bear** 25:10
**bearings** 81:9
85:13
**bedrest** 95:13
**began** 17:9
**beginning** 17:17
**behalf** 2:3,12
5:15 37:4
**believe** 8:7 11:2
14:25 18:18
25:3 33:18
40:20 47:6
59:12,15 70:7
70:11,13 71:6
80:23 83:7
84:15,16,20
93:15 94:12
107:1
**bell** 66:5
**benefit** 35:8
**best** 16:23 101:7
106:21,25
108:12
**best-in-class**
32:8
**bill** 90:18
**bills** 53:14,19
54:6 55:9
105:5
**bit** 25:7 61:20
74:24 89:16
94:11,16,18
**Biven** 19:7
**black** 81:3
**blacked** 28:10
**blank** 23:11

**blended** 23:14
**block** 34:19
**Board** 75:18
**Bob** 80:10,22,23
**bodily** 99:19
**bone** 86:8
**boss** 91:8 93:8
**bottom** 22:6
29:19,22 30:4
30:5,12,12,17
30:22 38:7
43:18 44:2,14
51:16 92:17
93:2
**box** 6:23 25:13
34:22
**boxes** 81:3
**Boyer** 2:14 5:10
**breached** 12:20
**break** 45:8 49:6
88:2
**briefed** 73:9
**briefly** 8:24
**bring** 32:25
**BRITTANY**
1:25 4:9
108:22
**broken** 31:19
**bruise** 83:6,7
86:14
**bruised** 8:7,7,17
8:18
**bruising** 8:14
86:16
**bumper** 105:25
106:1,2,3
**business** 6:22
11:7 15:16,18
16:5 98:13,14
100:25 101:4
105:23 106:14
**buy** 105:25

---
**C**
**C** 31:22
**calculate** 73:6
**calculated** 32:19
**calculating**
73:20

**calculation** 67:4
71:10
**calculations**
54:16
**calendar** 25:5
31:6 40:17
**call** 10:20 55:6
74:21 80:18
83:10 93:6
100:6
**called** 51:11
80:10
**capacity** 37:5
**capitalize** 20:11
**car** 72:6,19,24
94:12
**care** 86:22
101:18
**carriers** 78:9
**case** 5:4 11:24
12:6,19 13:17
13:22 14:12
18:13 22:20
23:3,9,18
46:16 48:9
52:6 60:7
61:13 65:23
68:22 69:10
72:13 73:12
75:6 78:11
99:19 100:2,24
102:22 103:20
104:7
**cases** 11:3 36:16
36:21 48:4
75:11 87:16
99:20 107:19
**casualty** 1:11
2:12 5:5 26:18
**categories** 22:10
**causing** 52:13
**Cecil** 58:20 59:6
59:7,10 86:19
86:20,22 87:14
87:17 88:4
89:3,8
**Cecil's** 86:21
87:3,11,22

88:9 89:1,13
89:23
**Central** 1:3 5:6
**certain** 23:8
32:15 47:1
57:11 59:22
85:3
**CERTIFICA...**
108:1
**Certified** 75:18
**certify** 108:4,12
**chance** 85:15
**change** 27:12
70:21 80:4
98:17
**changed** 24:12
70:23,24 91:10
96:21 101:24
102:19
**changes** 7:18,22
27:15 38:21
84:11
**changing** 27:20
**charges** 76:2
**choose** 69:8
**chronologically**
50:20
**Civil** 1:4 4:7 5:7
**claim** 3:15,16
7:14 8:22,25
9:7,9,12,16,21
10:2,3,6,17
12:10 13:8,11
13:14 14:20
15:20 16:21,24
17:2,5 23:7,20
23:25 30:1,3
30:17,24 36:9
39:17 40:7
42:20 43:7
46:2,6,9,19
47:7,16 49:13
49:15,20 50:2
50:11,25 51:8
53:20,22,23
54:9,17 55:5
55:10,17 56:14
56:21 58:12

62:4 66:2
67:19,21,23
68:8,14 69:4
69:25 70:6,16
70:19 71:3,4,8
73:20 74:16
77:5,10,12
78:7,14 80:3
85:12 88:6,16
91:2,5,13 92:9
92:20 93:12,14
93:22 96:14
98:6 99:3
100:11 102:9
102:12 103:7
103:11
**claim's** 72:3
**claimant** 17:2
96:14
**claiming** 60:6
**claims** 6:11,13
6:17,20 18:3
20:16,20 21:7
22:1 26:5 27:1
27:5,23 29:5,6
29:21 30:5
35:10,14 38:4
41:16,25 45:1
45:17,18,20
46:2,11,12
63:1 78:10
83:25 96:5
**clarification**
18:23
**clarify** 39:18
55:3 106:16
**clear** 37:3 105:2
**clearly** 72:3
**client** 55:7,15
57:2,2
**clients** 55:14
**close** 12:19
**closer** 43:22
44:8
**coaching** 98:21
**code** 6:24
**Collaborative**
22:9

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax

schedule@kentuckianareporters.com
www.kentuckianareporters.com

collection 49:14
collision 52:13
  85:21
column 26:22
  27:20 28:24
combined 58:1
  80:11,25 81:4
  81:6,22 82:2
come 10:23
  16:22 52:20
  53:22,24,25
  54:17,19 55:11
  56:3 57:21
  65:8,19 72:22
coming 28:15
comment 50:4
  59:18
comments 38:8
  38:11
COMMISSION
  108:24
COMMONW...
  108:2
communicatio...
  13:1
companies
  11:17 17:9,14
  17:18
company 1:11
  5:5 11:15
  30:18,22 38:22
  38:23 58:2
  97:11 105:24
complaint 78:7
  79:21 80:3
complaints 8:6
  95:3,5
complete 58:20
  60:4 62:2
completed
  104:18
completely 37:2
  83:11,14
  101:23 103:19
complimented
  22:22
comply 95:14
  104:13

compromise
  36:12
compromising
  36:16,18
computer 78:21
  82:4,8 90:14
concern 70:12
concerns 91:13
  91:16
CONCLUDED
  107:23
condition 8:1
  84:23 104:4
conditions 83:21
  94:10
conduct 96:5
condyle 85:25
conference
  107:17
confident 38:12
confirming
  81:18
confused 98:15
confusing 87:16
consented 103:4
considerably
  65:2 96:22
consideration
  33:12,16,24
  35:9 36:19
considered
  34:10 72:25
considering
  36:17
consistent 10:13
  18:25 70:25
  97:10,17,18
  101:13
constitutes
  108:11
consult 66:1,3
consulted 65:23
  66:21
consulting 66:21
contact 55:15
contacted 10:3
  66:23 93:8
contacts 55:13

contained 13:6
  81:2
continue 12:22
  30:19 34:7,14
continued 57:19
  95:7
continues 51:17
continuing
  20:13 21:11
  28:2,5
contrary 101:23
contribute
  29:22 30:4
contributing
  29:18 37:22
conversations
  13:1 65:19
cooperation
  98:10
copy 10:18
  14:13,15 58:20
  60:5 79:14
  85:11 88:8
corner 22:7
correct 16:10
  17:2,3 19:10
  19:11 24:16
  25:3,12,20
  27:24 28:25
  29:1,15 30:6
  31:21 32:3,17
  38:17 42:3
  43:18,25 44:14
  45:25 49:24,25
  51:4,5 52:3,4
  52:14,15 55:18
  55:19 56:8
  64:10 65:20,21
  66:18 68:15,18
  68:20,22 69:11
  69:18,25 70:6
  72:13 74:4,16
  75:4,5 76:18
  76:22 77:1,13
  78:12,14,18
  79:10 81:23
  82:17 83:25
  84:7 85:21

93:25 94:4,5,5
  94:24 96:25
  97:2,20 99:21
  99:22 100:4,5
  100:8,9,15,16
  100:18,21,22
  101:4,5,14
  103:4,7,18
  104:9 105:3,6
  105:9,10
  107:11
correctly 54:7
  67:14 71:7
correspondence
  88:3
cortical 85:24
cost 32:8
costs 20:12
  36:10
could've 24:11
  55:11,23 74:18
  83:13 91:17
counsel 14:22
  28:5,11,13,15
  55:12 59:23
  62:7,19 64:4
  73:15,15 80:11
  80:18 83:11
  108:13
counsel's 36:7
  81:17
County 6:25
couple 75:1 78:5
  88:12 95:24
court 1:1 4:10
  5:5,19 12:18
  12:21 13:1
  40:12 66:22
  73:10,11 77:21
  104:14,16
  108:23
Court's 18:25
coverage 51:20
  52:2 56:10
crack 28:16
criteria 37:18
critical 25:18
  31:22

cross 3:5 64:19
  66:24 68:24
  99:16
CSM 91:9
current 19:16
  57:9 104:3
currently 6:4
  44:18 45:4
  47:6 104:5

D

D 31:18,25
daily 101:3
Dale 9:23 10:1
  88:8
damage 35:18
  43:11
damages 33:12
  33:16,17,21,25
  34:13 35:1,9
  39:2,8 52:21
Damages/inju...
  52:17
date 1:24 55:16
  79:11 85:3,14
  85:18 102:2
  107:20 108:5
dated 63:18
dates 10:4,7
  62:22
dating 86:24
Dave 11:2 66:20
  73:21 74:22
day 4:5 40:6
  44:23 71:13,16
  71:21,25 73:6
days 95:24
deal 36:20
dealing 107:10
deals 32:1
Dearman 44:20
  44:21 46:1
  48:7,18 50:14
  51:9
Dearman's 46:6
December 81:15
  87:8 88:7,10
  90:12 98:2
  diseases 29:17

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
— COURT REPORTERS —

502-589-2273 Phone
502-584-0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 112

**deduction** 106:9
**deem** 90:5
  103:10
**deemed** 60:9
  72:19
**defendant** 1:12
  2:12 5:16
**defendant's**
  14:22
**defense** 10:20,23
  12:4,6,15
  13:10 15:3,9
  15:15 28:5
  36:7 62:7,19
  65:10,20 75:3
  80:18 81:17
  83:10 93:6
  107:3
**defense's** 101:8
**defining** 103:10
**definitely** 82:18
  96:21
**degeneration**
  84:4,7
**degenerative**
  7:18,22 8:2
  83:9,21 84:11
  94:10
**degree** 25:13
  26:8,11 32:10
  84:3
**delay** 103:6
**demand** 22:21
  23:8 57:20
  93:25
**demanded** 23:4
**demonstrated**
  26:24
**department**
  26:18
**depend** 99:20
  100:2
**depends** 27:17
  32:21 84:11
**DEPONENT**
  1:23
**deposed** 10:4
  46:18

**deposition** 4:3,6
  5:8 7:20 8:21
  10:7,15,21,23
  11:22,25 13:23
  14:7 64:12,14
  65:1,6,11,12
  70:20,24 82:22
  83:1,11 91:7
  91:11,20 92:12
  92:13,20 93:24
  97:3 102:11
  103:12 107:23
**depositions**
  11:23 13:17
  36:10 104:17
**describe** 6:15
**described** 44:5,7
**despite** 23:21
**detailed** 92:21
**determine** 64:24
**determining**
  68:24
**diagnostic** 7:17
**diagnostics**
  83:20 90:4
**diametrically**
  103:17
**diary** 38:24
**different** 19:23
  22:10 25:7,9
  37:3,18 38:21
  39:14 45:8,19
  45:24 64:15,17
  64:25 71:5
  74:1
**differentiate**
  11:10 17:12
**differently**
  102:9
**differing** 84:8
**difficult** 29:2
  61:13
**DIRECT** 3:4
  5:24
**direction** 108:10
**directly** 14:21
  55:11,21 70:8
  108:14

**disability** 72:23
**disabled** 60:9
  72:19 73:1
**discipline** 34:9
  34:16 35:4
**disclose** 12:22
  66:22 68:19
  69:9 86:25
  87:2
**disclosed** 17:1
  19:3 60:12
  70:9
**discovery** 18:13
  55:24 56:1,3
  102:22,25
  104:18
**discuss** 10:8
  61:5
**discussed** 21:7
  21:24 38:11
  42:16 51:8
  80:12 93:4
**discussing** 33:23
  81:1
**discussion** 42:23
  44:16 92:25
**discussions** 10:1
  39:1,7 42:19
  46:15,20 66:7
  82:19 93:20
**dispute** 52:12
**distance** 44:10
  44:17
**District** 1:1,2
  5:5,6
**Division** 1:3 5:6
**docket** 82:13
**doctor** 7:19
  53:10 54:1,13
  54:14 60:20
  61:2 62:9,11
  62:16 64:2,5
  71:12 73:3
  86:18 87:17
  94:9 95:2,7,12
  96:1
**doctor's** 95:14
**doctors** 94:7

95:5
**document** 30:3
  57:9 67:15
  71:14 74:12
**documentation**
  52:22 61:16,23
  62:16 89:21
**documentations**
  53:25
**documents** 8:20
  18:13 49:14
  89:7 106:11
**doing** 7:4 13:8
  20:13 36:14
  45:15,22 89:18
**dollar** 47:1
**downward** 34:7
**Dr** 7:18 8:15,22
  10:8,13,15,22
  11:22 13:21
  14:6 58:20
  59:6,7,10
  62:15 63:22,24
  65:12,18 66:4
  66:7,11 67:3,4
  68:13 70:5,10
  70:20,22 74:15
  74:24 75:6,16
  76:12,16 79:9
  82:13,16,20
  84:22 86:19,19
  86:21,22 87:3
  87:5,11,12,14
  87:17,22 88:4
  88:8 89:1,3,8
  89:13,23 91:7
  91:10,19 92:11
  92:12,20 93:6
  93:23 94:4,6
  98:16 99:2,7
  101:7,12,21
  103:12 105:2
  106:7,20
**driver** 52:12
**due** 33:10,11,15
  91:10
**duly** 108:7

**E**

**e-mail** 2:10,19
  28:7 88:6
**earlier** 42:15
  49:17 59:17
**easier** 28:16
  78:22
**Eastern** 1:2 5:6
  90:2
**easy** 72:12 95:24
**economic** 69:14
**economist** 65:22
  66:1
**edema** 85:23
  86:15
**effectively** 30:1
**efficiently** 6:18
**eight** 23:25
**either** 39:11
  55:21 57:3
  65:15 82:7
  108:13
**embrace** 36:3
**emergency** 8:14
**emphasis** 94:11
**employed** 6:4,7
  11:19 19:12
  69:16 100:24
  100:24
**employee** 38:8
  38:11 108:13
**employees** 45:3
**employment**
  18:9 61:14
**entered** 92:23
  104:14
**entire** 14:24
**entirety** 34:18
  34:19
**environment**
  32:2
**equated** 71:16
**ER** 8:6
**ergonomic** 32:1
**Ernest** 1:6 2:3
  5:4 7:15
**error** 58:6,16
  65:6,9 67:9
**especially** 90:2

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

100:21
**evaluate** 6:17
29:25 30:23
42:20
**evaluated** 102:9
**evaluating** 29:6
35:13
**evaluation** 3:11
13:7,14 25:4
26:25 27:13,21
31:6 32:16
33:4,11,15
34:20 37:8
39:16 40:15
42:7 59:2 74:6
82:11 100:10
101:9,9,24
103:6,11
**evaluations** 3:12
3:13,14 34:14
37:22,25 39:2
39:10 42:16
74:3
**eventually** 62:9
101:22
**everybody's**
75:2
**Everything's**
36:14
**evidence** 16:22
**exact** 43:6,24
**exactly** 38:2
67:1
**exaggerate**
69:16
**exam** 66:24
85:18
**examination** 3:4
3:5,6 5:24 59:3
76:6 99:16
104:25
**examinations**
75:22 76:3
**examine** 68:25
75:4
**examined** 64:19
**examiner** 47:25
48:3 49:1,3

75:3 76:6 91:8
99:8 105:11
**example** 17:4
32:15 36:8
43:24
**examples** 96:2
**exceed** 72:3
**Exceeded** 26:10
**excellence** 42:12
**Excellent** 22:19
**excuse** 73:15
**execute** 42:12
**exhibit** 18:21,22
22:4 24:25
25:1 31:1,3
40:11,13 77:17
77:19,25 78:1
79:19
**EXHIBITS** 3:9
**existed** 89:12,21
**exists** 17:14
**expense** 35:11
36:19
**expert** 63:21
64:3 66:21
68:25 69:14
97:22
**EXPIRES**
108:24
**explain** 11:12
**explained**
106:11
**explanation**
90:1
**explore** 61:20
89:16
**extension** 103:2
**extent** 78:17
**Externally**
22:14
**extra** 28:16
36:13

―――――――
**F**
**face-to-face**
38:25 39:3
**facility** 100:3
**FACSIMILE**
2:9,18

**fact** 11:19 12:5
12:11 38:25
69:3 79:21
86:3 88:9
100:13 106:15
**factor** 103:10
**fair** 11:20 29:8
42:20 55:22,23
76:7 83:1 96:9
96:18 98:2
101:18 104:18
**FAIRBANKS**
2:4 3:4,6 5:3
5:17,25 12:23
14:3,4 19:5
20:25 21:13,19
24:20,21 30:10
37:6 39:21,23
49:5,9,11 67:2
73:17 77:8,18
77:23 78:3
87:18,21,24
88:1,20 90:10
92:2,7 97:13
98:19,25 99:14
99:23 102:5
104:23 105:1
107:21
**Fairbankss** 2:5
5:11 77:16
**Fairfield** 6:23
26:7 41:1,4,11
44:22 48:2
**fairly** 29:6 30:1
30:24 59:22
**fairness** 55:17
**faith** 22:21
78:10
**familiar** 19:6
**familiarization**
28:14
**far** 52:11 85:24
102:21 104:15
**faster** 95:15
**fault** 52:7,9,13
**faulting** 95:9,11
**feasure** 103:22
103:23

**federal** 4:7
66:22
**feel** 38:12
**felt** 34:4
**female** 63:25
**femoral** 85:25
**figure** 9:6 47:14
57:13 71:22
72:1 73:7,19
82:10 93:19
95:17 106:12
**figured** 50:8
**figures** 43:12
74:3
**file** 8:22,25 9:7
9:13 10:17
12:10,13 14:11
14:19,20,23,24
14:25 15:6,9
15:10,20 26:17
28:1 32:20
34:2,4 35:16
46:5 47:19
51:12,13,19
52:22,23 54:1
55:6 56:19,21
57:1,5,23
58:21 59:7,20
60:3,11 62:1,3
62:4,8,12
63:13 67:19,21
68:8 70:25
71:15 72:18
74:6 76:21
83:19 85:5,12
88:25 89:5,6
89:17,22 92:25
93:3 96:14,21
99:6 103:25
107:8,14
**filed** 51:3 63:9
78:7 79:22
**files** 32:21,23
34:2,2,3 35:17
40:4 41:7
**filing** 105:16
**final** 47:15
**financially**

108:14
**find** 83:17 89:23
**fine** 50:8 79:17
**Fire** 1:11 2:12
5:4,16 10:24
11:7,10,12
15:3,15 51:4
52:2 56:10
58:1 63:11
65:20,22 70:17
71:3 78:8,24
79:9 82:25
88:4 90:19
94:2 103:4
104:13 105:5
**Fire's** 94:8 97:7
105:3
**firm** 11:6,6
17:19,20 18:2
18:6 54:22
55:21 107:9
**first** 26:22,24
29:17 32:4
34:21,22 35:24
37:11 42:14
44:10 50:25
51:19 57:12
68:10 75:6
78:24 82:6
92:8 103:14
107:13,16
108:6
**five** 22:13 43:20
44:3,9 77:11
**five-minute** 49:5
**flip** 8:24 22:3
29:9 34:6 37:7
40:3 50:9
63:14 77:14,14
80:5 81:8,11
85:9
**fluctuate** 16:21
**Focused** 22:14
**focuses** 20:19
**follow-up** 30:15
**follow-ups**
104:23
**following** 28:6

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202
schedule@kentuckianareporters.com
www.kentuckianareporters.com
502.589.2273 Phone
502.584.0119 Fax

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

95:17
**foregoing** 108:4
**form** 13:7,13
18:7 20:21
25:4 28:4 63:2
72:14 80:19
91:15 96:19
98:3,8,22
99:23,25
108:10
**formally** 77:10
**format** 25:7
**forth** 102:20
**forward** 37:21
63:14 77:14
81:8
**forwarded** 90:8
**Foster** 1:6 2:3
3:15 5:4,13
7:15,17,21 8:4
8:11 10:2 12:6
15:14 17:5
18:17 24:20,23
31:1 40:15
46:2,6,8,16
47:7,16 48:9
49:15 50:11,25
51:3 52:25
53:5,11,11
54:9,24,24
56:3,9 57:3,10
57:22 58:9
60:14 62:17
63:10 67:23
68:19 75:4
76:11,16 77:10
78:14 79:9
82:6 83:17,22
84:13 88:8
90:8,20 93:24
94:3 96:18
100:17,24
105:14
**Foster's** 9:9,12
9:16 12:12
13:8,11,14
14:11 15:18
21:18 53:3,14

56:21 64:8
65:7 68:22
69:4,25 70:18
88:4 98:6
100:10 104:3
105:9
**Fosters** 51:20
**found** 35:19
42:19 89:14
**four** 19:23 25:9
25:18 36:9
76:25 77:11
**fourth** 34:8
**fracture** 85:1
86:1,4,13,17
**fraying** 8:3
84:18
**front** 102:3
**full** 26:22 56:6
57:19,20
**fully** 73:9

_____

**G**

G 2:4
**gather** 61:10
**gathered** 63:1
**general** 6:15
21:6 30:3
33:12,16,17,20
33:24 34:1,13
35:1,9,15,18
39:2,8,9 43:11
45:10 61:13,15
**generally** 51:6
**getting** 12:19
38:1 49:18
55:17 61:15,16
61:22 87:10
**give** 5:21 21:11
55:7 61:4,8
85:6 87:5
**given** 12:1 26:9
27:15 60:14
62:18,20 63:10
106:12
**giving** 23:2,17
33:24
**go** 12:22 20:23
27:14 30:19

36:12,12 41:10
44:3 46:11
47:11,16 48:13
55:2 57:23
73:2 85:17
104:11
**goal** 20:1,2,6,8,8
21:3,5 27:9
32:11 35:21
**goals** 19:23
29:18
**going** 7:3 8:24
13:19 18:14,24
24:22 30:7,25
35:3 36:9
40:10 49:6,14
53:5 54:10
60:2 66:19
68:21 69:4,24
70:18 71:4,9
71:19,21 72:3
76:7 85:9 88:5
88:7,14 94:7
97:5
**good** 23:11,20
23:25 61:8
68:25 97:1,3,6
97:10,17
**Gosh** 19:19
38:20 46:21
75:8
**gotten** 52:19
60:10 63:8
88:23
**grade** 32:25
**graded** 32:14
**gross** 64:23
66:14,14 67:8
69:14 70:12
100:25 105:21
106:4
**group** 17:13,17
**growth** 20:11
**guess** 16:23
30:22 35:20
39:9,15 45:19
46:8 54:12
58:19 64:13,18

65:18
**guesstimate**
16:25
**guy** 105:8
**guys** 10:8 68:16
76:16 79:22
87:22

_____

**H**

**half** 100:14
**hand** 5:20 18:14
18:19 24:22
28:17 30:25
40:10 49:14
**handle** 56:12
83:25
**handled** 50:3
80:2
**handler** 45:17
45:18 46:2,12
63:1
**handlers** 56:23
**handling** 9:8,21
22:23 46:4,6,8
47:7 56:14,21
58:3,11 70:24
78:6 88:6,16
91:2 96:5 99:5
107:7
**happened** 10:12
12:5 39:4
46:13,14 92:4
92:23
**happy** 21:12
**Harbolt** 17:21
17:23
**hard** 15:11
**Hargadon** 17:21
17:23
**Harp** 22:20
**Harp-** 19:6
**Harp-Biven**
1:23 4:3 5:8
6:3,4 12:25
13:24 16:13
17:8 18:17
19:22 24:20,22
24:23 31:1
40:16 44:18

49:12 67:25
88:2 91:4
99:14
**head** 46:24
**heal** 95:15
**hear** 70:9
**heard** 28:15
**heart** 72:20
**Heather** 2:13
5:13,15 39:14
97:16 98:19
**held** 49:17
**help** 63:6 68:22
68:24 69:4,9
82:3,4 95:15
95:21 96:1
**helpful** 94:14
**hereof** 108:6
**Herrington**
17:21,24
**Hey** 55:6 95:12
**high** 33:11,16,24
33:25 34:5,14
39:12
**higher** 65:2
**highest** 26:11
**hired** 10:24 62:9
65:20 75:3
**hiring** 76:5
**HMCCOLLU...**
2:19
**hold** 46:25 88:17
**home** 7:3 41:7
41:22 47:24
48:1,3 49:1,3
**home-office**
91:8
**honest** 15:12
58:14
**honestly** 40:9
78:22
**Hopefully** 54:7
**hour** 49:6
**hurt** 95:20,23

_____

**I**

**idea** 26:2 46:10
46:21 47:9,13
48:9 12:75:9

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

schedule@kentuckianareporters.com
www.kentuckianareporters.com

502.589.2273 Phone
502.584.0119 Fax

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 115

76:4,22 78:25
90:17 95:1
107:15
**ideas** 38:12
**IDENTIFICA...**
18:22 25:1
31:3 40:13
77:25 78:1
**identify** 36:25
104:17
**II** 6:11
**imagine** 12:8
**IME** 7:19 58:24
59:1 60:23
61:1,3 62:9,11
62:16 79:23
101:16
**immediate** 48:6
48:8 61:18
**immediately**
42:18 102:12
**impaction** 85:1
85:25 86:4,13
86:17
**importance**
25:14
**important** 25:19
27:12 31:25
60:3 100:21
**impression**
58:11
**improve** 20:13
26:17 34:9
**improvement**
42:8
**improves** 20:14
**include** 36:7
90:3 101:1
**included** 82:12
106:4,7
**including**
105:21
**income** 66:15
69:16,21,25
70:19 71:2,4
73:20 74:3
100:20 101:1
105:21 106:5,7

**inconsistent**
83:2,4,14 93:7
97:19
**incorrect** 66:17
67:5 77:6
**increase** 30:5
47:11
**increases** 27:16
**indemnified**
71:7
**indentation**
85:24
**independent**
36:14 51:10,14
59:2 76:9
105:10
**INDEX** 3:1
**indicating** 53:4
**indirectly**
108:15
**individuals**
69:16
**information**
16:20 19:2
27:6,10,13,15
27:17,21 29:25
52:20 53:9
54:18 55:11
61:3,7 63:7
71:12 78:22
81:7 86:25
91:9 96:20
98:4,11,12
99:12 100:13
103:9
**informed** 17:4
**initially** 101:22
102:21
**injured** 8:4
**injuries** 8:11,13
35:10 55:9
72:6,8,16,20
83:8
**injury** 95:25
99:19
**instance** 55:20
**insurance** 6:6,20
16:14 17:9,14

30:18 58:2
80:24 96:5
**insured** 57:18
**intend** 12:20
**intending** 12:25
17:12
**interested**
108:14
**interject** 12:17
13:19 73:8
89:25
**interjected**
98:19
**interpret** 21:3
43:19
**interrupt** 21:12
**introduce** 5:13
**investigation**
32:15 33:4,13
34:20 35:2
96:6
**invoice** 16:5
**invoices** 15:16
106:14
**involved** 9:16
46:1 49:23
50:11,25 55:17
63:5 75:7,11
76:20 91:2
106:3
**involvement**
50:3
**issue** 14:12
38:24 73:9
**it'll** 32:25

**J**
**January** 28:10
**Jefferson** 6:25
**Jenkinson** 7:19
10:9,13 62:15
71:5 74:24
75:7,17 76:12
76:16 79:10
82:16,20 84:22
87:5 94:4,6
97:24 99:2,7
101:21 105:2
**Jenkinson's**

8:16,22 10:15
10:23 11:22
13:21 14:6
70:20,22 82:14
87:12 91:7,11
91:20 92:11,12
92:20 93:7,24
96:24 97:1
98:17 101:13
103:12
**Jennifer** 25:23
25:24 31:9
**job** 6:10,16
19:16 26:1,2,3
30:23,23 40:23
44:25 45:22
71:13 84:24
**joints** 84:4
**July** 63:18 85:18
**June** 8:5,9,12
9:14 33:6
62:23 76:24
**juror** 6:12
**jury** 16:17 43:9

**K**
**keep** 88:17
**keeping** 44:3
**KENDALL** 1:25
4:9 108:22
**Kentucky** 1:2
2:7,16 4:4,10
5:6,11 41:14
41:20,25 90:3
108:2
**kept** 15:23 59:22
98:12
**kind** 8:24 11:16
16:23 21:2
32:1 55:13
63:14 88:13
95:10
**knee** 7:25 8:1,17
53:1 83:18
85:1 86:5,14
94:17 95:4,20
**kneecap** 8:7,15
83:6
**knew** 90:20,25

102:6
**know** 9:2,5,18
9:21,24,25
10:11,19,22
11:14 13:20
16:14 19:12
26:6 27:25
28:9,14,20
29:5 30:23,23
32:18 37:14
38:1,6,20,24
39:9,13,13
40:1,8,23,25
41:17 45:3,9
45:15 46:3
47:10 48:7,11
48:12 50:7
51:12 52:11,24
53:3 54:16,18
54:20 55:9,14
55:24 56:9
57:3 59:4,9,9
59:14,20 60:17
60:25,25 61:4
61:5,6,8,13,17
62:8,21 63:6,8
63:10 65:6,8
66:4,11 70:8
70:14,17 71:14
72:23,25 73:2
73:3,18,25
74:9,14,20
75:14,15,16,18
75:20,22 76:2
76:19,24 78:19
78:23 79:11,24
80:25 81:4,6
82:7,9 83:19
83:20,22 84:12
84:21 85:14
86:19 87:15
88:15,23 89:10
89:12,20 90:11
90:13,14,15,21
91:17 92:8
93:6,18 94:6
94:18 95:2,6,6
95:11,12,14,23

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax

schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 116

96:2 99:6,12
102:19 104:3,6
104:12,15
106:24
**knowledge** 15:2
18:6
**known** 29:2,5
**knows** 43:9
**Kurt** 48:24,25
49:1 92:23

_____

**L**

**labeled** 18:17
24:23 40:15
49:15
**labor** 106:3
**LAE** 20:14
**LARGE** 108:2
**Laura** 1:23 4:3
5:8 6:3 22:19
22:22 26:23
28:14 29:18
35:8 36:2
37:12 42:18
104:22
**Laura's** 28:17
42:16
**law** 17:19,20
18:2
**lawsuit** 51:3
55:18 63:9
96:14
**lawyer** 10:24
11:1 107:7
**lawyers** 12:7,15
13:10 15:3,9
15:15 65:20
105:3 106:14
**leadership**
22:11
**Leading** 99:23
**learn** 22:23
**led** 35:20
**left** 8:8
**leg** 95:13
**legal** 18:1 22:23
73:10
**Lenihan** 17:21
17:23

**let's** 6:9 22:3
23:10,24 26:21
29:9 31:16
36:8 37:7 45:4
45:8 49:5
63:14 71:25
74:24 77:14,18
77:18,23 80:5
81:8,11 92:8
**letter** 15:4 81:17
**letters** 13:11,13
31:18 65:19
**level** 69:17
84:19
**levels** 96:1
**Lexington** 1:3
2:7,16 5:7
**liability** 52:5
**Liberty** 6:6,7
11:10,13,16,19
11:21 17:9,13
17:17 18:9
19:13 25:24
36:20,25 37:4
40:19 41:13,21
46:25
**limit** 57:20
**limits** 72:4,13
93:25
**line** 29:19,22
30:4,5,12,12
30:18,22
**lines** 26:20 50:1
**Lisa** 19:10
**list** 32:21 34:21
60:20,22
**listed** 8:13 20:8
22:11,16 25:17
25:18 28:23
31:22,25 35:4
53:13
**lists** 25:13 87:14
**litigate** 36:21
**litigation** 35:11
36:3,17
**little** 25:7 39:12
39:12,16 61:18
61:20 74:24

88:2 89:16
94:11,16,18
95:13 98:15
**lives** 19:19
**living** 84:12
**located** 26:6
40:25 75:20
**location** 41:11
41:20,22,25
87:20
**long** 6:7 15:12
16:2,12 19:21
19:21 45:6,9
45:12 60:12
61:10 62:25
63:3 76:11
84:21
**look** 9:13 19:6
20:4 23:10,24
26:21 31:5,13
31:20 32:4
37:21 39:13
56:25 74:5,12
85:4 90:13
92:8 101:10
106:17,21,25
**looked** 25:8 40:3
51:19 101:7
106:18,21
**looking** 23:1,25
28:1 32:5,13
37:10 38:10
41:6 42:14
57:5,12 58:17
62:22 63:17,18
74:14 81:13,14
81:15 92:15
**looks** 9:5 19:9
19:22 20:1
22:10 25:8
28:6 31:16,18
31:21 32:1,14
48:17 51:17
52:16 56:1
92:22
**loss** 13:11 20:12
20:14 32:8
58:20,21,23

54:5,8,17
55:10 56:18
64:8,20,24
66:2,12 68:14
69:24 70:6,16
71:9 82:13
101:9 106:2
**lost** 69:20,25
70:18 71:2,4
73:20
**lot** 7:16 9:5
56:17 74:7
83:25 84:23
94:18,20
**Louisville** 4:4
5:11 18:4
**low** 39:12 67:12
67:13 96:11

_____

**M**

**M** 2:13
**M-E-C** 48:22
**Ma'am** 6:1
**mailing** 51:12
**Majority** 41:9
**making** 43:8
65:18 82:16
96:8 100:10
**management**
32:9
**manager** 19:10
26:5 29:15
31:8 37:14
38:12 39:1
40:16,21 44:19
45:1,7,7,9,13
45:16 46:12
47:23,24 48:6
48:8
**manager's**
47:24
**manages** 45:3
**manipulate** 97:7
**manner** 50:2
**March** 50:14,15
51:7
**mark** 18:21
24:25 30:25
40:10 79:19

**marked** 18:22
25:1 31:3
32:12 40:13
77:25 78:1
**market** 20:15
**Maryland** 19:20
**math** 76:24
**math's** 77:13
**matter** 30:13
95:25 108:8
**McCollum** 2:13
3:5 5:15,15 7:9
11:14 12:17
13:19 14:1
18:23 19:2
20:21,23 21:10
21:14 24:18
28:2 30:7,19
36:24 39:18
49:7 63:2
66:19 72:14
73:8 77:3
80:19 87:16,19
88:17 89:25
91:15,25 92:5
94:25 96:19
97:5,9 98:3,8
98:15 99:17,24
100:1 104:21
104:24
**mean** 11:10 21:2
23:8 26:19
29:24 30:12
35:16 36:5
38:19 39:19,20
43:1,2,10 50:6
52:7 58:3 63:5
67:19,19 86:10
93:13 98:16,17
105:22
**means** 33:22
36:6 51:25
86:6,8 93:4
100:20
**meant** 35:15
37:14,24 38:2
74:18 80:14
**mechanic** 53:6

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 117

54:11 70:14
84:24
**mechanically**
108:9
**Mechley** 48:22
48:24,25 49:1
92:24 93:10
**medial** 85:24
**mediation** 22:20
27:14 36:10
**mediations**
26:23
**mediator** 22:22
**medical** 12:9,10
12:12,14 13:5
53:14,19 54:2
54:6 55:9
58:19 59:2
61:11,14 62:13
62:16,25 63:11
64:5 75:3,22
76:3,6,13,17
76:20 82:12
83:17 90:2
94:7 97:21,22
99:7 100:3
104:3 105:10
**medium** 84:8
**meet** 32:12 40:5
**meeting** 29:18
35:21 92:22
**MEHR** 2:5
**Melissa** 44:20
48:17 50:13
51:8
**memory** 67:18
75:2,10 82:1
**mentioned**
106:20
**Michael** 107:10
**mid-** 37:11
**mid-year** 29:13
29:17 32:13
33:4 37:11,20
**might've** 14:21
94:14
**mild** 84:8,10,14
84:18

**mind** 80:16
98:22
**mindset** 37:1
**mine** 9:2
**mistakes** 33:11
**mitigating** 20:12
**mixed** 37:12,15
**momentum**
20:12
**MONDAY** 4:5
**money** 28:15
29:3 30:16
33:19 35:10,18
38:4 39:16
40:4 42:17
43:14,18 44:2
103:23
**month** 85:20
**months** 33:5,6
76:25 77:11
81:13
**morbid** 83:10
**morbidly** 84:22
**motor** 8:5,12
52:13 85:21
**mouth** 79:16
**MRI** 85:20 86:3
88:19,24 89:4
89:11,18,23
90:12,20,20
**MRIs** 94:14
**Mutual** 6:6,8
11:11,13,16,20
11:21 17:10,13
17:17 18:9
19:13 25:24
36:20,25 37:4
40:19 41:13,21
47:1

**N**

**name** 5:11 6:1
48:22 89:23
**named** 63:22
**narrative** 68:3
**narrow** 44:17
**near** 80:7
**necessarily** 21:4
61:7 67:9,19

69:6
**necessary** 101:3
**need** 7:5 14:5
21:20 34:9
56:25 79:19
94:23 97:15
**needed** 43:2,4
50:7 62:17
94:22
**needing** 27:10
42:16 63:4
**needs** 7:9 63:6
**negative** 39:15
39:19
**negotiate** 6:17
**negotiation**
26:25
**net** 64:24 66:15
67:8,11 69:15
69:20,23 70:12
71:9 73:7,19
74:3 100:20
**never** 41:24
52:11,12 57:22
96:16 106:11
106:12
**new** 16:22 27:15
27:21 38:12
**nickel** 28:16
**Notary** 4:9
108:23
**note** 3:16 50:13
50:20 51:15
57:8 68:3 69:8
74:14 78:5
80:7,14,20
81:14,15 85:5
91:25 92:17,18
92:24
**noted** 33:12
**notes** 8:23,25
9:7 49:13,20
49:23 63:17
65:17 92:3,9
92:18 94:14
95:6
**number** 5:7
16:19 20:1,2,6

20:8 22:8,13
22:19 23:10
26:8,14 32:23
44:8 53:17
58:14 70:5,7,9
93:17,21
**numbers** 65:2
66:15 69:1
71:19,20
104:11
**numeric** 32:14
33:3
**numerical** 32:18

**O**

**obese** 72:22
84:22
**obesity** 83:10
**object** 21:14,15
30:7 66:19
77:3 80:19
97:5 98:22
**objection** 14:6
20:21 21:10,11
28:3 30:15,19
63:2 72:14
91:15 94:25
96:19 98:3,8
99:23,25
**objections** 98:20
98:20,23
**objective** 3:12
26:8,9,14 32:5
32:5,7 35:24
**objectives** 25:9
25:14,17 31:14
31:16,22
**obtain** 14:13
15:3
**obtained** 62:7
62:14 64:4
**obtaining** 99:19
**occupation-wise**
17:16
**occurred** 77:4
90:6
**October** 53:1
76:15,24 79:12
79:17 97:23

102:5,6,6,7,7
**offer** 44:10,11
47:2 57:18
58:1,15 78:16
78:17,23 79:6
80:11,25 81:4
81:6,18,22,25
82:2,6,6,17
96:17 98:1
**offered** 57:22
58:9,12
**offers** 57:10
78:14 96:8,9
**office** 6:23 41:3
41:10,11 42:1
44:22 47:24
48:1,3 49:1,3
107:4
**offices** 5:10
41:13,16
**oh** 10:11 23:14
47:18 50:15
56:8 77:18
84:17 86:19
102:10 103:16
**Ohio** 6:23 26:7
41:1 44:22
48:2
**okay** 7:21 9:3,11
10:22 14:3
15:13 16:7
17:12,16 18:20
19:1,4,22 22:3
22:8 23:10,14
23:24 24:6,9
24:13,24 29:9
30:21 31:4,13
32:4,6 34:6,23
36:23 37:9,14
37:20 38:3
39:4,6 43:8,13
44:18 45:6,12
47:10 48:16,19
49:16 50:5,12
50:12 51:2,19
52:11,24 53:8
54:25 57:8,14
58:8 59:13,20

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

schedule@kentuckianareporters.com
www.kentuckianareporters.com

502.589.2273 Phone
502.584.0119 Fax

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 118

60:23 61:20
62:3,15 63:16
64:1,16,25
67:22,24 68:1
68:5,8,9,12
69:13 70:23
72:2,7 73:5
74:1,8,11,25
75:9,16 76:15
77:23,24 79:1
79:4,8,13,20
79:25 80:6
81:8,12,12,19
84:16 85:10,19
85:23 86:16
88:23 89:16
91:12 92:10,14
94:6 95:22
97:19,21,23
98:14 99:14,25
101:6 107:2,21
**old** 15:15 16:4
83:22
**once** 58:23 62:3
63:5,5
**ones** 12:13 18:15
45:9
**ongoing** 17:2
46:19
**Oops** 50:12
**OpenM** 59:7
**OpenMRI** 58:20
59:8,13
**operating** 5:12
**operation** 18:7
101:3
**opinion** 15:1
34:4 35:19
50:1 61:5,25
64:7 66:12,25
98:17
**opinions** 68:21
69:3,9 97:9
103:15,17
**opportunity**
36:2
**opposed** 25:9
44:13 103:17

**opposite** 43:24
**order** 18:25
64:24 104:14
104:16
**ordering** 60:17
**orders** 95:14
**orthopedic** 53:4
54:10 75:18
**osteo** 86:6,8
**osteoarthritis**
8:3
**osteochondral**
85:25 86:4
**outcome** 33:4
**outside** 21:17
60:11
**overall** 29:11
34:8 37:10
**overpaid** 71:8
**owe** 21:2 29:7,8
29:23 30:11,13
30:24 40:7
**owed** 23:7,20,21

──────── **P** ────────
**P.M** 107:23
**PA** 2:14
**page** 3:2,10 22:3
22:7 23:24
24:18 26:21
29:9,10,10
34:6 35:24
37:8 42:7 50:9
50:13 51:16
56:6 63:14
67:23 68:10
77:15 80:5
81:11 85:11
92:15 93:1
108:6
**pages** 31:1 88:12
92:8
**paid** 23:7,20
30:17 35:17
56:17 90:15,18
90:21 91:6
105:5
**pain** 33:19,21,25
34:13 96:1

**paperwork**
14:24,24
**paragraph**
26:22 35:7
42:15 55:25
56:6 57:11,12
58:17 68:10
**part** 13:13 28:7
31:19 34:13,21
34:24 35:20,22
60:8 61:17
63:13 67:21
82:18 88:21
89:24 90:5
94:2 101:17
**partially** 13:7
**particular** 21:5
21:16,23 52:1
67:15
**particularly**
32:5
**particulars**
103:25
**parts** 70:14,15
101:1 105:22
106:4,9
**party** 52:9
**pay** 16:21 21:2
27:16 29:7
30:11,12,13,14
30:24 36:13
40:7 93:11
**paycheck** 11:21
**paying** 20:20
21:6 22:1
29:23 30:4
35:14
**payment** 91:5
96:15 104:1
**PC** 28:10
**pending** 55:18
**people** 93:15
94:13
**percent** 20:2,3,3
20:3,7
**percentage**
32:23
**perform** 82:25

**performance**
3:12 18:10,14
18:18 19:9,23
20:18 21:8,23
21:25 24:14
25:4,21 28:24
29:11 31:5
35:4,14 37:10
39:22,25 40:2
40:5,15,17
48:13
**performing** 61:3
**period** 9:8
**permanent** 83:8
**permission**
56:24,25
**permitted** 47:2
**person** 48:4
84:10
**personal** 26:20
93:13 96:2
**personally**
62:19 66:8
75:12
**pertain** 9:7
**pertinent** 60:5
**PETERSON** 2:5
**PGF@AUSTI...**
2:10
**phases** 33:5
**Phil** 5:11
**Philadelphia**
58:2 80:24
**PHILLIP** 2:4
**philosophy** 36:3
**phone** 10:20
39:5
**phonetic** 25:23
48:22
**physical** 41:3,20
41:22
**physician** 86:22
89:8
**physicians** 7:17
90:3 105:9
**piece** 62:16
**pinpoint** 50:10
**pinpointed** 43:4

43:6
**PIP** 56:9,14,16
56:19,20 57:1
57:5 71:7,8
90:15,17,18,21
90:21 103:25
104:1
**PL** 26:18,19
**place** 62:23
106:25 108:6
**placed** 24:6
94:11
**places** 60:20
**plaintiff** 1:7 2:3
64:20 83:6
87:3 102:16,24
103:21
**plaintiff's** 28:11
28:13,15 55:11
59:22 64:4,20
69:10,14 80:11
**plan** 73:24
**planning** 73:18
74:2,21
**play** 72:23
**please** 5:18,19
6:2 7:10 12:22
20:10 21:21
26:16
**point** 9:24,25
15:2,13 16:12
26:3 41:19
46:4 47:10
51:2,7 52:24
53:15 55:16
57:21,25 58:3
59:11 62:21
65:25 68:2
71:12 73:4
76:23 78:6,13
79:6,8 82:22
84:17 93:23
102:20 106:13
**policies** 6:20
**policy** 57:19,20
72:3,12 93:25
**port** 103:22,23
**portion** 35:18
502.589.2273 Phone

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
—— COURT REPORTERS ——

schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 119

**position** 6:10,16
6:19 20:15
26:1,2,3 40:23
45:6 46:25
70:17 71:3
94:8
**positive** 23:2,17
24:13 27:4,9
28:24
**positively** 29:19
37:23
**possible** 34:14
90:1 101:9
**possibly** 47:13
48:5 59:25
68:23 69:3,7,9
69:11 83:13
91:17 107:19
**Post** 6:23
**potential** 35:3
**practices** 78:11
**prefer** 98:23
**preparation**
49:24 66:24
**prepare** 8:20
**pretrial** 107:17
**previous** 71:19
89:7 101:13
**previously**
88:19 100:14
**price** 106:1
**Prieto** 2:14 5:10
**primarily** 107:7
**primary** 9:12
86:22
**prior** 50:3 58:3
60:5 64:21
71:23 73:12
78:17 83:17
88:4
**privilege** 12:19
**probably** 15:12
39:5 47:23,24
51:1 58:13
80:17,17,18
81:2 84:11
92:22 95:6,21
**problem** 13:4

72:21 87:19
92:2
**problems** 72:17
72:20 83:18
**procedure** 4:7
16:19
**PROCEEDIN...**
3:3 5:1
**process** 21:8
39:25 97:7
98:11
**produce** 16:1
32:8
**produced** 16:5
40:14
**producing** 37:12
**product** 20:13
**profit** 69:24
70:15 71:9
**Profitable** 20:11
**profits** 70:13
**profits/loss**
69:15,20
**progressive** 34:9
34:15 35:3
**promoted** 46:9
**promotion**
46:11
**prompt** 20:16
96:5 99:1,2,5
**promptly** 98:7
98:16
**proper** 20:16
67:7
**protect** 20:15
**provide** 20:14
63:6 68:16
100:3 102:17
102:21
**provided** 60:19
62:8 100:14
**pry** 7:4
**Public** 4:10
**pull** 32:20,24
85:7 88:3
**pulled** 88:6
**purchase** 101:1
105:22

**purchased**
38:23
**purpose** 66:23
**purposes** 7:5
**pursuant** 4:6
**put** 29:6 35:18
39:10 40:1
64:9,11 79:16
92:24 106:1
**putting** 38:4
39:2,16 40:4
106:3

_____

**Q**

**quality** 26:17
32:9 34:8
37:23 38:13
**quarter** 34:8
**question** 13:20
14:5 21:5
39:19 40:8
67:3 73:14,22
74:22 98:16
**questions** 12:25
18:15 32:22
49:13 78:5
80:15 98:21
99:15,18
105:12 107:21
**queue** 26:24
**quicker** 38:1
**quickly** 30:1
**Quintairos** 2:14
5:10
**quite** 16:2 78:22
98:11

_____

**R**

**radiologists**
94:13
**raise** 5:19
**range** 39:10,12
42:18,20 43:3
43:4,8,9,10,14
43:17,20,22
44:3,7,12
67:14 91:17,20
92:19
**ranges** 42:17

45:20 84:8
91:17
**ratio** 20:14
**re-evaluate**
102:12
**reached** 55:20
**read** 10:15
13:24 20:9
21:24 26:15
34:2,12,18,19
44:15
**real** 70:12
**realize** 57:21
**really** 16:8 21:9
27:25 30:21
31:17 38:5,5
38:20 40:8
52:12 55:12
66:24 68:24
82:3 97:11
100:7
**reap** 38:13
**reason** 59:23
60:8,8 61:16
90:4 93:16,21
94:2
**reasoning** 15:25
**reasons** 79:22
**reassigned** 9:17
9:18
**recall** 8:4 79:7
102:16
**receipts** 69:15
69:20,24 70:12
**received** 10:18
10:19 14:23
15:22 18:12
56:1 58:23
71:12 83:10
88:4 93:5 95:6
103:21 107:1
**recollection**
9:19 13:22
28:21 51:11,14
57:6 61:18
**record** 5:3 6:2
7:10 49:8,10
62:13 86:12

87:23,25 88:18
88:19,22,24
89:3,4,9,11,18
89:24 90:4,6
90:12 108:11
**recorded** 108:9
**records** 12:9,10
12:12,15 13:5
15:25 16:1
54:2 58:19
59:5,10,13
60:5,6,10,15
60:24 61:1,11
61:12,14,14,24
62:25 63:11
76:14,17,20
82:13 83:17
86:20,21 87:4
87:5,6,7,10,11
87:14,20,22
88:4,9,14 89:1
89:2,13 90:2
91:1 98:13,14
99:19 100:3,6
102:17
**recs** 58:19
**redacted** 7:9,11
61:16,21 74:7
100:14
**redactions**
18:24,24
**REDIRECT** 3:6
104:25
**reduce** 44:13
**reduced** 93:24
108:10
**refer** 92:1
**reference** 43:8
**referencing**
88:19
**referring** 33:18
43:11 49:19
57:11,15 85:3
89:8 92:22
**refers** 33:21
**refresh** 67:18
75:2 82:1
**refused** 57:18

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 120

102:16
**refusing** 102:21
**regarding** 68:14
**regardless** 13:6
74:2
**reiterate** 57:19
**reiterated** 78:15
78:18
**reiterating** 79:5
**related** 10:6
46:5 70:18
72:6,20 83:8,9
83:13,13 102:8
**relating** 60:6
**relation** 15:4
52:1 99:2,3
**relationship**
11:12
**relative** 108:13
**relayed** 53:9
**release** 59:24
60:16
**releases** 33:11
**relied** 15:12
**rely** 14:5 101:16
**relying** 82:16
**remain** 18:25
**remember** 7:14
7:16 8:6 10:10
14:12,13,23
15:11,13,19,25
16:2,8,11
38:25 39:6
42:23 46:22,23
48:12 57:25
58:14 60:19,21
61:12,14,22,22
62:1,1 63:13
63:24,25 64:7
64:14,18 65:24
66:13,15 67:13
67:14,15 68:6
71:7,11 72:18
74:10 78:6
79:5 82:22
84:17,22,25
85:2 87:1,4,10
87:12 88:25

89:18 91:23
93:16,20 98:13
106:18
**remind** 80:16
**reminder** 28:3
**render** 66:25
**reneged** 83:12
**Rennick** 25:23
31:9 35:13
**repair** 100:25,25
105:23
**repairing**
105:25
**report** 8:16,22
10:14 61:8
64:9,15 65:1,2
68:17 71:1
79:14 82:14
83:3,5,15
84:21 85:4,20
86:4 87:6,12
87:13 93:7
94:4 96:24
97:1,3,10
101:13,14,19
101:22,23,25
102:3 103:18
**reported** 42:2,4
42:5
**Reporter** 1:25
4:10 5:19
40:12 77:21
108:1,23
**reporting** 67:16
**reports** 7:18
101:16
**represent** 10:24
**representative**
36:25
**representing**
54:24 80:24
**reputation**
20:15
**request** 59:16
90:2 100:6
102:25
**requested** 15:15
59:21 89:10,17

103:2
**requests** 103:1
**reserve** 16:14,17
16:18 17:5
23:11,18,22
**reserving** 32:16
34:21 35:2
**reside** 6:25
**resolution** 6:11
73:12
**resolve** 27:1
**resolved** 24:1,9
**resolving** 22:20
23:3 27:23
**respond** 100:8
**responded**
102:25
**responses** 55:24
56:1,3
**responsible** 6:19
**rest** 23:14 34:16
**result** 23:20
39:16,19 40:4
**results** 23:11
26:22 27:20
28:24 32:13
35:24 37:12,15
37:16,17,23
38:13
**retained** 68:13
**retire** 87:17
**return** 53:5
71:24 72:15
**returns** 15:14
64:22 71:18
73:7,19 74:4
105:16,19
**review** 12:11
14:2,6,17
15:10 18:19
19:9,23 21:8
21:23 24:14
28:24 35:5
37:19 39:25
40:2 48:13
49:22 56:19,20
56:23 63:13
64:21 83:19

100:11
**reviewed** 8:20
9:1,2,7 11:24
14:9,20 15:9
15:21 16:10
18:10 20:18
34:2,3 35:16
35:17 46:5
49:19 65:12
67:20
**reviewer** 48:17
**reviewing** 25:21
31:10 40:17
**reviews** 18:14
21:25 39:22
**Richardson**
11:2,4 66:20
73:16,21 74:22
107:7,14
**Richardson's**
11:6 54:22
107:4
**Richmond**
88:24 89:4,11
89:18 90:12,20
**rid** 15:24
**right** 5:20 7:25
8:1,14,15,18
11:3 13:25
20:4 21:4
24:11 27:22,25
31:17,20 32:2
32:16 33:7
35:6 40:7 41:8
43:15 44:4,12
44:19 45:19,21
50:20 51:25
55:16 56:4,13
62:6 67:1
68:17 72:19
73:1 75:11
77:21 79:18,20
83:18 84:14
86:5,14 87:11
91:21 92:12
93:5 95:3
96:24 97:8,24
101:12 106:17

**right-hand** 22:6
**ring** 66:5
**rise** 6:20
**ROAD** 4:4
**room** 8:14
**RULES** 4:7
**ruling** 73:11

---

## S

**Safeco** 11:11
17:11
**Safeco's** 20:15
**saying** 16:2
36:17 43:25
54:10,13,23
56:20 57:4
72:10 93:6
97:16
**says** 11:21 20:9
22:9,19 23:10
23:13,25 26:23
27:19 28:5,10
32:8 33:4,10
34:7 35:8 36:2
37:11 38:11
42:8,11,15
43:16 53:2
54:3 57:17,24
58:18,23 68:13
69:8,13,19
70:3,4 74:17
80:10 81:17
85:23 88:25
93:3,3 101:19
**scale** 32:14
**scaling** 35:8
**schedule** 61:1
**scheduled** 60:24
79:23
**scheduling**
58:24 104:13
104:16
**scores** 34:7
**scroll** 88:12
**scrolling** 88:18
**se** 39:8
**second** 26:24
35:7 42:7,15

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

85:6
secretary/par...
18:1
section 29:10
38:7 42:8
52:16,21
Security 14:11
14:19 15:6
71:15 72:18
77:2 102:17
see 6:9 10:17
18:24 19:24
22:11,17,24
23:12,13 25:14
25:19 27:2
28:7,17 29:11
29:19 31:16,23
34:10 35:11
36:3 37:12
38:8,14 39:14
42:9,21 45:4
50:13,14,18,21
51:18 52:17
53:16 56:5
57:23 58:21
63:19,23 68:14
69:17,21,22
74:5 76:12
79:9 80:13
81:3,20 85:6
85:13 86:1
87:12,21 88:10
88:11,13,18
89:17 92:18
101:10
seeing 84:25
93:17
seek 42:11 47:2
seen 12:9 14:19
15:20 40:3
46:1 48:22
88:16 93:19
selected 105:3
self- 69:15
100:23
self-employed
70:13 100:17
105:15

send 13:10
76:11,16
sending 88:9
Senior 6:11
sent 14:21 53:10
79:9 91:1
sentence 29:17
33:9 35:8,23
37:11,20 38:10
42:14 43:16
57:14 58:18
69:13,19
separate 56:22
56:23
separated 71:24
September 80:7
81:14 82:2
series 63:17
serve 7:5
set 16:19 23:22
93:9 108:6
settle 27:5,6,9
27:10 93:12
settled 13:22
23:11,13 98:6
98:7 99:4
102:14 104:7
settlement 23:25
24:4,7 27:1,5
27:24 29:3
32:16 33:5,10
38:4 47:15
57:9 82:17
91:20 96:8,17
103:21
settling 6:20
23:18
sever 85:23
severe 84:9
SHEETS 3:11
SHELBYVIL...
4:4
shocked 22:23
SHORT 2:6
shortly 13:22
should've 70:1
shoulder 72:21
83:7

show 37:19
67:17 79:14
87:21 88:5
92:3
showed 7:18
37:16,17 71:24
89:7
showing 84:13
86:4,12 90:25
Shows 94:16
side 40:3 98:10
sides 76:7
sidewalk 28:17
Similarly 13:10
simply 27:21
single 21:15
sir 2:15 17:15
situation 28:1
57:9
six 22:10 23:10
25:9,18 45:5
62:23,24 76:25
skill 108:12
skills 26:25
27:13
slowly 17:22
Social 14:11,19
15:6 71:15
72:18 77:2
102:17
soft 35:9
solemnly 5:20
solid 99:11
somebody 9:24
39:11 47:3,16
54:22,23 55:21
76:6,9 84:3
90:19
somebody's
105:25
Sonya 40:18,19
42:24 43:1
Sonya's 43:13
sorry 17:22,23
24:18 25:10
34:25 39:18
48:21 50:17
56:5 74:8,23

82:3 87:9 92:6
93:2 102:2
sort 32:2 34:15
span 93:5
speaking 98:20
98:23
Specialist 6:11
specialists 45:20
specific 30:2
71:2 91:25
specifically
72:17 106:19
speculation 30:8
spoke 107:14,16
sprained 96:3
spurring 8:3
SSDI 58:21 59:7
59:20 60:3,6
60:11 61:24
62:3,12
standing 28:3
99:24
start 22:5 43:5
started 49:18
starts 22:8 51:16
state 4:10 6:1
67:3
stated 49:22
statement 20:8
21:5,23 29:14
38:16 84:5
states 1:1 5:5
29:18 37:21
status 80:12
stay 95:12
stenographica...
108:9
sticking 42:21
sticks 93:21
STIPULATION
4:1
stood 33:5
stop 66:16
Stouffer 80:10
80:22,23
STREET 2:6
strength 22:16
strong 26:24

83:5
studies 83:23
stuff 23:14
subject 34:15
SUBMITTED
108:25
subpoena 7:6
59:25
subsection
42:11
subsidiary
11:15,17 17:11
subtle 85:24
successful 26:23
suffering 33:19
33:21,25 34:13
suggested 38:13
98:24
suggesting
85:25
SUITE 2:6,15
4:4
summaries 12:6
12:14 13:5
summarized
13:11
summary 12:3
29:11,17 37:10
37:21 85:23
107:1
supervisor
33:23
supplied 15:24
59:24
support 94:7
supposed 30:14
sure 6:3,17,24
7:7 9:23 11:5
12:10 13:4,9
13:23 16:6
18:16,20 19:16
19:20 20:5,11
21:13 25:2,11
26:16 34:3
39:13 41:2
45:17 46:14
47:21 49:7,7
53:9,10,24

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax

schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 122

54:2,12,15
55:4,12 60:1,4
60:21 61:2
62:10,10 64:2
66:21 68:7,12
68:25 70:1
71:15 74:17
78:15,16,23
79:11,15,17
81:10,24 82:7
83:20 85:8
89:12,20 91:3
91:16,18 95:18
99:9,11 101:11
102:1,10
104:20,24
106:10
**surgeon** 53:4
54:10 75:19
**surgery** 52:25
83:8,13 94:9
94:22,23
**surprised** 84:6,9
**sustained** 8:12
83:6 85:1
86:14
**swear** 4:11 5:17
5:20
**switch** 47:11
**sworn** 108:7
**system** 68:3
**system's** 68:7
**systems-wise**
38:21

---

**T**

**table** 96:18,23
**take** 10:11,14
21:1,1 23:5,6
23:19 35:15
36:9,22 49:5
62:25 70:18
71:4 76:11
95:24 97:17
99:12
**taken** 4:3,6
82:23 92:12,13
94:13 104:17
108:5,11

**takes** 98:9
**talk** 10:5 27:20
49:18 56:13
74:24 93:9
**talked** 84:17
**talking** 8:25
33:15 39:21,25
54:22 63:21
78:11
**talks** 27:23
**tax** 15:14 64:21
71:18,23 73:7
73:19 74:4
105:16,19
**Team** 45:1
**tear** 94:16,19,20
**tearing** 84:18
**telecommute**
41:7
**TELEPHONE**
2:8,17
**tell** 13:3 16:17
18:12 31:14,17
32:7 33:16
47:13 48:14
54:25 55:7
58:8 60:2 61:8
64:5,16 66:11
67:25 70:5,8
70:23 71:5
74:13 75:16,25
78:22 79:1
83:4 84:16
92:11 93:8
107:16,19
**telling** 54:14
60:7 67:4
69:23 88:8
**tells** 95:12
**ten** 34:2 43:20
43:21 44:3,9,9
44:12,13
**tend** 69:16
**tendonitis** 84:20
**term** 16:14,14
**terms** 6:15 21:6
30:3
**testified** 30:8

65:3 93:7
97:12 101:22
106:8
**testify** 10:13
70:25 99:6
108:7
**testifying** 37:4
**testimony** 5:21
64:14 65:18
91:7,11 94:12
101:8 102:12
103:12 106:20
106:23
**Thank** 7:12
12:24 77:19,24
107:22
**Thanks** 51:12
**Thibodaux**
19:10,12 23:2
23:17
**thing** 32:2 37:16
40:7 46:18
**things** 21:24
32:15 35:2
36:10 38:21
49:18 61:15
72:22 91:10
96:3 101:3
**think** 7:21 8:11
8:17 9:13,23
10:11,12,18,19
11:15,16 15:22
15:22,23 16:4
19:19 21:16
23:21 24:4,4
27:12 29:5
37:16 39:12
41:1 43:7 45:4
45:14 48:10,20
49:22 50:24
51:6,7 52:19
53:4 58:5,5,13
58:15 59:24
61:18 62:5,7
62:12,13,15
64:23 65:5
66:20 67:6,7
67:13,21 68:2

71:8,11,17
73:3,9,11 74:7
74:18 75:1,14
77:1,7 78:15
79:12 80:17
81:24 83:24,24
84:20 86:13,18
86:20 87:4,9
88:21 91:16
93:15,16 94:9
94:12,20,21,21
95:16,19,21,23
96:17,20 97:11
98:2,6 99:5,14
101:10 102:3
104:21 106:4,6
106:6,20 107:9
107:13
**thinking** 33:20
34:12 72:21
73:5 93:22
**third** 34:8 38:10
**thoroughly** 6:18
42:12
**thought** 35:17
60:2 87:10,13
91:22,23,23,24
91:24 92:19
**threatened**
22:22
**three** 25:17 33:1
**tickets** 16:5
**tighten** 43:17
**tighter** 42:16
43:2,13 44:8
**time** 9:8 14:7
16:2,20 17:6
19:21 20:17
21:12,15,16
24:5,8 26:4
27:7,11,18
29:15 34:3
36:6,14 38:2
38:22 41:8,9
41:19,20 47:9
47:21 49:2
50:10 51:2,7
52:23,24 53:15

55:15 59:11
63:14 76:20,23
77:14 79:6,8
82:12 91:10
93:5,23 96:21
96:22 98:4,11
103:1,3,14
107:13,16
108:5
**timeframe**
46:14
**timely** 102:24
**times** 10:7 75:2
**tissue** 35:9
**title** 19:16 44:25
45:1,18 108:6
**titled** 22:14
29:10
**today** 8:21 49:24
78:11
**told** 10:12 46:17
53:11 54:1,14
65:10 67:11
70:7 71:12,13
73:4 83:15
95:7 101:21
102:7
**Tony** 9:23 10:1
10:5 88:8
**top** 22:9 42:18
43:15 44:4,12
46:23 50:16
80:7 91:24
**total** 24:4,6 54:3
**traits** 22:11
**transcript** 13:24
108:5,11
**transcripts** 12:1
**treating** 7:17
55:8,8 105:9
**trend** 34:7 37:19
**trends** 33:12
**triage** 47:18,22
48:4,8 91:8
93:9
**trial** 7:6 39:19
70:18 71:4
73:24 74:2,21

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

94:8
**tried** 73:1
**true** 29:2 69:4,6
84:15 86:11,11
98:18 108:11
**truly** 76:9
**truth** 5:22,22,22
61:6,9 101:20
108:7,7,8
**try** 29:8 40:6
44:17 55:12
95:7,24
**trying** 7:4 9:6
13:3 14:13
47:14 50:10
61:5 63:4
84:20 87:9
95:15,16,19
97:7
**TSV** 24:1,3
**turns** 97:1
**two** 31:16,19
33:1,5 34:2
45:8,14
**type** 18:2
**typewritten**
108:10
**Typically** 55:5
**typing** 58:16
**typo** 57:24 58:13
**typographical**
58:6,16

___ U ___

**uh-huh** 7:13
16:25 20:5
22:12,15,18
24:2,17 29:20
31:21 33:9,14
34:11 36:1
37:13 38:15
42:13 48:24
49:4 51:5 54:4
57:17 58:10,25
63:23 69:18
80:9 84:1
85:22 86:2
88:21 90:9,23
92:16 104:20

105:13
**UIM** 7:14 10:6
11:24 13:17
17:5 77:5,10
77:12 78:9,14
98:6 99:3
**UIMBI** 51:22
**ultimately** 91:5
**umbrella** 11:16
**uncommon** 84:2
**underlying**
73:15 103:21
103:22
**underneath**
11:17
**understand** 6:12
12:24 16:18
30:16,21 32:20
34:17 39:24
41:6 43:2 54:9
56:16 97:14
105:14,18,19
**understanding**
37:2,24 69:1
100:23 101:6
104:19
**understood**
11:18
**undervalue**
69:20,24 74:16
**unfair** 78:10
**United** 1:1 5:5
**unreasonably**
96:11
**unusual** 39:11
**update** 55:7
**upheld** 12:18
**urging** 94:3
**use** 36:11 38:22
64:19 67:8
71:9,19,21,25
73:7,19 99:7
**usually** 12:3
33:21 43:11
84:19 86:6
95:12,24,25

___ V ___

**V** 1:9

**value** 16:24 24:4
24:7 29:6 43:7
91:13 92:19
100:20
**valued** 23:9
**values** 32:18
33:3
**vehicle** 8:5,12
52:13 85:21
100:25
**vendors** 60:17
**versus** 5:4
**video** 5:3,12
13:21 14:1,6
49:9 65:15
87:24
**videos** 13:16
**Virginia** 19:19
**vocational** 63:21
64:3

___ W ___

**W-2** 100:17
**W-2s** 100:11
105:12,15,17
**wage** 13:11
53:19,21,22
54:5,8,17
55:10 56:17
64:20,24 66:2
66:12 68:14
70:6,15 82:13
100:10 101:9
106:2
**wages** 65:7
**waiting** 58:18
59:6 60:24
**waive** 12:21
**want** 5:13 16:13
20:9 21:10
32:4 37:3 57:4
60:25 61:2,6
76:6,9 77:16
78:4 79:16
90:24 95:14
96:5,8,11,14
99:11,24
101:1,9,20
**wanted** 11:11

12:17 14:25
20:6 22:13
43:6 49:12
53:21 60:15
68:23 104:11
**wanting** 36:21
**wasn't** 59:23
67:4 72:18,25
82:2 83:8
87:17 89:24
99:1 105:8
**watch** 13:16
**watched** 65:15
**way** 2:15 11:17
16:18 21:1,2
23:5 29:4
32:23,25,25
34:17 36:22
43:19,19,21
44:5 50:2 57:6
66:18 67:7
73:6,7 74:1
77:9 80:2 87:7
88:15 97:17
107:18 108:14
**we'll** 24:25
30:25 40:10
**we're** 49:9 62:21
62:22,23 77:11
78:11 87:24
105:2
**we've** 18:12 40:3
49:6 75:1
**wear** 94:16,18
94:20
**weight** 20:1,2,7
**welcome** 78:2
**went** 79:12,22
91:4
**weren't** 36:13
66:14 83:8
**WEST** 2:6
**Whereabouts**
7:24
**whim** 100:7
**wife** 64:21 71:24
105:16
**wife's** 65:7,7

106:6
**William** 66:4
**Williams** 40:18
42:24
**wish** 78:21
**witness** 4:11
5:17,23 13:25
19:1,4 20:22
67:1 78:2 90:9
92:6 97:8,21
98:18,21,24
108:4
**witnesses** 74:20
**wondering** 15:8
27:8 74:9
**Wood** 2:14 5:10
**word** 97:5
**words** 43:5,22
79:16
**work** 17:8,17,20
18:2,3 19:18
20:13 22:19
26:17 32:2
36:8 41:7
44:21 53:6
54:11 64:8
72:16 73:2,4
95:7,19
**worked** 17:11
17:19 19:20
41:19,23 42:18
**working** 11:4
17:9 29:5
**would've** 9:1,19
10:18,23 11:23
28:22 47:23
48:20 49:18
50:24 51:8
52:19 56:2
58:5 62:20
63:7 65:19
71:16 78:18,20
82:11,12 88:23
92:24 93:4,5,8
93:9 107:12
**wouldn't** 11:25
17:4 39:10
56:2 63:8 83:2

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

schedule@kentuckianareporters.com
www.kentuckianareporters.com

502.589.2273 Phone
502.584.0119 Fax

KENTUCKIANA
— COURT REPORTERS —

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 124

**written** 29:14
  33:3 38:16
  68:17 101:14
  103:18
**wrong** 25:3
  93:17
**wrote** 28:20
  68:2 89:6

___

**X**

**x-rays** 94:13

___

**Y**

**yeah** 16:25
  20:23 21:13
  22:9 27:25
  34:25 35:1
  40:6 43:16
  47:25 48:21,21
  48:24 50:17
  55:2 57:16
  58:15 64:6
  67:17,18 70:4
  72:11,11 77:1
  77:18 79:17
  82:15 84:1,9
  85:16 87:18
  97:16 102:8
  107:18
**year** 25:5 31:6,8
  31:15 34:16
  37:12 40:17
  42:15 71:17,17
  72:1,12 75:23
**year-end** 29:13
**year-old** 84:10
**yearly** 18:10
  20:18 21:25
**years** 6:9 41:24
  45:14 62:23,25
  76:25 77:5,11
**Yep** 77:9
**yesterday** 22:20
**you-all** 41:3
  60:24 62:9
  66:1 71:9
  73:18 74:20
  81:1 82:15
  87:7 90:11

97:23
**your-alls** 105:8

___

**Z**

**ZIP** 6:24
**zoom** 85:12 88:7

___

**0**

**01/07/2020**
  108:24
**04-03-15** 93:4
**04-30-15** 92:23
**05-11** 93:3
**08** 8:9 76:24
**08/19/2016**
  108:25

___

**1**

**1** 3:11 18:21,22
  20:1,6,8 26:8,9
  26:14 85:11
**10** 20:3
**10,000** 81:18,22
  82:5,9 97:4
  98:1
**10:00** 4:6 5:9
**100** 23:22 71:13
  71:16,21,25
  73:6 91:18
**100,000** 47:6,8
  47:11 52:1
  91:14 93:11
**100/$300** 51:24
**100000** 91:21
**100K** 23:11
**105** 3:6
**1057** 49:15
**1057-1153** 3:15
**1058** 93:2
**1059** 92:15
**1084** 81:11
**1091** 80:5
**1094** 77:15 78:4
**1095** 63:15
**1097** 51:16
**1098** 51:17
**1099** 56:7
**1100** 50:10,13
**1153** 49:15

**12** 85:18
**12:17** 107:23
**125** 24:23
**126** 26:21
**13-CV-426** 5:7
**138** 24:23 29:9
**14** 78:5 79:18
**15** 6:9 41:24
  67:23 68:10
**15:13-CV-426...**
  1:4
**157** 40:16
**162** 40:16
**164** 31:1
**165** 34:6
**166** 35:25
**17** 58:7
**17,154.50** 53:19
**17,264** 57:18,22
  58:9
**173** 31:2 37:8
**18** 3:11
**19** 51:15 81:15
**1970s** 86:24
  88:14
**19th** 57:8

___

**2**

**2** 3:12 20:2 22:8
  24:25 25:1
**20** 20:3
**200** 36:13
**2007** 18:18 19:9
  21:16,22
**2008** 8:5,12
  62:23 77:4
  85:18 90:16,18
**2009** 53:1
**201** 2:6
**2010** 25:5,22
  28:10 31:11
  77:6,7,11 87:8
  88:7,10 90:12
  99:3
**2011** 79:3
**2012** 3:13 31:6
  32:7,11 33:6
  35:2,1 37:7
**2013** 3:14 40:15

40:17 42:24
**2014** 9:14 48:13
  50:14,21 51:8
  51:16 56:16
  59:17 62:22
  63:18 76:15,25
  78:5,13 79:9
  79:12 80:8
  81:15 97:23
  98:2 102:7,8
**2015** 92:13 99:4
  107:17
**2016** 1:24 4:5
  5:9
**21** 28:10 63:18
**21,690.50** 54:3
**225-3731** 2:8
**225-3830** 2:9
**226-0057** 2:17
**226-0059** 2:18
**24** 3:12
**2452** 2:15
**25** 20:2 71:17
**25,000** 24:7
  103:21
**25K** 24:1
**26,000** 71:17,17
  72:1,12
**27th** 92:18
**28** 50:14 92:13
**28th** 50:15

___

**3**

**3** 3:13 20:3
  29:10 31:1,3
  80:7
**3,750** 22:21
**30** 3:13
**300** 2:15
**31** 88:7,10
**34** 18:18
**37** 22:3,6
**38** 24:20
**39** 18:18
**39K** 23:12,13,21

___

**4**

**4** 3:14 20:3
  22:19 40:11,13

**4,500** 78:18,23
  79:6 96:17,23
**4,536** 53:20,22
  54:17 56:17
**40** 3:14
**400** 4:4
**40507** 2:7
**40509** 2:16
**45** 20:2,7

___

**5**

**5** 3:3,4,15 77:20
  77:24,25
**50-** 84:9
**500** 36:8
**50s** 83:24 84:3
**515097** 6:23

___

**6**

**6** 3:16 50:21
  77:22,23 78:1
**60,000** 103:25
**61000** 23:18

___

**7**

**7** 77:22
**7,500** 24:10
  43:21 44:3,9
  58:1,14
**7:39** 93:3
**7264** 58:7
**7500** 24:1
**75K** 22:21
**77** 3:15
**78** 3:16

___

**8**

**8** 1:24 5:8 79:12
  79:18 102:5,6
  102:7,7
**800** 2:6
**859** 2:8,9,17,18
**8TH** 4:5

___

**9**

**9:57** 63:19
**90** 91:22
**91,500** 91:5
**93,000** 91:22

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of LAURA HARP-BIVEN, taken on August 8, 2016

Page 125

93:16,19
**9300** 4:3
**93000** 91:24
**99** 3:5 51:17

Kentuckiana Reporters
730 West Main St., Suite 101
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax

schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —