1

1       UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF KENTUCKY

3             CENTRAL DIVISION

4     JUDGE GREGORY F. VAN TATENHOVE

5       CIVIL ACTION NO. 5:13-CV-426

6

7             ERNEST FOSTER

8               PLAINTIFF

9

10                 V.

11

12    AMERICAN FIRE AND CASUALTY COMPANY, ET AL.

13              DEFENDANTS

14

15

16

17

18

19

20

21

22      Job No. CS2014770

23   DEPONENT:  DR. STEPHANIE BARNES

24   DATE:       FEBRUARY 26, 2015

25   REPORTER:  KAYLA GRANITI

2

1    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF, ERNEST FOSTER:
4    BARTLEY K. HAGERMAN
5    MEHR FAIRBANKS TRIAL LAWYERS, PLLC
6    201 WEST SHORT STREET, SUITE 800
7    LEXINGTON, KENTUCKY 40507
8    TELEPHONE NO.: (859) 225-3731
9    FACSIMILE NO.: (859) 225-3830
10   EMAIL: BKH@AUSTINMEHR.COM
11
12   ON BEHALF OF THE DEFENDANT, AMERICAN FIRE AND CASUALTY
13   COMPANY:
14   MICHAEL P. BARTLETT
15   MARKESBERY & RICHARDSON CO., LPA
16   2368 VICTORY PARKWAY, SUITE 200
17   CINCINNATI, OHIO 45206
18   TELEPHONE NO.: (513) 961-6200
19   FACSIMILE NO.: (513) 961-6201
20   EMAIL: BARTLETT@M-R-LAW.COM
21
22   ON BEHALF OF THE DEFENDANT, AMERICAN FIRE AND CASUALTY
23   COMPANY:
24   HEATHER M. MCCOLLUM
25   QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

3

1    2452 SIR BARTON WAY, SUITE 300
2    LEXINGTON, KENTUCKY 40509
3    TELEPHONE NO.: (859) 226-0057
4    FACSIMILE NO.: (859) 226-0059
5    EMAIL: HMCCOLLUM@QPWBLAW.COM
6
7    ON BEHALF OF THE DEFENDANT, PHILADELPHIA INDEMNITY
8    INSURANCE COMPANY:
9    ROBERT STOPHER
10   BOEHL STOPHER & GRAVES, LLP
11   400 WEST MARKET STREET, SUITE 2300
12   LOUISVILLE, KENTUCKY 40202
13   TELEPHONE NO.: (502) 561-9402
14   EMAIL: RSTOPHER@BSG-LAW.COM
15
16
17
18
19
20
21
22
23
24
25

4

1    INDEX
2                                        Page
3    DIRECT EXAMINATION BY MR. BARTLETT        6
4    CROSS EXAMINATION BY MR. STOPHER      76
5    BY MR. BARTLETT:                      88
6    FURTHER EXAMINATION               98
7    FURTHER EXAMINATION BY MR. STOPHER      103
8
9                EXHIBITS
10                                       Page
11   1 DR. STEPHANIE BARNES VOCATIONAL EVALUATION 17
12   2 UPDATED CASE APPEARANCE LIST           19
13

5

1              STIPULATION
2
3    The deposition of DR. STEPHANIE BARNES taken at MEHR
4    FAIRBANKS TRIAL LAWYERS, PLLC, 201 WEST SHORT STREET,
5    SUITE 800, LEXINGTON, KENTUCKY 40507 on THURSDAY the
6    26TH day of FEBRUARY, 2015, at approximately 2:00 P.M.
7    Said deposition was taken pursuant to the KENTUCKY
8    Rules of Civil Procedure. It is agreed that KAYLA
9    GRANITI, being a Notary Public and Court Reporter for
10   the State of Kentucky, may swear the witness.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

**6**

1    PROCEEDINGS
2
3         COURT REPORTER:  If you could just raise your
4    right hand for me, please?  Do you solemnly swear or
5    affirm the testimony you are about to give will be the
6    truth, the whole truth and nothing but the truth?
7         THE WITNESS:  I do.
8         COURT REPORTER:  Thank you.
9              DIRECT EXAMINATION
10   BY MR. BARTLETT:
11        Q It is Doctor, right?
12        A It is.
13        Q Okay.  Dr. Barnes, as I introduced myself a
14   moment ago, I'm Michael Bartlett.  I'm one of the
15   attorneys in this case.  I'm defending one of the
16   insurance carriers that has been sued by Mr. Ernest
17   Foster.  I'm pretty confident you've had your
18   deposition taken before; is that correct?.
19        A Yes, sir.
20        Q All right.  And usually I go through some
21   ground rules.  I think you're probably pretty well
22   aware of all of those.  If you need breaks, respond
23   verbally, things like that.  The only question I would
24   have is do you -- are you on any medications, or do you
25   have any medical conditions, that would impair your

**7**

1    ability to testify today?
2         A No, sir.
3         Q Thank you.  All right.  And what is your
4    full name?
5         A My name is Stephanie G. Barnes.
6         Q And the address I have for you is 8102
7    Stony Run Court, Louisville, Kentucky.  Is that
8    correct?
9         A No.  That address has changed to a P.O.
10   Box.
11        Q Okay.  And what is that?
12        A P.O. Box 99917, Louisville, Kentucky 40269.
13        Q All right.  And I see some letters behind
14   your name on your report, and we'll talk about your
15   report, but can you just tell me what those
16   abbreviations stand for?
17        A Yes, sir.  I have an RHD, which is a Doctor
18   of Rehabilitation degree, for the specialization in
19   rehabilitation and mental health counseling.  I have a
20   CVE, it is a Certified Vocational Evaluator
21   certification.  It is a national certification that
22   I've held since 1985.  It allows me to do testing and
23   assessment with the exception of any assessments that
24   are precluded by the psychological standards of a
25   particular state, such as in Kentucky, I can't do the

**8**

1    WAIS or the MMPI.  I can administer them, but I can't
2    interpret them.  I have a CRC, which is a Certified
3    Rehabilitation Counselor, it's a national certification
4    that I've held since 1990, and it allows me to practice
5    as a rehabilitation professional in all areas of the
6    United States.  It's the key certification for a
7    rehabilitation specialist.  I am a National Certified
8    Counselor, I've held this credential since 1996.  That
9    credential is a endorsement of my skills as a clinical
10   counselor, and I am licensed as a professional clinical
11   counselor in the Commonwealth of Kentucky.  I've held
12   that since 1998.  I am a Clinical Mental Health
13   Counselor -- in addition, there's one that's not on
14   there.  Would you like me to describe that, as well?
15        Q Please.
16        A I'm also a Licensed Professional Counselor
17   Associate, LPCA-S.  I'm an approved supervisor for
18   licensure associates in Kentucky while they're
19   undergoing their two years of supervised practice.
20        Q Thank you.  You mentioned Certified
21   Rehabilitation Counselor, and I think you kind of
22   described that, but so us lawyers can understand, what
23   does a Certified Rehabilitative Counselor do?
24        A Well it depends.  There are a number of
25   things that Certified Rehabilitative Counselors can do.

**9**

1    They are qualified to work as clinical and mental
2    health counselors, depending upon their curriculum of
3    training.  Some work in state agencies, some work in
4    colleges and private settings.  Some individuals do
5    forensic work.  The Certified Rehabilitative Counselor
6    endorses the individual's knowledge of individuals with
7    disabilities, work qualifications; assessment
8    interpretation, research.  Not everybody does forensic
9    work, but most everybody has some knowledge of forensic
10   work, so it's a very broad certification that covers a
11   lot of areas.
12        Q Now how is that, if it is different, how so
13   than a Certified Vocational Evaluator?
14        A The Certified Vocational Evaluator --
15   excuse me -- focuses only on assessment and testing,
16   while CRCs can do assessment and testing, the Certified
17   Vocational Evaluator focuses solely on that part of the
18   discipline as opposed to the generic application of the
19   rehabilitation counseling profession.
20        Q Now, the report that you prepared in this
21   case, I believe its date is June 5, '14, what parts of
22   your background did you rely upon to reach the
23   conclusions in that report?  Which -- meaning, was it
24   Certified Vocational Evaluator, was it more of a
25   Certified Rehabilitation?  Was it both?  Was it more?

3 (Pages 6 to 9)

**10**

1    A It was -- it was both. While I didn't do
2  formal assessment in this particular case, assessment
3  is not just testing. Assessment also has to do with an
4  individual's behavioral observations and so forth.
5  That's why it utilized both. But more so in this would
6  be the CRC aspect.
7    Q What aspects of that report would fall
8  under the Vocational Evaluator hat, if you will?
9    A The Vocational Evaluator hat would be more
10  consistent with the interview portion, because there is
11  some self-report information in there. The Certified
12  Vocational Evaluator would also pl -- come into play I
13  the summary where we look at his education and how that
14  impacts his occupational base.
15    Q Okay. And what about the Certified
16  Rehabilitation Counselor? What parts of that report
17  would have been done with that area?
18    A I think I need to clarify a little bit for
19  you.
20    Q Sure.
21    A Being a Certified Rehabilitation Counselor
22  does not preclude you from doing testing and
23  assessment. It just indicates you're not a specialist
24  in that area. So you -- you're asking me not apples
25  and oranges, but you're asking me different types of

**11**

1  apples. So both disciplines are used in the
2  formulation of the entire report, but the -- if you ask
3  me which ones are more assessment related, that would
4  be the two sections I indicated. The other sections
5  are just general rehabilitation practice.
6    Q So is it fair to say that anything that
7  relates to assessment would fall under the Vocational
8  Evaluator role?
9    A Again, let me clarify that that -- that
10  would be true for me, but there are individuals who do
11  not have a CVE but have a CRC or another credential who
12  also do assessments. So to separate them out like that
13  is really difficult, but your question was which one
14  specifically utivi -- utilized that portion of my
15  skills, and those two areas do. That doesn't mean that
16  the others didn't involve one or both of those.
17    Q All right. We'll get back to the report in
18  a minute. How many times, if you know, have you been
19  deposed?
20    A I can tell you how many times I have since
21  two th -- since May of 2009.
22    Q Okay. And is that with the list that you
23  had provided?
24    A Yes. It's been updated. I don't know that
25  you if you received the most recent list. The last

**12**

1  listing is 12-22-14 on the updated list.
2    Q All right. We do not have the updated list
3  so --
4    A What's the last date you have on your list,
5  sir?
6    Q May 30, 2014.
7    A Okay. There have been two -- two -- well,
8  actually, three. There are two more on the list, but
9  there are three more total since that listing.
10    Q Do you have extra copies of that?
11    A I think --
12    THE WITNESS: Didn't we make copies of this?
13    Q We can make copies during the break.
14    A Okay. We can make -- this is the updated
15  one, minus the one I did this morning.
16    Q Okay.
17    A So...
18    Q So that list that we'll attach as an
19  exhibit, that's everything going back to the last four
20  years, you said?
21    A May of 2009, so we're talking almost six
22  years.
23    Q And these -- are these just personal injury
24  workers' comp cases? In other words, these are not the
25  disability cases, too, correct?

**13**

1    A No. These are not the Social Security
2  Disability case. If you note on your listing, it will
3  tell you underneath what -- the action involved, so
4  there's been ADA discrimination, there have been
5  personal injury cases, there have been divorce
6  maintenance cases, so underneath you'll see what I was
7  retained for in that particular case.
8    Q Got you. And it's my understanding you
9  were in a deposition this morning as well?
10    A Yes.
11    Q Is that going to be on the updated list?
12    A It is not on the list. I -- I came --
13    Q So --
14    A -- directly from there --
15    Q -- there's got to be a fourth one then --
16    A -- to here. Yes.
17    Q Okay.
18    A No, that's the third one to add, so --
19    Q Third one.
20    A There's two on here that aren't on your
21  list and then the one this morning.
22    Q So this morning was not a Social Security
23  Disability case?
24    A No, sir. It was a -- it was a personal
25  injury case.

4 (Pages 10 to 13)

14

1    Q Out of curiosity, were you hired on behalf
2  of the plaintiff or the defendant in this morning's
3  case?
4    A This morning was a plaintiff's case.
5    Q Going through this list of cases, these are
6  not, and I don't know if it was asked or not, but these
7  are not a list of every case you've ever prepared a
8  report in going back to '09, correct?
9    A That's correct.
10   Q Is it fair to say there's more cases that
11 you've been -- that you've prepared reports in where
12 you have not been deposed?
13   A The -- the majority of them.
14   Q Now, do you -- tell me how it works. Do
15 you do reports for Social Security and, I guess,
16 private cases?
17   A Social Security, I'm in a non- -- a non-
18 biased position. I'm a neutral expert, so I am
19 retained by the Social Security Administration to do a
20 case  review and to appear for testimony, both with
21 questions posed by the judge, the representative, if
22 there is one, or the claimant themselves. In that
23 instance, I do not re -- prepare a formal report. The
24 other instances that I do prepare reports include
25 Veterans Administration Disability benefits, Federal

15

1  Workers' Compensation cases, personal injury, civil
2  actions, workers' compensation, employment
3  discrimination, divorce maintenance, anything that
4  involves occupational factors concerning an individual.
5    Q Okay. I guess excluding the Social
6  Security aspect of your business, how many reports have
7  you done since 2009?
8    A I average, and this is varied from year to
9  year, but right now I'm averaging somewhere between 200
10 to 300 a year.
11   Q Out of those 200 to 300, what's the split
12 plaintiff versus defendant?
13   A If we're looking at workers' comp, medical
14 injury, medical malpractice, things like that, the
15 split is about 50/50. I do a large number of cases for
16 the Veterans Administration disability, where, of
17 course, obviously, those are all plaintiff oriented.
18 But the remainder of my work is about half and half.
19 As a matter of fact, the divorce cases have split
20 equally. One husband, one wife, so...
21   Q As far as a written report, do you have a
22 flat fee, or do you work hourly?
23   A It depends on the referral source and what
24 they want done. My initial evaluation fee is $500 to
25 do the evaluation. Any professional time beyond that

16

1  is billed out at $150 an hour, and any travel time is -
2  - is billed out at $50 an hour with no mileage.
3    Q Is there an average amount of money that
4  you take in for a report case or...
5    A Probably right now the average is about
6  $900 -- $800 to $900 per report, and that's just your
7  basic report. A lot of them do not involve an
8  occupational loss analysis, so the time is different,
9  and a lot of them don't involve travel. So some of my
10 reports will go for the flat $500, while others might
11 range into the $1,200 range, but average is usually --
12 right now everything is going out at about $800 to
13 $900.
14   Q Do you know of any cases, whether these
15 here or any other cases you've been involved in in
16 litigation where your opinions or reports have been
17 challenged by the other side?
18   A No.
19   Q And have you ever had to go in front of a
20 judge in a Daubert hearing or anything like that?
21   A No, sir.
22   Q In this case in particular, do you know
23 what your current bill is?
24   A I -- I just recognized, as I pulled my file
25 out today, and I'm -- I'm residing between here and

17

1  Florida right now, for obvious reasons, based on the
2  weather yesterday, but I realized that I do not have my
3  actual billing statement with me in my file. I am
4  going to -- to estimate that it's probably about $650
5  at this point. It may be a little lower, I don't think
6  it's any higher.
7    Q So other than the missing billing, you've
8  brought your whole file here today; is that correct?
9    A Yes.
10   Q In your report -- and we can go ahead and
11 make it an exhibit, I suppose. It might be my only
12 exhibit, other than your case list.
13     MR. BARTLETT: You need one?
14     (EXHIBIT 1 MARKED FOR IDENTIFICATION)
15     THE WITNESS: No.
16     MR. BARTLETT: Okay.
17     THE WITNESS: I have -- I have one. Thank
18 you.
19     MR. BARTLETT: Bartley?
20     MR. HAGERMAN: I've got one. Thank you,
21 though.
22     MR. BARTLETT: We'll have enough.
23 BY MR. BARTLETT:
24   Q All right. What I've just handed everybody
25 else, which I assume you have, is the report, I think

5 (Pages 14 to 17)

**18**

1  it's -- I want to say 19 pages. Does that sound right
2  to you? The report, your CV and the list of cases?
3      A Probably with that, it would be. I only
4  have the report with -- and the loss tables with me,
5  but if you include the -- we probably faxed a bill and
6  a cover sheet on top of it, so that's probably not part
7  of it. But if it starts with page three --
8      Q Uh-huh.
9      A -- that's what I have, three through 11 are
10  the actual report.
11      Q All right. And just so you have it, here's
12  the exact -- the actual exhibit, and if you want o take
13  a look at that, it's your CV that we were provided and
14  the case list.
15      A That's what we had at that time.
16      MR. HAGERMAN: Yeah, you can refer to that.
17      THE WITNESS: Okay.
18  BY MR. BARTLETT:
19      Q All right. So the -- what we've now marked
20  as Exhibit 1 you agree that that's your report, CV and
21  the case list that we were provided?
22      A That is, yes.
23      Q The report, I think you signature is
24  June 5, 2014. That's page eight, correct?
25      A Yes.

**19**

1      Q Okay. And then, we'll clean this up later,
2  but Exhibit 2, we'll make the updated case list. All
3  right.
4      (EXHIBIT 2 MARKED FOR IDENTIFICATION)
5      Q With regard to the income you receive,
6  Doctor, from your various cases you're involved in, how
7  does the income from non-disability cases compare to
8  disability cases income?
9      A I'm not sure I understand what you're
10  asking, sir.
11      Q Do you make more money from disability
12  versus your more private area cases, or is it similar,
13  or is -- you make less money with disability?
14      A My -- my income is split almost 50/50
15  between Social Security and then my other consultations
16  in private practice. I do also teach on a part-time
17  basis, and that constitutes about ten percent of my
18  income, but in terms of the income arising from my
19  consultation or my private practice, about half comes
20  from Social Security and the other half from all the
21  other sources.
22      Q And you said you think you've billed about
23  $650. Is that like one invoice, or are there several
24  invoices for that?
25      A There's one invoice so far in this case.

**20**

1      Q Do you remember when that invoice was sent
2  out?
3      A I would -- I don't remember, but if the
4  report is dated 6-5, the invoice would have been sent
5  out at a time very near that, because whatever the date
6  is faxed here, which is 6-5, the invoice would have
7  been sent with that, so...
8      Q So have you spent any other time since
9  performing or completing your report -- have you spent
10  any other time on this case doing any records or any
11  other type of work?
12      A Just the -- the reviewing this -- reviewing
13  my materials, preparing for today and speaking with Mr.
14  Hagerman.
15      Q And that all happened today?
16      A Yesterday. I reviewed my materials
17  yesterday, and I spoke briefly with Mr. Hagerman
18  yesterday afternoon and this morning. And -- well, not
19  this morning, this afternoon.
20      Q Since June 5th of 2014, has Mr. Hagerman or
21  any other lawyer in this office provided you any
22  additional materials or documents for your review?
23      MR. HAGERMAN: You can answer that.
24      A The only thing is when I arrived today, he
25  had a set of materials that I had not had prior to

**21**

1  rendering my report, so they were not available for me
2  to consider at that time period.
3      Q What materials did you review, then, today?
4      A The disclosures and so forth of witnesses,
5  including my report and so forth, so I got his
6  disclosure list --
7      Q Okay.
8      A -- that he had me review today, and then
9  there are some medical records, historical medical
10  records, from the treating physician for Mr. Foster
11  that I did not have, and I really have not reviewed,
12  that he just told me that were in existence, should I
13  need to refer to them. So those are the only two
14  documents I've been provided.
15      Q And I may take a look at those in a moment,
16  but are those the Dr. Burandt records?
17      MR. HAGERMAN: I think she said she hasn't
18  really --
19      MR. BARTLETT: Yeah, you --
20      MR. HAGERMAN: -- had a chance to review
21  them.
22      THE WITNESS: I haven't even looked at them
23  enough --
24      MR. BARTLETT: I didn't know if it was
25  labeled or something.

6 (Pages 18 to 21)

22

1    THE WITNESS: I -- I don't see a letterhead
2 on it, and I really haven't looked at them enough to
3 know -- to -- to tell you that one way or the other,
4 so...
5 BY MR. BARTLETT:
6    Q Okay.
7    A I -- I honestly don't know.
8    Q That's fine. We can talk about that more
9 later. So other than those two packets of documents
10 that you were provided today, there have been no other
11 documents sent to you since June 2014; is that correct?
12    A Correct.
13    Q Okay. And I believe you said you reviewed
14 your own file, which you have here today, except for
15 the billing invoice, and those two documents, is that
16 the only documents you've reviewed in preparation for
17 today's deposition?
18    A That's the only documents I've reviewed in
19 preparation, yes, sir.
20    Q All right. If you want to look at your
21 report which we've marked as Exhibit 1, middle of the
22 page, maybe a third of the way down it says "Vocational
23 Evaluation." Do you see that, Doctor?
24    A I do.
25    Q What does "Vocational Evaluation" -- what

23

1 does that mean?
2    A Vocational evaluation involves a analysis
3 of an individual's work capacities, capabilities,
4 employment opportunities, basically looking at the
5 person from a standpoint as a potential employee and
6 what they can and cannot do.
7    Q All right. Is that what you did in this
8 case, you did a vocational evaluation?
9    A I did.
10    Q And then I see a date of evaluation is
11 May 27, 2014. Do you see that?
12    A Yes, sir.
13    Q And then your report, I think, is signed
14 almost -- I don't know the calendar, but several days
15 later, on June 5th. Is that common for you to have a
16 passage of time there before you complete your report?
17    A That's actually quicker than a lot of folks
18 complete their report. I -- I try to have my report
19 out within a 14-day period, if all the medical evidence
20 and everything is -- is common.
21    Q Okay.
22    A Given that that was around the holiday,
23 that was pretty -- pretty quick, actually.
24    Q Now, if you can describe, when you conduct
25 a vocational evaluation, what do you do? What is your

24

1 normal course of action, if you have a normal course of
2 action?
3    A Well, I don't have a normal course of
4 action. There are some things that go into all
5 evaluations, but it's dependent upon referral and the
6 client. In all instances I would request medical
7 information regarding the client, because if we have no
8 medical information or no vocational restrictions, or
9 actual impairment listing, not impairment ratings, but
10 impairment listings with specific restrictions, then
11 there's no reason to do a vocational evaluation, so
12 there's got to be some evidence of a medical situation,
13 a medical change for the individual. Then I would do
14 an interview which consists of about an hour of asking
15 a standard questionnaire-type set of information for
16 the individual. I may or may not do academic testing,
17 interest testing, or other types of vocational testing.
18 That's the basic interview. That's the $500 interview.
19 Following that, I may or may not do a wage-loss
20 analysis or additional research on occupations or
21 occupational base, based upon the request of the
22 referral source. In addition, I may be asked to do
23 other types of services. Finding specific research,
24 reviewing other documents after the fact. Once I have
25 all the information in place, I go ahead and render a

25

1 report, and that takes care of that aspect of it,
2 unless I'm asked to do anything additionally.
3    Q Okay. Before I forget to ask you, have you
4 had any follow-up interviews with Mr. Foster since May
5 of 2014?
6    A No, sir.
7    Q All right. Just going down the list you
8 just provided me, in this case, you reviewed medical
9 information, correct?
10    A Yes, sir.
11    Q Okay. And to the extent there's any
12 medical restrictions, you reviewed that as well,
13 correct?
14    A Yes, sir.
15    Q And you conducted an interview, correct?
16    A Yes.
17    Q Was that an in-person interview?
18    A It was.
19    Q And is that in your office in Louisville?
20    A No. It was actually at the Social Security
21 Administration Office of Disability and adjudication
22 here in town. I met Mr. Foster there while I was doing
23 Social Security hearings one day.
24    Q And where is that office?
25    A It is -- you know, I don't know the street

7 (Pages 22 to 25)

**26**

1  address for that office. It's out at the -- it used to
2  be. I -- I don't have the address. It's out by
3  Hamburg, out there in Lexington. I just know how to
4  get there. I don't know the street address.
5      Q Did you all have like a separate room or
6  something?
7      A Yes. We --
8      MR. HAGERMAN: I think it's Buena Vista
9  Road --
10     A There it is. Buena Vi -- yeah. I go to so
11  many of them, sometimes they all run together.
12     Q What --
13     A Like I said, I know how to get there. I
14  had a -- a separate conference room with just him his
15  wife and myself.
16     Q All right. I've never been to that
17  building. Is that a big building, or --
18     A It -- it's not a big building. The Social
19  Security office is housed on the first floor. It was
20  built specifically for them, and the hearing office is
21  located on the second floor. It's a two-story building
22  that specifically is for government use.
23     Q Where was the conference room located?
24  First or second floor?
25     A On the second floor. All of the ODAR

**27**

1  offices are on the second floor, and all the Social
2  Security folks are on the first floor. They're two
3  separate entities, even though they're the same agency.
4      Q Elevator in the building?
5      A Yes.
6      Q Do you know if Mr. Foster took the
7  elevator, or --
8      A Yes.
9      Q -- the steps?
10     A He took the elevator.
11     Q Are there any steps leading in or out of
12  the building that he would have had to take that day?
13     A Not that day, no.
14     Q All right. Do you remember how long your
15  interview lasted?
16     A About an hour and a half.
17     Q That seems a little bit longer than normal,
18  right?
19     A It does. He was talkative. Mr. Foster was
20  a very gregorious [sic], and he had a lot he wanted to
21  talk about that wasn't relevant to what I wanted to
22  know, but he seemed like a very nice gentleman, so I
23  let him talk.
24     Q So it sounds like the additional time
25  wasn't due to the complexity of the case, but it was

**28**

1  just the person you were talking with.
2      A Correct.
3      Q And you mentioned a standard questionnaire.
4  Do y have a printed-off set of questions that you go
5  by, or --
6      A I -- I do. I don't have that form with me
7  today, but I do have a -- a set of questions that is
8  typically what I follow. It's a guideline. That
9  information is then reduced into the interview portion
10  of the report.
11     Q Now, is that something that you created, or
12  did you get that?
13     A I created it.
14     Q How long ago did you create that set of
15  questions?
16     A I've been using that for approximately ten
17  years now, with a few revisions and in between, but the
18  basic parts for about ten years.
19     Q Have you had any revisions to the set that
20  you used to ask questions of Mr. Foster? Has that been
21  revised since then?
22     A No.
23     Q Same one?
24     A (No verbal response).
25     Q And then you mentioned sometimes the -- the

**29**

1  fourth area under the basic evaluation would be
2  vocational testing, correct?
3      A Correct.
4      Q Did you perform any vocational testing
5  here?
6      A I did not on this particular gentleman.
7      Q Is there a reason you did not?
8      A He does not have a GED. He has a limited
9  Eastern Kentucky education, and there really wasn't any
10  reason for me to look into vocational or academic
11  testing in terms of vocational retraining or education
12  opportunities for this gentleman. Normally, I do that
13  when we have individuals who have either an extremely
14  low educational capability or an extremely high one
15  that we anticipate, so I look for consistency. In his
16  case, there wasn't really any need for me to do that.
17     Q If you could, educate me. What's the
18  purpose of vocational testing?
19     A Let me give you a good example. The
20  average high school graduate in the Commonwealth of
21  Kentucky reads at about a 10th grade level and performs
22  math at about an 8th grade level. So when we talk
23  about individuals having a "high school education," the
24  fact that they have it does not mean that they
25  necessarily truly function at that level of -- of

8 (Pages 26 to 29)

30

1  academic achievement. So when someone has a high
2  school education in some areas, I often find them to be
3  marginally literate, at best, which would be 4th to 6th
4  grade level in terms of their true academic skills
5  versus their attained grade level, so academic testing
6  would have to do with whether or not a person was
7  qualified for education retraining or what level of
8  work skills we would expect them to be able to navigate
9  or handle in the workplace.
10       Q So is there any reason that vocational
11  would have helped your evaluation of Mr. Foster?
12       A Not in my opinion. In this case, it would
13  not.
14       Q And that's because he had no formal
15  certificates like a GED or --
16       A It --
17       Q -- a limited --
18       A -- it -- he did -- he did not. He was
19  self-employed as a mechanic, a self-taught-type
20  mechanic. He did have some vocational training, but he
21  was -- his -- his -- a lot of people are very hands-on
22  smart and not real book smart, and his indication to me
23  was that that was consistent with him. He's not a --
24  un-smart men, he's just a individual who, on paper,
25  doesn't have a large amount of education and training.

31

1  So in his area, the marketability of -- in his area,
2  the marketability is quite low for an individual who
3  has his educational background, unless they have some
4  kind of skill or can do heavy labor-type work.
5       Q Would you agree with me that he does have
6  skill, as far as knowledge and experience, based on all
7  the work he has done as a mechanic?
8       A Absolutely.
9       Q And there's some value to that, though,
10  right?
11       A Yes.
12       Q How does that -- the value of his
13  experience and his skill is when I -- when I took his
14  deposition, sounds like he had very specific types of
15  mechanical things that he did. With his specialized
16  knowledge and experience, how does that factor into
17  your vocational evaluation?
18       MR. HAGERMAN: Object. Compound. You can
19  answer.
20       A The problem is, he has those experiences,
21  but he doesn't have the paper trial to back up those
22  experiences. So were he to seek employment with
23  someone else was a mechanic doing oil changes or
24  something of that sort, it's unlikely, with his
25  educational history, that he would be hired by an

32

1  outside employer. So while he has that knowledge, and
2  he has that skill, it's like any other type of obtained
3  -- personally obtained knowledge or skill without a
4  degree, certification or something to back it up, the
5  marketability in the employer world is minimal, and in
6  his case, practically nil, given his physical
7  restrictions on top of his academics.
8       Q And then is there anything else that you
9  could classify as your basic evaluation that we haven't
10  talked about that you performed in this case?
11       A I don't think so, sir.
12       Q And my notes, I wrote down, there's some
13  additional types of things, additional categories of
14  things you do, other than your basic evaluation. One
15  of those things would be research, wage loss, or
16  occupational search. Did you do that in this case?
17       A I did.
18       Q What did you do?
19       A I was asked to ch -- I'm sorry. I was
20  asked to calculate the anticipated earnings loss for
21  his remaining work life from the point of his -- I
22  would say point of his injury, but in this case, he
23  worked part time for a lo -- for a period after that,
24  so I extrapolated out, based on loss for the part-time
25  work and then total loss for the remaining years.

33

1       Q So that -- I mentioned two things, wage
2  loss and occupational search. Are those two separate
3  things, or --
4       A They are two separate things. In his case,
5  I did not do an occupational search. I do occupational
6  searches when people have the residual ability to do
7  other occupations. In -- in his case, I did not find
8  that he had the ability, given his combination of
9  educational limitations and his degree of physical
10  impairment. There was no reason for me to do an -- an
11  analysis or an occupational search.
12       Q Am I saying it right, that you researched
13  the wage loss, or did you do something else?
14       A Well, it's a process. There are -- are
15  work life tables and work-life articles. There are
16  research articles that one uses to make the numerical
17  calculations in terms of -- of occupational loss. It's
18  not an exact science, but it's the best documentation
19  we have. I did that information, calculated average
20  wages. With self-employed individuals, it's a little
21  difficult at times. Calculated his wages based on his
22  income tax returns and made a -- made tables concerning
23  my opinion of what he would have lost or what he had
24  lost in his part-time work.
25       Q I've looked through your report several

9 (Pages 30 to 33)

34

1  times. Is there a reason you didn't attach any work
2  life tables or any other articles that you just talked
3  about?
4      A No. There's no reason I didn't, I just
5  didn't.
6      Q Can -- do you remember what work life
7  tables or articles you relied upon?
8      A The work life table would be the standard
9  work life table, which is the one that the government
10  puts out through the Bureau of Labor Statistics. And I
11  cross-referenced that with the Scru -- sorry. Skoog
12  and Ciecka Table.
13      Q How do you spell those?
14      A C-O-O-G -- I'm sorry. S-K-O-O-G, C-I --
15  and C-I-E-C-K-A.
16      Q Now, what do those tables provide as far as
17  relevant information when you're completing a report?
18      A Well, the -- there are tables that provide
19  simply years remaining to work based on a person's age.
20  There s age. Ther there are tables that provide simply
21  years remaining to work based on a erson'part-time
22  work.ividuals ition of ecuuare other tables that
23  provide information based on remaining work years based
24  upon gender, educational level, types of jobs, as in
25  whether individuals are performing skilled, semi-

35

1  skilled, unskilled, light, medium, heavy, sedentary
2  work. There are also tables that deal with individuals
3  who are self-employed and what their life expectancies
4  are, and there is newer research that shows that just
5  given the fact that individuals now live longer, and --
6  whether out of choice or out of economic need, new
7  research that indicates individuals now work well into
8  their 70s, especially in less-strenuous occupations.
9      Q It looks like your work life expectancy, or
10  loss of that, in this report is 7.745 years. Do you
11  agree with that?
12      A I agree that that's the figure that came
13  up, yes.
14      Q Where did that figure come from?
15      A The figure came from the table indicating
16  that -- and this is a table that I may or may not have
17  with me today. The -- it came up for him based upon
18  the fact that he is a male with less than a high school
19  education, and that is based on a study from Southern
20  Methodist University incorporating the tables, but
21  adding to them the educational level and so forth.
22      Q So it's based on his gender and his
23  education level?
24      A In this case, yes. And -- and his age.
25      Q And his age. Did you rely upon any tables

36

1  that are specific to mechanic or heavy mechanic-type
2  work?
3      A No.
4      Q Do you know if there are any tables that
5  are that specific to that type of job?
6      A There are not tables that are specific to
7  that. There's research specific to those types of
8  things.
9      Q Did you review any of that research?
10      A Not for this case. I have for other cases,
11  but not -- not -- not reviewed for this case, because
12  it's one of those things that somewhat sticks in my
13  head because I've used it before.
14      Q What sticks in your head that is applicable
15  to this case?
16      A When individuals are doing heavier work,
17  such as construction labor, heavy mechanics, things of
18  that nature, heavier work versus brain work, the
19  majority of individuals have to change jobs by the time
20  they're 50 to 55, because their body just wears out.
21  So the research indicates that the heavier the work,
22  the more likely -- if a person is less educated, the
23  more likely that they'll have problems and have to
24  leave the work force earlier or be rehabilitated,
25  change careers, and so forth.

37

1      Q Mr. Foster was 53 when this accident
2  happened, right?
3      A Yes.
4      Q So that's kind of right in the middle of
5  that 50 to 55 range where he may have had to start
6  transitioning out of a heavy mechanic-type job,
7  correct?
8      MR. HAGERMAN: Object. Speculation. You can
9  answer that, though.
10      A He may have. I don't' know, but he may
11  have.
12      Q And he was 55 at the time you interviewed
13  him, right?
14      A Yes, sir.
15      Q All right. As far as page one of your
16  report, there's a section that says "Background." The
17  information in there, where did you gather that
18  information from?
19      A It would have come from -- in this
20  particular summary, it would have come from the police
21  report, his interview, and the medical records. So a
22  combination of those things.
23      Q There's a sentence in there where it says
24  "He has had no real relief in his stability, swelling,
25  and remains in pain with sustained time on his feet."

10 (Pages 34 to 37)

**38**

1 Where did you get that information?
2 A Well, the surgery to the knee is in the
3 medical records as well as he reported that. The
4 swelling and stability and -- and the pain would have
5 come from his interview.
6 Q Did he have a cane with him when you
7 interviewed him?
8 A I -- no. He did not.
9 Q And did he remain seated the whole
10 interview?
11 A No. He got up and -- and stretched twice.
12 Q He stretched in the room?
13 A Yeah. Just stretched his le -- he
14 stretched his legs twice, just stood up in the room and
15 -- the chairs aren't very comfortable there, so...
16 Q Was it -- can you describe how he
17 stretched? Was it --
18 A He just stood up and -- and -- and
19 stretched his leg out, and -- because he was seated for
20 a long period of time. Stretched his leg out and stood
21 for a little bit.
22 Q And then there's some information
23 background that said that he turned over the auto
24 mechanic business to his son and is no longer involved?
25 Did you get that information from the interview?

**39**

1 A From him, yes.
2 Q Did he give you any other information about
3 the turning over of the business, and was it sold or
4 was it given?
5 A He -- he did not tell me that. He di -- he
6 didn't share anything about that.
7 Q But he said he's not involved in operating
8 or working there?
9 A Correct.
10 Q Okay. And did he self-report that his
11 disability benefits were a little over $800 a month?
12 A Yes.
13 Q You haven't seen all of this -- the
14 complete Social Security file, correct?
15 A Not the complete file, no. I have seen
16 some of the information from Social Security, but I
17 have not seen his entire file.
18 Q And then on page two when we are talking
19 about Mr. Foster's educational summary, you note that
20 he did complete vocational training in auto mechanics.
21 Do you know if that was formal training that he
22 completed?
23 A It would have been, or it would not be
24 noted under that section.
25 Q So him having formal vocational training in

**40**

1 auto mechanics, how does that factor into your analysis
2 as to his still having knowledge that he could pass on
3 to others? Is it -- is that not enough that he had
4 vocational training? In other words --
5 A No.
6 Q -- he -- is it your --
7 MR. HAGERMAN: Let him finish the question.
8 THE WITNESS: I'm sorry.
9 Q Is it your opinion that he would have
10 needed formal education such as a GED in addition to
11 that?
12 MR. HAGERMAN: Object. Compound. You can
13 answer.
14 A As I stated, he has skills. He does not
15 have qualifications. He has the knowledge. My
16 understanding is, he's worked with his son and taught
17 his son a number of things in the business. So
18 unofficially, he can do that. But were he to go out
19 into an employment setting, his knowledge is not worth
20 as much as someone with the credentials or the
21 certifications. And the fact that he has not gotten
22 updated formal training on a lot of mechanics
23 procedures and requirements and so forth would hinder
24 him.
25 Q Did you notice any abnormalities with the

**41**

1 way Mr. Foster was walking when you interviewed him?
2 A He had -- he had a uns -- he had an
3 unsteady gait and a limp.
4 Q Was there one leg that he was favoring?
5 A He was -- he was trying to keep the
6 pressure off of his -- of his right leg.
7 Q On page -- page five here, there's several
8 different page numbers, one says page seven, but page
9 five or seven, depending on which part you're looking
10 at --
11 A Tell me what the top is. Okay.
12 Q Five, it says Ernest -- "Foster, Ernest" --
13 A Okay.
14 Q -- "page five."
15 A Page five over on my --
16 Q When you're discussing your --
17 A -- on my --
18 Q -- interview.
19 A Okay.
20 Q I think we all know he was employed as a
21 mechanic, and then it says "Between 2008 and 2010 he
22 worked only part time." How do you know that?
23 A He indicated to me that he had worked only
24 part time, and his earnings, based upon his Social
25 Secur -- I'm sorry, his income tax forms indicated a

11 (Pages 38 to 41)

**42**

1  significant reduction in earnings consistent with his
2  report of part time.
3      Q Do you have the income tax records that you
4  reviewed with --
5      A Yes.
6      Q -- you?  Do you mind if I see those?
7      THE WITNESS: You okay with that?
8      MR. HAGERMAN: Yes.  That's fine.
9      Q Looks like you just handed me 2007 to 2011.
10  My quick glance -- is that accurate?
11      A No.  There's a 2012 report --
12      Q I'm sorry.
13      A -- in here.
14      Q I missed that.  So 2007 until 2012, right?
15      A Correct.
16      Q When you said that his earnings were
17  reduced, do you know how -- how much they were reduced
18  by?
19      A In 2008 through 2010?
20      MR. HAGERMAN: I'll object.  Lack of
21  foundation.  But you can answer.
22      A I believe that I figured within my analysis
23  in Table A what his loss was between 2008 and 2000 and
24  -- did you say '10 or '12?  I'm sorry.
25      Q '10.

**43**

1      A I -- I believe I've indicated that in Table
2  A, and again in Table B.
3      Q And how is that indicated in Table A?
4      A Well in Table A it's showing the reduction
5  in his work hours, so when one has a reduction in their
6  work hours, and you'll see in 2007, he made $10,000 --
7  almost $10,000 more than he did in 2008, is wages
8  consistently go down from 2007 forward.
9      Q You didn't review anything that lists the
10  amount of hours he actually worked for the years, did
11  you?
12      A No.
13      Q Did he tell you how many hours a week or a
14  month or a year he worked?
15      A No.
16      Q How -- why did you choose 2,080 hours for--
17      A Bec --
18      Q 2007?
19      A Because the average full-time workload is
20  40 hours a week for 52 weeks in a year.
21      Q And then in 2008 and 2009, you chose 1,040.
22  Why is that?
23      A Part time.  He indicated that he didn't
24  know exactly how many hours he worked, but that he felt
25  like he was working about half as much as what he had

**44**

1  been.
2      Q And this accident happened in June of 2008,
3  right?
4      A Yes.
5      Q So that would have been about middle of the
6  year, correct?
7      A Yes.
8      Q So in 2008, wouldn't that be a li --
9  wouldn't ten th -- 1,040 hours, wouldn't that be a
10  little bit low, because he actually worked half a year
11  at full time?
12      A My understanding was there was a period of
13  time after his injury that he did not work at all, so
14  that the majority of those hours were in that first six
15  months of 2008, that he did not work a number of months
16  after that because of his knee.
17      Q So are you assuming, then, that in 2008,
18  for the first six months, that was full-time work,
19  then, right?
20      A Yes.
21      Q All right.  You haven't reviewed any of the
22  invoices that he kept, the day-to-day receipts, have
23  you?
24      A No.
25      Q If I told you that the invoices for the

**45**

1  first five months, because that's all there were in
2  2008, totaled $11,000 in gross receipts, does that
3  comply, or di -- is that consistent with your findings
4  here, as far as his prior earnings?
5      MR. HAGERMAN: Object.  Lack of foundation
6  and speculation, but you can answer.
7      A I don't know how to answer that, because if
8  that's the invoices, then that's what the invoices say.
9  I don't know if there's other income, I don't know how
10  his income is derived, what he's reporting versus what
11  he's invoicing out.  So I -- I don't have any way to
12  answer that, sir.
13      Q Okay.  And the 2,080 or the 1,040 hours,
14  that's an estimation, correct?
15      A Yes.
16      Q All right.  On Table A, it says "Earnings
17  reported by federal income tax returns."  You see that?
18      A Yes.
19      Q What does "earnings" mean to you?
20      A Earnings is remuneration for time spent
21  performing work-related task or other types of income.
22      Q Okay.  And so in 2007, his earnings were
23  $37,267, correct?
24      A Yes.
25      Q And you've calculated that that's $18 per

12 (Pages 42 to 45)

**46**

1    hour, based on 2,080 hours. Now I don't have a
2    calculator, but is that $37,267 divided by 2,080 is
3    going to work out to about $18 an hour?
4        A Yes, sir.
5        Q All right. And the same thing goes for
6    2008, the earnings divided by the hours comes into $26
7    -- 60 -- $26.65 an hour?
8        A Yes.
9        Q That's a lot higher than his 2007 hourly
10   rate, is it not?
11       A It is, sir.
12       Q And why is that higher?
13       A I have no idea. He either performed more
14   work, or he performed work that he was able to bill at
15   a higher rate. I have -- I have no -- I went strictly
16   with his report, not with any factors associated with
17   how he earned it.
18       Q Did you have any discussion with Mr. Foster
19   about what he charges for his labor? Or what he
20   charged for his labor, sorry?
21       A I did not.
22       Q Do you know if he paid himself a wage?
23       A I don't know that. I know that he told me
24   that he charged differing things to differing people
25   and that sometimes he didn't charge people at all

**47**

1    because he knew they didn't have the money, so that's
2    the only thing I asked about his wages and his -- his
3    scale. And that's why he could not provide me an
4    hourly rate that he typically billed out.
5        Q So you have the same analysis there from
6    2009, and then in 2010 the parenthetical states "Based
7    on undetermined hours part-time work." What does that
8    mean?
9        A He -- he had no idea how many hours he
10   worked, but he knew that portion of income was
11   attributable to him.
12       Q And then the same thing goes down to '11,
13   that 3,684? You see that?
14       A Yes, sir.
15       Q That is -- was he still getting that from
16   his car business?
17       A Yes.
18       Q And the 2012, that was from the car
19   business, too, the 1,701?
20       A Yes.
21       Q All right. And you haven't added back in
22   any amounts that he received from no-fault wage-loss
23   benefits, right?
24       A No.
25       Q Or Social Security Disability income,

**48**

1    correct?
2        A Correct.
3        Q Those two sources of money would be
4    considered income, would they not?
5        MR. HAGERMAN: Object. Calls for a legal
6    conclusion. You can answer.
7        A The disability benefits, I don't know
8    whether those are taxable or considered income. The
9    Social Security benefits are not taxable income or
10   earnings, so they are benefits that, were it not for
11   his inability to work, he would not be drawing. So I
12   did not factor them in as earnings, as I'm looking at
13   simply earnings associated with -- or not income, but
14   earnings associated with work activity, not with
15   subsidies or benefits.
16       Q What's the difference between earnings and
17   end-of-the-day, putting money in your pocket?
18       A Technically, none.
19       Q Okay. Average earnings. The first line
20   there says "Average earnings, 2007 to 2009." How did
21   you come up with those numbers there, that -- the
22   amount and the per hour?
23       A I took the 2007, 2008, 2009 tax returns,
24   which were verifiable by hours, and totaled that,
25   divided that into a mean of 29,483 for those three

**49**

1    years, which came out to $14.17 per hour.
2        Q Do you know how many hours that is?
3        A That's based on 2,080, so that would be per
4    year. It's $14.17 per hour per year.
5        Q And then the next line, "'07 to '08,
6    $43,321." Where does that come from?
7        A That comes from the 2007 time period to
8    2008, when he earned the -- when he had the full-time
9    earnings in 2007, 2008 and the first -- I'm sorry.
10   2007 and the first part of 2008.
11       Q What do you mean, "The first part of 2008?"
12       A He -- he worked full time prior to the
13   accident in 2008.
14       Q Okay. I -- can you -- I mean -- forgive
15   me. When you said eighth-grade-level math in some
16   people, I'm probably at eighth-grade-level math.
17       A I -- I understand.
18       Q But $20.83 an hour, how do you come up with
19   that?
20       A I came up with $43,321, which was his
21   average full-time earnings. 2007 to 2009, he worked in
22   2007 basically full time. In 2008 he worked part of
23   that time full-time. In 2007 and '08 we estimated,
24   based on the 2007 income and a portion of the 2008
25   income that he indicated he worked full time, to have

13 (Pages 46 to 49)

50

1  $43,321 on full-time basis. The 2007 to 2009 earnings,
2  I added and came up with that mean for those three
3  years at $14.17 per hour. The 2010, '11 and '12, I did
4  not include in that, because we don't know how many
5  hours he worked. Therefore, it would not seem
6  reasonable for me to come up with a further assumption
7  about part time versus full-time work.
8      Q So I'm still trying to understand. Average
9  full-time earnings, you take the $37,267 from '07,
10 correct?
11     A Yes.
12     Q And you add a portion of 2008?
13     A A portion of 2008.
14     Q What portion? Whatever $43,321 minus 37
15 is? Minus 2007's number?
16     A Yes.
17     Q Okay. About $6,000? $6,100, or so?
18     A Somewhere in there, yes, sir.
19     Q That's a different number than the year --
20 the whole 2008 earnings, is it not?
21     A It is a --
22     MR. HAGERMAN: I'm going to object. I think
23 it's mischaracterization of these numbers, but you can
24 answer.
25     A It -- it is a different number than the

51

1  entire 2008, because he did not work all of 2008. He
2  took several months off in 2008 and then returned on a
3  part-time basis, so...
4  BY MR. BARTLETT:
5      Q So you're -- I think you said you're
6  estimating what his 2008 full-time earnings were.
7      A Yes.
8      Q All right. And you don't have the records
9  going back to 2003, the tax records, correct?
10     A No. I only have the ones referenced.
11     Q Would the 2003 through 2006 tax records
12 give you a better picture of his full-time earnings?
13     MR. HAGERMAN: Objection. Speculation. You
14 can answer.
15     A It might. It would -- it would add more
16 data.
17     Q All right. I was going to add this up. So
18 then going back to Table A, it looks like you took your
19 $20.83 an hour and the -- I guess multiply that by 20 -
20 - 2,080 hours to come up with your anticipated income.
21     A Yes.
22     Q Have I followed you that far?
23     A Yes, sir.
24     Q All right. So then you take, on Table B,
25 the actual income and the income that I see for those

52

1  years, that matches up with the earnings that you
2  listed in Table A, correct?
3      A Correct.
4      Q So income earnings, same thing for that
5  purpose that you can put in together. And so you take
6  what his actual income, which you gained from the tax
7  returns, deduct his anticipated income and that's how
8  you arrive at your loss of earnings?
9      A Yes.
10     Q Are there any other ways to calculate wage
11 loss or impairment to earn?
12     A There are numerous ways to do so. I'm not
13 an economist, so I -- I'm not a numbers expert. So I
14 go with the vocationally appropriate way that I know
15 how to do it, which is take their work life, look at
16 their income, and add in the common, based upon the
17 Department of Labor data, the common wage increase per
18 year for cost of living or whatever.
19     Q So to back up, we talked about the 7.745
20 years, and it's -- you add that on, then, to his age of
21 injury of 53, so he -- his work life expectancy would
22 have been just a little over 60 years old for him?
23     A For him, yes.
24     Q I'm just curious. The -- the earnings or
25 income that you've used to calc -- in your

53

1  calculations, they appear to come from the gross
2  receipts on his Schedule Cs. Would you agree with
3  that?
4      A Yes.
5      Q Why use gross receipts rather than net or
6  business income?
7      A Well, the gross receipts are the actual
8  numbers that are left from all sources of his income
9  after deducting for his business expenses and so forth.
10 So that's why I would use that number.
11     Q All right. Well, which year are you
12 looking at there?
13     A 2007.
14     Q Okay. So for 2007, I don't have the return
15 in front of me, but I have the numbers. I have that
16 his Schedule C gross receipts were $37,267. Would you
17 agree with that?
18     THE WITNESS: Give me just a second here.
19 Sorry. Schedule C.
20     A Yes. I would agree with that, sir.
21     Q Okay. And I want to make sure I understood
22 what you just said. Did you just say that the Schedule
23 C gross receipts is his income after certain
24 deductions?
25     A I'm sorry, I was looking at the wrong line.

14 (Pages 50 to 53)

**54**

1    I was looking at his adjusted gross income.
2        Q  Okay.  So would you agree with me that the
3    Schedule C gross receipts are total income before
4    deductions?
5        A  Yes.
6        Q  And that, in fact, in 2007, he had expenses
7    totaling $34,041.  Do you see that?
8        A  Yes, I do.
9        Q  Leaving a net business income of $3,220,
10   correct?
11       A  Yes.
12       Q  Why use $37,267 to calculate his earn --
13   loss of earnings versus his net business income?
14       A  He did earn that amount of money.  The
15   expenses certainly are a part of that process, but his
16   earnings are at that $37,000 level, so he had the
17   capacity to earn the money.  How it was disbursed is a
18   little bit different --
19       Q  You --
20       A  -- in terms of the -- of the expenses and
21   supplies.  Self-employment is an interesting animal.
22       Q  He didn't put $37,000 in a pocket.
23       A  No, he did not, sir.
24       Q  That year he actually put a little over
25   $3,200 in his pocket, correct?

**55**

1        A  According to his income tax, yes.
2        Q  And that's all we have is his income tax
3    return.  We -- I have his invoices, which are similar,
4    but that's all we can go on, correct?
5        A  Yes.
6        Q  All right.  So when you're calculating wage
7    loss, it's what money didn't go into your pocket, is it
8    not?
9        MR. HAGERMAN:  Object to the form of that
10   question, but you can answer.
11       A  I think it -- that it can be, yeah.  I
12   think that's arguably a way to look at it.
13       Q  Okay.  The Schedule C gross receipts, that
14   includes everything that -- every dollar that he
15   received in, according to tax returns, that's where
16   that is noted, right?
17       A  Yes.
18       Q  And unless he specifies on his business
19   records that some things, some income was for parts and
20   supplies and other was for labor, you have no idea how
21   to break that down, correct?
22       A  Correct.
23       Q  Did you do any calculations based on his
24   net business income or loss?
25       A  No, sir.

**56**

1        Q  When you look through 2003, and I know you
2    won't have these, but 2003 through 2007, the average
3    business income, not gross receipts, but business
4    income, totals about $5,166.  That's a lot lower of a
5    number than the anticipated income that you used,
6    right?
7        A  Yes, sir.
8        MR. HAGERMAN:  Object.  Lack of foundation.
9    You can answer.
10       A  Sorry.  Yes, sir.
11       Q  So what's his actual lost income impairment
12   to earn, is it what you have, or is it a lower number,
13   based on what he actually earned?
14       MR. HAGERMAN:  Object.  Compound.  Legal
15   conclusion.  You can answer.
16       A  I think it could be either.
17       Q  How so?
18       A  I think that depending upon what you're
19   looking at, his capacity to earn is what he earns.
20   What he profits is variable, depending upon his
21   expenses, his supplies and so forth.  He earns what he
22   earns.  Where it's disbursed out is different.  What he
23   pays taxes on may be different than what he earns, but
24   his actual money that comes in is consistent with the
25   numbers I've used.

**57**

1        Q  Except for 2011 and 2012, because I think
2    that was actually income or earnings attributable to
3    his wife's business, unless you know otherwise...
4        A  I -- I believe that that's correct.
5        Q  Okay.
6        A  The 2011-2012, you think it's from his
7    wife?
8        Q  I believe so.  If you want to take a look
9    at the schedule --
10       A  Let me take a look.
11       Q  -- and see.
12       A  Because I believe what he told me was he
13   was still getting a little bit of money from his son.
14       MR. STOPHER:  Sorry to interrupt.  Michael,
15   what figure are you asking about right now?  I'm sorry.
16       MR. BARTLETT:  2011 and '12, her actual
17   income, Schedule C.
18       MR. STOPHER:  Okay.  My apologies.
19       A  Yeah.  The Schedule C on 2012 is for his
20   wife, not for him, and the 2011 one would also appear
21   to be his wife's business.  So those two would be
22   errors on my part.
23   BY MR. BARTLETT:
24       Q  All right.  So we don't know what he really
25   made, if anything, from the auto business in '11 or

15 (Pages 54 to 57)

**58**

1  '12?
2      A That's correct.
3      Q All right.  And in 2010, there's -- it's an
4  E-Z form, but it's a breakdown of gross receipts and
5  expenses, isn't that correct?
6      A Correct.
7      Q So we don't' know if that's net or -- or
8  gross, other than it says "Gross," right?
9      A That's correct.
10     Q Okay.  Were you aware that he received --
11     A Actually, in 2010, we do know that that is
12  his -- that is his net profit from the business.
13     Q How do we know that?
14     A It is on -- at least that's what it was
15  claimed as.
16     Q Right.  And the way that they came to that
17  was it was $5,900 in gross receipts and zero expenses,
18  so the gross and the net are actually the same,
19  correct?
20     A That's correct.
21     Q Okay.
22     A Just wanted to be clear on that point.
23     Q And the fact that he didn't claim expenses,
24  do you know if that's consistent with his prior years'
25  tax returns?

**59**

1      MR. HAGERMAN: Objection. Speculation. You
2  can answer.
3      A I -- I don't know, sir.
4      Q All right.  Are you aware that he received
5  income in the form of no-fault wage loss payments for
6  2009, '10 and '11?
7      A No.
8      Q You haven't considered that in forming your
9  opinions?
10     A No.  I was not aware of it.
11     Q Would that be relevant as a form of income
12  in determining his alternate loss of earnings?
13     A Again, I refer back to the fact that that's
14  a supplementary benefit that, were it not for the
15  accident, he would not have.  It doe -- it does
16  constitute money in his pocket, but it's not earned
17  income.
18     Q But if you make $10,000 a year, and then
19  one year you only make $5,000, but another -- your PIP
20  paid you $2,000 back, it's -- you really earned $7,000
21  that year, did you not?
22     A You --
23     MR. HAGERMAN: Object. Speculation.
24     Q You put $7,000 -- it came in the door, did
25  it not?

**60**

1      A You put $7,000 in your pocket.  You didn't
2  earn the $2,000.  You were -- you were provided the
3  $2,000 because of a incident or a specific event.  You
4  didn't earn it.  You received it based upon a policy
5  that you've paid into, so it's not earned.
6      MR. HAGERMAN:  And note my objection to the
7  last question, also asked and answered.
8      Q If you were to consider PIP or Social
9  Security as income earned for the various years, would
10  that not then lower the loss of earnings amount that
11  you've arrived at?
12     MR. HAGERMAN: Objection. Speculation. You
13  can answer.
14     A If we consider those as income, it would
15  lower my numbers.
16     Q Do you have any idea what those numbers
17  would be if you considered them?
18     A Well, we know he's making somewhere in the
19  vicinity of $800 a month in terms of his Social
20  Security benefits.  I don't know what his PIP payment
21  was, so I -- I can tell you that he would at least be
22  receiving not necessarily the $800 a month, because I'm
23  sure part of that goes out for his Medicare coverage.
24  But he would be receiving a portion of the money.
25     Q Social Security records that I have

**61**

1  indicate he makes $9,000 -- or he receives Social
2  Security benefits totaling $9,720 a year.
3      A Okay.
4      Q Can we assume that that's an accurate
5  number based on $800 a month is what he --
6      A It's very close, yes.
7      Q And I think you said you don't believe that
8  he gets taxed on the Social Security Disability
9  benefits, correct?
10     A My understanding is they're not taxable.
11     Q So he's getting various checks, but
12  eventually, at the end of the year, he puts $9,720 in
13  his pocket, essentially tax free.  Would you agree that
14  that's more money than what he was making when you look
15  at his net income amounts?
16     MR. HAGERMAN:  You can answer that.
17     A For some years, yes, it would be.
18     Q What years?
19     A I think we indicated that in 2007 -- well,
20  now, again, that's -- that's difficult.  It would be
21  more than what he reports as his profit from his
22  business in any year on here.  Not what he earned, but
23  from the profit associated with his business, yes.
24     Q So he's making more money through his
25  disability benefits and the tax advantages of that than

16 (Pages 58 to 61)

---

**62**

1  he ever did in the auto mechanic business, as far as
2  income, net profit, correct?
3      MR. HAGERMAN: Objection. Lack of
4  foundation. You can answer.
5      A I don't know. I know what's reported on
6  here, but I don't know what he put in his pocket as a
7  supp -- as a self-employed individual.
8      Q Okay. Is it an acceptable calculation of
9  impairment to earn to take his average income levels
10  and multiply them by the work life expectancy that you
11  provided?
12      A Yes.
13      Q So if we average his 2003 to 2007 net
14  income, I think I said it came up with about $5,166,
15  and you multiply that by 7.745 years, do you know what
16  that totals?
17      MR. HAGERMAN: Objection. Lack of
18  foundation. You can answer.
19      A Wh -- I'm sorry, what was your number?
20  $5,000 whatever?
21      Q $5,166.
22      A Somewhere between $35,000 and $40,000.
23      MS. MCCOLLUM: Excuse me. Can we go off the
24  record? I need to go pay my meter.
25      MR. BARTLETT: We can take a break. That's

---

**63**

1  fine.
2      (OFF THE RECORD)
3  BY MR. BARTLETT:
4      Q Doctor, in looking at your report, your
5  conclusions or summary, you noted that Mr. Foster
6  sustained a severe knee injury. Why do you classify
7  that as a "severe knee injury?"
8      A I classified that as a severe inj -- severe
9  knee -- knee injury based upon the amount of treatment
10  he has had, the severity of the restrictions, and the
11  opinions that he's going to continue to need further
12  treatment, possibly a knee replacement, at some point
13  based upon the injury.
14      Q Have you reviewed any medical records that
15  discuss whether Mr. Foster will require a knee
16  replacement?
17      A Not require. I sa -- I said the likelihood
18  that he will need a knee replacement is increased.
19      Q But did that come from a record, or did
20  that come from Mr. Foster?
21      A That came from the doctor's record that I
22  saw today, the first note.
23      Q But you didn't have that when you filled
24  out your report, right?
25      A No.

---

**64**

1      Q So when you filled out your report, did
2  that come from Mr. Foster?
3      MR. HAGERMAN: Which -- let me just clarify.
4  Which records? You pointed at these.
5      THE WITNESS: I'm sorry. It was -- yeah. It
6  was -- it wasn't those records. Wa -- it was -- I'm
7  sorry. It was the hospital -- wait a minute. It was
8  Dr. Burandt's records that I -- and I did have those at
9  the time.
10  BY MR. BARTLETT:
11      Q Okay.
12      A And I'm looking to make sure whether or not
13  he did tell me.
14      Q If you look on page five, one, two, three,
15  four, fifth paragraph down, starts "Mr. Foster
16  indicates," about two-thirds of the way through, it
17  says --
18      A Yeah. That's what I'm looking for, sir.
19      Q "He is advised may or will require --
20      A Okay.
21      Q -- knee replacement."
22      A That's -- that's what I was looking for
23  was, di -- did I get it from both, and I did.
24      Q So you got it from the records when you
25  made the report, too?

---

**65**

1      A Yes.
2      Q Do you know which record? Did you flag
3  that record?
4      A I -- I don't have them flagged at this
5  point. If you want to take the time for me to look for
6  it, I will, but it does indicate that in the treatment
7  notes that there's a likelihood he's going to need a
8  knee replacement.
9      Q And that was in the records --
10      A Of Doctor --
11      Q -- you have from Dr. Burandt?
12      A Yes.
13      Q The report says you had seven --
14  July 28, 2008, from May 21st of 2012?
15      A Yes.
16      Q Okay. You also say that his hobbies have
17  been eliminated, he can no longer perform activities
18  such as going to car shows? Do you know if that's
19  still accurate?
20      A I do not, sir. I haven't spoken with him
21  since this interview.
22      Q If he's still able to go on trips and
23  attend car shows and do some activities, does that
24  affect your opinions or conclusions in your report at
25  all?

---

17 (Pages 62 to 65)

66

1     MR. HAGERMAN: Object. Speculation. You can
2     answer.
3          A Not necessarily, because people often can
4     continue activities that they can perform within their
5     own -- their own capabilities and at their own
6     discretion. The activities that he's performing are
7     not precluded by the fact that he has a bad knee. They
8     may be reduced or have to be acco -- have to be done in
9     a different manner, but they're not precluded from
10    doing those.
11         Q Would that affect your statement that he
12    has severe limitations, his ability to go on trips,
13    things like that?
14         MR. HAGERMAN: Same objection. You can
15    answer.
16         A It's basically the same answer.
17         Q And you also said that he has not worked at
18    a substantial gainful activity level since 2009. What
19    does "substantial gainful activity level" mean?
20         A Substantial gainful activity means work
21    that is performed and renders approximately $1,000 a
22    month in earnings.
23         Q Is that like based on some sort of data --
24         A It's a -- it's a Social Security
25    Administration and federal government regulation. It's

67

1     -- that sub -- that indicates substantial gainful
2     activity.
3          Q According to Social Security records, the
4     Social Security Administration determined that Mr.
5     Foster was disabled as of February 2011. Does that
6     change any of your opinions or conclusions in your
7     report?
8          MR. HAGERMAN: Object. Lack of foundation.
9     You can answer.
10         A It does not change my opinions. There are
11    different criteria for Social Security disability than
12    there are for total disability. At his age, he has
13    some factors working in his favor, that even if he were
14    capable of working, he would not be found to be able to
15    make an appropriate adjustment to work. So the Social
16    Security criteria give people credit for being less
17    educated and older, so as he aged, his likelihood of
18    earn -- of -- of qualifying for his disability,
19    regardless of his limitations, increased.
20         Q According to the Social Security records,
21    he became disabled due to -- I want to get it right, so
22    -- I believe it was due to knee, shoulder and heart
23    issues. Did you review any records that said it was
24    those three things?
25         MR. HAGERMAN: Object. Compound. You can

68

1     answer.
2          A I did not review the findings associated
3     with his disability claim. I reviewed his application
4     and his award letter but not his actual decision.
5          Q So you don't know if shoulder problems or
6     heart problems, if they're more severe or not than the
7     knee, for purposes of disability evaluation, do you?
8          A I do not.
9          Q And he didn't report those things to you?
10         A I did not make note in the interview that
11    he reported those things to me, so I do not believe
12    that he mentioned those.
13         Q And then it says "There are no sedentary
14    jobs he can perform with his occupational profile."
15    What does that mean?
16         A He is an individual who has a -- extremely
17    limited educa -- who has a limited education, which is
18    less than a high school education. He is of advanced
19    age, meaning that he is 55 or above, at the point that
20    I did my report. And his work history has not rendered
21    him with any transferable skills that can be used in a
22    sit-down or sedentary job. So those three factors
23    qualify him for -- basically, for ruling out all types
24    of -- of employment that he might otherwise be suited
25    for. He does not have office skills, he does not have

69

1     things to do, basically, sit-down work.
2          Q And forgive me if we asked this earlier,
3     but you didn't perform an occupation search hased on
4     your findings of him, correct?
5          A I didn't need to, no, sir.
6          Q Earlier, I believe you mentioned that his
7     son, who he turned the business over to, was still
8     giving some money to Mr. Foster. Did I hear that
9     correctly?
10         A At some point, he was subsidizing Mr.
11    Foster some for the -- the work. I believe his son was
12    running the business part of the time that Mr. Foster
13    was still working part time.
14         Q Do you know how much money his son was
15    providing Mr. Foster from the business?
16         A No, sir.
17         Q You mentioned that he goes to the garage
18    and socializes? Do you remember him telling you that?
19         A Yes.
20         Q And it says that he has a bench in the
21    garage where he spends most of his time socializing?
22    Do you remember hearing about a bench?
23         A Yes.
24         Q Do you know what kind of bench they were
25    discussing?

18 (Pages 66 to 69)

**70**

1  A He told me he had created his own
2  comfortable bench that he could sit on, and that's why
3  I used the term "bench" in quotation marks, is it's
4  really not a bench. He calls it a bench, but it's some
5  kind of thing he has rigged with pillows and so forth
6  that he can tolerate sitting there and drinking coffee
7  and socializing with people.
8  Q So it's a place to sit, right?
9  A Yes.
10  Q Versus a -- it's not a work bench?
11  A It is not a work bench at all. It's his
12  own special seating arrangement that he's created so he
13  can tolerate being in the shop for a longer time
14  period.
15  Q The fact that the Social Security
16  Administration said that his medical -- that the
17  medical evidence showed that conditions were not severe
18  enough to become disabled until February 22, 2011, does
19  that change any of your calculations in your report?
20  A No.
21  Q That's a date that's after what you've
22  noted when he stopped working, is it not?
23  A It is.
24  Q What does that mean to you that they said
25  that he could have been working, according to the

**71**

1  medical evidence, for another year and a half or so?
2  MR. HAGERMAN: Object. Lack of foundation.
3  You can answer.
4  A Yeah. I haven't seen the decision, so I
5  don't know what the judge based his decision on.
6  Q Are the business invoices -- let me back
7  up. The complete Social Security file, is that
8  something that would have aided you in forming your
9  opinions?
10  A I don't know, because I don't know what was
11  in the file. Sometimes that information provides
12  actual residual functional capacities or medical
13  evaluations that can be considered. But again, as I
14  stated, the criteria are different for Social Security
15  than they are for actual work in competitive employment
16  in any other type of legal setting.
17  MR. HAGERMAN: Note an objection. Speculate
18  to the last question.
19  Q You're familiar with disability files,
20  though, I take it?
21  A Yes.
22  Q Would there not be, in every disability
23  file, information gathered from the person seeking
24  benefits, much like you would have done in an interview
25  for vocational evaluation?

**72**

1  MR. HAGERMAN: Object. Speculation, lack of
2  foundation. You can answer.
3  A There is an interview that is in each file
4  and forms that are filled out with the same types of
5  information which I collected.
6  Q So based on your experience with disability
7  files, then, are there certain forms that are always
8  done in each file? Certain tasks?
9  MR. HAGERMAN: Same objection. You can
10  answer.
11  A Yes.
12  Q Okay. And then there are sometimes other
13  things done, depending on the case, for the disability
14  file?
15  MR. HAGERMAN: Same objection. You can
16  answer.
17  A Yes.
18  Q All right. If you just go by, based on
19  your experience with disability files, the stuff that
20  you would commonly see in each file, would any of that
21  have relevant information for your vocational
22  evaluation?
23  MR. HAGERMAN: Same objection. You can
24  answer.
25  A The only information that would have been

**73**

1  included that might have changed my opinion would be if
2  there were medical source statements or residual
3  functional capacities that provided specific
4  restrictions that I could have applied in terms of what
5  residual capacities Mr. Foster had. All of the other
6  information would have been expected to be fairly
7  consistent with what I collected.
8  Q But you wouldn't know if it was consistent
9  or not until you reviewed that information versus your
10  information, correct?
11  MR. HAGERMAN: Same objection, but you can
12  answer.
13  A As I said, would be expected to be fairly
14  consistent.
15  Q Fair enough. The daily business records
16  for several years for Mr. Foster's work that he
17  performed and the money that he -- the bills that he
18  provided show what he charged people. Are those
19  something that would be relevant to your vocational
20  analysis?
21  MR. HAGERMAN: Same objection, but you can
22  answer.
23  A They -- they might have been relevant, they
24  might not have been. I realize, in his business, that
25  what one charges for parts and what ch -- one charges

19 (Pages 70 to 73)

74

1 for some things on the invoice are not necessarily what
2 one paid for those things, so I don't know how much
3 usability there would be with that.
4    Q In other words, you don't know how reliable
5 the documents for invoice in this type of business
6 would be?
7    MR. HAGERMAN: Object.
8    Q Is that what I'm hearing?
9    MR. HAGERMAN: Object. Speculation, lack of
10 foundation. You can answer.
11    A What I'm saying, sir, is that in general,
12 anyone who is self-employed in a service or a -- a
13 business situation submits what they submit. Whether
14 or not it's reliable or not is at the discretion of the
15 individual. And that's not specific just to Mr.
16 Foster. That applies to anybody who is self-employed.
17    Q Okay. And 2000 -- the additional tax
18 returns, 2003, 2004, 2005, 2006, certainly those would
19 have had additional information that would have
20 assisted you in forming your opinions, doing your
21 calculations, correct?
22    MR. HAGERMAN: Object. Speculation, lack of
23 foundation. You can answer.
24    A It would have given me more historical
25 earnings information. It would not have necessarily

75

1 provided me with any information that would change his
2 post-injury status, so historically, it would add to my
3 review. Opinion wise, most likely would not have
4 changed.
5    Q "Historically" meaning a better sample of
6 his average earnings pre-injury?
7    MR. HAGERMAN: Same objection. You can
8 answer.
9    A More data.
10    Q More data is a good thing here, right?
11    A Could be, yes.
12    Q Okay.
13    MR. HAGERMAN: I'm going to object. Same
14 objection to the last question. You're -- it's okay.
15 BY MR. BARTLETT:
16    Q We can -- we can go off the record.
17        (OFF THE RECORD)
18 BY MR. BARTLETT:
19    Q All right.
20    MR. BARTLETT: I think that's all I have for
21 now. If anyone else has any questions?
22    MR. STOPHER: I do. Kayla, can you hear me
23 okay if I -- I turn away from you or drop my voice --
24    COURT REPORTER: Yeah, you should be fine.
25    MR. STOPHER: -- kind of call me on it, okay?

76

1    COURT REPORTER: Okay.
2        CROSS EXAMINATION
3 BY MR. STOPHER:
4    Q Dr. Barnes, I'm Bob Stopher, I represent
5 Philadelphia Insurance in this case. Could you tell us
6 when you were first contacted about this case, the
7 Ernest Foster versus American Fire and Philadelphia?
8    A I don't have the exact date. I would not
9 be able to provide that for you. It was probably an
10 email or a telephone request to do the evaluation.
11    Q Okay. Does that mean you don't have any
12 record of when the first contact was made?
13    A That's correct. I don't.
14    Q Did you ever have any record of when the
15 first contact was made?
16    A I would have had an email or a phone record
17 prior to setting the appointment, sir.
18    Q And what happened to that email or phone
19 record?
20    A Most likely, it's still in my email file.
21    Q But you didn't bring it with you today?
22    A No, sir.
23    Q Did you receive a subpoena to bring
24 everything pertinent to this case today?
25    A I have not seen one. I'm not going to say

77

1 I didn't receive it. I've not checked my mail in about
2 a week.
3    Q Okay.
4    MR. STOPHER: Bartley, I may be wrong, and I
5 think I saw a subpoena from Michael that you all agreed
6 to accept.
7    MR. HAGERMAN: Okay.
8 BY MR. STOPHER:
9    Q Okay, Dr. Barnes. Do you have some other
10 materials at your office or on your computer wherever
11 that may be, that you -- about this case that you
12 didn't bring today?
13    MR. HAGERMAN: Just one --
14    A The only thing -- go ahead.
15    MR. HAGERMAN: That's -- you -- you can
16 answer that question, but to the extent he's asking for
17 any content of any communications with our office,
18 that's privileged. I'm going to instruct you not to
19 answer that. And the subpoena asks her to bring --
20 excuse me -- to the extent you -- but excluding any
21 attorney work product, and this subpoena is clearly
22 meant to be within the bounds of Rule 26, and so to
23 that end, we'll object and instruct you not to answer.
24 But if you can answer without talking about the content
25 of our communications or violating any attorney-client

20 (Pages 74 to 77)

78

1   privilege or product, then you can answer that
2   question.
3       A The only thing that is not in my file would
4   be actual emails or phone notations concerning
5   conversations with you or your off -- with -- not with
6   you but with Mr. Fairbanks or with someone in this
7   office.
8       Q Okay. The topic that led me down this path
9   initially was this, the date of the first contact.
10      A Correct.
11      Q And you've got something in your file that
12  I gather, or on a computer somewhere, that I gather
13  would tell us the answer to that without revealing any
14  work product of Mr. Hagerman or his firm, right?
15      A I don't know, because I don't recall that
16  email.
17      Q And you didn't --
18      A It may have specifics.
19      Q And you didn't bring it.
20      A I did not, sir.
21      Q Okay.
22      MR. STOPHER: Mr. Hagerman, I'm going to
23  suggest that I think maybe possibly we need to have a
24  discussion about what's fair game and what's not fair
25  game with an expert. I'm certainly not so bold as to

79

1   suggest that every single item that you've provided to
2   Dr. Barnes would be discoverable, necessarily, but I
3   think it may require a little more analysis than that
4   to say what's your work product versus what's not. But
5   I I guess we can have that discussion another day.
6   BY MR. STOPHER:
7       Q Did I understand correctly, Dr. Barnes,
8   that -- well, let me just ask it. You've indicated
9   that you're residing between Kentucky and Florida.
10  Where is your office these days?
11      A My office is in Louisville.
12      Q Okay. And what's the physical address in
13  Louisville?
14      A The physical address is 720 West Main in
15  the Mueller Building.
16      Q And I gather, from what you're saying that
17  you may winter in Florida and summer in Kentucky. Is
18  that the essence of it?
19      A It doesn't really work that way, quite.
20  I'm not a snowbird, but I do go back and forth, and
21  have been for a number of years.
22      Q Okay. And at your office, 720 West Main
23  Street in Louisville, you would have the emails and the
24  other items that you mentioned just a little while ago;
25  is that correct?

80

1       A Not at that office. They would not be.
2   They would be on my computer, which is not located in
3   that office.
4       Q All right. Where is your computer?
5       A Right now, my computer is in -- is in my
6   car.
7       Q Okay. We're talking about a laptop?
8       A Yes, sir.
9       Q Okay. You referenced some source material
10  specifically a publication from the Bureau of Labor
11  Statistics on work life expectancy. Could you tell us
12  exactly what edition and what publication of the BLS
13  you referred to for that?
14      A Let's see if I can find which one I
15  actually used. I don't have that with me, sir. I'm not
16  sure exactly which one I used, so I'd rather not --
17      Q Is that on your laptop computer?
18      A No. That's actually in a -- in a file.
19      Q Okay. And where is that file located?
20      A That file is actually in Florida right now.
21      Q Okay. Do you have an office in Florida as
22  well?
23      A No.
24      Q Is it at your residence in Florida?
25      A Yes, sir.

81

1       Q And where is your residence in Florida?
2       A 610 47th Avenue North, Saint Petersburg
3   33703.
4       Q Would I be correct in assuming that the
5   Bureau of Labor Statistics puts out different
6   publications at different times concerning work life
7   expectancy?
8       A That's correct, sir.
9       Q And which edition -- I'm sorry. Which
10  precise publication of the BLS did you refer to for
11  that?
12      A I referred to the Work Life Expectancy
13  Table. The Work Values Table.
14      Q And how often are those updated by the BLS?
15      A It depends. The la -- that one, I believe,
16  was 2012. The BLS does not update them as frequently
17  as some other sources.
18      Q And of course, we're dealing with an
19  accident that happened in 2008, correct?
20      A Yes.
21      Q Did you go back and compare the 2008
22  edition of the Work Life Expectancy Tables to the 2012?
23      A No, I did not, sir.
24      Q You mentioned Skoog and Ciecka. Is that
25  just one particular work by those authors that you

21 (Pages 78 to 81)

82

1  referred to?
2      A Is -- it is one -- it is not a work by the
3  authors, it is work containing the tables from those
4  authors.
5      Q Okay. What work is it that contains the
6  Skoog --
7      A There is a --
8      Q -- and Ciecka tables?
9      A -- a journal in the Earnings Analyst,
10 Volume One, from 1998 on work life expectancy for the
11 self-employed, which refers to those tables. There's
12 also a Bulletin 2254 in the Earnings Analyst from
13 Volume 12, 2012, which indicates work life expectancy
14 tables and tort gender inequality. Those two sources
15 basically deal with a more intensive analysis, other
16 than just straight years of work life expectancy.
17     Q Okay. If we were to ask you for precise
18 references to precise editions of these documents, you
19 could provide that?
20     A Yes. I --
21     Q And those are --
22     A -- actually have two of them today.
23     Q Okay. Great. We'll make arrangements to
24 copy those in just a moment. And do I understand
25 correctly that the 7.745 work life expectancy that you

83

1  used for Mr. Foster was a mean or a median, or was it a
2  single value from a single publication?
3      A It was a single value.
4      Q And which precise publication did that
5  single value come from?
6      A That would have come from the work life --
7  the Work Value Table, sir.
8      Q The Work Value Table?
9      A Yes, sir.
10     Q And that's a publication of --
11     A The Bureau of Labor Statistics.
12     Q And that was the 2012 edition?
13     A Yes.
14     Q And is that for self-employed individuals,
15 or is that for all workers?
16     A That's for all work --
17     Q That's a bad question. Is that for self-
18 employed people, is it for all workers, self-employed
19 or other, is it for all human beings?
20     A That table simply extrapolates out work
21 life based upon an individual's gender and age.
22     Q You mentioned that you have an interview
23 form that you use when you meet the folks in this
24 context --
25     A Yes.

84

1      Q -- is that right?
2      A Yes.
3      Q And I think you said you don't have that
4  form with you today, but you do have that form and
5  could provide that form to us; is that correct?
6      A I can.
7      Q I assume you took notes when you met with
8  Mr. Foster?
9      A I did.
10     Q And do you have your notes here today?
11     A They're on the computer, sir.
12     Q Do you have your notes here on the table in
13 front of you today?
14     A No, sir.
15     Q You're not claiming that that's privileged
16 information somehow, are you?
17     MR. HAGERMAN: You don't have to answer that.
18 That's obviously something that the attorney would
19 assert in your behalf, so we can address that later.
20 If you'd like to make a request for those documents,
21 but she says she doesn't have them with her here today,
22 so...
23     MR. STOPHER: Well, she's got more than a
24 request. She's got a subpoena.
25     THE WITNESS: I've never received --

85

1      MR. HAGERMAN: Well, you don't --
2      THE WITNESS: -- this yet.
3      MR. HAGERMAN: -- have -- you don't have to
4  answer that.
5      THE WITNESS: Okay. That's fine.
6      MR. STOPHER: Wait, wait. You're not saying
7  that your work product, when she's interviewing your
8  client --
9      MR. HAGERMAN: We can go off the record if we
10 need to have a discussion about --
11     MR. STOPHER: No. We don't -- we need it on
12 the record.
13     MR. HAGERMAN: Okay.
14     MR. STOPHER: Are you saying it's work
15 product when she talks to your client?
16     MR. HAGERMAN: I'm saying that she doesn't
17 have it with her here today, and you're asking her to
18 assert a claim of a privilege, and I'm telling her that
19 she doesn't have to answer that question.
20     MR. STOPHER: Okay. I agree that it's a
21 privilege that you may assert. I'm asking you if
22 you're asserting it. If you're asserting that her
23 interview with your man is work product, we're going to
24 need to take that up with the judge soon. Is that your
25 assertion?

22 (Pages 82 to 85)

86

1       MR. HAGERMAN: Are you asking for the content
2   -- you're asking her about a document that's not here
3   today. What are -- what are you asking?
4       MR. STOPHER: Are you asserting work product?
5   Yes, no?
6       MR. HAGERMAN: Yes.
7       MR. STOPHER: Okay, great. We'll have to
8   take that up on Monday, I guess.
9   BY MR. STOPHER:
10      Q Any other material? Any other notes that
11  you have concerning Mr. Foster that you don't have here
12  on the table today, Dr. Barnes?
13      A No, sir.
14      Q Okay. Do you have a typical request for
15  information that you use in a matter like this? For
16  example, tax returns, if you have them? Medical
17  records, if you have them? Requests for information
18  that you make as a matter of routine custom and
19  practice in a matter like this?
20      A I ask for medical records and anything else
21  that the attorney would like me to consider.
22      Q Okay. And is that request made in writing
23  or orally or both? How?
24      A Orally.
25      Q Orally?

87

1       A Yes, sir.
2       Q Okay. So there would have been a request
3   made orally in this case for some records pertaining to
4   Mr. Foster. For example, tax records, medical records,
5   so forth; is that correct?
6       A I don't know, because I've done other
7   cases, and they may well have just sent those without
8   me having to ask for them, sir.
9       Q Okay. And if there is any correspondence
10  along those lines, that is not here today?
11      A I didn't make any request for records on
12  this case.
13      Q Okay. You received some records?
14      A Correct.
15      Q Okay. And you received them from whom?
16  Mr. Foster, his lawyers?
17      A From this office.
18      Q From this law firm that represents
19  Mr. Foster?
20      A Yes, sir.
21      Q Okay. And are you saying that there is
22  some correspondence from this law firm that you didn't
23  bring with you today?
24      A I'm saying there may be some email
25  correspondence --

88

1       Q Okay.
2       A -- including trying to schedule this
3   deposition.
4       Q Okay. I'm not quite so concerned about
5   scheduling the deposition as I am about information
6   that was transmitted to you for your consideration in
7   arriving that the opinions that you've come to.
8       A I -- I di --
9       MR. HAGERMAN: Is that a question, or -- I
10  didn't hear a question there, so you don't have to
11  answer it, and wait until he asks a question.
12  BY MR. BARTLETT:
13      Q Is there such information?
14      A There's nothing other than what I have in
15  this file, unless it's in an email. There was no
16  information transmitted to me that's not in this
17  file --
18      Q Okay --
19      A -- in terms of things to review in records.
20      Q So you're saying the documents were
21  provided to you by email?
22      A I don't know. I said they may have been
23  provi -- no. I did not say they were provided by
24  email. I said there might be emails referring to
25  documents, but the documents commonly are mailed in

89

1   hard copy from this office.
2       Q Okay. Do you typically ask for as much
3   earnings history information as is readily available?
4       A No.
5       Q You leave it up to the lawyers to provide
6   to you what they want you to consider?
7       A As I stated, I ask for medical records and
8   whatever they would like to have considered.
9       Q Right. I think you just agreed with me
10  that you leave it up to the lawyers to decide what they
11  want you to consider.
12      A Yes.
13      Q Can we look at the tax returns that you do
14  have from 2007? Just let me get my notes here. From
15  2007 to 2012 you have tax returns, correct?
16      A Yes, sir.
17      Q All right. And there's a Schedule C for
18  Ernest Foster Auto Repair for 2007; is that correct?
19      A Yes, sir.
20      Q Okay. Line seven shows gross income of
21  $37,267, correct?
22      A Yes.
23      Q And the total expenses of $34,041, correct?
24      A Yes.
25      Q And a net profit of $3,226, correct?

23 (Pages 86 to 89)

90

1    A Correct.
2    Q That was the last full year before Mr.
3 Foster's accident, correct?
4    A Yes, sir.
5    Q And that was the money that actually went
6 into his pocket, as you put it, for that entire year,
7 according to this tax return. Is that correct?
8    A Yes.
9    Q You're not suggesting that he under-
10 reported the gross receipts of the business, are you?
11    . A I'm not suggesting that, no, sir.
12    Q You're not suggesting that he over-reported
13 the expenses on this Schedule C, are you?
14    A No, sir.
15    Q You have no reason to believe that this is
16 anything other than an accurate reflection of the
17 profit from that business. Correct, ma'am?
18    MR. HAGERMAN: You can answer that.
19    A Yes.
20    Q As a matter of fact, as you know white
21 well, on page one of the tax return, you've got to sign
22 it under penalty -- I'm sorry. You've got to sign it
23 under penalty of perjury, correct?
24    A Yes, sir.
25    Q You're not suggesting that Mr. Foster did

91

1 anything other than report honestly and accurately the
2 net income from his business, are you?
3    A I am not suggesting that, sir.
4    Q Okay. And do you have some background and
5 education in accounting?
6    A No.
7    Q Do you have some background and education
8 in taxation, particularly income taxation?
9    A No, sir.
10    Q Do you have some background or education in
11 statistics?
12    A Yes.
13    Q And what's your background and education in
14 statistics, please?
15    A I have nine hours of graduate-level
16 statistics in terms of research and analysis in
17 inferential descriptive and multiple regression
18 analysis.
19    Q Okay. Isn't it a generally recognized
20 principle of statistics that the more data you have,
21 the more reliable the statistic will be?
22    A Yes.
23    Q And that could apply to something as simple
24 as income on a tax return, right?
25    A Yes.

92

1    Q Did you review Mr. Foster's deposition in
2 this case?
3    A No, sir.
4    Q Have you asked to review his deposition in
5 this case?
6    A No, sir.
7    Q Are you expecting to review his deposition
8 in this case?
9    A No, sir.
10    Q Have you asked to review his tax returns
11 for the years 2003 to 2006?
12    A No, sir.
13    Q Are you expecting to review those
14 documents, his tax returns from '03 to '06?
15    A No, sir.
16    Q I had a nice reminder from the Social
17 Security Administration not too terribly long ago about
18 my earnings history, a Social Security statement.
19    A Uh-huh.
20    Q You're quite familiar with those, I gather,
21 by virtue of your work in Social Security cases?
22    A Yes.
23    Q Did you ask for a Social Security statement
24 about Mr. Foster?
25    A No, sir.

93

1    Q Have you ever seen one about Mr. Foster?
2    A No, sir.
3    Q That's something that any taxpayer or any
4 wage earner can obtain about himself with a minimum of
5 effort, isn't it?
6    A Yes.
7    MR. HAGERMAN: I object. Speculation. You
8 can answer that.
9    A Yes, you can.
10    Q All right. Are you planning to look at Mr.
11 Foster's Social Security statement earnings history?
12    A No.
13    Q Had you been asked to perform some testing
14 on Mr. Foster, would you have done so?
15    A Yes.
16    MR. HAGERMAN: Object. Speculation, but you
17 can answer that.
18    A Sorry.
19    Q You were not asked to perform any testing
20 on him; am I right?
21    A I was not asked to.
22    Q Okay. You mentioned, I believe, two major
23 categories of testing that perhaps could have been
24 done. Academic testing was one, and interest testing
25 was another, correct?

24 (Pages 90 to 93)

94

1       A Yes.
2       Q And is there a third or fourth or fifth
3   category that I left out?
4       A I don't know that I mentioned any more, but
5   there are other testing that can -- that can be done.
6       Q Such as?
7       A Primarily what we call aptitude testing,
8   which involved individuals' visual spatial abilities,
9   ability to use their hands, reasoning abilities, things
10  such as that.
11      Q Okay. Would I understand correctly that as
12  a Certified Rehabilitation counselor, from time to time
13  you're asked to counsel people, or advise people, on
14  what might be appropriate occupations for them going
15  forward into the future? Is that correct?
16      A Yes.
17      Q And to do that sort of thing, would I
18  assume correctly that you would normally want some
19  testing to see what they're interest in, what they have
20  aptitude for? That sort of thing?
21      A Depending on the case, yes.
22      Q Okay. Do you, from time to time in certain
23  cases, refer people that you see, that you interview,
24  for vocational rehabilitation services?
25      A It depends on what type of cases you're

95

1   asking me.
2       Q Okay. Let's take work comp cases, for
3   example. Do you sometimes refer people for vocational
4   rehabilitation when they've had an on-the-job injury in
5   a comp case?
6       A I don't technically refer, but I'll make a
7   recommendation in the report that the person could
8   benefit from the services, sir.
9       Q Okay. And in the work comp system, is
10  there a method of addressing that, if it's determined
11  that vocational rehabilitation is appropriate?
12      A It is usually part of the settlement or the
13  discussion concerning the settlement.
14      Q Okay. Is it also true that sometimes
15  people who have disabilities not as the result of a
16  lawsuit or a tort accident or work comp case can still
17  can still benefit from vocational rehabilitation
18  services provided by the state of Kentucky?
19      A Yes.
20      Q And is that -- are those services available
21  free of charge, in some instances?
22      A Yes.
23      Q Are you saying that there's not a blessed
24  thing on this earth that Mr. Foster can do in terms of
25  employment these days? Is that your opinion?

96

1       A I'm saying that there's not anything he can
2   do 40 hours a week, 2,080 hours a year, given his
3   profile.
4       Q Okay. But we don't know exactly how many
5   hours a week he was working in 2007, for example, the
6   last full year before the accident, right?
7       A That's correct, sir.
8       Q It is entirely possible that he could work
9   part time, is that what you're saying?
10      MR. HAGERMAN: Object. Speculation. You can
11  answer.
12      A I think you used the term "blessed thing on
13  earth that he could do." The reality is that there are
14  individuals every day that find a job. It may be an
15  accommodated job, it may be a once-in-a-lifetime job.
16  One lady I had had a job watching television
17  commercials so she could lay on her couch and counted
18  how many times commercials were shown during a day.
19  She's the only person I've ever heard had it. So for
20  me to sit here and say that there's absolutely no job
21  ever that this man could do, I can't say that. But
22  what --
23      Q Okay.
24      A -- I can say is that based upon the
25  information that I have and the restrictions I have, it

97

1   is unlikely that there is an employer anywhere within a
2   100-mile radius of his residence that is going to hire
3   him.
4       Q Is that based partly on his age?
5       A That's one of the factors, yes, sir.
6       Q And partly on his -- what you've described
7   as very limited education?
8       A It -- it's what I've described. It's also
9   the way that that's defined under the Bureau of Labor -
10  - Depart -- the Department of Labor Standards.
11      Q Okay. I'm not meaning to be harsh --
12      A No. I'm -- I'm sorry.
13      Q -- but that was the --
14      A And I'm not meaning to -- to respond in
15  that way. I just don't -- I -- I don't -- it -- that's
16  not an opinion. That is -- that is actually
17  verifiable.
18      Q That he has a very limited education --
19      A Yes, sir.
20      Q -- as defined in the literature, let's say?
21      MR. HAGERMAN: Just be sure and wait until he
22  finishes his question. That's all right. You can
23  answer.
24      A Yes.
25  BY MR. BARTLETT:

25 (Pages 94 to 97)

**98**

1    Q Okay. Have you reviewed the report of Dr.
2  David Jenkinson in this case?
3    A No.
4    Q Are you aware that Mr. Foster was examined
5  by Dr. David Jenkinson at the request of the defense?
6    A No.
7    MR. STOPHER: Bear with me a moment. I want
8  to look over my notes, but we're -- if we're not at the
9  finish line, we're on the home stretch, okay? Heather,
10  if you have some questions.
11    MS. MCCOLLUM: No, we are --
12    MR. STOPHER: Or Michael, if you have some
13  more, by all means, go ahead, and it will save time.
14    MR. HAGERMAN: Heather, do you have any
15  questions at this time?
16    MS. MCCOLLUM: No. We are bifurcated in the
17  State, and I don't really waive that.
18    MR. BARTLETT: You mind, Bob?
19    MR. HAGERMAN: Go ahead. Go ahead. I just
20  want to make sure we're doing this one at a time
21  instead of all as a barrage, so if we could go back to
22  Michael, now at this time.
23    MR. BARTLETT: Sure.
24    FURTHER EXAMINATION
25  BY MR. BARTLETT:

**99**

1    Q Doctor, is there a difference in your line
2  of work between lost wages and impairment of ability to
3  earn wages?
4    A The term "impairment" does not always have
5  a vocational relevance to it. For example, a person
6  can be impaired and have no actual disabling condition
7  but be impaired in terms of their abilities to compete
8  for jobs or certain -- perform certain functions. For
9  example, you could have a 600-pound individual who
10  couldn't do sedentary work because they wouldn't fit in
11  the work area and be able to address the work station.
12  That's certainly not necessarily a physical impairment,
13  but it's a limitation and a -- and a impair -- a
14  limitation on ability to earn, if you can't actually
15  get to work or get in the workspace. Loss of earnings,
16  again, "earnings" is defined as effort that's put forth
17  for remuneration, some type of remuneration. So
18  impairment is different than earnings.
19    Q As far as types of damages and amounts of
20  money that a jury could award, are you familiar with
21  various types of those damages in your experience?
22    A Not -- not as familiar as a lot of other
23  individuals, sir.
24    Q Okay. Do you know if there's a difference
25  between showing an amount of past lost wages, the wages

**100**

1  that you haven't earned because of something, versus
2  your ongoing or future impairment of your ability to
3  earn? Is there a difference between those two types of
4  things?
5    A Yes.
6    Q And what's the difference?
7    A Lost wages are easier to quantify, because
8  you're not projecting into the future. And when you
9  project into the future, there are certain assumptions
10  that one has to either accept or not accept. The other
11  thing is that sometimes impairments are not permanent
12  in nature, so that you're looking at a restricted time
13  period in terms of loss of earnings or loss of wages,
14  whereas individuals may be able to return to a
15  differing level of earnings. So that's the way that I
16  -- that I personally look at the two differently and
17  that the field predominantly does.
18    Q Did you calculate any lost wages in this
19  circumstance here?
20    A The wage loss came across in terms of the
21  years where he worked part time. There was an offset
22  for the wage -- the anticipated wage loss, and then the
23  future earnings would have kicked in at the point that
24  he -- the three year -- the -- the remaining three
25  years or so that he does not have any work at all

**101**

1  projected to be in his earnings.
2    Q So in other words, Table B would have been
3  wage loss?
4    A I believe it's Table C. I'm sorry. Table
5  B, I think, is wage loss, and Table C is the remaining
6  2.745 years.
7    Q But as we discussed earlier, 2011 and 2012,
8  those were errors, so as far as wage loss, it should
9  only be '08, '09 and '10, then, correct?
10    A You could look it -- at it that way, or you
11  could say that actually, by the fact that those are
12  errors, he earned nothing, and therefore they would be
13  the entire amount versus the offset amount that I've
14  listed, so it would actually add 54 -- ballpark, $5,400
15  to that $163,000 figure. Because I gave him credit for
16  $5,400 of earnings that does not belong to him.
17    Q So when you're calculating lost wages,
18  though, and you said yourself, a lot of times it's
19  easier to calculate, is that because there's more
20  documentation like a W-2 employee? I earned $1,000
21  this month, now I don't? Is that what you're saying?
22    A The -- the W -- well, certainly. When an
23  individual has a W-2 or a 1099 situation versus being
24  totally self-employed and tracking the way that -- that
25  Mr. Foster did, there are more checks and balances in

26 (Pages 98 to 101)

102

1 place. Therefore, it's a more reliable analysis,
2 because the data is generated by a source that's more
3 required to be accurate --
4      Q Uh-huh.
5      A -- than some self-employed individuals are.
6      Q And there's a big difference between what a
7 W-2 or 1099 would show as far as income and the various
8 numbers associated with income for a self-employed
9 person, is there not?
10      MR. HAGERMAN: Object. Lack of foundation,
11 speculation. You can answer that, though.
12      A Well, one could say that, but being self-
13 employed, and my -- my record keeping generates 1099s,
14 because most of the people that -- that I work with,
15 I'm accountable for reporting the income that I
16 receive. So depending upon not self-employment in
17 general, but depending on the nature of the self-
18 employment and the business, the reliability of the
19 record keeping may vary.
20      Q I guess what I was asking is when -- you
21 know, if you're a W-2 or 1099 employee, you're still
22 going to have a gross and a net, because they're going
23 to withhold certain things.
24      A Correct.
25      Q Correct? Which is similar to a self-

103

1 employed person, you're going to have a gross and a
2 net, correct?
3      A Yes.
4      Q But the deductions are going to be
5 different between those two types of employments, or
6 three, if you count the 1099. That's the difference,
7 correct?
8      MR. HAGERMAN: Object. Compound, lack of
9 foundation, speculation, but you can answer.
10      A You still have to pay the same -- the same
11 types of -- of benefits to a degree, but you're not as
12 bound as a employee under a W-2.
13      Q So it's easier to determine, then, wage
14 loss and impairment to earn from W-2, 1099 employees,
15 because there's more data, then, correct?
16      A Yes.
17      MR. BARTLETT: Bob, do you have any other?
18      FURTHER EXAMINATION
19 BY MR. STOPHER:
20      Q We talked about the interview notes, Dr.
21 Barnes. Those are not here today, correct?
22      A Correct, sir.
23      Q We talked about email communications that
24 were with the law firm representing Mr. Foster. Those
25 are not here today, correct?

104

1      A Correct.
2      Q Your accounting or billing information
3 about this matter, that's not here today, either,
4 correct?
5      A It is not.
6      Q Okay. That is on your computer somewhere,
7 your laptop, correct?
8      A The billing information, my bookkeeper will
9 have. The other information will be on my laptop.
10      Q Okay. If you've provided this already,
11 forgive me. What is your charge for your time here
12 today?
13      A My charge for the deposition for the first
14 hour and a half is a flat four -- $375 for the hour and
15 a half. The prep time is billed at $150 an hour, and
16 travel time is billed at $50 an hour.
17      Q Okay. Could we kind of go through a little
18 inventory of what you do have here today? Got a file,
19 a manila folder here. What's the first item that you
20 have in there?
21      A Well, the first item was my report, so...
22      Q Okay.
23      A That -- that's been pulled --
24      Q All right.
25      A -- for me to refer to.

105

1      Q Okay.
2      A The second item I have are the tax
3 returns --
4      Q For '07 to '12?
5      A '07 to '12.
6      Q All right.
7      A The third item I have is the disability
8 application that was completed by Mr. Foster as well as
9 his award letter, so --
10      Q And --
11      A -- that's the --
12      Q -- those are Social Security Disability
13 application and --
14      A Social Security --
15      Q -- award letter? Okay.
16      A -- applications. My understanding is he
17 was awarded at the state agency level. Therefore,
18 there is not a judge's decision or a rationale --
19      Q Right.
20      A -- which may be well why I don't have that
21 information, because he didn't go through the appeals
22 process and so forth.
23      Q Okay. If you could hold that out for just
24 a moment, I'll ask that that be copied at the next
25 break, okay? The Social Security documents you just

27 (Pages 102 to 105)

106

1  mentioned, okay?
2  MR. HAGERMAN: You can sit that aside.
3  THE WITNESS: Okay.
4  BY MR. STOPHER:
5  Q All right, thank you.
6  A Yeah. My -- my appearance list is in a
7  different thing.
8  Q Okay.
9  A I have a copy of the police report.
10  Q Okay.
11  A A copy of the MRI from Richmond Open MRI.
12  Q The date of that study is what?
13  A 7-12-08.
14  Q Okay.
15  A Yeah, that's the only one. 7-12-08.
16  Q Okay, thank you.
17  A I have a copy of the medical records.
18  Q Okay, the ones that are referenced in your
19  report?
20  A Yes, sir. Those are the medical records
21  referenced in my report. And oh, there's my report
22  that we pulled out, okay. That's the only thing that's
23  associated with the file. As I indicated, I do have an
24  updated vitae, an updated appearance list, and the
25  references that I cited that you asked me about, sir.

107

1  Q Okay. Can we put all of those items that
2  you just mentioned aside for copying?
3  A Okay. We've got an appearance list, we have
4  this, you've seen these, okay? The --
5  MR. HAGERMAN: Yeah, you can just set those
6  aside.
7  A That's the updated resume, so that's
8  everything that -- that I have.
9  Q Okay. Does that --
10  A Oh, that's -- I'm sorry. That's all I had,
11  sir.
12  Q All right.
13  A I was trying to put everything back where
14  it --
15  Q Okay.
16  A -- where I took it out.
17  Q All right. As we sit here today, right now
18  at this moment, is there any further work that you're
19  planning to do on this case before the trial, which is
20  currently set for March 24th?
21  A No, sir.
22  MR. STOPHER: Okay. That's all I have right
23  now. Thank you.
24  MR. BARTLETT: That's all I have, because we
25  break down everything --

108

1  MR. HAGERMAN: I'm just -- and I'm just going
2  to make a statement on the record that my previous
3  objection with regards to work product information, I
4  also feel the things requested were outside the scope
5  of Rule 26, so add that to my objection. That's all I
6  wanted to say.
7  MR. STOPHER: You're saying that the notes of
8  Dr. Barnes's interview with your client is outside the
9  scope of Rule 26 as being what, irrelevant?
10  MR. HAGERMAN: As outside the scope of
11  Rule 26.
12  MR. STOPHER: Okay. I think we have a
13  disagreement on that. Okay.
14  MR. HAGERMAN: Okay.
15  (DEPOSITION CONCLUDED AT 5:04 P.M.)
16
17
18
19
20
21
22
23
24
25

109

1  CERTIFICATE OF REPORTER
2  COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was stenographically and mechanically recorded
10  by me and reduced to typewritten form under my
11  direction, and constitutes a true record of the
12  transcript as taken, all to the best of my skill and
13  ability. I certify that I am not a relative or
14  employee of either counsel, and that I am in no way
15  interested financially, directly or indirectly, in this
16  action.
17
18
19
20
21  KAYLA GRANITI, COURT REPORTER / NOTARY
22  MY COMMISSION EXPIRES: 12/12/2018
23  SUBMITTED ON: 03/11/2015
24
25

28 (Pages 106 to 109)